**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |
|---|---|
| **IN RE DIGITAL TURBINE, INC. SECURITIES LITIGATION** | No. 1:22-cv-00550-DAE |
|  | <u>CLASS ACTION</u> |
|  | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | <u>JURY TRIAL DEMANDED</u> |

**<u>TABLE OF CONTENTS</u>**

I.    NATURE OF THE ACTION AND OVERVIEW ........................................................ 1

II.   JURISDICTION AND VENUE .............................................................................. 6

III.  PARTIES ............................................................................................................. 7

IV.   SUBSTANTIVE ALLEGATIONS ......................................................................... 9

      A.    Background Of The Company And Its Business .................................... 9

      B.    Digital Turbine's Rapid Revenue Growth ........................................... 10

      C.    AdColony And Fyber Add To Digital Turbine's Impressive Revenue Growth ... 14

      D.    The Truth Begins To Emerge ............................................................... 17

            1.    Digital Turbine Announces That Its Previously Reported Revenue For The First Three Quarters Of FY 2022 Should No Longer Be Relied Upon After Determining That Certain Of The Revenues Of AdColony And Fyber Should Be Reported Net Of License Fees And Revenue Share ............... 17

            2.    Digital Turbine Issues Its Restated Financials For The First Three Quarters Of FY 2022, Admitting To A Material Weakness In The Company's Internal Controls ..................................................................................... 20

            3.    Digital Turbine Announces Its Q4 2022 Financial Results, Resulting In Disappointing Revenue And Year-Over-Year Growth............................ 23

      E.    Digital Turbine's Class Period Financial Results Were Not Presented In Accordance With GAAP........................................................................ 25

      F.    Defendants Were, At Minimum, Deliberately Reckless In Recording The Entirety of AdColony And Fyber's Revenue On A Gross Basis Without Regard To The Nature Of The Underlying Transaction(s) ............................................. 28

V.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................................... 33

      A.    False and Misleading Statements And Omissions Relating To The Acquisitions Of AdColony And Fyber........................................................................ 33

      B.    False and Misleading Statements And Omissions Relating To Digital Turbine's Q1 2022 Financial Results ........................................................................... 38

      C.    False and Misleading Statements And Omissions Relating To Digital Turbine's Q2 2022 Financial Results ........................................................................... 44

       D.       False and Misleading Statements And Omissions Relating To Digital Turbine's Q3 2022 Financial Results ............................................................................. 52

VI.     ADDITIONAL SCIENTER AND CORPORATE SCIENTER ALLEGATIONS .......... 58

       A.       The Individual Defendants Were Motivated To Misrepresent The Fyber And AdColony Acquisitions To Increase Their Compensation ................................... 59

       B.       The Individual Defendants Were Motivated To Misrepresent The Fyber And AdColony Acquisitions To Increase Their Compensation ................................... 61

       C.       Further Allegations That Support A Strong Inference Of Scienter ..................... 62

             1.       The Magnitude, Importance And Duration Of The Fraud Supports A Finding Of Scienter ...................................................................................... 62

             2.       The Individual Defendants Signed Sarbanes-Oxley Certifications Attesting That They Personally Supervised Digital Turbine's Controls And Procedures .................................................................................................. 62

       D.       Corporate Scienter Allegations ........................................................................... 63

VII.    LOSS CAUSATION ....................................................................................................... 64

VIII.   CLASS ACTION ALLEGATIONS ............................................................................... 66

IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ................................................................................................................... 68

X.      INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ................................................................................................. 71

XI.     CLAIMS FOR RELIEF ................................................................................................. 72

XII.    PRAYER FOR RELIEF ................................................................................................. 76

XIII.   JURY TRIAL DEMANDED .......................................................................................... 77

Lead Plaintiff Howard J. Burch, along with plaintiff Jay Robison (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, hereby bring this Consolidated Amended Class Action Complaint ("Complaint") against Digital Turbine, Inc. ("Digital Turbine" or the "Company"), William Stone ("Stone"), and Barrett Garrison ("Garrison") (together, "Defendants"). The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Digital Turbine; securities analysts' reports about the Company; press releases and other public statements issued by and disseminated by the Company; and media reports about the Company. Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that purchased or otherwise acquired Digital Turbine securities between February 26, 2021 and May 31, 2022, inclusive (the "Class Period"). Plaintiffs pursue claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Digital Turbine is a mobile advertising technology company that offers products and solutions relating to mobile applications. Through these products and solutions, Digital Turbine enables brand discovery, user engagement and acquisition, and monetization

opportunities for device manufacturers, mobile carriers, and application or "app" publishers and developers.

3.      Both the Company and its top-line, or revenue, have grown tremendously in recent years.  Just prior to, and during the Class Period, Digital Turbine's revenue grew at rates of well over 100% on a year-over-year basis each quarter.

4.      Most of this recent growth was due to Digital Turbine's strategic expansion through acquisitions, including the Company's Class Period acquisitions of AdColony Holding AS ("AdColony"), a mobile video advertising platform, and Fyber N.V. ("Fyber"), a cross-platform monetization platform with expertise in mediation, real-time bidding, advanced analytics tools, and video.  These acquisitions made Digital Turbine a "full-stack mobile advertising solution," enabling the Company to be a direct player in mobile advertising and providing it with recurring revenue streams.

5.      Once Digital Turbine completed the acquisitions of AdColony and Fyber on April 29 and May 25, 2021, respectively, the Company's revenues were expected to, and did, catapult. On June 1, 2021, Defendant Garrison explained during an earnings call that "the key rationale of our new acquisitions is based on driving new revenue growth[,]" and Defendants noted that with the closing of AdColony and Fyber, Digital Turbine was now a company with over $1 billion in annualized revenue.  Following the AdColony and Fyber acquisitions, the acquisitions appeared to indeed drive incredible revenue growth.  Digital Turbine reported revenue of: $212.6 million in Q1 2022,[1] growing 264% year-over-year; $310.2 million in Q2 2022, growing 338% year-

---

[1] Digital Turbine's fiscal year ("FY") ends on March 31.  References to a fiscal year, such as fiscal year 2022, or FY 2022, mean the fiscal year ending March 31 of that year (*e.g.*, FY 2022 runs from April 1, 2021 to March 31, 2022).  References to Q1 2022 refers to the Company's fiscal quarter ended June 30, 2021, Q2 2022 refers to the Company's fiscal quarter ended

over-year; and $375.5 million in Q3 2022, growing 324% year-over-year.

6. Moreover, Digital Turbine reported solid revenue and growth figures specifically attributable to AdColony and Fyber. In announcing Digital Turbine's Q1 2022 results – the first quarter after acquiring AdColony and Fyber, Defendant Stone noted that the revenue and related growth "showcases the operating leverage of the model, the strength of the businesses independently and doesn't include much in terms of synergies that we believe will fuel future top and bottom line growth for the company. We also believe it demonstrates how well we are now positioned with real scale to attack the $300 billion plus mobile media market."

7. Analysts and the market were impressed. In each of these quarters analysts noted that Digital Turbine continued to beat their revenue estimates, and the Company's stock shot to a Class Period closing price high of $91.40 per share on November 1, 2021.

8. But on May 17, 2022, after the close of market, Digital Turbine issued a press release revealing that it will "restate its financial statements for the interim periods ended June 30, 2021, September 30, 2021, and December 31, 2021, following a review of the presentation of revenue net of license fees and revenue share for the Company's recently acquired businesses."

9. In a Form 8-K also filed after the close of market on May 17, 2022, Digital Turbine provided estimated adjustments to its previously reported revenue figures, preliminarily estimating that the Company's revenue would decrease by huge amounts: $54.5 million, or 34.5%, for Q1 2022; $121.6 million, or 64.5%, for Q2 2022; and $158.7 million, or 73.2%, for Q3 2022.

10. Digital Turbine also provided further explanation into Defendants' decision to

September 30, 2021, and Q3 2022 refers to the Company's fiscal quarter ended December 31, 2021.

3

restate these financial results in the May 17, 2022 Form 8-K, explaining that, after reviewing AdColony and Fyber's product lines and related contracts, "the Company concluded that [AdColony and Fyber] acts as an agent in certain of their respective product lines and, as a result, the revenues for those product lines should be reported net of license fees and revenue share. Previously, all revenues of [AdColony and Fyber], … were reported on a gross basis."

11.    On this news, the Company's shares fell $1.93, or 7.1%, to close at $25.28 per share on May 18, 2022, on unusually heavy trading volume.

12.    On May 27, 2022, Digital Turbine issued its restatement on Forms 10-Q/A for Q1-Q3 2022 to report revenue net of license fees and revenue share expense for product lines wherein AdColony and Fyber act as an agent (the "Restatement").  In the Restatement, Defendants confirmed that Digital Turbine's revenues were overstated by the same amounts announced on May 17, 2022.  Digital Turbine's originally reported year-over-year growth percentages, which were originally reported as between 264% and 337%, also tumbled in the Restatement, decreasing to 170.9%, 166.8%, and 144.7%, respectively in Q1-Q3 2022.

13.    The revenues attributable to AdColony and Fyber likewise greatly decreased due to the Restatement.  Whereas, for example, Digital Turbine previously reported revenues of $157.4 million attributable to Fyber during Q3 2022, Digital Turbine reported restated revenues of just $30.7 million attributable to Fyber for that same quarter—*a 412.7% overstatement*.

14.    Also in the Restatement, Digital Turbine's management, including Defendants Stone and Garrison, conceded that Digital Turbine's internal controls over financial reporting and disclosure controls and procedures were not effective and there existed material weaknesses in the Company's internal controls over financial reporting as of June 30, 2021, September 30, 2021, and December 31, 2021.  The Restatement explained that the material weakness related to

the Company's "internal control for business combinations [which] did not include a control adequately designed to ensure acquiree accounting policies, as they relate to presentation and classification, were conformed to those of the Company and GAAP."

15.    Indeed, in accordance with United States generally accepted accounting principles ("GAAP"), when a revenue transaction involves a third party in providing goods or services to a customer, the company must determine whether revenue should be reported on a gross or net basis based on an assessment of whether the company is acting as the principal or as an agent in the transaction.

16.    Although Defendants stated that they did not adequately ensure that the accounting policies of its acquirees conformed to GAAP upon business combination in the Restatement, Digital Turbine implicitly admitted that upon acquisition, Defendants had *changed* AdColony's accounting policies to be in violation of GAAP.

17.    Prior to Digital Turbine's acquisition of AdColony, AdColony, in accordance with IFRS[2] and GAAP, recognized revenue either on a gross basis or on a net basis, based on the nature of the underlying agreement or transaction.  However, when Digital Turbine acquired AdColony, Defendants abandoned that approach and, in violation of GAAP, began recognizing and reporting revenue entirely on a gross basis without regard to the nature of the underlying transactions upon which the revenue was based.

18.    Then, after the close of trading on May 31, 2022, Digital Turbine announced its quarterly and fiscal year 2022 financial results for the period ended March 31, 2022, reporting quarterly revenue of $184.1 million—a ***massive*** miss from analysts' previous revenue estimates

---

[2] International Financial Reporting Standards ("IFRS") is equivalent in nature to GAAP.  In particular, IFRS and GAAP are essentially identical in providing principal versus agent considerations for revenue recognition purposes.

of $332-$338 million, and even a miss on certain analysts' revised revenue estimates following the Restatement.

19.    The May 31, 2022 earnings announcement also revealed to the market AdColony's low historic growth rate of just 2% and restated AdColony and Fyber's reported revenues for Q4 2021, which the Company had announced when it closed the AdColony acquisition in April 2021.

20.    On this news, Digital Turbine's shares fell $5.75, or 22.61%, to close at $19.68 per share on June 1, 2022, on unusually heavy trading volume.

21.    In sum, throughout the Class Period, Defendants materially overstated the Company's revenue and related growth figures and failed to disclose that that the Company's internal controls and procedures were inadequate.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.  Accordingly, Plaintiffs seek to pursue securities fraud claims under Section 10(b) of the Exchange Act against Defendants and under Section 20(a) of the Exchange Act against each of the Individual Defendants.

## II.    JURISDICTION AND VENUE

22.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and

Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this Judicial District.

25.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**III.    PARTIES**

26.    Lead Plaintiff Howard J. Burch, as set forth in the certification previously filed with the Court, incorporated by reference herein (ECF No. 20-3), purchased Digital Turbine securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

27.    Plaintiff Jay Robison, as set forth in the updated accompanying certification, incorporated by reference herein, purchased Digital Turbine securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

28.    Defendant Digital Turbine is incorporated under the laws of the Delaware with its principal executive offices located at 110 San Antonio Street, Suite 160, Austin, Texas. Digital Turbine's shares trade on the NASDAQ exchange under the symbol "APPS."

29.    Defendant William Stone ("Stone") has served as Digital Turbine's Chief Executive Officer ("CEO") since October 2014 and as a member of the Company's Board of

Directors since January 2015.  Previously, from November 2013 until his appointment as CEO,

Stone served as the Company's President and Chief Operating Officer, and from August 2012 to

November 2013, Stone served as the CEO of the Company's wholly owned subsidiary.  Stone

has over 30 years of global experience in wireless, technology, mobile content, marketing, and

distribution.  Stone holds an M.B.A.

30.    Throughout the Class Period, Stone spoke to investors and analysts on conference

calls.  Stone possessed the power and authority to control the contents of the Company's public

filings with the SEC.  During the Class Period, Stone signed and certified the accuracy of Digital

Turbine's Form 10-K for the fiscal year ended March 31, 2021 and Forms 10-Q and 10-Q/A for

each quarterly period from June 30, 2021 through December 31, 2021.

31.    Defendant Barrett Garrison ("Garrison") has served as Digital Turbine's

Executive Vice President and Chief Financial Officer ("CFO") since October 2016.  Previously,

Garrison served as the CFO of Competitor Group, Inc. from March 2014 to March 2015, and the

CFO of Netspend from June 2013 to March 2014, as well as Netspend's Treasurer/VP of Finance

from October 2008 to June 2013.  Prior to Netspend, Garrison served in senior financial roles

and holds an M.B.A. with a concentration in finance.

32.    Throughout the Class Period, Garrison spoke to investors and analysts on

conference calls.  Garrison possessed the power and authority to control the contents of the

Company's public filings with the SEC.  During the Class Period, Garrison signed and certified

the accuracy of Digital Turbine's Form 10-K for the fiscal year ended March 31, 2021 and

Forms 10-Q and 10-Q/A for each quarterly period from June 30, 2021 through December 31,

2021.

33.    Defendants Stone and Garrison (together, the "Individual Defendants"), because of

their positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.      Background Of The Company And Its Business

34.    Digital Turbine is a mobile advertising technology company.  As explained in the Company's annual report on Form 10-K for the fiscal year ended March 31, 2021 (the "2021 10-K"), "Digital Turbine, Inc., through its subsidiaries, simplifies content discovery and delivers it directly to mobile devices.  Its on-device media platform powers frictionless application and content discovery, user acquisition and engagement, operational efficiency, and monetization opportunities."

35.    Digital Turbine provides value to its customers, mobile carriers, and original equipment manufacturers ("OEMs"), using its proprietary features, such as its legacy onboard software, where the Company's platform would pre-load mobile apps during a user's initial smartphone set-up process, and its "Single Tap" installation, which enables smartphone users to instantly install an app on their smartphone with a single tap instead of having to direct users to

an app store, improving the likelihood that an app is installed when a user clicks on an advertisement.

**B.     Digital Turbine's Rapid Revenue Growth**

36.     In recent years, Digital Turbine's business has seen incredible growth.  During the Class Period, Defendants highlighted this accelerating growth, particularly its revenue growth, in the Company's quarterly earnings announcements, earnings calls, and investor presentations.  A May 2021 Investor Presentation, for example, noted that Digital Turbine's "[r]evenue grew 142% year-over-year in the March quarter and has grown at an overall compounded annual growth rate of 70% from Fiscal 2016 to Fiscal 2021."  This May 2021 Investor Presentation illustrated the Company's dramatic revenue growth in a series of charts:



37.     Most of the Company's recent growth was due to Digital Turbine's recent strategic expansion through acquisitions, which as Defendant Stone described during a June 1, 2021 earnings call, "successfully assembled the key pieces for our full stack end-to-end ad tech platform."  These acquisitions made Digital Turbine a direct player in mobile advertising, and provide recurring revenue streams for the Company.

38.     On February 28, 2020, Digital Turbine completed the acquisition of Mobile Posse. Digital Turbine explained in its 2021 10-K that "[t]he addition of Mobile Posse's offerings will

10

provide synergies and options for our partners and advertisers.  The [c]ompany's suite of offerings continue to focus on promoting higher user engagement and boosting advertising revenue for mobile operators and OEMs."

39.    On March 1, 2021, Digital Turbine completed the acquisition of Appreciate, a programmatic mobile advertising demand-side platform company.  As Digital Turbine explained in its 2021 10-K, "Appreciate's platform collaborates closely with mobile measurement partners ('MMPs'), exchanges, advertisers, and other partners to programmatically provide a transparent ecosystem designed to optimize user acquisition and ROI for the mobile advertisers utilizing its platform.  Deploying Appreciate's technology expertise across Digital Turbine's global scale and reach should further benefit partners and advertisers that are a part of the combined Company's platform."

40.    On February 26, 2021, the first day of the Class Period, Digital Turbine announced that it had entered into a definitive purchase agreement to acquire AdColony Holding AS ("AdColony") for between $350 million to $375 million, depending on AdColony achieving certain target net revenues, less associated cost of goods sold, over the twelve-month period ending December 31, 2021.  Digital Turbine's acquisition of AdColony was completed on April 29, 2021.

41.    Digital Turbine described AdColony in its 2021 10-K as "a leading mobile advertising platform servicing advertisers and publishers with a reach of more than 1.5 billion monthly global users.  AdColony's proprietary video technologies and rich media formats are widely viewed as a best-in-class technology delivering third-party verified viewability rates for well-known global brands."

42.    The February 26, 2021 announcement of Digital Turbine's acquisition of

11

AdColony included comment from Defendant Stone, who was quoted as saying that "[t]he ability for Digital Turbine to utilize AdColony's unique mobile advertising solutions across our vast device distribution footprint will unlock significant new monetization opportunities for the combined company's platform offerings." Defendant Stone also assured investors that "[c]onsidering the current run-rate of recurring business at AdColony, along with expected realized synergies and the terms of consideration, we anticipate that the AdColony transaction will be substantially accretive to our expected profitability in the first full year following the transaction."

43.    On March 22, 2021, Digital Turbine announced that it had entered into a definitive purchase agreement to acquire approximately 95% of the shares of Fyber N.V. ("Fyber") for close to $600 million, including a $50 million earn-out payment to be paid in newly issued Digital Turbine common stock and/or cash, based on Fyber achieving certain future target net revenues over the twelve-month period ending on March 31, 2022. The initial closing of the acquisition of 95.1% of the outstanding voting shares of Fyber was completed on May 25, 2021.

44.    Digital Turbine described Fyber in its 2021 10-K as "a leading mobile advertising monetization platform empowering global app developers to optimize profitability through quality advertising. Fyber's proprietary technology platform and expertise in mediation, real-time bidding, advanced analytics tools, and video combine to deliver publishers and advertisers a highly valuable app monetization solution."

45.    The March 22, 2021 announcement of the Company's acquisition of Fyber included comment from Defendant Stone on Digital Turbine's recent acquisitions, who was quoted as saying:

> Combined with our recently announced AdColony and Appreciate acquisitions, Fyber represents an extremely valuable puzzle piece for Digital Turbine to

strategically assemble one of the largest full-stack mobile advertising solutions in the industry that will be advantageously positioned to leverage the Company's vast device distribution footprint and array of innovative products, such as Single-Tap. We believe that we will have all of the critical elements of a truly unique next-generation ad-tech ecosystem that, once integrated, will enable Digital Turbine to play a far more prominent and profitable role in the fast-growing and secularly-thriving $200+ billion mobile advertising and connected TV marketplace.

46.    The acquisitions of AdColony and Fyber were expected to catapult Digital Turbine's revenues. Following Digital Turbine's February 26, 2021 announcement of the purchase agreement to acquire AdColony, analysts from Craig-Hallum Capital Group raised their price target for Digital Turbine to $90 from a previous price target of $80 in a report released the same day. On March 22, 2021, following Digital Turbine's announcement of the purchase agreement to acquire Fyber, the Craig-Hallum analysts further raised their price target to $105 per share, commenting that "APPS is on track to do $1B+ in revenues in CY22 following the close of their 3 acquisitions. Appreciate already closed, AdColony should close mid-April and Fyber should close by end of May. Once all 3 acquisitions are fully closed, we think APPS will be doing $1B+ in revenues on an annual basis."

47.    A March 22, 2021 Oppenheimer analyst report similarly modeled $1 billion in pro-forma revenue for FY 2022, and Oppenheimer raised its price target for Digital Turbine stock from $90 to $100 per share. And a March 23, 2021, analyst report from Roth Capital Partners modeled pro-forma revenue for Digital Turbine of $936 million for FY 2022 and raised their price target to $115 from $100 per share.

48.    During the Company's June 1, 2021 earnings call, Defendant Garrison noted that "the key rationale of our new acquisitions is based on driving new revenue growth[.]" Defendant Stone also twice confirmed analysts' projected revenue estimates on June 1, 2021, as part of the Company's announcement of its Q4 2021 and FY 2021 financial results and during Digital

Turbine's Q4 2021 earnings call.  As part of the June 1, 2021 announcement, Defendant Stone was quoted as saying: "The combination of Digital Turbine, Appreciate, AdColony, and Fyber position us as a company with greater than $1 billion in profitable annualized revenue."  And during the earnings call held that same day, Defendant Stone stated in his opening comments that "[t]oday, with the closing of Fyber, AdColony, Appreciate and our own Digital Turbine triple-digit organic growth, we are now a company that has over $1 billion of annualized revenue[.]"

49.    Also during the June 1, 2021 earnings call, Defendant Stone explained that the Company's future revenue growth would largely come from Digital Turbine's acquisitions, which were recurring revenue sources for the Company: "It's important to note for investors, while we expect our dynamic install business to continue to grow, it will be less than 20% of our total revenues as we begin reporting all revenues from our acquisitions.  Our recurring revenues now represent over 50% of our total revenues compared to over just 10% when we purchased the Mobile Posse business last year."

## C.    AdColony And Fyber Add To Digital Turbine's Impressive Revenue Growth

50.    AdColony and Fyber quickly contributed to Digital Turbine's reported revenues, which continued growing at impressive and exponential rates.  In each of the first three quarters of FY 2022, as illustrated in the following table, Digital Turbine reported impressive quarterly net revenue and year-over-year ("YoY") growth percentages, both on an as reported basis and on a pro-forma basis, which, as the Company explained, "provide[s] investors with quarterly results and comparisons as if all acquired businesses were owned for the entirety of the [respective] quarters of fiscal 2021 and fiscal 2022."

| | Reported Net Revenue | Pro Forma Net Revenue | YoY Growth % (As-Reported Basis) | YoY Growth % (Pro Forma Basis) |
|---|---|---|---|---|
| Q1 2022 | $212.6 million | $292.0 million | 264.3% | 104% |
| Q2 2022 | $310.2 million | (same as net revenue) | 338% | 63% |
| Q3 2022 | $375.5 million | (same as net revenue) | 324% | 38% |

51.    Moreover, after the acquisition of AdColony and Fyber, Digital Turbine continued to report solid revenue and growth figures derived from each company.  Combined, AdColony and Fyber consisted of Digital Turbine's "In-App Media" business.  In the Company's earnings releases, Digital Turbine reported YoY growth for its In-App Media segments of 117% for Q1 2022, 61% for Q2 2022, and 40% for Q3 2022.  Digital Turbine also reported revenue specifically attributable to the two acquired companies and provided the YoY growth in the earnings releases:

| | Net Revenue | Pro Forma Net Revenue | YoY Growth % |
|---|---|---|---|
| **AdColony** | | | |
| Q4 2021[3] | $58.3 million | (not reported) | 37% |
| Q1 2022 | $44.9 million | $63.24 million | 46% |
| Q2 2022 | $61.5 million | (not reported) | 19% |
| Q3 2022 | $94.3 million | (not reported) | 28% |
| **Fyber** | | | |
| Q4 2021 | $102.4 million[4] | (not reported) | 179% |
| Q1 2022 | $49.6 million | $113.47 million | 198% |
| Q2 2022 | $125.7 million | (not reported) | 93% |
| Q3 2022 | $157.4 million | (not reported) | 48% |

---

[3] As part of the Company's announcement that it had completed the acquisition of AdColony on April 29, 2021, Digital Turbine provided both AdColony and Fyber's reported revenue and growth figures for the quarter ended March 31, 2021 (Digital Turbine's Q4 2021).

[4] In their April 29, 2021 announcement, Digital Turbine reported revenues for Fyber "revenue "in excess of €85 million in the March quarter, representing year-over-year growth of 179%." The U.S. dollar/Euro average quarterly exchange rate provided by the European Central Bank for January to March 31, 2021 was 1.2048.  *See* https://sdw.ecb.europa.eu/quickview.do?SERIES_KEY=120.EXR.Q.USD.EUR.SP00.A (last visited January 30, 2023).

52.    In the Company's August 9, 2021 earnings call discussing Q1 2022 financial results, Defendant Stone stated that the reported Q1 2022 revenue and YoY pro forma growth "showcases the operating leverage of the model, the strength of the businesses independently and doesn't include much in terms of synergies that we believe will fuel future top and bottom line growth for the company.  We also believe it demonstrates how well we are now positioned with real scale to attack the $300 billion plus mobile media market."

53.    Analysts were impressed with the reported revenue results.  For example, analysts from Oppenheimer commented in their August 9, 2021 report that "APPS reported impressive FY1Q22 results, widely exceeding both our estimates and guidance on broad-based strength in all segments.  Reported revenue was 12% above model ….  Pro forma organic revenue grew 104.4% yoy, led by Fyber +198%, 'Classic Apps' +93%, then AdColony +46%.  Investors are starting to get an early glimpse into the earnings power of Digital Turbine's newly integrated, independent mobile advertising platform[.]"  Similarly, the analysts from Canaccord Genuity noted in their August 10, 2021 report that "it was clear the company outperformed on basically every metric.  APPS beat our consensus-high revenue … by 8%[.]"

54.    On November 1, 2021, the Company's share price reached its Class Period closing price high of $91.40 per share.  Following the announcement of Digital Turbine's Q2 2022 financial results on November 2, 2021, analysts from Maxim Group in their November 3, 2021 report commented that revenue of $310.2 million beat their estimates, and attributed the beat to "better performance across the board."

55.    On February 8, 2022, in Digital Turbine's announcement of Q3 2022 financial results and during the earnings call held the same day, Defendants provided a revenue estimate of between $1.225 billion and $1.240 billion for the full FY 2022, implying revenues for Q4

2022 of between $326.7 million and $341.7 million.  During the earnings call, Defendant

Garrison highlighted that the "implied growth in the midpoint of our guidance, has our fiscal

2022 revenues growing over 50% year-over-year."

56.    Analysts from Macquarie Research in their February 9, 2022 report stated that

"Digital Turbine delivered F3Q revenue of $375m above our $355m estimate ….  Organic

revenue growth of 38% was strong if not spectacular[.]"  Macquarie further noted that "[t]he

item that seemed to weigh on last quarter's results, AdColony's slow revenue growth, swung

sharply up in F3Q[.]"  Based on the provided guidance, analysts provided the following

estimates for Digital Turbine's Q4 2022 revenues: Oppenheimer estimated revenues of $338

million; Roth estimated revenues of $334.8 million; Craig-Hallum estimated revenues of $334.2

million; and Maxim Group estimated revenues of $334.2 million.  Consensus estimate for the

Company's Q4 2022 revenue was $332.3 million as reported by FactSet, and $336.45 million as

reported by Seeking Alpha.[5]

### D.    The Truth Begins To Emerge

#### 1.    Digital Turbine Announces That Its Previously Reported Revenue For The First Three Quarters Of FY 2022 Should No Longer Be Relied Upon After Determining That Certain Of The Revenues Of AdColony And Fyber Should Be Reported Net Of License Fees And Revenue Share

57.    On May 17, 2022, after the close of market, Digital Turbine announced that "it will

restate its financial statements for the interim periods ended June 30, 2021 [Q1 2022], September

30, 2021 [Q2 2022], and December 31, 2021 [Q3 2022], following a review of the presentation

of revenue net of license fees and revenue share for the Company's recently acquired

---

[5] https://seekingalpha.com/news/3843561-digital-turbine-fq4-consensus-eps-revenue-estimates-up-yy (last visited January 29, 2023).

businesses." The Company's press release explained that "[t]he revenue for certain product lines of the recently acquired businesses, which are separate reportable segments, will now be reported net of license fees and revenue share, rather than on a gross basis, as had been previously reported."

58.    The May 17, 2022 press release further explained that the changes will "have the offsetting effect of decreasing both revenue and license fees and revenue share in a like amount," and thus there would be "no change to the previously reported GAAP income from operations, GAAP net income/loss" and other non-GAAP income metrics. Defendant Garrison provided comment in the press release, who was quoted as saying: "We believe that this change will also help facilitate peer comparisons for analysts and investors, …. Furthermore, we believe that it will help us to more effectively highlight the relative gross margin and EBITDA margin profile of our profitable business model."[6]

59.    Digital Turbine also filed a Form 8-K with the SEC on May 17, 2022 after the close of market, providing further explanation into Defendants' decision to restate its financial results for the first three quarters of FY 2022:

> In connection with the integration of the Company's recently acquired businesses (AdColony Holding AS and Fyber N.V. (the "Acquired Companies")), management performed a review of the presentation of revenues and license fees and revenue share based on the accounting guidance for revenue recognition, including considerations of principal and agent (or "gross and net") presentation. After a detailed review of the Acquired Companies product lines and related contracts with customers and publishers, the Company concluded that each

---

[6] Later, on May 31, 2022, Digital Turbine held an earnings call in which the Individual Defendants both highlighted that this revenue reporting change would align the Company's revenue with their peers. For example, Defendant Stone noted during the call: "We've also changed some of our revenue reporting in our app growth platform business from gross revenue to net reporting.… But from my perspective, this helps simplify our operational approach and also provide investors a better apples-to-apples measure with our peers[.]" Defendant Garrison similarly commented that "[w]e believe these reporting changes should assist investors with peer comparisons[.]"

Acquired Company acts as an agent in certain of their respective product lines and, as a result, the revenues for those product lines should be reported net of license fees and revenue share.  Previously, all revenues of the Acquired Companies, which are reported as separate segments referred to as In App Media – AdColony and In App Media – Fyber, respectively, were reported on a gross basis.  The Company's legacy business, which is reported in a separate segment referred to as On Device Media is not impacted by the change described above and continues to be reported on a gross basis.  Further, the acquisitions of the Acquired Companies were completed during the three-month period ended June 30, 2021 and, as a result, there is no impact to the fiscal year-ended March 31, 2021.

The corrections have the effect of decreasing both net revenue and license fees and revenue share in a like amount in the quarterly financial statements for each Relevant Period.  The corrections do not relate to nor have any impact on the Company's operating performance, income from operations, net income/(loss), or cash flows and the financial position and liquidity of the Company remain unchanged.

60.     The May 17, 2022 Form 8-K also provided a table summarizing the estimated adjustments, noting that such amounts were subject to the Company's restatement analysis, and thus Digital Turbine could give no assurance that no further adjustments would arise.  The following table summarizes the provided estimated revenue adjustments, and a calculation of by how much Digital Turbine's revenue was estimated to be overstated:

|  | As Reported Net Revenue | Preliminary Estimated Adjusted Net Revenue | Adjustment | % Overstated |
|---|---|---|---|---|
| Q1 2022 | $212.6 million | $158.1 million | ($54.5 million) | 34.5% |
| Q2 2022 | $310.2 million | $188.6 million | ($121.6 million) | 64.5% |
| Q3 2022 | $375.5 million | $216.8 million | ($158.7 million) | 73.2% |

61.     Digital Turbine also noted in the May 17, 2022 Form 8-K that the "Company's management has concluded that in light of the classification error described above, the Company's disclosure controls and procedures were not effective at June 30, 2021, September 30, 2021, and December 31, 2021.  Management is in the process of completing its assessment of internal control over financial reporting, and will update the evaluation of disclosure controls and procedures in the restated Form 10-Qs for the Relevant Periods."

62.    On all of this negative, Company specific news, the Company's shares fell $1.93, or 7.1%, to close at $25.28 per share on May 18, 2022, on unusually heavy trading volume.

**2.    Digital Turbine Issues Its Restated Financials For The First Three Quarters Of FY 2022, Admitting To A Material Weakness In The Company's Internal Controls**

63.    On May 27, 2022, Digital Turbine issued a Form 10-Q/A for each of the first three quarters of FY 2022 (collectively, the "Restatement").

64.    In the Restatement, Digital Turbine's financial statements for Q1-Q3 2022 were restated to report revenue net of license fees and revenue share expense for product lines wherein AdColony and Fyber act as an agent.  As a result, Digital Turbine's originally reported revenues and YoY growth greatly decreased:

| | | Q1 2022 | Q2 2022 | Q3 2022 |
|---|---|---|---|---|
| Net Revenues | As Reported | $212.6 million | $310.2 million | $375.5 million |
| | As Restated | $158.1 million | $188.6 million | $216.8 million |
| | Amount Overstated | $54.5 million | $121.6 million | $158.7 million |
| | % Overstated | 34.5% | 64.5% | 73.2% |
| YoY Growth | As Reported | 264.3% | 337.6% | 323.8% |
| | As Restated | 170.9% | 166.8% | 144.7% |
| Pro Forma Net Revenue | As Reported | $292.0 million | (same as net revenues) | (same as net revenues) |
| | As Restated | $180.5 million | | |
| | Amount Overstated | $111.5 million | | |
| | % Overstated | 61.8% | | |
| Pro Forma YoY Growth | As Reported | 104% | 63% | 38% |
| | As Restated[7] | 76% | 52% | 33% |

65.    The Restatement also restated the revenues attributable to AdColony and Fyber,

---

[7] Digital Turbine did not provide the restated pro forma YoY growth percentage but did provide restated pro forma net revenue figures, such that a restated pro forma YoY growth percentage can be calculated.  In the Restatement, Defendants revised the pro forma net revenue as follows: Q1 2022 ($180.472 million); Q1 2021 ($102.376 million); Q2 2021 ($123.997 million); Q3 2021 ($163.278 million).

and based on the restated pro-forma net revenues provided, the maximum In-App Media pro

forma YoY growth:

| | | Q1 2022 | Q2 2022 | Q3 2022 |
|---|---|---|---|---|
| AdColony Net Revenues | As Reported | $44.9 million | $61.5 million | $94.3 million |
| | As Restated | $30.3 million | $40.6 million | $58.4 million |
| | Amount Overstated | $14.6 million | $20.9 million | $35.9 million |
| | % Overstated | 48.2% | 51.5% | 61.5% |
| Fyber Net Revenue | As Reported | $49.6 million | $125.7 million | $157.4 million |
| | As Restated | $9.2 million | $23.5 million | $30.7 million |
| | Amount Overstated | $40.4 million | $102.2 million | $126.7 million |
| | % Overstated | 439.1% | 434.9% | 412.7% |
| In-App Media Pro Forma YoY Growth | As Reported | 117% | 61% | 40% |
| | Maximum Restated[8] | 63% | 30% | 27% |

66.    Also in connection with the Restatement, Digital Turbine's management, including

---

[8] The Restatement did not provide the restated In-App Media pro forma YoY growth percentages or the restated pro forma revenue for Q1 – Q3 2021 and Q1 2022 for AdColony and Fyber. However, as explained in note 7, *supra*, Digital Turbine did provide total pro forma revenue for Q1-Q3 2021 and Q1 2022, and thus the restated In-App Media pro forma YoY growth percentage can be calculated by first determining the net revenues attributed to Digital Turbine's On Device Media reporting segment (the Company's legacy single reporting segment prior to acquiring AdColony and Fyber, and which was not restated) in Q1 2021 ($62.298 million), Q2 2021 ($74.7 million), Q3 2021 ($93.403 million), and Q1 2022 ($120.383 million) from the total reported pro forma revenue for Q1 – Q3 2021 and Q1 2022.

Subtracting revenue attributable to On Device Media from the restated total pro forma net revenues amounts to pro forma revenue attributable to In-App Media of $40.078 million for Q1 2021, $49.297 million for Q2 2021, $69.875 million for Q3 2021, and $60.089 million for Q1 2022.  The In-App Media pro forma growth is then determined by dividing the total revenue attributable to In-App Media (AdColony and Fyber's net revenues) in the applicable quarter in FY 2022 by the applicable quarter in FY 2021 and subtracting 1. For example, for Q2 2022, In-App Media Pro Forma YoY Growth = (($40.6 million+$23.5 million)/$49.297 million) – 1, or 30.18%.

Digital Turbine also did not provide restated intercompany eliminations.  Being conservative, and allowing for the highest possible restated growth rate, for Q1 2022, the $5.04 million in originally reported intercompany eliminations is assumed to be upstream, *i.e.*, In-App Media sells to legacy Digital Turbine, and so the $5.04 million is included in the "restated" pro-forma In-App Media revenue of $65.13 million for Q1 2022.  Also, to allow for the highest possible restated growth rate, intercompany eliminations are not included in the pro forma revenue attributable to In-App Media for Q1-Q3 2021.

Defendants Stone and Garrison, conceded that Digital Turbine's internal controls over financial reporting and disclosure controls and procedures were not effective and there existed material weaknesses in the Company's internal controls over financial reporting as of June 30, 2021, September 30, 2021, and December 31, 2021.

67.    As Defendants explained in their 2022 Form 10-K filed on June 6, 2022, "[a] material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."

68.    Management concluded that the material weakness in the Company's internal controls existed because Digital Turbine's "internal control for business combinations did not include a control adequately designed to ensure acquiree accounting policies, as they relate to presentation and classification, were conformed to those of the Company and GAAP."

69.    The Restatement also laid out management's plan to remediate the identified material weakness.  In connection with preparing the Restatement, Defendants claimed to have conducted a review "of the recently acquired business' product lines with the assistance of a large, third-party accounting firm as part of the annual financial close and reporting process[,]" "includ[ing] a review, at the acquired businesses, of representative customer contracts and agreements, supply/publisher agreements, and each product line's business model and operations with key operations personnel."  The Company also hired a Chief Accounting Officer, and created and filled key positions relating to internal audit and global tax.  In addition, the Company stated that, in order to effectively remediate the material weakness, it planned to improve its policies and procedures by:

• Strengthening the Company's procedures for reviewing accounting policies of material acquired companies, inclusive of the accounting for revenue, through initial reviews during the due diligence period and alignment of accounting policies prior to the first interim reporting date;

• Standardizing customer and publisher contract review processes to ensure consistent accounting and reporting of revenue transactions; and

• Formalizing the approval process for making changes to the global chart of accounts and accounting systems to ensure the accurate classification of financial statement amounts, including changes resulting from material acquisitions.

### 3. Digital Turbine Announces Its Q4 2022 Financial Results, Resulting In Disappointing Revenue And Year-Over-Year Growth

70. On May 31, 2022, after the close of market, Digital Turbine announced its financial results for Q4 and full fiscal year of 2022. This earnings release was also attached as exhibit 99.1 to a Form 8-K filed with the SEC also on May 31, 2022, after the close of market. As part of the announcement, the Company reported that Q4 2022 revenue "totaled $184.1 million, representing a 94% increase year-over-year on an as-reported basis and a 19% increase year-over-year as compared to the comparable pro forma figure for the fiscal fourth quarter of 2021."

71. The earnings release also reported Q4 2022 revenues specifically attributable to AdColony and Fyber, while also providing pro forma revenue for Q4 2021 and YoY growth for the two acquired companies based on these results (amounts reported in thousands):

| | Three months ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2022** | | **2021** | | **% Change** | |
| On Device Media | $ | 119,211 | $ | 97,471 | 22 | % |
| In App Media - AdColony | | 40,357 | | 39,407 | 2 | % |
| In App Media - Fyber | | 29,215 | | 20,328 | 44 | % |
| Elimination | | (4,648) | | (2,361) | 97 | % |
| Consolidated | $ | 184,135 | $ | 154,845 | 19 | % |

72. Thus the May 31, 2022 earnings release not only revealed to the market

AdColony's low historic growth rate of just 2%, but also restated the reported net revenues of AdColony and Fyber that Digital Turbine announced in their April 29, 2021 release.

|  | As Reported Q4 2021 Net Revenue | As Restated Q4 2021 Net Revenue | Amount Overstated | % Overstatement |
|---|---|---|---|---|
| AdColony | $58.3 million | $39.4 million | ($18.9 million) | 48% |
| Fyber | $102.4 million | $20.3 million | ($82.1 million) | 404.4% |

73.    On this news, Digital Turbine's shares fell $5.75, or 22.61%, to close at $19.68 per share on June 1, 2022, on unusually heavy trading volume.

74.    Analysts and market observers noted that the Company's financial results missed consensus revenue estimates.  For example, a June 17, 2022 *Seeking Alpha* report observed that "[t]here is no doubt that the market did not expect Digital Turbine, Inc (NASDAQ:APPS) to report revenues of $184.1M in FQ422.  However, it is essential to note that this is attributed to the changes in its accounting report methods[.]"[9]  The report continued: "Nonetheless, since analysts and investors were expecting revenues in the range of $300M with a consensus revenue estimate of $336.45M, representing YoY growth of 253.9%, it is apparent that many were taken aback by the changes in its accounting reporting method."

75.    A July 5, 2022 *Seeking Alpha* report observed that: "In DT's 3Q22 earnings call, the management guided $1,240 million for its FY22 revenue.  If we were to do some math, this means that in 4Q22, we should roughly expect $341.7 million of revenue.  However, the actual revenue only came in at $184.1 million, a 46% revenue decline.  This surprise caused DT's share price to decline 39% after its earnings [based on APPS stock decline from June 1, 2022 through

---

[9]  https://seekingalpha.com/article/4518959-digital-turbine-q1-performance-key-to-recovery-not-a-buy-now (last accessed February 2, 2023).

June 13, 2022]."[10]

76.    Analysts from Oppenheimer noted in their June 1, 2022 report that "[a]nalysis was complicated by the recent restatement which converted substantial AdColony and Fyber revenue from a gross basis to net, reducing reported revenue by more than a third[.]"  Analysts from Roth also commented on Digital Turbine's lower revenue growth figures, noting that Q4 2022 revenue of $184.1 million was lower than their May 23, 2022 revised estimate of $193.3 million by around 5% and "[t]otal revenue was -5% lower, growing ~94% y/y and ~19% on a Pro-forma basis, although that figure slowed from -38% growth in 3Q."

### E.    Digital Turbine's Class Period Financial Results Were Not Presented In Accordance With GAAP

77.    Federal regulations strictly govern what must be included in documents filed with the SEC. In particular, federal regulations required Defendants to comply with United States generally accepted accounting principles ("GAAP"), which are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.

78.    SEC Regulation S-X requires that financial statements as filed with the SEC be prepared in accordance with GAAP.  Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).

79.    Furthermore, the fact that Digital Turbine restated its financial statements and disclosed that its financial statements for Q1 2022, Q2 2022, and Q3 2022 should not be relied upon is an admission that they were false and misleading when originally issued.  (Accounting Principles Board Opinion ("APB") No. 20 at ¶¶ 7-13; Financial Accounting Standards Board

---

[10] https://seekingalpha.com/article/4521869-digital-turbine-the-good-and-bad-takes-of-the-recent-quarter (last accessed February 2, 2023).

Statement No. 154 at ¶ 25).

80.     Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities.  Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants.

81.     Digital Turbine admitted on May 17, 2022, when announcing that its previously issued financial results should not be relied upon, that "based on the accounting guidance for revenue recognition, including considerations of principal and agent (or 'gross and net') presentation" "the Company concluded that [AdColony and Fyber] acts as an agent in certain of their respective product lines and, as a result, the revenues for those product lines should be reported net of license fees and revenue share[,]" whereas previously, Digital Turbine reported all revenue on a gross basis.

82.     ASC Topic 606-10-55-36–55-40 provides guidance on determining whether an entity is a principal or agent in a transaction for revenue recognition purposes.  ASC 606-10-55-36 explains that when a revenue transaction involves a third party "in providing goods or services to a customer, the entity should determine whether the nature of its promise is a performance obligation to provide the specified goods or services itself (that is, the entity is a principal) or to arrange for those goods or services to be provided by the other party (that is, the entity is an agent)."  This determination must be for each specified (*i.e.*, distinct) good or service (or bundle of goods and services) promised to the customer.  *Id.*  Thus, "[i]f a contract includes more than one specified good or service, an entity could be a principal for some specified goods or services and an agent for others."  *Id.*

83.    To determine the nature of the entity's promise, after identifying the specified goods/service to be provided, the entity assesses "whether it controls … each specific good or service before that good or service is transferred to the customer."  ASC 606-10-55-36A.

84.    ASC 606-10-55-37 explains that "[a]n entity is a principal if it controls the specified good or service before that good or service is transferred to a customer.  However, an entity does not necessarily control a specified good if the entity obtains legal title to that good only momentarily before legal title is transferred to a customer."

85.    ASC 606-10-55-38 explains that "an entity is an agent if the entity's performance obligation is to arrange for the provision of the specified good or service by another party.  An entity that is an agent does not control the specified good or service provided by another party before that good or service is transferred to the customer."

86.    If an entity is a principal, revenue is recognized "in the gross amount of consideration to which it expects to be entitled in exchange for the specified good or service transferred" when or as the entity satisfies a performance obligation.  ASC 606-10-55-37B.

87.    If an entity is an agent, revenue is recognized "in the amount of any fee or commission to which it expects to be entitled in exchange for arranging for the specified goods or services to be provided by the other party" when or as the entity satisfies a performance obligation.  "An entity's fee or commission might be the net amount of consideration that the entity retains after paying the other party the consideration received in exchange for the goods or service to be provided by that party."  ASC 606-10-55-38.

88.    ASC 606-10-55-39 further provides indicators that an entity controls the specified good/or service before transfer to a customer (and is thus a principal), including, but not limited to: (a) "The entity is primarily responsible for fulfilling the promise to provide the specified good

27

or service[;]" (b) "The entity has inventory risk before the specified good or service has been transferred to a customer or after transfer of control to the customer[;]" and (c) "The entity has discretion in establishing the price for the specified good or service."

> **F.    Defendants Were, At Minimum, Deliberately Reckless In Recording The Entirety of AdColony And Fyber's Revenue On A Gross Basis Without Regard To The Nature Of The Underlying Transaction(s)**

89.    After Digital Turbine closed on the acquisition of AdColony, Digital Turbine filed a Form 8-K/A with the SEC on July 14, 2021, signed by Defendant Garrison, amending the Form 8-K filed on May 4, 2021 to "provide certain historical audited financial statements of AdColony and unaudited pro forma financial information of the Company and AdColony after giving effect to the Acquisition as required by Item 9.01 and pursuant to Rule 3-05 of Regulation S-X and Article 11 of Regulation S-X."

90.    The audited financial statements of AdColony as of December 31, 2020 was attached as exhibit 99.1 to the July 14, 2021 Form 8-K/A.  A summary of AdColony's significant accounting policies, including its revenue recognition policy, was included as Note 2 to these financial statements.  AdColony's revenue recognition policy stated, in relevant part:

> In the normal course of business, AdColony acts as an intermediary in executing transactions with third parties. ***The determination of whether revenue should be reported on a gross or net basis is based on an assessment of whether AdColony is acting as the principal or an agent in our transactions with advertisers.*** The determination of whether AdColony is acting as a principal or an agent in a transaction involves judgment and is based on an evaluation of the terms of each arrangement. While none of the factors individually are considered presumptive or determinative, in reaching our conclusions on gross versus net revenue recognition, ***AdColony places the most weight on the analysis of whether AdColony is the primary obligor in the arrangement.***
>
> For the revenue generated through AdColony-owned properties, and agreements where AdColony has a contractual relationship with both the publisher and the associated advertisement supplier, AdColony is responsible for identifying and contracting with third-party advertisers, establishing the selling prices of the advertisements sold, and performing all billing and collection activities, including retaining credit risk, as well as bearing sole responsibility for fulfillment of the

advertising. Accordingly, ***AdColony acts as the principal in these arrangements and, therefore, reports revenue earned and costs incurred related to these transactions on a gross basis.***

For agreements where the publisher has a direct contractual relationship with the advertiser, ***revenue is recognized on a net basis, as AdColony is not the primary obligor and does not assume the fulfillment and credit risk.***

91.    Also attached to the July 14, 2021, Form 8-K/A as exhibit 99.2, was the condensed, combined financial statements of Digital Turbine and AdColony for FY 2021 (ended March 31, 2021).  In addition to combining the financial results of these two companies, Digital Turbine stated that it "performed a preliminary review of AdColony's accounting policies to determine whether any adjustments were necessary to ensure comparability in the unaudited pro forma condensed combined financial information."

92.    According to Defendants, the identified differences were described in exhibit 99.2 to the July 14, 2021, Form 8-K/A.  However, the identified differences did not include an adjustment or reclassification to account for all of AdColony's revenue on a gross basis. Moreover, the combined financial statements further noted that "[a]t this time, the Company is not aware of any other differences that would have a material effect on the unaudited pro forma condensed combined financial information, including any differences in the timing of adoption of new accounting standards."

93.    But, as the Company implicitly admitted in its May 17, 2022, announcement, upon acquisition, Defendants *indeed changed* AdColony's accounting policies in a material way, and the changes they made were in violation of GAAP.  As described above, in accordance with GAAP, AdColony's accounting policies provided for recognizing revenue on either a gross or a net basis depending on the nature of the transaction and AdColony's agreement(s) with customers.  Defendants abandoned that approach and, in violation of GAAP, began recognizing and reporting revenue entirely on a gross basis without regard to the nature of the underlying

transactions upon which the revenue was based.  As the restated financials demonstrate, reporting all revenue from AdColony as well as Fyber on a gross basis had the effect of materially overstating the Company's revenue and related growth figures.

94.    Indeed, as part of the Restatement, Defendants for the first time included a discussion of principal versus agent reporting as part of the Company's significant accounting policies, stating:

> The determination of whether we act as a principal or as an agent in a transaction requires significant judgement and is based on an assessment of the terms of customer arrangements and the relevant accounting guidance. When we are the principal in a transaction, revenue is reported on a gross basis, which is the amount billed to DSPs, advertisers and agencies. When we are an agent in a transaction, revenues are reported net of license fees and revenue share paid to app publishers or developers.

*        *        *        *

> The Company has determined that it is a principal for its Brand and Performance offerings [offered through its AdColony segment] as the advertisers or agencies provide parameters for their target audiences, as well as a budget for ad campaigns. Once an advertiser or advertising agency provides its specifications, the Company has the discretion to fulfill the campaign by utilizing its data and proprietary technology. The Company controls the service because it has the ultimate discretion in purchasing ad inventory; and once an ad inventory slot is purchased, filling that ad inventory slot. As a result, the Company reports the revenues billed to advertisers and agencies on a gross basis and revenue shares paid to publishers as license fees and revenue share.

> The Company has determined that is an agent in transactions on its Marketplace platforms [through its AdColony and Fyber segments]. The Company acts as an intermediary between DSPs and publishers by providing access to a platform and the SDKs that allow both parties to transact in the buying and selling of ad inventory. The transaction price is determined through a real-time auction and the Company has no pricing discretion or obligation related to the fulfillment of the advertising delivery.

95.    Thus, as part of the Restatement, Defendants went back to AdColony's original determination that revenue should be recognized on both a gross and net basis, depending on the nature of the agreement with customers, as required by GAAP.

30

96.     Moreover, it makes no difference that prior to Digital Turbine's acquisition, AdColony prepared its financial statements in accordance with International Financial Reporting Standards ("IFRS").  IFRS has been adopted by more than 144 countries, and is equivalent in nature to GAAP in the United States.  In particular, paragraphs B34 through B38 of IFRS 15 provide principal versus agent considerations, which are almost identical to ASC 606-10-55-36 through ASC 606-10-55-38 (detailed in Section IV.E, *supra*).  In other words, both IFRS and GAAP (under ASC 606) require entities to take into account the nature of a transaction and/or agreement to determine whether to recognize revenue on a net or gross basis.

97.     According to IFRS 15-B34, "[w]hen another party is involved in providing goods or services to a customer.  The entity shall determine whether the nature of its promise is a performance obligation to provide the specified goods or services itself (ie the entity is a principal) or to arrange for those goods or services to be provided by the other party (ie the entity is an agent). An entity determines whether it is a principal or an agent for each specified good or service promised to the customer."  Thus, "[i]f a contract with a customer includes more than one specified good or service, an entity could be a principal for some specified goods or services and an agent for others."

98.     To determine the nature of the entity's promise, after identifying the specified goods/service to be provided, the entity assesses "whether it controls … each specified good or service before that good or service is transferred to the customer."  IFRS 15-B34A.

99.     IFRS 15-B35 explains that "[a]n entity is a principal if it controls the specified good or service before that good or service is transferred to a customer.  However, an entity does not necessarily control a specified good if the entity obtains legal title to that good only momentarily before legal title is transferred to a customer."

100.  IFRS 15-B36 explains that "[a]n entity is an agent if the entity's performance obligation is to arrange for the provision of the specified good or service by another party. An entity that is an agent does not control the specified good or service provided by another party before that good or service is transferred to the customer."

101.  If an entity is a principal, revenue is recognized "in the gross amount of consideration to which it expects to be entitled in exchange for the specified good or service transferred."  IFRS 15-B35B.

102.  If an entity is an agent, revenue is recognized "in the amount of any fee or commission to which it expects to be entitled in exchange for arranging for the specified goods or services to be provided by the other party" when or as the entity satisfies a performance obligation.  "An entity's fee or commission might be the net amount of consideration that the entity retains after paying the other party the consideration received in exchange for the goods or services to be provided by that party."  IFRS 15-B36.

103.  IFRS 15-B37 further provides indicators that an entity controls the specified good/or service before transfer to a customer (and is thus a principal), including, but not limited to: (a) "the entity is primarily responsible for fulfilling the promise to provide the specified good or service[;]" (b) "the entity has inventory risk before the specified good or service has been transferred to a customer or after transfer of control to the customer[;]" and (c) "the entity has discretion in establishing the price for the specified good or service."

104.  In sum, AdColony's accounting policies prior to Digital Turbine's acquisition – in accordance with IFRS and GAAP – provided for recognizing revenue either on a gross basis or on a net basis depending on the nature of the transaction and AdColony's agreement(s) with customers.  Defendants abandoned AdColony's approach, and in violation of both GAAP and

IFRS, began recognizing and reporting revenue entirely on a gross basis without regard to the nature of the underlying transactions upon which the revenue was based. As the restated financials demonstrate, reporting all revenue from AdColony as well Fyber on a gross basis had the effect of materially overstating the Company's revenue and related growth figures.

## V.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

105.    As detailed below, Defendants made materially false and misleading statements and omissions throughout the Class Period relating to the growth and revenue synergies resulting from the AdColony and Fyber acquisitions, Digital Turbine's revenue and related growth figures, the Company's compliance with GAAP, and Digital Turbine's internal controls and procedures.

### A.    False and Misleading Statements And Omissions Relating To The Acquisitions Of AdColony And Fyber

106.    The Class Period begins on February 26, 2021, when Digital Turbine published a press release announcing that it had entered into a definitive purchase agreement to acquire AdColony. The February 26, 2021, press release was also filed with the SEC on March 1, 2021 as exhibit 99.1 to Form 8-K, signed by Defendant Garrison. In the press release, Defendant Stone was quoted as stating, in relevant part: "We look forward to welcoming the AdColony team to the Digital Turbine family and believe that *this strategic transaction will accelerate our growth* and is a positive for our partners, advertisers, employees and shareholders."

107.    Defendant Stone's quote in the February 26, 2021, press release concluded: "Considering the current run-rate of recurring business at AdColony, along with expected realized synergies and the terms of consideration, *we anticipate that the AdColony transaction will be substantially accretive to our expected profitability in the first full year following the transaction*."

108.    On March 22, 2021, Digital Turbine published a press release announcing that it

had entered into a definitive purchase agreement to acquire approximately 95% of the shares of Fyber. The March 22, 2021 press release was also filed with the SEC on March 23, 2021 as exhibit 99.1 to Form 8-K, which was signed by Defendant Garrison. As part of the press release, Defendant Stone was quoted as stating, in relevant part: "We are certainly excited about the *anticipated revenue synergies that Fyber, AdColony and Appreciate will engender for the combined company*, our partners, and our customers."

109.    On April 29, 2021, Digital Turbine issued a press release announcing the completion of the acquisition of AdColony. The April 29, 2021 press release was also filed with the SEC on April 30, 2021 as exhibit 99.1 to Form 8-K, signed by Defendant Garrison. As part of that announcement, the Company reported AdColony's preliminary financial results for the quarter ended March 31, 2021, reporting revenue of "approximately $58.3 million, representing growth of 37% as compared to revenue in the first quarter of 2020."

110.    In the April 29, 2021 announcement, Digital Turbine also reported Fyber's preliminary financial results for the quarter ended March 31, 2021, reporting revenue "in excess of €85 million in the March quarter, representing year-over-year growth of 179%."

111.    On Digital Turbine's website, the Company posted an Investor Presentation dated May 18, 2021. Within this presentation, on page 27, Digital Turbine included a slide with preliminary revenue results for the recent quarter ended March 31, 2021:

### Real-Time Update – Breakout Performance[1] and Combined $1B+ Scale

*Preliminary upside results across the board for the recent March quarter and collective Y/Y growth of greater than 100%*

| Company | March Quarter 2021 Revenue (in USD Millions) | Change Y/Y |
|---|---|---|
| Digital Turbine | $95.1 | 142% |
| AdColony | $58.3 | 37% |
| Fyber | $102.9 | 179% |
| **Total Combined** | $256.3 | **116%** |

Combined revenue already exceeds $1B on an annualized basis
(pre-revenue synergies)

[1]Based on preliminary unaudited results reported by the respective companies in April 2021; subject to adjustment based on completion of final audits.

112.　　On May 25, 2021, Digital Turbine issued a press release announcing the completion of the acquisition of Fyber.  The May 25, 2021 press release was also filed with the SEC on May 28, 2021 as exhibit 99.1 to Form 8-K, which was signed by Defendant Garrison. The announcement included comment from Defendant Stone, who was quoted as saying, in relevant part: "Combined with our recently completed AdColony and Appreciate acquisitions, Fyber represents a very important puzzle piece for Digital Turbine in its mission to develop one of the largest full-stack, fully-independent, mobile advertising solutions in the industry. ***The combined platform offering is already generating more than $1 billion in annualized revenue***[.]"

113.　　Defendant Stone's concluding commentary in the May 25, 2021 announcement stated, in relevant part: "As evidenced by ***the reported 179% year-over-year revenue growth in the March quarter***, the Fyber team has done an amazing job of building a highly differentiated, growing and profitable standalone business."

114.　　On June 1, 2021, Digital Turbine issued a press release announcing its Q4 and FY 2021 financial results.  The June 1, 2021 press release was also filed with the SEC that same day as exhibit 99.1 to Form 8-K, which was signed by Defendant Garrison.  The announcement

included comment from Defendant Stone, who is quoted as saying, in relevant part: "***The combination of Digital Turbine, Appreciate, AdColony, and Fyber position us as a company with greater than $1 billion in profitable annualized revenue.***"

115.    The emphasized statements and the statements reporting AdColony and Fyber's revenue and related growth figures, above in ¶¶106-114, were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a.    That Digital Turbine, in a departure from GAAP, would account for the entirety of AdColony's and Fyber's revenue on a gross basis without regard to the nature of the revenue;

b.    That, as Defendants later admitted in connection with the Restatement, "the Company acted as an agent, rather than as a principal, in certain product lines of the recently acquired businesses [AdColony and Fyber] and, as a result, revenue for those product lines should have been reported net of license fees and revenue share expense[,]" rather than on a gross basis.

c.    That Defendants' decision to recognize all revenue attributable to AdColony and Fyber on a gross basis had the effect of materially overstating the Company's, AdColony's, and Fyber's revenue and related revenue growth figures.

i.    As a result, in announcing Digital Turbine's Q4 2022 and FY 2022 financial results on May 31, 2022, Defendants restated AdColony's revenue for the quarter ended March 31, 2021, to $39.4 million, overstating originally reported net revenue of $58.3 million by $18.9 million, or 48%.

36

ii.    As a result, AdColony's originally reported growth rate of 37% was materially misstated.

iii.    As a result, in announcing Digital Turbine's Q4 2022 and FY 2022 financial results on May 31, 2022, Defendants restated Fyber's revenue for the quarter ended March 31, 2021, to $20.3 million, overstating originally reported revenue of $102.9 million/ €85 million by $82.6 million, or 406.9%.

iv.    As a result, AdColony's originally reported growth rate of 179% was materially misstated.

v.    As a result, Digital Turbine was not generating more than $1 billion in annualized revenue.

vi.    As a result, Defendants' statements about revenue growth and synergies resulting from the AdColony and Fyber acquisitions were materially misleading.

116.    On July 14, 2021 Digital Turbine filed with the SEC a Form 8-K/A, signed by Defendant Garrison.  Attached as exhibit 99.2 to this Form 8-K/A was pro forma combined financial information of the Company and AdColony as of and for the fiscal year ended March 31, 2021, which stated in relevant part:

> The accounting policies used in the preparation of this unaudited pro forma condensed combined financial information are those set out in the Company's audited consolidated financial statements as of and for the year ended March 31, 2021. The Company performed a preliminary review of AdColony's accounting policies to determine whether any adjustments were necessary to ensure comparability in the unaudited pro forma condensed combined financial information. The Company identified differences and certain amounts that have been reclassified to conform to the Company's financial statement presentation, as described below. ***At this time, the Company is not aware of any other differences that would have a material effect on the unaudited pro forma condensed combined financial information***, including any differences in the timing of adoption of new accounting standards.

117.    The statement emphasized above in ¶116 was materially false and/or misleading

when made and/or omitted to state material facts necessary to make the statements not

misleading because: (1) prior to Digital Turbine's acquisition of AdColony, AdColony, in

accordance with IFRS and GAAP, recognized revenue either on a gross basis or on a net basis,

based on the nature of the underlying agreement or transaction; (2) in purporting to describe the

differences between Digital Turbine's accounting policies and the accounting policies that had

been followed by AdColony prior to the acquisition, Defendants failed to disclose that Digital

Turbine, in a departure from GAAP, IFRS, and AdColony's revenue recognition practices based

on the varying nature of underlying agreement(s) or transaction(s), would instead account for the

entirety of AdColony's revenue on a gross basis without regard to the nature of the revenue; (3)

as Defendants later admitted in connection with the Restatement, "the Company acted as an

agent, rather than as a principal, in certain product lines of the recently acquired businesses

[AdColony and Fyber] and, as a result, revenue for those product lines should have been reported

net of license fees and revenue share expense[,]" rather than on a gross basis; and (4)

Defendants' decision to recognize all revenue attributable to AdColony on a gross basis had the

effect of materially overstating the Company's reported revenue and related revenue growth

figures.

### B.    False and Misleading Statements And Omissions Relating To Digital Turbine's Q1 2022 Financial Results

118.    On August 9, 2021, Digital Turbine issued a press release announcing its financial

results for the first fiscal quarter of 2022.  The August 9, 2021, press release was also filed with

the SEC that same day as exhibit 99.1 to Form 8-K, signed by Defendant Garrison.  For the first

fiscal quarter of FY 2022, Digital Turbine announced (1) net revenue of $212.6 million, (2) pro

forma revenue of $292.0 million, (3) pro forma year-over-year revenue growth of 104%, (4) "In-

App Media" revenue of $92.3 million, (5) revenue attributable to AdColony of $44.9 million, (6)

revenue attributable to Fyber of $49.6 million, (7) pro-forma revenue attributable to AdColony of $63.241 million, and (8) pro-forma revenue attributable to Fyber of $113.465 million.

119.    The August 9, 2021, press release also included comment from Defendant Stone who was quoted as saying: "We are off to a fast start in fiscal 2022 *with more than 100% year-over-year pro forma revenue growth*."

120.    The August 9, 2021 press release further quoted Defendant Stone as saying: "With respect to our financial performance during the June quarter, … *In-App Media revenue growth of … 117%*, respectively, *on a year-over-year basis*."

121.    Later on August 9, 2021, Digital Turbine held an earnings call to discuss these financial results.  During his prepared remarks, Defendant Stone stated: "At a macro level, our consolidated actual results were *$213 million in revenue*, ….  *Our top line … growth were over 100%* … on a pro forma basis[.]"

122.    Defendant Stone also discussed the growth of both AdColony and Fyber in his prepared remarks during the August 9, 2021 earnings call, stating: "*AdColony has an impressive 46% year-over-year growth* comparing this June quarter to last June quarter;" and "Fyber's full quarterly results were impressive, showcasing *nearly 200% year-over-year growth.*"

123.    Defendant Garrison similarly discussed revenue and growth figures during his prepared comments during the August 9, 2021 earnings call, stating: "*Revenue of $212.6 million in the quarter was up 260% as reported and 104% on a pro forma basis*."

124.    Defendant Garrison also discussed AdColony and Fyber's performance during the August 9, 2021 earnings call, stating: "*Total In-App Media AdColony revenue contributed $44.9 million during the quarter and was up 46% on a pro forma basis.  Our In-App Media -- our In-App Fyber business contributed $49.6 million during the quarter and was up over*

*190% on a pro forma basis. On a pro forma basis, as if both Fyber and AdColony were owned for the full quarter, total consolidated pro forma revenue for the fiscal quarter '22 would have been $292 million, representing a 104% increase.*"

125.    Also on August 9, 2021, Digital Turbine filed its Form 10-Q for the quarter ended June 30, 2021 (the "Q1 2022 10-Q"), which was signed by Defendants Stone and Garrison. Therein, Digital Turbine reported (1) net revenue of $212.6 million, (2) pro forma revenue of $292.0 million, (3) revenue attributable to AdColony of $44.9 million, (4) revenue attributable to Fyber of $49.6 million, and (5) a net revenue increase of 264.3% on a year-over-year basis. The Q1 2022 10-Q also reported pro-forma revenue of $142.9 million for Q1 2021.

126.    Note 2 accompanying the financial statements in the Q1 2022 10-Q stated: "The accompanying condensed consolidated financial statements are presented in accordance with accounting principles generally accepted in the United States ("U.S."), or GAAP."

127.    The emphasized statements, the statements reporting Digital Turbine's various revenue and related growth figures, and the statements attesting that the Company's financial statements were presented in accordance with GAAP made in ¶¶118-126 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a.    That Digital Turbine's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated.

b.    That the Company's financial statements for Q1 2022 had materially overstated Digital Turbine's net revenue and growth figures.

c.    That, as Defendants later admitted in connection with the Restatement,

"the Company acted as an agent, rather than as a principal, in certain product lines of the recently acquired businesses [AdColony and Fyber] and, as a result, revenue for those product lines should have been reported net of license fees and revenue share expense[,]" rather than on a gross basis as was done in reporting the Q1 2022 revenue and related growth figures.

        i.     As a result, Defendants restated Digital Turbine's net revenue for Q1 2022 to $158.1 million, overstating the Company's originally reported net revenue of $212.6 million by $54.5 million, or 34.5%.

        ii.    As a result, Defendants restated Digital Turbine's year-over-year revenue growth for Q1 2022 to 170.9%, from the Company's originally reported year-over-year revenue growth of 264.3%.

        iii.   As a result, Defendants restated Digital Turbine's pro forma revenue for Q1 2022 to $180.5 million, overstating the Company's originally reported pro forma revenue of $292.0 million by $111.5 million, or 61.8%.

        iv.   As a result, Defendants restated Digital Turbine's pro-forma revenue for Q1 2021 to $102.4 million, overstating the Company's originally reported pro-forma revenue of $142.9 million for Q1 2021 by $40.5 million, or 39.6%.

        v.    As a result, Defendants restated Digital Turbine's pro forma year-over-year revenue growth for Q1 2022 to 76%, from the Company's originally reported pro forma year-over-year revenue growth of 104%.

        vi.   As a result, Defendants restated Digital Turbine's net revenue attributable to AdColony for Q1 2022 to $30.3 million, overstating the Company's originally reported net revenues attributable to AdColony of $44.9 million by $14.6 million, or 48.2%.

        vii.   As a result, Defendants restated Digital Turbine's net revenue

attributable to Fyber for Q1 2022 to $9.2 million, overstating the Company's originally reported net revenues attributable to Fyber of $49.6 million by $40.4 million, or 439.1%.

viii.    As a result of Defendants restating the net revenue attributable to AdColony and Fyber, the "In-App Media" revenue of $92.3 million as reported in the August 9, 2021 earnings release was false, and was actually between $37.7 million and $39.5 million, depending on the amount of restated intercompany eliminations of $1.8 million should be included in determining total restated "In-App Media" revenue.

ix.    As a result of Defendants restating Digital Turbine's pro forma revenue for Q1 2021 and Q1 2022, the In-App Media revenue growth of 117% as reported by Defendant Stone was false, and was actually at most 63%.

x.    As a result of Defendants restating the net revenue attributable to AdColony and Fyber, the Q1 2022 pro-forma revenue attributable to AdColony of $63.241 million, and the Q1 2022 pro-forma revenue attributable to Fyber of $113.465 million were materially misstated.

xi.    As a result of Defendants restating the net revenue attributable to AdColony and Fyber, the pro forma revenue growth for Q1 2022 of 46% for AdColony and over 190% for Fyber were materially misstated.

128.    The Q1 2022 10-Q also stated under Item 4. Controls and Procedures:

**Evaluation of Disclosure Controls and Procedures**

Under the supervision of and with the participation of our management, including our Chief Executive Officer, who is our principal executive officer, and our Chief Financial Officer, who is our principal financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Report. The term "disclosure controls and procedures," as set forth in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized,

and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosures. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective***.

129.     Attached as Exhibits 32.1 and 32.2 to Digital Turbine's Q1 2022 10-Q were certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2002[11] (the "SOX 906 Certifications"), signed by Defendants Stone and Garrison, which certified, "to such officer's knowledge, that: "The Quarterly Report on Form 10-Q for the period ending June 30, 2021 of the Company (the 'Form 10-Q') fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and ***the information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company***."

130.     The foregoing statements emphasized in ¶¶128-129 were materially false and/or misleading for the same reasons as stated above in ¶127.  In addition, the statements in ¶¶128-129 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because they failed to disclose the following adverse facts:

---

[11] SOX requires a public company to evaluate and report on the effectiveness of its internal controls over financial reporting annually and that the principal officers certify their responsibilities for financial reports in each quarterly and annual filing.

   a.  That, as Defendants later admitted in connection with the Company's Restatement, Digital Turbine's internal controls over financial reporting were not effective as of the time these statements were issued and a material weakness existed in the Company's internal controls over financial reporting.

   b.  That, as Defendants later admitted in connection with the Company's Restatement, "management determined the Company acted as an agent, rather than as a principal, in certain product lines of the recently acquired businesses [AdColony and Fyber] and, as a result, revenue for those product lines should have been reported net of license fees and revenue share expense."

   c.  That Defendants' failures to report certain product lines of AdColony and Fyber on a net basis caused material misstatements in Digital Turbine's financial results, including the misstatements identified in ¶127.

  **C.**  **False and Misleading Statements And Omissions Relating To Digital Turbine's Q2 2022 Financial Results**

  131.  On November 2, 2021, Digital Turbine issued a press release announcing its financial results for the second fiscal quarter of 2022.  The November 2, 2021 press release was also filed with the SEC that same day as exhibit 99.1 to Form 8-K, signed by Defendant Garrison.  For the second fiscal quarter of FY 2022, Digital Turbine announced (1) net revenue of $310.2 million, (2) year-over-year revenue growth of 338% on an as-reported basis, (3) pro forma year-over-year revenue growth of 63%, (4) "In-App Media" revenue of $187.2 million, (5) year-over-year growth on a pro forma basis of 61% for "In-App Media," (6) revenue attributable to AdColony of $61.5 million, (7) revenue attributable to Fyber of $125.7 million, (8) pro-forma year-over-year revenue growth of 19% for AdColony, and (9) pro-forma year-over-year revenue growth of 93% for Fyber.

132.    Later on November 2, 2021, Digital Turbine held an earnings call to discuss these financial results.  During his prepared remarks, Defendant Stone began his commentary by stating, in relevant part: "It was just a few months ago in June that we were on our earnings call announcing our DT revenue results of just over $310 million for the full fiscal year. ***And today, we are announcing quarterly revenue results that are nearly equal to those annual results from the entirety of last year.***"

133.    Defendant Stone then discussed the Company's financial results for Q2 2022, stating, in relevant part: " On a consolidated basis, we delivered just over ***$310 million in revenue*** …. Compared to the September quarter of last year, ***this represents a 338% increase on an as-reported basis and a 63% increase on a pro forma basis for revenues***[.]"

134.    In discussing AdColony results on the November 2, 2021 earnings call, Defendant Stone stated, in relevant part: "Turning to our AdColony segment. ***AdColony had approximately 20% year-over-year growth comparing the September quarter to last September quarter.***"

135.    In discussing AdColony results on the November 2, 2021 earnings call, Defendant Stone stated, in relevant part: "Turning to Fyber.  ***Fyber's full quarterly results were impressive, showcasing year-over-year growth of over 90%.  Fyber has achieved over 140% of last year's revenue in the first 9 months of 2021 compared to the full year of 2020***."

136.    Defendant Garrison similarly discussed revenue and growth figures during his prepared comments during the November 2, 2021 earnings call, stating: "***Revenue of $310.2 million in the quarter was up 338% as reported and 63% on a pro forma basis.***"

137.    Defendant Garrison also discussed AdColony and Fyber's performance during the November 2, 2021 earnings call, stating: "***Total In-App Media, AdColony revenue contributed $61.5 million during the quarter and was up 19% on a pro forma basis.  Our In-App Fyber***

*business contributed $125.7 million during the quarter and was up 93% on a pro forma basis*."

138.    Also on November 2, 2021, Digital Turbine filed its Form 10-Q for the quarter ended September 30, 2021 (the "Q2 2022 10-Q"), which was signed by Defendants Stone and Garrison.  Therein, Digital Turbine reported (1) net revenue of $310.2 million, (2) revenue attributable to AdColony of $61.5 million, (3) revenue attributable to Fyber of $125.7 million, and (4) a net revenue increase of 337.6% on a year-over-year basis.  The Q2 2022 10-Q also reported pro-forma revenue of $190.2 million for Q2 2021.

139.    Note 2 accompanying the financial statements in the Q2 2022 10-Q stated: "The accompanying condensed consolidated financial statements are presented in accordance with accounting principles generally accepted in the United States ("U.S."), or GAAP."

140.    The emphasized statements, the statements reporting Digital Turbine's various revenue and related growth figures, and the statements attesting that the Company's financial statements were presented in accordance with GAAP made in ¶¶131-139 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a.    That Digital Turbine's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated.

b.    That the Company's financial statements for Q2 2022 had materially overstated Digital Turbine's net revenue and growth figures.

c.    That, as Defendants later admitted in connection with the Restatement, "the Company acted as an agent, rather than as a principal, in certain product lines of the recently acquired businesses [AdColony and Fyber] and, as a result, revenue for those product lines

should have been reported net of license fees and revenue share expense[,]" rather than on a gross basis as was done in reporting the Q2 2022 revenue and related growth figures.

        i.     As a result, Defendants restated Digital Turbine's net revenue for Q2 2022 to $188.6 million, overstating the Company's originally reported net revenue of $310.2 million by $121.6 million, or 64.5%.

        ii.     As a result, Defendants restated Digital Turbine's year-over-year revenue growth for Q2 2022 to 166.8%, from the Company's originally reported year-over-year revenue growth of 337.6%.

        iii.     As a result, Defendants restated Digital Turbine's pro-forma revenue for Q2 2021 to $124 million, overstating the Company's originally reported pro-forma revenue of $190.2 million for Q2 2021 by $66.2 million, or 53.4%.

        iv.     As a result, Defendants restated Digital Turbine's pro forma year-over-year revenue growth for Q2 2022 to 52%, from the Company's originally reported pro forma year-over-year revenue growth of 63%.

        v.     As a result, Defendants restated Digital Turbine's net revenue attributable to AdColony for Q2 2022 to $40.6 million, overstating the Company's originally reported net revenues attributable to AdColony of $61.5 million by $20.9 million, or 51.5%.

        vi.     As a result, Defendants restated Digital Turbine's net revenue attributable to Fyber for Q2 2022 to $23.5 million, overstating the Company's originally reported net revenues attributable to Fyber of $125.7 million by $102.2 million, or 434.9%.

        vii.     As a result of Defendants restating the net revenue attributable to AdColony and Fyber, the "In-App Media" revenue of $187.2 million as reported in the November 2, 2021 earnings release was false, and was actually between $59.1 million and $64.2

million, depending on the amount of restated intercompany eliminations of $5.1 million should be included in determining total restated "In-App Media" revenue.

viii.   As a result of Defendants restating Digital Turbine's pro forma revenue for Q2 2021 and Q2 2022, the In-App Media revenue growth of 61% in the November 2, 2021 earnings release was false, and was actually at most 30%.

ix.   As a result of Defendants restating the net revenue attributable to AdColony and Fyber, the pro forma revenue growth for Q2 2022 of 19% for AdColony and 93% for Fyber, as well as Defendant Stone's statement that "Fyber has achieved over 140% of last year's revenue in the first 9 months of 2021 compared to the full year of 2020," were materially misstated.

141.   The Q2 2022 10-Q also stated under Item 4. Controls and Procedures:

**Evaluation of Disclosure Controls and Procedures**

Under the supervision of and with the participation of our management, including our Chief Executive Officer, who is our principal executive officer, and our Chief Financial Officer, who is our principal financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Report. The term "disclosure controls and procedures," as set forth in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosures. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective***.

142.    Attached as Exhibits 32.1 and 32.2 to Digital Turbine's Q2 2022 10-Q were the

SOX 906 Certifications, signed by Defendants Stone and Garrison, which certified, "to such

officer's knowledge," that: "The Quarterly Report on Form 10-Q for the period

ending September 30, 2021 of the Company (the "Form 10-Q") fully complies with the

requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and ***the***

***information contained in the Form 10-Q fairly presents, in all material respects, the financial***

***condition and results of operations of the Company***."

143.    The foregoing statements emphasized in ¶¶141-142 were materially false and/or

misleading for the same reasons as stated above in ¶140.  In addition, the statements in ¶¶141-

142 were materially false and/or misleading when made and/or omitted to state material facts

necessary to make the statements not misleading because they failed to disclose the following

adverse facts:

a.    That, as Defendants later admitted in connection with the Company's

Restatement, Digital Turbine's internal controls over financial reporting were not effective as of

the time these statements were issued and a material weakness existed in the Company's internal

controls over financial reporting.

b.    That, as Defendants later admitted in connection with the Company's

Restatement, "management determined the Company acted as an agent, rather than as a

principal, in certain product lines of the recently acquired businesses [AdColony and Fyber] and,

as a result, revenue for those product lines should have been reported net of license fees and

revenue share expense."

c.    That Defendants' failures to report certain product lines of AdColony and

Fyber on a net basis caused material misstatements in Digital Turbine's financial results,

49

including the misstatements identified in ¶140.

144.    On Digital Turbine's website, the Company posted an Investor Presentation dated November 11, 2021.  On page 6 of this presentation, Digital Turbine included a slide with "key stats," reporting that the Company was generating $1 billion in annualized revenue, and included line charts, which showed the Company's rapid revenue growth, amounting to over $300 million in revenue for Q2 2022:



145.    The November 11, 2021 investor presentation again presented the above revenue growth line chart on page 33, reporting over $300 million in revenues for the Company in Q2 2022.

146.    On page 35 of the November 11, 2021 investor presentation, Digital Turbine reported pro forma revenues of $602.3 million for the first half of FY 2022 (*i.e.*, as if the acquisitions of Appreciate, AdColony and Fyber were owned for all of the first half of FY 2022), representing a growth of 81% from revenues generated during the first half of FY 2021:

| in millions except EPS | 1st Half Fiscal 2022 | 1st Half Fiscal 2021 | Change Y/Y |
|---|---|---|---|
| Revenue[4] | $602.3 | $333.0 | 81% |
| Non-GAAP Adj. EBITDA[1,4] | $96.5 | $34.0 | 184% |
| Non-GAAP EPS[2] | $0.78 | $0.28 | 176% |

147.    The November 11, 2021 investor presentation repeated that Digital Turbine's pro forma year-over-year revenue growth for the first half of FY 2022 was 81% on page 37.

148.    Also on November 11, 2021, Digital Turbine held its 2021 Virtual Analyst Day. During the presentation, Defendant Garrison stated: "And as you saw earlier, we just crossed $300 million in revenue in our most recent quarter."

149.    Later during the 2021 Analyst Day, Defendant Garrison stated: "On a pro forma basis, revenues of $602 million, grew 81% year-on-year[.]"

150.    The statements reporting Digital Turbine's various revenue and related growth figures in the November 11, 2021 investor presentation detailed in ¶¶144-149 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a.    That the Company's financial results for Q2 2022 had materially overstated Digital Turbine's net revenue and growth figures.

b.    That, as Defendants later admitted in connection with the Restatement, "the Company acted as an agent, rather than as a principal, in certain product lines of the recently acquired businesses [AdColony and Fyber] and, as a result, revenue for those product lines should have been reported net of license fees and revenue share expense[,]" rather than on a gross basis as was done in reporting the Q2 2022 revenue and related growth figures.

i.    As a result, Defendants restated Digital Turbine's net revenue for Q2 2022 to $188.6 million, overstating the Company's originally reported net revenue of $310.2

million by $121.6 million, or 64.5%.

        ii.     As a result, Digital Turbine was not generating $1 billion in annualized revenue.

        iii.     As a result, Defendants restated Digital Turbine's pro forma revenue for the first half of FY 2022 to $369 million, overstating the Company's originally reported pro forma revenue of $602.3 million for the first half of FY 2022 by $233.3 million, or 63.2%.

        iv.     As a result, Defendants restated Digital Turbine's pro forma revenue for the first half of FY 2021 to $226.4 million, and as such, the Company's pro forma year-over-year revenue growth for the first half of FY 2022 was 63%, from the originally reported pro forma year-over-year revenue growth for the first half of FY 2022 of 81%.

**D.  False and Misleading Statements And Omissions Relating To Digital Turbine's Q3 2022 Financial Results**

151.    On February 8, 2022, Digital Turbine issued a press release announcing its financial results for the third fiscal quarter of 2022.  The February 8, 2022 press release was also filed with the SEC that same day as exhibit 99.1 to Form 8-K, which was signed by Defendant Garrison.  For the second fiscal quarter of FY 2022, Digital Turbine announced (1) net revenue of $375.5 million, (2) year-over-year revenue growth of 324% on an as-reported basis, (3) pro forma year-over-year revenue growth of 38%, (4) "In-App Media" revenue of $251.7 million, (5) year-over-year growth on a pro forma basis of 40% for "In-App Media," (5) revenue attributable to AdColony of $94.3 million, (6) revenue attributable to Fyber of $157.4 million, (7) pro-forma year-over-year revenue growth of 28% for AdColony, and (6) pro-forma year-over-year revenue growth of 48% for Fyber.

152.    The February 8, 2022 press release also included comment from Defendant Stone

who was quoted as saying, in relevant part: "***Top-line growth of 324% and 38%, on an as-reported basis and pro forma basis, respectively***, is certainly a great result[.]"

153.    Later on February 8, 2022, Digital Turbine held an earnings call to discuss these financial results.  During his prepared remarks, Defendant Stone commented on the Company's financial results stating, in relevant part: " For the December quarter, ***we delivered just over $375 million in revenue …. Compared to the December quarter of last year, this represents over a 300% increase on an as-reported basis and nearly a 40% increase on a pro forma basis for revenues.***"

154.    In discussing AdColony results on the February 8, 2022 earnings call, Defendant Stone stated, in relevant part: "Turning to our AdColony segment.  AdColony rebounded strong from the September quarter, with ***53% sequential growth and 28% year-over-year growth comparing December quarter to last year***."

155.    In discussing Fyber results on the February 8, 2022 earnings call, Defendant Stone stated, in relevant part: "Turning to Fyber. Fyber's full quarterly results were impressive, ***showcasing year-over-year growth of nearly 50%***."

156.    Defendant Garrison similarly discussed revenue and growth figures during his prepared comments during the February 8, 2022 earnings call, stating: "***Revenue of $375.5 million in the quarter was up 324% as reported and 38% on a pro forma basis.***"

157.    Defendant Garrison also discussed AdColony and Fyber's performance during the November 2, 2021 earnings call, stating: "***Total In-App Media AdColony revenue contributed $94.3 million during the quarter and was up 28% on a pro forma basis.  Our In-App Fyber business contributed $157.4 million during the quarter and was up 48% on a pro forma basis.***"

158.    During the question and answer portion of the February 8, 2022 earnings call,

Defendant Garrison fielded a question concerning about his previous commentary that Digital Turbine's EBITDA was outpacing the revenue growth. Defendant Garrison responded, in relevant part, by again highlighting the Company's revenue growth, stating: "I would say, we've -- I'll highlight that *we grew revenue 38%,* and on an apples-to-apples basis, our cash expenses were flat."

159.    Also during the question and answer portion of the February 8, 2022 earnings call, Defendant Stone, in response to a request to elaborate on how AdColony "turned around in the December quarter", began his response by highlighting AdColony's revenue growth for the quarter: "So yes, on AdColony, *they had a really nice quarter. And really proud of the rebound in performance there.* The brand business continues to grow, and that's highly strategic for our larger end-to-end ad tech ambitions to be able to leverage some of those brands and names I mentioned in my prepared remarks. *So we're seeing really nice growth there, across the board.*"

160.    Stone next addressed a question on the slowing revenue growth numbers for Fyber, stating: "On the Fyber side, yes, you're right. It's just a little bit of a *large numbers.* Fyber hit a really inflection point in the December quarter of last year. But I do want to emphasize that *we're still talking about 50-plus percent growth in that business.*"

161.    Also on February 8, 2022, Digital Turbine filed its Form 10-Q for the quarter ended December 31, 2021 (the "Q3 2022 10-Q"), which was signed by Defendants Stone and Garrison. Therein, Digital Turbine reported (1) net revenue of $375.5 million, (2) revenue attributable to AdColony of $94.3 million, (3) revenue attributable to Fyber of $157.4 million, and (4) a net revenue increase of 323.8% on a year-over-year basis. The Q3 2022 10-Q also reported pro-forma revenue of $271.5 million for Q3 2021.

54

162.     Note 2 accompanying the financial statements in the Q2 2022 10-Q stated: "The accompanying condensed consolidated financial statements are presented in accordance with accounting principles generally accepted in the United States ("U.S."), or GAAP."

163.     The emphasized statements, the statements reporting Digital Turbine's various revenue and related growth figures, and the statements attesting that the Company's financial statements were presented in accordance with GAAP made in ¶¶151-162 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the following adverse facts:

a.     That Digital Turbine's financial results and financial statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated.

b.     That the Company's financial statements for Q3 2022 had materially overstated Digital Turbine's net revenue and growth figures.

c.     That, as Defendants later admitted in connection with the Restatement, "the Company acted as an agent, rather than as a principal, in certain product lines of the recently acquired businesses [AdColony and Fyber] and, as a result, revenue for those product lines should have been reported net of license fees and revenue share expense[,]" rather than on a gross basis as was done in reporting the Q3 2022 revenue and related growth figures.

i.     As a result, Defendants restated Digital Turbine's net revenue for Q3 2022 to $216.8 million, overstating the Company's originally reported net revenue of $375.5 million by $158.7 million, or 73.2%.

ii.     As a result, Defendants restated Digital Turbine's year-over-year revenue growth for Q3 2022 to 144.7%, from the Company's originally reported year-over-year

revenue growth of 323.8%.

iii.     As a result, Defendants restated Digital Turbine's pro-forma revenue for Q3 2021 to $163.3 million, overstating the Company's originally reported pro-forma revenue of $271.5 million for Q3 2021 by $108.2 million, or 66.3%.

iv.     As a result, Defendants restated Digital Turbine's pro forma year-over-year revenue growth for Q3 2022 to 33%, from the Company's originally reported pro forma year-over-year revenue growth of 38%.

v.     As a result, Defendants restated Digital Turbine's net revenue attributable to AdColony for Q3 2022 to $58.4 million, overstating the Company's originally reported net revenues attributable to AdColony of $94.3 million by $35.9 million, or 61.5%.

vi.     As a result, Defendants restated Digital Turbine's net revenue attributable to Fyber for Q3 2022 to $30.7 million, overstating the Company's originally reported net revenues attributable to Fyber of $157.4 million by $126.7 million, or 412.7%.

vii.     As a result of Defendants restating the net revenue attributable to AdColony and Fyber, the "In-App Media" revenue of $251.7 million as reported in the February 8, 2022 earnings release was false, and was actually between $83.2 million and $89.1 million, depending on the amount of restated intercompany eliminations of $5.9 million should be included in determining total restated "In-App Media" revenue.

viii.     As a result of Defendants restating Digital Turbine's pro forma revenue for Q3 2021 and Q3 2022, the In-App Media revenue growth of 40% in the February 8, 2022 earnings release was false, and was actually at most 27%.

ix.     As a result of Defendants restating the net revenue attributable to AdColony in both Q2 2022 and Q3 2022, the reported sequential growth for AdColony of 53%

was false, and was actually 43.8%.,

x.      As a result of Defendants restating the net revenue attributable to

AdColony and Fyber, the pro forma revenue growth for Q3 2022 of 28% for AdColony and 48%

for Fyber, as well as Defendant Stone and Garrison's comments on the growth of AdColony and

Fyber for the quarter were materially misstated.

164.    The Q3 2022 10-Q also stated under Item 4. Controls and Procedures:

**Evaluation of Disclosure Controls and Procedures**

Under the supervision of and with the participation of our management, including
our Chief Executive Officer, who is our principal executive officer, and our Chief
Financial Officer, who is our principal financial officer, we conducted an
evaluation of the effectiveness of our disclosure controls and procedures as of the
end of the period covered by this Report. The term "disclosure controls and
procedures," as set forth in Rules 13a-15(e) and 15d-15(e) under the Exchange
Act, means controls and other procedures of a company that are designed to
ensure that information required to be disclosed by a company in the reports that
it files or submits under the Exchange Act is recorded, processed, summarized,
and reported within the time periods specified in the SEC's rules and forms.
Disclosure controls and procedures include, without limitation, controls and
procedures designed to ensure that information required to be disclosed by a
company in the reports that it files or submits under the Exchange Act is
accumulated and communicated to the company's management, including its
principal executive and principal financial officers, as appropriate to allow timely
decisions regarding required disclosures. Management recognizes that any
controls and procedures, no matter how well designed and operated, can provide
only reasonable assurance of achieving their objectives and management
necessarily applies its judgment in evaluating the cost-benefit relationship of
possible controls and procedures. ***Based on the evaluation of our disclosure
controls and procedures as of the end of the period covered by this Report, our
Chief Executive Officer and Chief Financial Officer concluded that, as of such
date, our disclosure controls and procedures were effective.***

165.    Attached as Exhibits 32.1 and 32.2 to Digital Turbine's Q3 2022 10-Q were the

SOX 906 Certifications, signed by Defendants Stone and Garrison, which certified, "to such

officer's knowledge," that: "The Quarterly Report on Form 10-Q for the period ending

December 31, 2021 of the Company (the "Form 10-Q") fully complies with the requirements of

Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and ***the information contained in***

*the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company*."

166.    The foregoing statements emphasized in ¶¶164-165 were materially false and/or misleading for the same reasons as stated above in ¶163.  In addition, the statements in ¶¶164-165 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because they failed to disclose the following adverse facts:

a.    That, as Defendants later admitted in connection with the Company's Restatement, Digital Turbine's internal controls over financial reporting were not effective as of the time these statements were issued and a material weakness existed in the Company's internal controls over financial reporting.

b.    That, as Defendants later admitted in connection with the Company's Restatement, "management determined the Company acted as an agent, rather than as a principal, in certain product lines of the recently acquired businesses [AdColony and Fyber] and, as a result, revenue for those product lines should have been reported net of license fees and revenue share expense."

c.    That Defendants' failures to report certain product lines of AdColony and Fyber on a net basis caused material misstatements in Digital Turbine's financial results, including the misstatements identified in ¶163.

## VI.    ADDITIONAL SCIENTER AND CORPORATE SCIENTER ALLEGATIONS

167.    As alleged herein, Defendants acted with scienter because Defendants knew or at the very least, recklessly disregarded the fact that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that

such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

168.    As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Digital Turbine, their control over, and/or receipt and/or modification of Digital Turbine's allegedly materially misleading misstatements and omissions and/or their associations with the Company which made them privy to confidential proprietary information concerning Digital Turbine, participated in the fraudulent scheme alleged herein.

169.    The fraudulent scheme at issue lasted for several fiscal quarters and fundamentally inflated the revenues of the Company.  The successful execution of this scheme required systematic coordination and top-down command and control, which could not be done without the knowledge and approval of the Company's highest ranking executives.  Indeed, the significance of the corporate actions required to participate in this scheme could not have been accomplished by low-level employees acting alone.

A.    **The Individual Defendants Were Motivated To Misrepresent The Fyber And AdColony Acquisitions To Increase Their Compensation**

170.    Defendants' scienter is further evidenced by the Class Period transactions in Digital Turbine stock by Individual Defendant William Stone and former Chief Technology Officer Christine Collins, which were suspicious in both timing and amount, permitting them to accumulate more than *$6 million* total in ill-gotten proceeds.  The sales are summarized in the following chart:

| Filer Name | Transaction | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| **William Gordon Stone III** | 3/2/2022 | $46.87 | 20,271 | $950,102 |
| Chief Executive Officer | 3/2/2022 | $46.03 | 50,000 | $2,301,500 |
| | | | **70,271** | **$3,251,602** |
| | | | | |
| **Christine Collins** | 6/15/2021 | $70.02 | 40,000 | $2,800,800 |
| Former Chief Technology Officer | | | | |
| | | | | |
| **Total** | | | **110,271** | **$6,052,402** |

171.    The insider sales were also suspicious in timing.  As demonstrated above, Defendant Stone's sales occurred a mere two months before the May 17, 2022 announcement that Digital Turbine would be restating its financial statements for the interim periods ended June 30, 2021, September 30, 2021, and December 31, 2021, when Digital Turbine's stock was trading at artificially high prices.  Likewise, Collins' sales occurred when Digital Turbine's shares were trading at a near-Class Period high of $70.02.  Additionally, none of these transactions were made pursuant to a Rule 10b5-1 Trading Plan.  The suspiciousness of the insider stock sales raises a strong inference that these insiders were aware of Digital Turbine's need to restate its financial statements when they sold their shares and used that information in connection with the sales to avoid the significant losses in share value that would follow from Digital Turbine's massive stock price decline.

172.    Further, the insider sales were unusual compared to the prior trading history for Defendant Stone and Collins, neither of whom sold any Digital Turbine shares during the 12 months preceding the Class Period.  Similarly, neither have sold any Digital Turbine shares since the end of the Class Period.  The absence of trades before and after the Class Period, when Digital Turbine's shares were ***not*** trading at artificially high values as a result of Defendants'

false and misleading statements and omissions, further raises a strong inference that these Company insiders were acutely aware of Digital Turbine's need to restate its financial statements when executing their respective stock sales.

**B.    The Individual Defendants Were Motivated To Misrepresent The Fyber And AdColony Acquisitions To Increase Their Compensation**

173.    During the Class Period, the Individual Defendants were motivated to make optimistic false and misleading statements and omissions about the Company's business, operations, and prospects by Digital Turbine's performance-based executive compensation plan. Digital Turbine's executive compensation plan had three main components: base salary, an annual bonus structure, and long-term equity compensation.

174.    Digital Turbine's 2022 executive compensation was described in its 2022 Proxy Statement, filed on Form DEF 14A on July 15, 2022 ("2022 Proxy Statement").  The 2022 Proxy Statement was incorporated by reference into Digital Turbine's Form 10-K for the fiscal year for the time period ended March 31, 2022.

175.    Under the plan, performance bonuses for executives were based in part on "fees and expenses related to acquisitions."  According to the 2022 Proxy Statement, for the fiscal year for the time period ended March 31, 2022, Defendants Stone and Garrison's "performance goals *were inclusive of the Company's acquisitions of Fyber N.V. and AdColony Holding AS during the first quarter of fiscal 2022*."  Notably, as stated in the 2022 Proxy Statement, the Company did not account for the need to restate its financials when determining the Individual Defendants' executive compensation.  In the 2022 Proxy Statement, Digital Turbine specifically stated that "[a]chievement of the revenue goal was measured on a gross basis rather than a net basis *despite the restatement of fiscal year 2022 quarterly results* (as a result of net basis reporting of revenues for certain Fyber and AdColony revenue streams) due to the need to utilize consistency

in methodology in assessing achievement of performance goals and due to the benign nature of the restatement." Thus, Defendants Stone and Garrison were motivated by the Company's executive compensation plan account for the entirety of AdColony's revenues on a gross basis without regard to the nature of the revenue, in a departure from GAAP, from the time of the acquisitions, in order to maximize the return on their performance bonuses.

176.    For their efforts during the fiscal year for the time period ended March 31, 2022, the Individual Defendants were paid handsomely. Stone was paid a performance bonus of $134,000 on top of his $575,000 base salary, and Garrison was paid a performance bonus of $64,000 on top of his $365,000 base salary.

177.    Digital Turbine's performance-based executive compensation plan, which directly tied a portion of the Individual Defendants' compensation to "fees and expenses related to acquisitions," thus provides further indicia of scienter.

### C.    Further Allegations That Support A Strong Inference Of Scienter

#### 1.    The Magnitude, Importance And Duration Of The Fraud Supports A Finding Of Scienter

178.    The magnitude of Defendants' over-statement of revenue and the subsequent Restatement contributes to a strong inference of scienter. As detailed in ¶¶63-65, *supra*, Defendants' accounting misstatements over-stated Digital Turbine's reported revenue by 34.5% to 73.2% during the Class Period.

#### 2.    The Individual Defendants Signed Sarbanes-Oxley Certifications Attesting That They Personally Supervised Digital Turbine's Controls And Procedures

179.    The Individual Defendants SOX certifications also contribute to a strong inference of scienter. In addition to the SOX 906 Certifications detailed in ¶¶129, 142, and 165, *supra*, Defendants Stone and Garrison certified the accuracy of each of the Q1-Q3 2022 10-Qs,

in accordance with Section 302 of the Sarbanes-Oxley Act of 2002, including that they were responsible for establishing and maintaining the Company's disclosure controls and procedures and had:

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]

180.    Moreover, Digital Turbine's many misleading Form 10-Q and 10-K reports were always followed by earnings calls during which each of the Individual Defendants described the favorable, but inaccurate, financial results (several examples of such calls are set forth herein).

### D.    Corporate Scienter Allegations

181.    The Company is liable for the acts of the Individual Defendants and its other employees and agents under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

182.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

183.    Aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Digital Turbine as an entity.  Corporate scienter may be alleged independent of individual defendants where a statement is made or approved by a corporate official sufficiently knowledgeable about the company to know the statement was false or misleading.  Here, the statements alleged were made to the investing public regarding the Company's revenue, revenue growth, recent acquisitions and their contribution to Digital Turbine's revenue growth, and internal controls—all important topics that would necessarily

require approval by appropriate corporate officers.

## VII.    LOSS CAUSATION

184.    The markets for Digital Turbine's common stock was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, the Individual Defendants made false and misleading statements and omissions and engaged in a scheme to deceive the market that artificially inflated the price of Digital Turbine's publicly-traded securities.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

185.    During the Class Period, Plaintiffs and the Class purchased Digital Turbine securities at artificially inflated prices and were damaged thereby.  Accordingly, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

186.    Artificial inflation in APPS's stock price was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions was partially revealed to the public on May 17, 2022 and May 31, 2022.  As a direct result of these partial disclosures, the price of Digital Turbine's publicly traded securities declined precipitously on heavy trading volume, causing economic injury to Plaintiffs and other members of the Class.

187.    On May 17, 2022, after the market closed, Digital Turbine disclosed that it would restate its financial statements for the periods ended June 30, 2021, September 30, 2021, and December 31, 2021.  Specifically, the press release stated:

> The revenue for certain product lines of the recently acquired businesses, which are separate reportable segments, will now be reported net of license fees and revenue share, rather than on a gross basis, as had been previously reported. The changes have the offsetting effect of decreasing both revenue and license fees and

revenue share in a like amount, while simultaneously increasing reported gross profit margin and Non-GAAP Adjusted EBITDA margin, in the interim financial statements for each relevant period.

188.    Digital Turbine also filed a Form 8-K with the SEC on May 17, 2022 after the close of market, providing further explanation into Defendants' decision to restate its financial results for the first three quarters of FY 2022:

> In connection with the integration of the Company's recently acquired businesses (AdColony Holding AS and Fyber N.V. (the "Acquired Companies")), management performed a review of the presentation of revenues and license fees and revenue share based on the accounting guidance for revenue recognition, including considerations of principal and agent (or "gross and net") presentation. After a detailed review of the Acquired Companies product lines and related contracts with customers and publishers, the Company concluded that each Acquired Company acts as an agent in certain of their respective product lines and, as a result, the revenues for those product lines should be reported net of license fees and revenue share. Previously, all revenues of the Acquired Companies, which are reported as separate segments referred to as In App Media – AdColony and In App Media – Fyber, respectively, were reported on a gross basis.

> Previously, the Company's revenues were reported as approximately $212.6 million for the three-month period ended June 30, 2021, $310.2 million for the three-month period ended September 30, 2021, and $375.5 million for the three-month period ended December 31, 2021. Based on its preliminary assessment, the Company expects that revenue on a net basis will be reported as approximately $158.1 million for the three-month period ended June 30, 2021, $188.6 million for the three-month period ended September 30, 2021, and $216.8 million for the three-month period ended December 31, 2021.

189.    The May 17, 2022 Form 8-K further stated that "the Company's disclosure controls and procedures were not effective at June 30, 2021, September 30, 2021, and December 31, 2021."

190.    Following this news, the Company's shares fell $1.93, or 7.1%, to close at $25.28 per share on May 18, 2022, on unusually heavy trading volume.

191.    On May 31, 2022, after the close of market, Digital Turbine announced its financial results for the fourth quarter and full fiscal year of 2022.  This earnings release was also

attached as exhibit 99.1 to a Form 8-K filed with the SEC on May 31, 2022, after the close of market. The May 31, 2022, earnings release reported disappointing Q4 2022 revenue and growth figures, announcing that revenue for the quarter "totaled $184.1 million, representing a 94% increase year-over-year on an as-reported basis and a 19% increase year-over-year as compared to the comparable pro forma figure for the fiscal fourth quarter of 2021."

192.    The May 31, 2022 earnings release also reported Q4 2022 revenues specifically attributable to AdColony of $40.4 million and Fyber of $29.2 million. In addition, the May 31, 2022 announcement revealed to the market AdColony's low historic growth rate, reporting 2% YoY growth for Q4 2022, but also effectively restated the reported net revenues of AdColony and Fyber for Q4 2021, reporting Q4 2021 pro forma revenue of $39.4 million for AdColony and $20.3 million for Fyber.

193.    On this news, Digital Turbine's shares fell $5.75, or 22.61%, to close at $19.68 per share on June 1, 2022, on unusually heavy trading volume.

194.    Each disclosure of adverse facts which removed inflation from Digital Turbine's stock price was connected to Defendants' false and misleading statements and omissions and fraudulent conduct alleged herein. The timing and magnitude of Digital Turbine's stock price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. As a direct result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock price, Plaintiffs and other Class members have suffered significant losses and damages.

## VIII.  CLASS ACTION ALLEGATIONS

195.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that

purchased or otherwise acquired Digital Turbine securities between February 26, 2021 and May 31, 2022, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

196. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Digital Turbine's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Over one billion Digital Turbine shares were traded publicly during the Class Period on the NASDAQ. As of May 24, 2022, Digital Turbine had 98,394,091 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Digital Turbine or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

197. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

198. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

199. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Digital Turbine;

c.      whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d.      whether Defendants engaged in a scheme to defraud investors;

e.      whether the price of Digital Turbine securities were artificially inflated because of Defendants' conduct complained of herein; and

f.      to what extent the members of the Class have sustained damages and the proper measure of damages.

200.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

201.    The market for Digital Turbine's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Digital Turbine's securities traded at artificially inflated prices during the Class Period.  On November 1, 2021, the Company's share price closed at a Class Period high of $91.40 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Digital

Turbine's securities and market information relating to Digital Turbine, and have been damaged thereby.

202.    During the Class Period, the artificial inflation of Digital Turbine's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements and omissions about Digital Turbine's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Digital Turbine and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements and omissions during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

203.    At all relevant times, the market for Digital Turbine's securities was an efficient market for the following reasons, among others:

a.    Digital Turbine shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.    As a regulated issuer, Digital Turbine filed periodic public reports with the SEC and/or the NASDAQ;

c.    Digital Turbine regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-

ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

       d.    Digital Turbine was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and/or

       e.    The average daily trading volume for Digital Turbine's securities during the Class Period was approximately 3.476 million shares with more than 98.39 million shares of stock outstanding as of May 24, 2022 and a market capitalization reaching over $8.78 billion during the Class Period.

       204.    As a result of the foregoing, the market for Digital Turbine's securities promptly digested current information regarding Digital Turbine from all publicly available sources and reflected such information in Digital Turbine's share price. Under these circumstances, all purchasers of Digital Turbine's securities during the Class Period suffered similar injury through their purchase of Digital Turbine's securities at artificially inflated prices and a presumption of reliance applies.

       205.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the

sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

206.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

207.    The statements and omissions alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

208.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Digital Turbine who knew that the statement was false when made.

## XI.    CLAIMS FOR RELIEF

### FIRST CLAIM

#### Violation of Section 10(b) of The Exchange Act and
#### Rule 10b-5 Promulgated Thereunder
#### Against All Defendants

209.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

210.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Digital Turbine's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

211.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Digital Turbine's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

212.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Digital Turbine's financial well-being and prospects, as specified herein.

213.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Digital Turbine's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Digital Turbine and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

214.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

215.    Defendants had actual knowledge of the misrepresentations and/or omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Digital Turbine's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

216.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Digital Turbine's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Digital Turbine's securities during the Class Period at artificially high prices and were damaged thereby.

217.     At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems

that Digital Turbine was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Digital Turbine securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

218.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

219.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

220.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

221.    Individual Defendants acted as controlling persons of Digital Turbine within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements

were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

222.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

223.    As set forth above, Digital Turbine and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Awarding equitable, injunctive, and other relief as the Court may deem just and proper.

## XIII.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: February 17, 2023

By:   *Pavithra Rajesh*

**GLANCY PRONGAY & MURRAY LLP**
Kara M. Wolke
Leanne H. Solish
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: kwolke@glancylaw.com
       lsolish@glancylaw.com
       prajesh@glancylaw.com

*Counsel for Plaintiffs and*
*Lead Counsel for the Class*

**AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING P.C.**
Sammy Ford IV
State Bar No. 24061331
Jordan Warshauer
State Bar No. 24086613
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Telephone: (713) 665-1101
Facsimile: (713) 665-0062
Email: sford@azalaw.com
       jwarshauer@azalaw.com

*Liaison Counsel for Plaintiffs and Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Jonah H. Goldstein
Eric I. Niehaus
Joseph J. Tull
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  (619) 231-1058
Facsimile:  (619) 231-7423
Email: jonahg@rgrdlaw.com
       ericn@rgrdlaw.com
       jtull@rgrdlaw.com

*Additional Counsel*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel for Plaintiff Jay Robison*

## **CERTIFICATE OF SERVICE**

        I hereby certify that on February 17, 2023, I electronically filed a true and correct copy the foregoing document with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.

                                     */s/ Pavithra Rajesh*
                                     Pavithra Rajesh