**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| IN RE DIGITAL TURBINE, INC. SECURITIES LITIGATION | No. 1:22-cv-00550-DAE |
| | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND .......................................................................... 3

   A.  Digital Turbine And Its Rapid Strategic Expansion In The Mobile Advertising
       Industry ............................................................................................. 3

   B.  Digital Turbine's Acquisition Of AdColony And Fyber Catapult The Company's
       Revenue Growth ................................................................................ 4

   C.  Digital Turbine Announces That Its Remarkable Revenue And Growth Figures
       Were Materially Overstated ............................................................. 6

       1.  Digital Turbine Announces The Need To Restate Its Previously Reported
           Revenue For The Three Quarters Of Financial Results Following The
           AdColony and Fyber Acquisitions .............................................. 6

       2.  In Connection With The Restatement, Digital Turbine Admits That It
           Improperly Accounted For The Acquired Companies' Revenues In
           Contravention To GAAP .......................................................... 7

   D.  Digital Turbine Announces Its Q4 2022 Financial Results, And Restates AdColony
       and Fyber's Previously Reported Revenue For Q4 2021 ................... 9

III.  APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION ......... 10

IV.  PLAINTIFFS ADEQUATELY ALLEGE MATERIAL MISREPRESENTATIONS ..... 11

   A.  The Vast Majority Of Defendants' Statements Were Admittedly Materially False
       And Misleading ................................................................................ 11

   B.  AdColony And Fyber's Pre-Acquisition Financial Results Were Also Admittedly
       Materially False And Misleading ...................................................... 13

   C.  Statements About The Acquisitions Find No Refuge In The PSLRA Safe Harbor
       Or The Bespeaks Caution Doctrine .................................................. 14

   D.  Statements About The Acquisitions Are Not Immaterial Puffery ....... 15

V.  PLAINTIFFS ADEQUATELY ALLEGE A STRONG INFERENCE OF
    SCIENTER ....................................................................................................... 16

   A.  AdColony's Application Of Principal-Gross/Agent-Net Revenue Accounting
       Supports A Strong Inference Of Scienter ........................................ 17

   B.  The Facts And Circumstances Of The Restatement Supports Scienter ....... 19

1.   The Magnitude Of The Restatement Supports A Strong Inference Of Scienter ...................................................................................... 20

2.   The Nature And Context Of The Violated Accounting Principle Supports Scienter ...................................................................................... 22

C.   Plaintiffs' Motive Allegations Further Support An Inference Of Scienter........... 24

1.   Defendants' Insider Transactions Evidence Scienter .............................. 24

2.   Defendants' Compensation Packages Evidence Scienter ........................ 27

D.   Additional Factors Bolster The Already Strong Inference Of Scienter ................ 27

E.   Scienter Has Been Pled As To Digital Turbine ..................................................... 29

F.   Defendants Do Not Provide A More Compelling Non-Culpable Inference ......... 30

VI.   PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION .................................... 31

A.   The May 31, 2022 Corrective Disclosure Is Causally Connected to Plaintiffs' Theory of Fraud ..................................................................................................... 32

B.   Both Corrective Disclosures Are Causally Connected to Pre-Acquisition Statements About AdColony and Fyber .............................................................. 34

VII.   PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON CLAIMS ................... 35

VIII.   CONCLUSION .............................................................................................................. 35

## **TABLE OF AUTHORITIES**

CASES

*ABC Arbitrage v. Tchuruk,*
   291 F.3d 336 (5th Cir. 2002) ........................................................................................ 18

*Abrams v. Baker Hughes Inc.,*
   292 F.3d 424 (5th Cir. 2002) ........................................................................................ 27

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...................................................................................................... 10

*Barrie v. Intervoice-Brite, Inc.,*
   397 F.3d 249 (5th Cir. 2005) ........................................................................................ 24

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) ...................................................................................................... 11

*Berger v. Compaq Computer Corp.,*
   1999 WL 33620108 (S.D. Tex. Dec. 22, 1999) ............................................................ 14

*Brody v. Zix Corp.,*
   2006 WL 2739352 (N.D. Tex. Sept. 26, 2006) ............................................................ 26

*Browning v. Amyris, Inc.,*
   2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) .............................................................. 26

*Budde v. Glob. Power Equip. Grp., Inc.,*
   2017 WL 6621540 (N.D. Tex. Dec. 27, 2017) ............................................................. 30

*Callinan v. Lexicon Pharms., Inc.,*
   479 F. Supp. 3d 379 (S.D. Tex. 2020) ........................................................................... 1

*Carlton v. Cannon,*
   184 F. Supp. 3d 428 (S.D. Tex. 2016) ......................................................................... 28

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,*
   497 F.3d 546 (5th Cir. 2007) ........................................................................... 20, 25, 26

*Chalverus v. Pegasystems, Inc.,*
   59 F. Supp. 2d 226 (D. Mass. 1999) ............................................................................ 20

*City of Pontiac Gen. Emps.' Ret. Sys. v. Asar,*
   2016 WL 1322484 (W.D. Tex. Apr. 1, 2016) ............................................................... 21

*Congregation of Ezra Sholom v. Blockbuster, Inc.,*
   504 F. Supp. 2d 151 (N.D. Tex. 2007) ........................................................................ 25

*Flaherty & Crumrine Preferred Income Fund Inv. v. TXU Corp.*,
565 F.3d 200 (5th Cir. 2009) ................................................................... 24

*In re Aetna Inc. Sec. Litig.*,
34 F. Supp. 2d 935 (E.D. Pa. 1999) .......................................................... 18

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ........................................................ 22

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010)............................................... *passim*

*In re Baan Co. Sec. Litig.*,
103 F. Supp. 2d 1 (D.D.C. 2000) ............................................................... 23

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ................................................. 18, 29

*In re Computer Assoc. Class Action Sec. Litig.*,
75 F. Supp. 2d 68 (E.D.N.Y. 1999) ........................................................... 16

*In re Concho Res. Inc.*,
2023 WL 2297425 (S.D. Tex. Feb. 23, 2023) ............................... 13, 14, 15

*In re Dell Inc., Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008)................................................. 25, 27

*In re El Paso Elec. Co. Sec. Litig.*,
2004 WL 377555 (W.D. Tex. Feb. 23, 2004)............................................. 25

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ...................................................... 14

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
762 F. Supp. 2d 942 (W.D. Tex. 2010).................................................. 11, 13

*In re Fleming Cos. Inc. Sec. & Deriv. Litig.*,
2004 WL 5278716 (E.D. Tex. June 10, 2004)......................... 17, 18, 20, 31

*In re Integrated Elec. Servs., Inc. Sec. Litig.*,
2006 WL 54021 (S.D. Tex. Jan. 10, 2006)................................................ 21

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) .................................................. 22, 23

*In re Sec. Litig. BMC Software, Inc.*,
183 F. Supp. 2d 860 (S.D. Tex. 2001) ...................................................... 26

*In re Seitel, Inc. Sec. Litig.*,
    447 F. Supp. 2d 693 (S.D. Tex. 2006) ...................................................................... 20

*In re Triton Energy Ltd. Sec. Litig.*,
    2001 WL 872019 (E.D. Tex. Mar. 30, 2001) ........................................................... 20

*In re Venator Materials PLC Sec. Litig.*,
    547 F. Supp. 3d 624 (S.D. Tex. 2021) ...................................................................... 14

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) ............................................................................... 9, 28

*Isquith v. Middle S. Utils., Inc.*,
    847 F.2d 186 (5th Cir. 1988) ................................................................................. 11

*Izadjoo v. Helix Energy Sols. Grp., Inc.*,
    237 F. Supp. 3d 492 (S.D. Tex. 2017) ...................................................................... 30

*Kaltman v. Key Energy Servs., Inc.*,
    447 F. Supp. 2d 648 (W.D. Tex. 2006) ......................................................... 11, 13, 20

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
    810 F.3d 951 (5th Cir. 2016) ...................................................................... 24, 25, 26

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ........................................................................... *passim*

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ................................................................................. 29

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)................................................................................................ 10

*McNamara v. Bre-X Minerals Ltd.*,
    197 F. Supp. 2d 622 (E.D. Tex. 2001).................................................................... 11

*Mendi Yoshikawa v. Exxon Mobil Corp.*,
    2022 WL 4677621 (N.D. Tex. Sept. 29, 2022)........................................................ 25

*Mun. Emps.' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*,
    935 F.3d 424 (5th Cir. 2019) ................................................................................. 27

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
    929 F. Supp. 2d 740 (M.D. Tenn. 2013)................................................................. 21

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) ................................................................................. 27

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) ................................................................. 21

*Norfolk Cnty. Ret. Sys. v. Ustian*,
    2009 WL 2386156 (N.D. Ill. July 28, 2009)............................................. 21

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023) ..................................................... 14, 15, 28

*Parmelee v. Santander Consumer USA Holdings, Inc.*,
    2018 WL 276338 (N.D. Tex. Jan. 3, 2018) ........................... 22, 31, 33, 35

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) ............................................................ 18, 28

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ............................................................ 31, 33

*R2 Invs. LDC v. Phillips*,
    401 F.3d 638 (5th Cir. 2005) ................................................................. 24

*Ramirez v. Exxon Mobil Corp.*,
    334 F. Supp. 3d 832 (N.D. Tex. 2018) ............................................. 10, 32

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ................................................................... 26

*Schott v. Nobilis Health Corp.*,
    211 F. Supp. 3d 936 (S.D. Tex. 2016) ......................................... 31, 32, 33

*Singh v. 21Vianet Grp., Inc.*,
    2017 WL 4322483 (E.D. Tex. Sept. 13, 2017) ....................................... 17

*Smith v. Reg'l Transit Auth.*,
    756 F.3d 340 (5th Cir. 2014) ............................................................. 9, 10

*Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*,
    365 F.3d 353 (5th Cir. 2004) ............................................................ 24, 27

*Spitzberg v. Houston Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) ..................................................... 14, 16, 17

*Stone v. Life Partners Holdings, Inc.*,
    26 F. Supp. 3d 575 (W.D. Tex. 2014)..................................................... 16

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)................................................................... 29

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)......................................................................... 9, 11, 16, 17

*Tuchman v. DSC Commc'ns Corp.*,
  14 F.3d 1061 (5th Cir. 1994) ......................................................................... 27

*U.S. ex rel. Adrian v. Regents of the Univ. of Cal.*,
  363 F.3d 398 (5th Cir. 2004) ......................................................................... 35

RULES

Fed. R. Civ. P. 15............................................................................................ 35

REGULATIONS

17 C.F.R. § 240.10b-5(b) ................................................................................ 11

Lead Plaintiff Howard J. Burch, along with plaintiff Jay Robison (collectively "Plaintiffs"), respectfully submit this opposition to Defendants'[1] motion to dismiss (Dkt. No. 44, the "Motion")[2] the Consolidated Amended Class Action Complaint (Dkt. No. 38, the "Complaint").

## I.    INTRODUCTION

Plaintiffs more than adequately plead violations of the federal securities laws resulting from Digital Turbine's admitted massive overstatement of revenue from two recently acquired companies, AdColony and Fyber, that Defendants repeatedly stressed were "the key" to "driving new revenue growth" and cause Digital Turbine to earn "over $1 billion of annualized revenue."

To begin, by virtue of the Company's May 27, 2022 Restatement filed with the SEC, Defendants concede the falsity of the vast majority of their Class Period (February 26, 2021 to May 31, 2022) statements.  Defendants are left with the hollow defense that the alleged misstatements could not be made with the requisite scienter because they: (i) somehow did not discover the improper accounting treatment prior to closing the acquisitions that would catapult Digital Turbine to over $1 billion dollars in revenue; and (ii) waited more than nine months post-acquisition to undertake a comprehensive review of revenue accounting.  The well-pled allegations of the Complaint demonstrate that Defendants' excuses are simply not believable.

The relevant accounting rule regarding how Digital Turbine reported AdColony's and Fyber's revenues from contracts with customers that involve third parties is straightforward: U.S.

---

[1] Defendants are Digital Turbine, Inc. ("Digital Turbine" or the "Company"), CEO William Stone ("Stone"), and CFO Barrett Garrison ("Garrison").

[2] Citations to the Motion are "Mot. __," citations to the exhibits attached to the Declaration of Michael J. Biles (Dkt. No. 45) are "Mot. Ex. __," and citations to the Complaint are "¶__." Unless otherwise noted, alterations, citations, and quotations are omitted and emphasis is added.  Plaintiffs do not oppose the multitude of exhibits submitted in support of the Motion to the extent they are considered "for the purpose of determining the statements they contain; not for proving the truth of their contents." *Callinan v. Lexicon Pharms., Inc.*, 479 F. Supp. 3d 379, 399 (S.D. Tex. 2020).

generally accepted accounting principles ("GAAP") provides that when recognizing revenue from a contract with customers that involves a third party, a company must determine whether it is acting as the principal in the transaction or as an agent of a third party.  If acting as a principal, the company reports all of the funds received as top-line revenue and reports associated costs separately.  If the company is acting as an agent, it reports as revenue only the amount from the transaction that it keeps, net of funds passed through to the other party.  Under the first scenario, a company can report significantly higher revenue than under the second.

For the first three quarters after closing on the acquisitions, Digital Turbine improperly reported all of the revenue from AdColony and Fyber on a gross basis.  Defendants' only purported excuse for this error was that it was an accounting mistake, which took 12 months to identify and correct.  The well-pled facts of the Complaint refute this explanation and demonstrate that Defendants must have known, or were severely reckless in not knowing, that Digital Turbine was improperly and materially overstating its revenues.

Indeed, it is inconceivable that Digital Turbine would acquire a company without first performing due diligence to confirm how a target company makes and reports revenue, particularly when revenue was the "key rationale" for the acquisitions.  It is likewise inconceivable that the revenue recognition policy would go unnoticed during a "preliminary review" of an acquired company's accounting policies.  But that is what Defendants would have the Court believe.  Had Defendants actually undertaken such a review, they would have learned of the appropriate principal-gross/agent-net revenue accounting, because AdColony, in accordance with GAAP, applied it prior to its acquisition.  ¶90.  Instead, Digital Turbine chose to abandon, or recklessly disregarded, the proper accounting in order to report massive revenue in the first three quarters following the acquisitions, in line with the promised "over $1 billion in annualized revenues," and

highlighting revenue growth that topped 300%.  In May 2022, after Digital Turbine restated its financial results due to the improper recording of the Acquired Companies' revenues on a gross basis, the Company reported much more modest revenue, and the related growth figures were in line with what Digital Turbine had been reporting prior to the acquisitions.

Defendants challenge the adequacy of the Complaint's pleading of a small handful of statements as false, scienter, and loss causation.  These facts, along with the additional allegations in the Complaint, give rise to the requisite inference that the challenged statements were false and/or misleading, were made with scienter, and that they caused Plaintiffs and the other members of the putative class substantial damages.  Defendants' Motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    Digital Turbine And Its Rapid Strategic Expansion In The Mobile Advertising Industry

Digital Turbine is a mobile advertising technology company, that "through its subsidiaries, simplifies content discovery and delivers it directly to mobile devices."  ¶34.  The Company has a variety of proprietary features in the mobile advertising space.  For example, Digital Turbine's legacy onboard software preloads mobile apps during a user's initial smartphone setup process.  Another product is the Company's "single tap" installation process, which enables smartphone users to install an app on their smartphones with a single tap, rather than using the app store.  ¶35.

In the years leading up to the Class Period, Digital Turbine has reported significant growth largely due to strategic acquisitions in order to assemble a "full stack end-to-end ad tech platform."  ¶¶36-37.  During the Class Period, Defendants repeatedly highlighted the Company's accelerating growth and, specifically, its revenue growth.  For example, during a May 2021 investor presentation, Digital Turbine displayed a dramatic increase in revenue during the 2021 fiscal year,[3]

---

[3] Digital Turbine's fiscal year ("FY") ends on March 31.  References to a fiscal year, *i.e.*, FY 2022,

amounting to 142% year-over-year ("YOY") revenue growth.  ¶¶36-37.

**B.    Digital Turbine's Acquisition Of AdColony And Fyber Catapult The Company's Revenue Growth**

On the first day of the Class Period, February 26, 2021, Digital Turbine announced that it would acquire AdColony for between $350 million and $375 million.  The acquisition of AdColony was completed on April 29, 2021.  ¶40.  In the 2021 10-K, Digital Turbine described AdColony as a "leading mobile advertising platform servicing advertisers and publishers with a reach of more than 1.5 billion monthly global users.  AdColony's proprietary video technologies and rich media formats are widely viewed as a best-in-class technology delivering third-party verified viewability rates for well-known global brands."  ¶41.

On March 22, 2021, Digital Turbine announced that it would acquire 95% of Fyber for almost $600 million.  The Fyber acquisition closed on May 25, 2021.  ¶43.  Digital Turbine described Fyber in its 2021 10-K as "a leading mobile advertising monetization platform empowering global app developers to optimize profitability through quality advertising.  Fyber's proprietary technology platform and expertise in mediation, real-time bidding, advanced analytics tools, and video combine to deliver publishers and advertisers a highly valuable app monetization solution."  ¶44.  In announcing the completion of the Fyber acquisition, Stone explained that: "Combined with our recently completed AdColony and Appreciate acquisitions, Fyber represents a very important puzzle piece for Digital Turbine in its mission to develop one of the largest full-stack, fully-independent, mobile advertising solutions in the industry.  The combined platform offering is already generating more than $1 billion in annualized revenue[.]"  ¶112; *see also* ¶45.

The acquisitions of AdColony and Fyber (together, the "Acquired Companies") were

---

mean the fiscal year ending March 31 of that year (FY 2022 runs from April 1, 2021 to March 31, 2022).  References to Q1 2022, for example, refers to the quarter ended June 30, 2021.  ¶5, n.1.

expected to accelerate Digital Turbine's revenues and revenue growth (¶¶46-49), with Garrison stating that "the key rationale of our new acquisitions is based on driving new revenue growth[.]" ¶47. Following the announcements of each of the Acquired Companies, analysts raised their price targets for Digital Turbine, and commented that the combined company was expected to generate yearly revenue of over $1 billion. ¶¶46, 47. Stone confirmed that Digital Turbine's annualized revenue was expected to top $1 billion (¶48), and explained that Digital Turbine's future revenue growth would be from the recent acquisitions. ¶49.

For Q1-Q3 2022, the Acquired Companies' additions to Digital Turbine's revenue growth held true—Digital Turbine reported impressive quarterly net revenue and YOY growth (¶50):

|  | Reported Net Revenue | Pro Forma Net Revenue | YOY Growth % (As-Reported) |
|---|---|---|---|
| Q1 2022 | $212.6 million | $292.0 million | 264.3% |
| Q2 2022 | $310.2 million | (Same) | 337.6% |
| Q3 2022 | $375.5 million | (Same) | 323.8% |

Digital Turbine also reported impressive revenue and growth figures for the Acquired Companies themselves. ¶51.

The reported results were well-received by analysts. For example, Oppenheimer noted that Digital Turbine's Q1 2022 results, announced on August 9, 2021, exceeded its expectations and guidance, focusing on revenue growth, "led by Fyber +198%, 'Classic Apps' +93%, then AdColony +46%." ¶53. After the November 2, 2021 announcement of Digital Turbine's Q2 2022 results, Maxim Group commented that revenues of $310.2 million beat their estimates. ¶54. Digital Turbine reported its Q3 2022 results on February 8, 2022, providing a stellar revenue estimate of $1.225-$1.240 billion for FY 2022, and implying Q4 2022 revenue of $326.7-$341.7 million. ¶55. Garrison noted that their projection had FY 2022 revenues "growing over 50% year-over-year." *Id.* Macquarie Research noted that Digital Turbine's Q3 3022 revenue of $375 million

was above their $355 million estimate.  ¶56.

> **C.**  **Digital Turbine Announces That Its Remarkable Revenue And Growth Figures Were Materially Overstated**
>
> > **1.**  **Digital Turbine Announces The Need To Restate Its Previously Reported Revenue For The Three Quarters Of Financial Results Following The AdColony and Fyber Acquisitions**

On May 17, 2022, after the close of market, and more than one year after Digital Turbine closed on the AdColony and Fyber acquisitions, the Company announced that it had to restate its financial statements for the first three quarters of FY2022 "following a review of the presentation of revenue net of license fees and revenue share for the Company's recently acquired businesses." ¶57.  Digital Turbine announced that "revenue for certain product lines of the recently acquired businesses … will not be reported net of license fees and revenue share, rather than on a gross basis, as had been previously reported." *Id.*

Also on May 17, 2022, the Company filed a Form 8-K with the SEC, which further explained that the Acquired Companies each act as an agent in certain of their product lines and, as such, the revenues for those product lines should be reported net of license fees and revenue share.  ¶59.  The following table summarizes Digital Turbine's estimated adjustments (¶60):

|  | **As Reported Net Revenue** | **Preliminary Estimated Adjusted Net Revenue** | **Adjustment** | **% Overstated** |
|---|---|---|---|---|
| Q1 2022 | $212.6 million | $158.1 million | ($54.5 million) | 34.5% |
| Q2 2022 | $310.2 million | $188.6 million | ($121.6 million) | 64.5% |
| Q3 2022 | $375.5 million | $216.8 million | ($158.7 million) | 73.2% |

The May 17, 2022 Form 8-K also conceded that "the Company's disclosure controls and procedures were not effective at June 30, 2021, September 30, 2021, and December 31, 2021." ¶61.  On this news, Digital Turbine's share price fell $1.93, or 7.1%, to close at $25.28 per share on May 18, 2022, on unusually high trading volume.  ¶62.

On May 27, 2022, Digital Turbine issued Forms 10-Q/A for Q1-Q3 2022 (collectively, the

"Restatement"). ¶63. The Restatement confirmed Digital Turbine's estimated revenue adjustments, and, as a result, previously reported revenue growth figures decreased dramatically (¶64), and brought the revenue growth figures back into line with pre-acquisition rates (*see* ¶36):

|  | **As Reported YOY Revenue Growth** | **As Restated YOY Revenue Growth** |
| --- | --- | --- |
| Q1 2022 | 264.3% | 170.9% |
| Q2 2022 | 337.6% | 166.8% |
| Q3 2022 | 323.8% | 144.7% |

Also in connection with the Restatement, Digital Turbine's management, including Stone and Garrison, conceded that Digital Turbine's internal controls over financial reporting and disclosure controls and procedures were not effective and there existed material weaknesses in the Company's internal controls over financial reporting as of June 30, 2021, September 30, 2021, and December 31, 2021. ¶66. More specifically, Defendants determined that Digital Turbine's "internal control for business combinations did not include a control adequately designed to ensure acquiree accounting policies, as they relate to presentation and classification, were conformed to those of the Company and GAAP." ¶68. To remediate the material weaknesses, Digital Turbine stated that it planned to, among others, "[s]trengthen[] the Company's procedures for reviewing accounting policies of material acquired companies, inclusive of the accounting for revenue, through *initial reviews during the due diligence period and alignment of accounting policies prior to the first interim reporting date*[.]" ¶69.

> **2.** **In Connection With The Restatement, Digital Turbine Admits That It Improperly Accounted For The Acquired Companies' Revenues In Contravention To GAAP**

As part of Digital Turbine's May 17, 2022 Form 8-K, an explanation for the decision to restate the Company's financial results for the first three quarters of FY 2022 was given:

> In connection with the integration of the Company's recently acquired businesses (AdColony Holding AS and Fyber N.V. (the "Acquired Companies")), management performed a review of the presentation of revenues and license fees

7

and revenue share based on the accounting guidance for revenue recognition, including considerations of principal and agent (or "gross and net") presentation. After a detailed review of the Acquired Companies product lines and related contracts with customers and publishers, the Company concluded that each Acquired Company acts as an agent in certain of their respective product lines and, as a result, the revenues for those product lines should be reported net of license fees and revenue share. Previously, all revenues of the Acquired Companies, which are reported as separate segments referred to as In App Media – AdColony and In App Media – Fyber, respectively, were reported on a gross basis. (¶59).

By reporting all of the Acquired Companies' revenues on a gross basis, without consideration as to whether the companies acted as a principal or agent in their respective contracts, Defendants failed to adhere to GAAP. ¶¶77-88. The relevant GAAP authority is Topic 606-10-55-36–55-40, which provides guidance on determining whether an entity is a principal or agent in a transaction for revenue recognition purposes. ¶82. When a revenue transaction involves a third party "in providing goods or services to a customer," ASC 606-10-55-36 explains that "the entity should determine whether the nature of its promise is a performance obligation to provide the specified goods or services itself (that is, the entity is a principal) or to arrange for those goods or services to be provided by the other party (that is, the entity is an agent)." ¶82.

"An entity is a principal if it controls the specified good or service before that good or service is transferred to a customer." ¶84 (quoting ASC 606-10-55-37). "[A]n entity is an agent if the entity's performance obligation is to arrange for the provision of the specified good or service by another party[,] and "does not control the specified good or services provided by another party before that good or service is transferred to the customer." ¶85 (quoting ASC 606-10-55-38).

If the entity is considered a principal, then it recognizes revenue "in the gross amount of consideration to which it expects to be entitled in exchange for the specified good or service transferred[.]" ¶86 (quoting ASC 606-10-55-37B). However, if the entity is considered an agent, then it recognizes revenue on a net basis, *i.e.*, "the net amount of consideration that the entity retains after paying the other party the consideration received in exchange for the goods or service

to be provided by that party." ¶87 (quoting ASC 606-10-55-38).

Defendants' make it seem that they were first made aware of GAAP's principal-gross/agent-net accounting as part of its "more comprehensive review of revenue accounting for AdColony and Fyber" in the fourth quarter of 2022. Mot. at 10; ¶59. But, prior to its acquisition, AdColony previously applied principal-gross/agent-net revenue accounting. ¶90. Indeed, Digital Turbine attached AdColony's audited financial statements as of December 31, 2020 to a July 14, 2021 SEC filing. ¶¶89-90; Mot. Ex. 19. Therein, AdColony provided a summary of its revenue recognition policy, which clearly stated that AdColony applied the principles of principal-gross/agent-net revenue accounting. ¶90. Despite failing to disclose to investors otherwise (¶¶91-92), upon combination of AdColony's financials to Digital Turbine's, Defendants abandoned the principal-gross/agent-net revenue accounting, in contravention to GAAP, and reported all of AdColony's revenues on a gross basis. ¶¶59, 93-95, 104.[4]

**D.    Digital Turbine Announces Its Q4 2022 Financial Results, And Restates AdColony and Fyber's Previously Reported Revenue For Q4 2021**

On May 31, 2022, the Company announced disappointing Q4 2022 and full FY 2022

---

[4] In the factual background of their Motion, Defendants claim that this allegation is false, and rather, that Digital Turbine "left the principal-gross accounting treatment used by AdColony and Fyber in place." Mot. at 10. Despite the wealth of pages attached as exhibits in support of their Motion, Defendants cite ***nothing*** to support this factual contention. Moreover, Defendants' contention ignores that on a motion to dismiss, the Court "the allegations must … be taken as true[,]" *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)), and may not resolve disputed fact issues. *Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 347 (5th Cir. 2014).

Indeed, Defendants fail to explain why Plaintiffs' allegations are "false." As Defendants' attached exhibits show, Plaintiffs did not misquote or take out of context AdColony's revenue recognition policy. Prior to being acquired by Digital Turbine, AdColony, as stated in its audited financial statements, did indeed account for revenue both on a principal-gross and agent-net basis, depending on the nature of the transaction. Mot. Ex. 19 at 9; *see also* ¶90 (quoting AdColony's revenue recognition policy). And Digital Turbine admitted in its May 17, 2022 announcements that it reported "all revenues of the Acquired Companies… were reported on a gross basis." ¶59; *see also* ¶57; Mot. Ex. 8 at 3, 8 (May 17, 2022 Form 8-K).

financial results, with Q4 2022 revenue totaling just $184.1 million.  ¶70.  This reported revenue was significantly less than previously expected revenue of around $336-$342 million, and even lower than revised estimated revenues.  ¶¶74-76.

Digital Turbine also reported results for the Acquired Companies, and therein, restated results for their Q4 2021 revenue.  ¶¶71-72.  For example, previously reported Q4 2021 revenue for AdColony and Fyber was $58.3 million and $102.9 million, respectively.  ¶¶51, 109, 110.  The Company now reduced those figures to $39.4 million and $20.3 million, respectively.  For Q4 2022, the Company announced revenue from AdColony at just $40.3 million, which represented only 2% growth over the prior year.  Fyber's Q4 2022 revenue was reported as $29.2 million, representing 44% growth.  *Id.*  On this news, the Company's share price fell $5.75, or 22.61%, to close at $19.68 per share on June 1, 2022, on unusually heavy trading volume.  ¶73.

## III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

In the Fifth Circuit, "[m]otions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted."  *Lormand v. US Unwired, Inc*., 565 F.3d 228, 232 (5th Cir. 2009).  To withstand one, a complaint need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To state a claim under §10(b) and Rule 10b–5, a plaintiff must plead: "(1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff relied; and (5) that proximately caused the plaintiff's injuries."  *Ramirez v. Exxon Mobil Corp*., 334 F. Supp. 3d 832, 852 (N.D. Tex. 2018); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

When faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor."  *Lormand*, 565 F.3d at 232; *see also Smith*, 756 F.3d at 347 (in assessing a Rule 12(b)(6) motion,

the Court does not resolve disputed fact issues).

## IV.    PLAINTIFFS ADEQUATELY ALLEGE MATERIAL MISREPRESENTATIONS

The Complaint more than adequately alleges that Defendants violated Rule 10b-5(b), which makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  A statement or omission is materially misleading if it would alter the "total mix" of information available and "if there is a substantial likelihood a reasonable shareholder would consider it important" to the investment decision.  *McNamara v. Bre-X Minerals Ltd.*, 197 F. Supp. 2d 622, 631 (E.D. Tex. 2001); *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, n.17 (1988).

"[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers."  *Lormand*, 565 F.3d at 248-49.  A defendant bears a duty to disclose facts "necessary in order to make the statements made … not misleading."  *Tellabs*, 551 U.S. at 318 (alteration in original).  Whether there has been adequate disclosure "is a mixed question of fact and law and, therefore, is a question for a jury."  *Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 208 (5th Cir. 1988).

### A.    The Vast Majority Of Defendants' Statements Were Admittedly Materially False And Misleading

Digital Turbine's Restatement constitutes an admission that previously reported information is materially false or misleading.  *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 762 F. Supp. 2d 942, 982, n.25 (W.D. Tex. 2010) (gathering cases); *Kaltman v. Key Energy Servs., Inc.,* 447 F. Supp. 2d 648, 658 (W.D. Tex. 2006) (falsity sufficiently pled because the company's "announcement of the need to restate its earnings constitutes an admission that its public filings are false.").  Thus, Defendants cannot – and do not – contest that they made material false and

11

misleading statements in Digital Turbine's 2022 quarterly financial statements, and statements related to, and deriving from, those results in press releases, earnings calls, and investor presentations. *See generally* ¶¶118-165. *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 709-10 (W.D. Tex. 2010) (restatement operated as an admission that company's public filings were false in many material respects, including the falsity of prior, non-financial information).

The Restatement admitted that Digital Turbine's revenues and related figures were overstated by huge margins. The Company's total revenues decreased by $54.5 million, or 34.5%, for Q1 2022; $121.6 million, or 64.5%, for Q2 2022; and $158.7 million, or 73.2%, for Q3 2022. ¶64. Defendants also restated Digital Turbine's reported YOY revenue growth figures and the revenue attributable to AdColony and Fyber by massive amounts — for example, Fyber's net revenue was overstated by over 400% in each of the first three fiscal quarters of 2022. ¶¶64, 66; *see also* ¶¶127, 140, 150, 163 (detailing the restated and originally reported revenue figures).

The Restatement also admitted that numerous non-financial statements made by Defendants during the Class Period were false, including: (1) statements that Digital Turbine's financial statements were presented in accordance with GAAP (¶¶126, 139, 162); (2) statements that Stone and Garrison concluded that Digital Turbine's disclosure controls and procedures were effective (¶¶128, 141, 164); (3) Stone and Garrison's certifications pursuant to Section 906 of the Sarbanes-Oxley ("SOX") Act of 2002, which certified that the information contained in the Q1-Q3 2022 Form 10-Qs "fairly presents, in all material respects, the financial condition and results of operations of the Company" (¶¶129, 142, 165); and, (4) after the acquisitions, that the Company was generating $1 billion in annualized revenue (¶144). Defendants do not contest, and thus concede, the falsity of these statements.

Lastly, Defendants do not challenge the falsity of the statement made in the pro forma

12

combined financials of Digital Turbine and AdColony, filed on July 14, 2021, that assured: "At this time, the Company is not aware of any other differences [in AdColony's accounting policies] that would have a material effect on the unaudited pro forma condensed combined financial information."  ¶116.  This statement was materially false and misleading, because prior to its acquisition, AdColony recognized revenue on either a gross basis or net basis depending on the nature of the underlying transaction.  ¶¶90-104, 117.  Although Defendants purportedly reviewed AdColony's accounting policies to determine necessary adjustments and reclassifications (¶91), they did not disclose that the Company departed from AdColony's revenue recognition practices – which were in accordance with GAAP – by accounting for the entirety of AdColony's revenue on a gross basis without regard to the nature of the revenue.  ¶117; Mot. Ex. 8 ("Previously, all revenues of the Acquired Companies, … were reported on a gross basis.").

**B.      AdColony And Fyber's Pre-Acquisition Financial Results Were Also Admittedly Materially False And Misleading**

Prior to the acquisitions of AdColony and Fyber, Defendants reported the revenue and growth figures of these companies.  ¶¶109, 110, 113.  Despite Defendants' Motion stating otherwise (Mot. at 28), on May 31, 2022, as part of the Company's earnings release announcing financial results for the fiscal quarter ended March 31, 2022, Digital Turbine restated AdColony and Fyber's financial results for the fiscal quarter ended March 31, 2021, lowering AdColony's revenue by 48%, or $18.9 million, and Fyber's revenue by 406.9%, or $82.6 million.  ¶¶71-72, 115(c)(i)-(iv).  That Defendants "relied" on the Acquired Companies in reporting these results makes no difference for purposes of pleading falsity—by restating the Q4 2021 revenue results, Defendants admitted that they were materially false and misleading when made.  *E.g.*, *Enron*, 762 F. Supp. 2d at 982, n.25; *Kaltman*, 447 F. Supp. 2d at 658.  For pleading purposes, this is sufficient to allege falsity.  *In re Concho Res. Inc.*, 2023 WL 2297425, at *15 (S.D. Tex. Feb. 23, 2023).  For

this same reason, Digital Turbine and Stone's statements that the Company's combined revenue was exceeding $1 billion in annualized revenue – which calculation was based on later-restated revenue figures – was likewise materially false and misleading. ¶¶111, 112, 114.

**C.**    **Statements About The Acquisitions Find No Refuge In The PSLRA Safe Harbor Or The Bespeaks Caution Doctrine**

Defendants argue that three of Stone's statements discussing the acquisitions are protected by the PSLRA's safe harbor, which protects a forward-looking statement as non-actionable to the extent that statement is identified as forward looking and is accompanied by meaningful cautionary language. *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 210 (5th Cir. 2023). The bespeaks caution doctrine is the "judicially created equivalent to the PSLRA's 'safe harbor' provision," and operates similarly. *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 576 (S.D. Tex. 2002). "[I]f the representation or omission is fraudulent, independent of the existence of a forward-looking statement, the representation or omission is not shielded simply because a forward-looking statement exists." *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 657 (S.D. Tex. 2021).

A mixed present/future statement is not entitled to safe harbor when the forward-looking statement's falsity is about a present fact. *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014). Stone's statements about the acquisitions and expected revenue growth and synergies relied on present and historical facts as to AdColony and Fyber's revenues. ¶¶106-108. As explained above, these revenues were admittedly false, as were the growth rates Defendants repeatedly touted. Similarly, the PSLRA safe harbor and bespeaks caution doctrine do not apply to material omissions. *Berger v. Compaq Computer Corp.*, 1999 WL 33620108, at *14 (S.D. Tex. Dec. 22, 1999); *Concho Res.*, 2023 WL 2297425, at *13. Stone's statements failed to disclose that, as part of the acquisitions, Digital Turbine recognized all revenue attributable to AdColony

14

and Fyber on a gross basis in violation of GAAP, which had the effect of materially overstating revenue and growth figures, and therefore rendered Stone's statements that, for example, the acquisitions would "accelerate [Digital Turbine's] growth" materially misleading.  ¶¶107, 115.

Defendants claim that these statements are unactionable because they were "accompanied by risk disclosures that warned investors of the ways that Digital Turbine's actual results could differ from the forward-looking statements."  Mot. at 29-30.  But in order for these protections to apply, the accompanying risk disclosures must be meaningful.  *Lormand*, 565 F.3d at 244.  The Fifth Circuit recently explained that in order to be meaningful, it "must disclose substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors."  *Six Flags*, 58 F.4th at 211.  The risk disclosures to which Defendants cite (Mot. at 30), would be applicable to any company during an acquisition – and renders them entirely boilerplate.  *Concho Res.*, 2023 WL 2297425, at *14.[5]  By no means did these disclosures "give meaningful warning" to investors that Digital Turbine did not have sufficient procedures for reviewing and aligning the accounting policies of the Acquired Companies prior to the first interim reporting date (¶69), and rather than aligning the accounting policies with each company and with GAAP, Defendants, in contravention to GAAP, accounted for all revenues of AdColony and Fyber on a gross basis, which would have the effect of significantly overstating revenues and related growth figures.  *Six Flags*, 58 F.4th at 212 (cautionary language that did not address the actual risk at issue was not meaningful).

**D.     Statements About The Acquisitions Are Not Immaterial Puffery**

Defendants also argue that three of Stone's statements discussing the acquisitions are

---

[5] Nor could the cited risk disclosures actually apply to the few statements challenged as forward looking.  Defendants cite to risk warnings in the 2021 10-K, which was issued on June 10, 2021 (Mot Ex. 1 at 115), months after the February and March 2021 statements.  ¶¶106-108.

"immaterial corporate puffery."  Mot. at 30-31 (citing ¶¶106, 108, 112).  Only statements that "contain no concrete factual or material misrepresentation" may be deemed "puffery."  *Lormand*, 565 F.3d at 249 n.14; *accord Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014).  Statements that the acquisitions would accelerate growth, would offer the combined Company with revenue synergies, and together "is already generating more than $1 billion in annualized revenue"[6] — when, in fact, the combined Company's revenues and growth were materially inflated by improperly accounting for the Acquired Companies' revenues — are not puffery.  *In re Computer Assoc. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (statement that company was "solidly positioned for growth" was actionable because it failed to disclose "alleged improper accounting and revenue inflating practices").

## V.    PLAINTIFFS ADEQUATELY ALLEGE A STRONG INFERENCE OF SCIENTER

To plead scienter, a complaint must state particularized facts supporting a strong inference that Defendants acted with either an "intent to deceive, manipulate, or defraud" or "severe recklessness."  *Spitzberg*, 758 F.3d at 684.  Severe recklessness is "an extreme departure from the standards of ordinary care … that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Id.*  While Plaintiffs must allege a "'strong'—*i.e.* a powerful or cogent—inference" of scienter, *Tellabs*, 551 U.S. at 324, the Fifth Circuit has held that "[a]llegations of circumstantial evidence … will suffice" in establishing that inference.  *Lormand*, 565 F.3d at 251.

---

[6] Defendants point to the portion of Stone's in ¶112 that describes Fyber as "a very important puzzle piece for Digital Turbine …" as puffery.  But Plaintiffs do not allege that this sentence was false and/or misleading.  Rather, Plaintiffs allege that Stone's next sentence: "The combined platform offering is already generating more than $1 billion in annualized revenue" was materially false and misleading.  *See* ¶115 ("The **emphasized statements** … above, in ¶¶106-114, were materially false /or misleading when made and/or omitted to state material facts necessary to make the statements not misleading ….").

An inference of scienter need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. Rather, scienter is adequately alleged where "a reasonable person would deem the plausible inference of scienter cogent and at least as strong as any opposing inference one could draw from the facts alleged." *Lormand*, 565 F.3d at 252. "[W]here there are competing inferences that establish or negate the scienter requirement, a tie favors the plaintiff." *Spitzberg*, 758 F.3d at 686.

Finally, the scienter inquiry is holistic: it is "whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Lormand*, 565 F.3d at 251. Applying these principles here, a reasonable person would deem the inference of scienter drawn from the facts alleged in the Complaint as cogent and *at least* as compelling as any opposing inference.

## A. AdColony's Application Of Principal-Gross/Agent-Net Revenue Accounting Supports A Strong Inference Of Scienter

A strong inference of scienter may be established when plaintiffs allege that defendants "knew facts or had access to information suggesting that their public statements were not accurate, or … failed to check information they had a duty to monitor." *In re Fleming Cos. Inc. Sec. & Deriv. Litig.*, 2004 WL 5278716, at *4 (E.D. Tex. June 10, 2004) ; *Singh v. 21Vianet Grp., Inc.*, 2017 WL 4322483, at *3 (E.D. Tex. Sept. 13, 2017) (same).

Prior to its acquisition by Digital Turbine, AdColony – in accordance with its revenue recognition policy, IFRS, and GAAP – applied principal-gross/agent-net revenue accounting depending on the nature of the transaction with advertisers. ¶90. This revenue recognition policy was clearly disclosed in AdColony's financial results as of December 31, 2020, which Digital Turbine attached to a July 14, 2021 SEC filing signed by Garrison. ¶¶89-90; Mot. Ex. 19. AdColony's application of principal-gross/agent-net revenue accounting serves as a powerful

17

contemporaneous fact[7] suggesting that Defendants ignored obvious red flags and had access to information contradicting all of Defendants' Class Period statements.

To be sure, either a "preliminary review of AdColony's accounting policies" when combining the financials with Digital Turbine's (¶91), or cursory due diligence prior to or in connection with the acquisition would have revealed that AdColony employed principal-gross/agent-net revenue accounting. *See, e.g.*, *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) (finding a strong inference of knowledge for statement announcing strategic partnership as "[i]t is reasonable to assume, given the importance of these deals to the company, that [defendant company] would have familiarized itself with the financial condition of [the other companies in the deal]").[8]   Indeed, how a company makes and reports revenues would be, and should be, top of mind in any acquisition — let alone one in which the Individual Defendants touted that driving revenue growth was the "key rationale for our new acquisitions" and "position[ed] us as a company with greater than $1 billion in profitable annualized revenue" (¶¶42-49). *See also, e.g.*, *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 784 & n.37 (S.D. Tex. 2012) (that defendants "made numerous and frequent statements" about alleged misstatements supported scienter).

Defendants argue that because the Acquired Companies warranted that their financial statements were correct, there can be no scienter for the pre-acquisition statements.  Mot. at 24-

---

[7] Defendants make much out of Plaintiffs not "identify[ing] an internal memo, e-mail, or presentation" or offering confidential witnesses.  Mot. at 16-17.  But the law is clear that plaintiffs are only required to plead facts, not detailed evidentiary matter.  *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 356 (5th Cir. 2002); *Fleming*, 2004 WL 5278716, at *6 ("[T]he particularity rules should not be interpreted to require the pleading of facts which, because of the lack of discovery, are in defendants' exclusive possession.").

[8] *See also, e.g.*, *In re Aetna Inc. Sec. Litig.,* 34 F. Supp. 2d 935, 953-54 (E.D. Pa. 1999) (finding a strong inference that defendants/officers had conscious knowledge of misrepresentations and omissions concerning financial impact and success of integration with acquired company from their high-level executive positions and the significance and importance of the acquisition).

25. But when both companies warranted that their statements were correct – despite having different revenue recognition policies for similar transaction structures (*e.g.* Mot. Ex. 6 at 12 (Fyber's revenue recognition policy))[9] – the difference serves as a glaring red flag indicating that one of those methods was wrong, which should have prompted Defendants to determine which manner of revenue recognition was aligned with GAAP. Moreover, these differences would also serve as a huge red flag alerting Defendants that Digital Turbine's internal controls failed to adequately ensure acquiree accounting policies were conformed to GAAP. That Digital Turbine's peers account for revenue in the appropriate manner is another red flag. ¶58 & n.6.

For all these same reasons, Defendants' proffered opposing inference: realizing there was a revenue accounting issue only after a comprehensive analysis with KPMG after reporting three quarters of false financials was "diligent" (Mot. at 14), is not cogent or compelling. In the Restatement, Defendants admitted that in order to remediate the material weakness in internal controls, they would be "[s]trengthening the Company's procedures for reviewing accounting policies of material acquired companies, inclusive of the accounting for revenue, through ***initial reviews during the due diligence period and alignment of accounting policies prior to the first interim reporting date***" (¶69)—essentially admitting that initial reviews of the Acquired Companies' accounting policies were not undertaken during either the due diligence period or when combining the financials of the companies. To be sure, such an admission is not exculpatory, but deeply indicative of Defendants' scienter during the Class Period.

### B.    The Facts And Circumstances Of The Restatement Supports Scienter

While a restatement does not always establish a *strong* inference of scienter, it does, at a

---

[9] Likewise, had Defendants performed even cursory due diligence prior to and during the acquisition of Fyber, they would have seen that Fyber did not apply principal-gross/agent-net revenue accounting for similar transactions.

19

minimum, "provide *some* basis to infer scienter." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552 (5th Cir. 2007).[10]  "[W]hen the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter." *In re Triton Energy Ltd. Sec. Litig.*, 2001 WL 872019, at *11 (E.D. Tex. Mar. 30, 2001).[11]

### 1. The Magnitude Of The Restatement Supports A Strong Inference Of Scienter

The magnitude of Digital Turbine's Restatement is clearly evident.  Defendants admitted that the Company's revenues were overstated by $54.5 million, or 34.5%, for Q1 2022, $121.6 million, or 64.5%, for Q2 2022, and $158.7 million, or 73.2%, for Q3 2022.  ¶¶60, 64.  The prominently featured YOY growth figures also decreased dramatically, going from 264.3% to 170.9% in Q1 2022, from 337.6% to 166.8% in Q2 2022, and from 323.8% to 144.7% in Q3 2022 (¶64), and brought the YOY growth percentages for Q1-Q3 2022 back in line with the rate Digital Turbine reported just prior to the acquisitions (*e.g.*, ¶36).  Revenue for AdColony decreased by between 48.2% to 61.5% for the first three quarters in 2022.  And for Fyber, the Restatement had the most dramatic effect: revenue for Q1 2022 decreased by between 412.7% to 439.1%.  The size of these errors supports a strong inference of scienter.  *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 705 (S.D. Tex. 2006) (finding that a restatement in which company's revenues decreased by 30% in the first nine months of one year and 15% in another year "significantly contributes to a finding of scienter"); *ArthroCare*, 726 F. Supp. 2d at 721-22 (restatement that reduced revenue by 12.4%, 7.3%, 4%, and 1%, contributed to a finding of scienter); *Chalverus v. Pegasystems, Inc.,*

---

[10] *Accord Kaltman*, 447 F. Supp. 2d at 664 (a "restatement, although not dispositive, adds weight to the scienter calculus").

[11] *See also Fleming*, 2004 WL 5278716, at *37 (similar).

59 F. Supp. 2d 226, 234 (D. Mass. 1999) ("a number of courts have held that significant overstatements of revenue tend to support the conclusion that defendants acted with scienter").

Defendants argue that the magnitude of the Restatement is not enough to support an inference of scienter for two reasons. Mot. at 21-22. First, they argue that Plaintiffs must also plead allegations showing Defendants' knowledge, recklessness, or that Defendants ignored red flags, and that Plaintiffs have failed to do so. *Id.* at 21. But, as detailed in Section V.A, above, Plaintiffs sufficiently plead that Defendants' statements were made, at minimum, recklessly and that Defendants ignored a glaring red flag: AdColony's own revenue recognition policy.

Second, Defendants argue that the Restatement did not impact Digital Turbine's net income, and thus was not meaningful.[12] But courts have found a restatement to be significant in magnitude even when the results actually adjusted net income upwards in certain periods. *See, e.g.*, *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 758, 784-87 (M.D. Tenn. 2013) (magnitude of restatement supported a strong inference of scienter, even though net income was overstated in certain periods and understated in others).[13]

This is particularly true when the misstatements affect metrics and factors that are "key to measuring [a company's] financial performance and [were] a subject about which investors and analysts often inquired" which further "reinforces the inference of scienter." *New Orleans Emps.*

---

[12] Defendants' cited cases are inapposite. In *In re Integrated Elec. Servs., Inc. Sec. Litig.*, 2006 WL 54021, at *3 (S.D. Tex. Jan. 10, 2006), the restatement amounted to a $5.7 million, or 14%, reduction in net income over a 30-month period. Here, Defendants overstated revenues by much higher figures and percentages in **each** of the quarterly financial periods restated. ¶¶60, 64, 115. And, in *City of Pontiac Gen. Emps.' Ret. Sys. v. Asar*, 2016 WL 1322484, at *11 (W.D. Tex. Apr. 1, 2016), the court found that inconsistent adjustments to net income, while "not strong enough on its own to satisfy the pleading standard[,]" did "provide some basis from which to infer scienter[.]"

[13] *See also Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009) (magnitude of restatement raised a strong inference scienter notwithstanding the fact that "the accounting errors did not consistently overstate income or understate expenses").

21

*Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011). Here, the Restatement related to the "key rationale" for acquiring AdColony and Fyber: "driving new revenue growth." ¶¶48, 49. Digital Turbine's revenue and growth were top of mind for Defendants, investors, and analysts. For example, Stone highlighted Q2 2022 revenue growth to "showcase[]" the instant success of the Acquired Companies. ¶52. Analysts cited the revenue growth opportunities in raising their price targets following the announcements of the acquisitions (¶¶46-47). *E.g.*, *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 639 (E.D. Va. 2000) (significance of three contracts to MicroStrategy "certainly makes less credible the inference that the Defendants were not aware of or did not recklessly disregard the [revenue] accounting irregularities relating to these contracts."). Moreover, the overstated revenue figures allowed Digital Turbine's reported revenue to be in line with estimates and guidance that annualized revenue would top $1 billion (¶¶48, 55), and to beat analysts' quarterly revenue estimates (¶¶46, 47, 53, 54, 56). *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) (accounting violations that allowed company to meet internal revenue guidance and consensus revenue estimates supported finding of scienter).

### 2. The Nature And Context Of The Violated Accounting Principle Supports Scienter

Other factors may strengthen the inference of scienter arising from a restatement, including the context of the GAAP violations, the nature of the accounting errors, the relative simplicity of the accounting principles involved, and the completeness of defendants' disclosures concerning its accounting treatment. *See, e.g.*, *ArthroCare*, 726 F. Supp. 2d at 722 ("the relative simplicity of the issues" that led to a restatement "significantly contribute[d] to a finding of scienter"); *Parmelee v. Santander Consumer USA Holdings, Inc.*, 2018 WL 276338, at *4 (N.D. Tex. Jan. 3, 2018) ("when the context of the misapplication of accounting principles or restatement are taken into account" such errors in accounting contribute to a strong inference of scienter).

The accounting error underlying the Restatement here is Defendants' *failure* to apply principal-gross/agent-net revenue accounting. Defendants argue that the nature of this error was subjective and qualitative. Mot. at 25-26. While Defendants may be right that judgment must be exercised in assessing the transactions and facts and circumstances when actually applying the principal-gross/agent-net accounting, Defendants' application is not at issue — because it was never applied. Instead, all of the Acquired Companies' revenues were reported on a gross basis (¶59), which significantly and positively impacted revenue growth. The decision to actually apply the appropriate GAAP is not complicated, but rather straightforward, and supports a finding of scienter here. *See, e.g.*, *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000) ("violations involving the premature or inappropriate recognition of revenue suggest a conscious choice to recognize revenue in a manner alleged to be improper, and may therefore support a stronger inference of scienter."); *MicroStrategy*, 115 F. Supp 2d at 637-38 (acknowledging that "the application of accounting principles often involves details and minutiae," but that the improper revenue recognition practices at issue were "relatively simple" and supported a finding of scienter).

The context of Defendants' failure to apply principal-gross/agent-net accounting also supports an inference of scienter. Defendants cannot claim ignorance of these accounting principles when AdColony, prior to its acquisition (¶90), applied principal-gross/agent-net revenue accounting in accordance with GAAP, as did Digital Turbine's peers (¶58 & n.6). Garrison and Digital Turbine also told investors that in combining the financial results of AdColony with the Company's that they "performed a preliminary review of AdColony's policies to determine" all necessary adjustments and ensure comparability. ¶¶89, 91. In this filing, Defendants failed to disclose that it was changing AdColony's revenue recognition policy to recognizing revenue solely on a gross basis. ¶¶93, 116. Thus, either Defendants were aware of principal-gross/agent-net

23

revenue accounting and abandoned its application to boost revenue figures, or Defendants were severely reckless in not identifying and applying principal-gross/agent-net accounting prior to the Restatement. *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 264 (5th Cir. 2005) ("that the defendants persisted in the incorrect accounting" after it was brought to their attention supported a strong inference of scienter).

### C.    Plaintiffs' Motive Allegations Further Support An Inference Of Scienter

"[M]otive and opportunity allegations may meaningfully enhance the strength of the inference of scienter." *Flaherty & Crumrine Preferred Income Fund Inv. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009); *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 368 (5th Cir. 2004). Significantly, where a complaint alleges clear motive for alleged misstatements or omissions, the strength of its circumstantial evidence of scienter need not be as great. *Cf. R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005) (in the absence of motive allegations, "the strength of its circumstantial evidence of scienter must be correspondingly greater").

### 1.    Defendants' Insider Transactions Evidence Scienter

"Insider stock sales can enhance an inference of scienter if the trading occurs 'at suspicious times *or* in suspicious amounts.'" *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 960 (5th Cir. 2016); *Southland*, 365 F.3d at 368 (same). The Complaint pleads that Stone's and Chief Technology Officer Christine Collins' trading was suspicious in both timing and amount. ¶¶170-172.

Stone's stock sales were suspicious in timing because they occurred two months before the May 17, 2022 corrective disclosure that Digital Turbine would be restating its financials (¶171), and during the time when Digital Turbine and KPMG were undertaking the comprehensive review of the Acquired Companies' revenue accounting (Mot. at 10 (citing Mot. Ex. 6 at 40)). The price of Digital Turbine's stock was between $46 and $47 dollars – roughly $20 dollars higher than the

24

price after the May 17, 2022 partial corrective disclosure – when Stone sold over 70,000 shares for proceeds of $3,241,602.  ¶¶62, 171.  *See Cent. Laborers'*, 497 F.3d at 553 ("Suspicious" generally means "sales are out of line with prior trading practices or at times calculated to maximize personal profit.").  Defendants argue that Stone's stock sales on September 8, 2020 negate any inference of scienter because he sold a higher percentage of his shares on that date, but Digital Turbine's stock price on that date was $24.10, almost 50% lower than Stone's Class Period sales.[14]  In fact, Stone's March 3, 2022 sales netted him a higher return than his September 8, 2020 sales even though he sold fewer shares.[15]  Thus, Defendants' argument actually supports Plaintiffs' allegations that Stone's stock sales were suspicious in timing and amount by capitalizing on the price of Digital Turbine's shares shortly before the May 17, 2022 restatement announcement.[16]

---

[14] Due to a scrivener's error, Plaintiffs inadvertently omitted Stone's September 8, 2020 sales when alleging that Stone had not sold any shares in the 12 months preceding the Class Period.  ¶172. Regardless, Defendants' own case law notes that "previous trading history, while an important factor, need not be pleaded as a per se matter; 'instead, the court looks at the information that is pled and determines whether the timing or scope is unusual.'"  *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 897 (W.D. Tex. 2008).  Defendants also claim that Plaintiffs erred in alleging that Stone did not sell any APPS stock after the Class Period by citing to a Form 4 filed with the SEC ***after the filing of the Complaint***.  Mot. at 18.  Despite the impossibility of pleading Stone's post-Class Period stock sale in the Complaint, Defendants' reliance on this sale is of no moment and doesn't undermine the inference of scienter from Stone's suspicious Class Period sales.

[15] Defendants' argument that Stone's sales were not a large percentage of his holdings is also unconvincing.  *See In re El Paso Elec. Co. Sec. Litig.*, 2004 WL 377555, at *7 (W.D. Tex. Feb. 23, 2004) (sales of 51,000 and 32,000 shares supported an inference of scienter "when read in conjunction with other scienter allegations.").  Defendants' cited case law for this proposition is also inapposite. In *Mendi Yoshikawa v. Exxon Mobil Corp.*, unlike here, plaintiffs made no additional scienter allegations other than trading for two of the three insiders who made stock sales. 2022 WL 4677621, at *7 (N.D. Tex. Sept. 29, 2022).  Likewise, in *Congregation of Ezra Sholom v. Blockbuster, Inc.*, plaintiffs relied solely on stock sales and insufficient confidential witness statements.  504 F. Supp. 2d 151, 165 (N.D. Tex. 2007).

[16] Defendants' argument that Stone's stock sales were not suspicious because he retained over a million shares at the end of the Class Period is also unpersuasive because when considered holistically, Plaintiffs' allegations of Stone's Class Period stock sales compel an inference of scienter.  Defendants' cited authority does not change that result.  In *Cent. Laborers'*, plaintiffs, unlike here, did not allege the stock sales were suspicious in timing.  497 F.3d at 553.  And, in *Diodes*, unlike here, "there [was] no basis to infer that … trades [of non-defendant insiders] were

The stock sales by Collins, another corporate insider, were also suspicious in timing and amount because Collins sold 40,000 shares when Digital Turbine's stock was priced at over $70, and that these sales were unusual because Collins had not sold any shares in the twelve months before the Class Period. ¶¶171-72. *See Cent. Laborers'*, 497 F.3d at 553 (*supra*). Defendants do not contest these allegations, but instead claim that because Collins is not a defendant, her stock sales are meaningless. But *In re Sec. Litig. BMC Software, Inc.*, cited by Defendants for this proposition, is distinguishable because "executives could not sell stock [for a four month period] under SEC guidelines because of [recent] acquisition[s]", and "no [d]efendant sold [] stock during the first twenty days of any quarter or during the last month of any quarter," when Stone and Collins made their Class Period sales. 183 F. Supp. 2d 860, 901, 903 (S.D. Tex. 2001).[17]

Defendants' focus on Garrison's lack of stock sales during the Class Period is not convincing.[18] Courts have found stock sales indicative of scienter even where not every defendant sells shares. *See, e.g.*, *Brody v. Zix Corp.*, 2006 WL 2739352, at *7 (N.D. Tex. Sept. 26, 2006) (insider sales established scienter even though two of five individual defendants did not sell shares during the class period). Defendants' cited case law is also distinguishable. For example, plaintiffs in *Abrams* only alleged sales by a single corporate insider and plaintiffs there did not allege that

---

suspicious" because plaintiffs plead no "allegations about the individuals' prior trading practices." 810 F.3d at 961.

[17] *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *17 (N.D. Cal. Mar. 24, 2014), also cited by Defendants, is out of circuit, and distinguishable on its facts because there, plaintiffs "[did] not allege facts … to show that any sales were 'unusual' or 'suspicious'" and "plead[ed] no trading history … that [the insider's] stock sales [were] inconsistent with his usual trading patterns.")

[18] Defendants also cite extensively to sales Garrison made "for tax liabilities." Mot. at 17, n.8. But Defendants' attempt to explain the purported reasons for their insider transactions (*e.g.*, tax payments) is a dispute for summary judgment. *See, e.g.*, *Rubinstein v. Collins*, 20 F.3d 160, 169 n.38 (5th Cir. 1994) (declining to consider at pleading stage if insider sales allegedly supporting scienter were to pay taxes).

26

these sales occurred "at times calculated to maximize personal profit." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424 (5th Cir. 2002); *see also Southland*, 365 F.3d at 369 (alleged insider trading occurred during a secondary offering, and "plaintiffs [did] not allege that officer or director sales during a secondary public offering [were] unusual"); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 420 (5th Cir. 2001) (the sole seller of four individual defendants was an "outside director").

### 2.   Defendants' Compensation Packages Evidence Scienter

Stone and Garrison's performance-based compensation further supports an inference scienter because their "performance goals were inclusive of the Company's acquisitions of Fyber N.V. and AdColony." ¶175.  While Stone and Garrison's bonuses may not be as "large" as bonuses alleged in Defendants' cited authority (Mot. at 20), "bonus plans may be considered in conjunction with other scienter allegations." *ArthroCare*, 726 F. Supp. 2d at 723.  Considered alongside Plaintiffs' other allegations of scienter, these bonuses add to an inference of scienter.[19]

### D.   Additional Factors Bolster The Already Strong Inference Of Scienter

Two additional "plus" factors further strengthen the already strong inference of scienter. First, in light of Digital Turbine's focus on growth through strategic acquisitions and the importance Defendants' placed on revenue growth as an indicator of the immediate success of the Acquired Companies, understanding the basis and accounting for the revenue of AdColony and Fyber were critically important.  ¶¶36-37, 46-56.  Courts in this Circuit frequently apply a "core

---

[19] Defendants' cited case law does not compel a different result. *Tuchman v. DSC Commc'ns Corp.*, is distinguishable because there, unlike here, plaintiffs' only scienter allegation was the motivation for incentive bonuses.  14 F.3d 1061, 1068 (5th Cir. 1994); *see also Mun. Emps.' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 431 (5th Cir. 2019) (unlike here, "performance-based bonuses that [defendants] could receive … proved to be well out of reach"). Defendants' reference to *In re Dell*, is also inapposite because there, plaintiffs did not allege any "figures comparing the long-term bonuses [defendants] received during the class period with those they received previously."  591 F. Supp. 2d at 898.

operations" inference to find that company executives acted with scienter where the challenged statements go to the core of the company's business.  *See, e.g.*, *Plotkin*, 407 F.3d at 700 (*supra*); *Six Flags*, 58 F.4th at 219 (although "[t]he China parks were not critical to Six Flags' survival, … they were an important aspect of future growth prospects" and thus contributed to inference of scienter).[20]  The importance of the Acquired Companies' revenues and their contribution to Digital Turbine's revenue growth thus supports an inference of scienter.

Second, Stone and Garrison executed SOX certifications attesting both that the information contained therein fairly presented, "in all material respect, the financial condition and results of operations of the Company" (¶¶129, 142, 165), and that they were responsible for establishing and maintaining Digital Turbine's disclosure controls and procedures which had been "designed" to ensure all material information, including from the subsidiaries, was made known to the Individual Defendants (¶¶179, 180).  SOX certifications "contribute significantly" to scienter if defendants had "reason to know or suspect the financial statements they were then signing contained material misrepresentations or omissions."  *ArthroCare*, 726 F. Supp. 2d at 724; *Shaw Grp.*, 537 F.3d at 545 (scienter may be inferred from SOX certifications where "facts establishing that the officer who signed the certification had a reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other red flags, that the financial statements contained material misstatements or omissions").  As explained in Section V.A, *supra*, "glaring" accounting irregularities and red flags were present and provided Stone and Garrison reason to know the financial statements contained material misstatements and that the failure to incorporate the

---

[20] While the core operations inference is often applied to smaller companies, "there is no bright-line rule based in the company's size.…  No one 'special circumstance' is dispositive."  *Carlton v. Cannon*, 184 F. Supp. 3d 428, 484 (S.D. Tex. 2016); *see also Six Flags*, 58 F.4th at 219 (core operations inference contributed to the inference of scienter despite the company's large size).

principal-gross/agent-net revenue accounting in accordance with GAAP constituted a material weakness in internal controls.

Defendants arguments to the contrary fail.  Mot. at 22-23.  As explained above, while determining whether the newly acquired companies acted as a principal or agent in a particular contract or transaction may be fact-dependent and subjective, the decision to actually apply principal-gross/agent-net accounting is not, particularly under these circumstances.  Nor does it matter that the acquired companies had undergone their own audits from top accounting firms. Rather, that the Acquired Companies, after being audited by top accounting firms, determined to account for revenue for similar business lines differently, is a giant glaring accounting irregularity.

### E.     Scienter Has Been Pled As To Digital Turbine

As several courts have recognized, a complaint may allege facts that give rise to a strong inference of corporate scienter even if that complaint fails to "name the individuals who concocted the fraud." *BP*, 843 F. Supp. 2d at 789 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).[21]  This occurs when the circumstances surrounding a misstatement give rise to an inference that it was "approved by corporate officials sufficiently knowledgeable about the company to know that the [statement] was false."  *Id.* at 710.

Here, when the revenues of AdColony and Fyber were combined with the Company's financial statements, someone at Digital Turbine knew that AdColony had previously recognized revenue on an agency-net basis when AdColony had acted as an intermediary in the transaction, and had the authority to cause that revenue recognition policy to not be carried over as part of the

---

[21] *Accord Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant" so long the facts give rise to "a strong inference that *someone* whose intent could be imputed to [the Company] acted with the requisite scienter," even if that person cannot be identified).

29

combined financials.  As such, if not the Individual Defendants, someone within the Company "sufficiently knowledgeable about the company" had to have known that the decision to not continue with principal-gross/agent-net revenue accounting was made and thus inflated revenue from the Acquired Companies.  In addition, the decision not to disclose that Digital Turbine abandoned AdColony's principal-gross/agent-net revenue accounting upon acquisition is strong evidence of corporate scienter.  The most plausible inference is that a high-ranking employee with substantial control over the Company's SEC filings directed both the abandonment of the principal-gross/agent-net revenue accounting and the omission of that abandonment.

###### F.      Defendants Do Not Provide A More Compelling Non-Culpable Inference

Defendants offer that the more plausible and compelling inference is that they reasonably relied on the pre-acquisition accounting treatment put in place by the Acquired Companies.  Mot. at 27.  But as explained herein, such reliance was not reasonable when the Acquired Companies put in place different revenue accounting treatments for similar transactions.  And while it may be both reasonable and prudent to hire a third-party accounting firm to ensure "integration … was accomplished" properly, that does not absolve Defendants from recklessly reporting headline revenue growth, *i.e.*, the key driver of these acquisitions, in three interim quarters.

Defendants urge the Court to follow two cases in determining that the Plaintiffs' allegations amount to mere negligence.  But materially overstating revenues and growth of the Acquired Companies due to the abandonment of the appropriate revenue accounting is hardly analogous to the circumstances of *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492 (S.D. Tex. 2017), in which the court found that defendants were, at most, negligent in forecasting the length of time a vessel would be in dry dock.  And, while in *Budde v. Glob. Power Equip. Grp., Inc.*, 2017 WL 6621540, at *2-*5 (N.D. Tex. Dec. 27, 2017), the allegations suggest that the executives "took steps to make sure that financial information was reported accurately," Plaintiffs' allegations

30

and Defendants' admissions[22] make it clear that no such steps were taken until Q4 2022.  Rather, when viewed holistically, Plaintiffs allege a cogent and compelling inference of scienter.

## VI.    PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION

To plead loss causation, Plaintiffs must allege only "a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss," *i.e.*, "a material misrepresentation or omission," followed by a disclosure "of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock" and investor loss. *Lormand*, 565 F.3d at 258.  Such a "corrective disclosure" can occur through "partial disclosures." *Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 957 (S.D. Tex. 2016).  Loss causation allegations must meet Rule 8(a)'s notice pleading standard, which "is not a … difficult one to satisfy." *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc*., 769 F.3d 313, 321 (5th Cir. 2014).

Plaintiffs have adequately pled loss causation by giving "some indication of the loss and the causal connection" they have "in mind." *Id.*  Plaintiffs allege Defendants' misrepresentations were corrected on May 17, 2022 and May 31, 2022 through partial disclosures of previously-undisclosed negative impacts on the Company's revenues resulting from its lack of internal controls and improper accounting.  ¶¶184-194.[23]  Each disclosure resulted in a significant stock price decline on unusually heavy trading volume.  *See Parmelee*, 2018 WL 276338, at *6 (allegations that "company's stock price dropped" twice upon release of fraud-related information sufficient); *Fleming*, 2004 WL 5278716, at *42 (allegations that price dropped "in the days after

---

[22] *E.g.*, ¶69; Mot. at 10 (stating that the Company's comprehensive review of accounting did not take place until three quarters after Digital Turbine began reporting financial results for the Acquired Companies, and well after the due diligence period for the acquisitions).

[23] Digital Turbine's stock price declined more than 7% on May 18, 2022 (¶190) as a result of the May 17, 2022 disclosure (¶¶187-189) and declined more than 22% on June 1, 2022 (¶193) as a result of the May 31, 2022 disclosure (¶¶191-192).

31

the truth was revealed" sufficient).  Given the expert-intensive causation analysis, courts recognize the validity of corrective disclosures "is a highly fact intensive inquiry that need not be reached at this point."  *Schott*, 211 F. Supp. 3d at 959-60; *see also Ramirez*, 334 F. Supp. 3d at 858 ("it is often inappropriate to … resolve disputes over loss causation" at the Rule 12(b)(6) stage).

        **A.**        **The May 31, 2022 Corrective Disclosure Is Causally Connected to Plaintiffs' Theory of Fraud**

Defendants assert that "the May 31st corrective disclosure is not causally connected to Plaintiffs' theory of fraud" because "the lower than expected earnings in Q42022 have no bearing on statements made in Q1, Q2 or Q3."  Mot. at 32, 33.  Defendants' myopic argument is belied by the plain language of the alleged misstatements wherein Defendants explicitly highlighted and touted the earnings, revenue power and profitability resulting from the AdColony and Fyber acquisitions, while concealing the lack of internal controls, improper accounting, and the negative impact on its Q1- fiscal year 2022 (Q1-Q4) financial performance.

To begin, on February 26, 2021, the Company glowed that "the AdColony transaction will be substantially accretive to our expected profitability *in the first full year* following the transaction."  ¶42.  After announcing the subsequent acquisition of Fyber and stressing that "we are certainly excited about the anticipated revenue synergies that Fyber, AdColony and Appreciate will engender" analysts modeled that "*APPS is on track to do $1B in revenues in CY22* following the close of their acquisitions."  ¶46; *see* ¶47 (two additional analysts modeling approximately $1 billion in FY 2022 revenue).  On May 25, 2021 Digital Turbine announced the completion of the Fyber acquisition, stressing that "the combined platform offering is already generating *more than $1 billion in annualized revenues*."  ¶112.  And, in its Q1 2022 (August 9, 2021) and Q2 2022 (November 2, 2021) respective earnings releases Defendants broke out YOY growth to highlight the revenue growth attributable to AdColony and Fyber and continued to stress the profitability of

32

these acquisitions into FY 2022 and beyond.  ¶¶51-54, 118-129, 131-142.  Moreover, on February 8, 2022 during its announcement of Q3 2022 results, Defendants provided revenue estimates for the full FY 2022 with Garrison highlighting that "the implied growth in the midpoint of our guidance has our *fiscal 2022 revenues* growing over 50% *year over year*."  ¶55.

These numerous alleged misstatements directly (i) stressed the increased revenues and related growth of Digital Turbine resulting from the AdColony and Fyber acquisitions; and (ii) concealed the Company's lack of internal controls, improper accounting, and impact on FY 2022 performance.  As such, they wholly undermine Defendants' claim that the alleged misstatements in Q1-Q3 had no relationship whatsoever to the disappointing Q4 2022 and FY 2022 disappointing financial results.  The May 31 disclosure of disappointing Q4 and 2022 earnings was directly related to the precise subject matters of the alleged misstatements, and the Complaint details the causal connection to more than sufficiently plead loss causation.  *See Schott*, 211 F. Supp. 3d at 957; *Parmelee*, 2018 WL 276338, at *6.  Defendants' challenge fails.

Defendants also contend that the May 31st press release is not corrective because it revealed no new information related to the misstated revenue and growth numbers from Q1-Q3 and "the only new information in the press release is the disappointing 4Q earnings information." Mot. at 34.  Not so.

Preliminarily, as set forth above, the misstatements alleged in the Complaint are not simply limited to the financial results restated from Q1-Q3 due to the lack of internal controls.  The Complaint explicitly details that the Q4 release restated the Q4 2021 revenue results for AdColony and Fyber.[24]  Moreover, the Q4 release provided additional corrective information relating to

---

[24] The Q4 release undoubtedly corrected Q4 2021 revenue numbers for AdColony and Fyber, and have thus provided Defendants with sufficient notice of the causal connection. *Amedisys*, 769 F.3d at 321.  Defendants' arguments to the contrary (Mot. at 33-34) do not change this.

Defendants' misrepresentations of the Company's revenues and related growth – which concealed the impact of its lack of internal controls on the entire FY 2022, including Q4.

For example, a June 17, 2022 *Seeking Alpha* report observed that "[t]here is no doubt that the market did not expect Digital Turbine, Inc. (NASDAQ: APPS) to report revenues of $184.1M in FQ422. However, *it is essential to note that this is attributed to the changes in its accounting report methods[.]*" ¶78. The report continued: "Nonetheless, since analysts and investors were expecting revenues in the range of $300M with a consensus revenue estimate of $336.45M, representing YoY growth of 253.9%, *it is apparent that many were taken aback by the changes in its accounting reporting method*." ¶76. Thus, even though the lack of internal controls was disclosed on May 17, 2022, the financial impact continued thereafter into Q4 and was revealed on May 31, 2022 when the Company reported disappointing Q4 and FY 2022 results.

Further evidence that the impact of the Restatement impacted Q4 and FY 2022 results is shown by the fact that an analyst noted in a June 1, 2022 report following the Q4 release that "[a]nalysis [of Q4 2022] was complicated by the recent restatement which converted substantial AdColony and Fyber revenue from a gross basis to net, reducing reported revenue by more than a third[.]" Because new information disclosing the continued impact of the previously concealed truth was revealed on May 31, 2022, Plaintiffs have more than adequately pled loss causation.

**B.    Both Corrective Disclosures Are Causally Connected to Pre-Acquisition Statements About AdColony and Fyber**

Last, the statements made before or at the time of the acquisitions are causally connected to the corrective disclosures. Defendants stressed that "*this strategic transaction will accelerate our growth*" and "*we anticipate that the AdColony transaction will be substantially accretive to our expected profitability in the first full year following the transaction*." ¶¶106-107. Similarly, in connection with the Fyber acquisition, Defendants touted that "*[t]he combined platform*

*offering is already generating more than $1 billion in annualized revenue*" and attributed "*the reported 179% year-over-year revenue growth in the March quarter*" to Fyber. ¶¶112-113. These misstatements directly relate to the Company's subsequent corrective disclosures wherein they admitted that the Company overstated the revenue and related growth figures concerning these acquisitions and revealed the financial impact on its profitability for the entire FY 2022. Plaintiffs have more than alleged "a facially 'plausible' causal relationship between the fraudulent statements and omissions and plaintiff's economic loss." *Lormand*, 565 F.3d at 258.

## VII.    PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON CLAIMS

Defendants only argue that the §20(a) claims fail because the underlying §10(b) claims must be dismissed. Because the §10(b) claims survive, so do the Section 20(a) claims. *See Parmelee*, 2018 WL 276338, at *7.

## VIII.    CONCLUSION

The Court should deny Defendants' Motion. Alternatively, if the Court grants any part of the motion, Plaintiffs request leave to amend pursuant to Rule 15 of the Federal Rules of Civil Procedure as this is the first complaint this Court has considered on this matter. *See U.S. ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004).

///

///

///

35

Dated: June 2, 2023                    Respectfully submitted,

                                       **GLANCY PRONGAY & MURRAY LLP**

                                       By:   */s/ Leanne H. Solish*
                                       Kara M. Wolke
                                       Leanne H. Solish
                                       Pavithra Rajesh
                                       1925 Century Park East, Suite 2100
                                       Los Angeles, CA 90067
                                       Telephone: (310) 201-9150
                                       Facsimile: (310) 201-9160
                                       Email: kwolke@glancylaw.com
                                               lsolish@glancylaw.com
                                               prajesh@glancylaw.com

                                       *Counsel for Plaintiffs and*
                                       *Lead Counsel for the Class*

                                       **AHMAD, ZAVITSANOS & MENSING, PLLC**
                                       Sammy Ford IV
                                       State Bar No. 24061331
                                       Jordan Warshauer
                                       State Bar No. 24086613
                                       1221 McKinney Street, Suite 2500
                                       Houston, Texas 77010
                                       Telephone: (713) 665-1101
                                       Facsimile: (713) 665-0062
                                       Email: sford@azalaw.com
                                               jwarshauer@azalaw.com

                                       *Liaison Counsel for Plaintiffs and Class*

                                       **ROBBINS GELLER RUDMAN & DOWD LLP**
                                       Jonah H. Goldstein
                                       Eric I. Niehaus
                                       Joseph J. Tull
                                       655 West Broadway, Suite 1900
                                       San Diego, CA 92101
                                       Telephone:  (619) 231-1058
                                       Facsimile:  (619) 231-7423
                                       Email: jonahg@rgrdlaw.com
                                               ericn@rgrdlaw.com
                                               jtull@rgrdlaw.com

                                       *Additional Counsel*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel for Plaintiff Jay Robison*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 2, 2023, I electronically filed a true and correct copy

the foregoing document with the Clerk of Court using the CM/ECF system which will send a

notice of electronic filing to all counsel of record who have consented to electronic notification.

*/s/ Leanne H. Solish*
Leanne H. Solish
