IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE DIGITAL TURBINE, INC. SECURITIES LITIGATION | § § § | Master File No. 1:22-CV-550-DAE<br><br>CLASS ACTION |
| This Document Relates to:<br><br>ALL ACTIONS. | § § § § | |

ORDER GRANTING
DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

This consolidated case arises from two related class action lawsuits brought under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act") on behalf of persons and entities that purchased or otherwise acquired Digital Turbine securities between February 26, 2021 and May 31, 2022, inclusive (the "Class Period."). Before the Court is a Motion to Dismiss Plaintiffs' Consolidated Complaint, filed on April 18, 2023, by Defendants Digital Turbine ("Digital Turbine"), Digital Turbine CEO William Stone ("Stone"), and Digital Turbine CFO Barrett Garrison ("Garrison") ("Individual Defendants" and with Digital Turbine "Defendants"). (Dkt. # 44.)

Lead Plaintiff Howard J. Burch, together with Plaintiff Jay Robison (collectively, "Plaintiffs"), filed a Response on June 2, 2023. (Dkt. # 48.) Defendants filed a Reply on July 3, 2023. (Dkt. # 52.) After careful consideration

of the memoranda filed in support of and in opposition to the Motion, the Court, for the reasons below, **GRANTS** Defendants' Motion to Dismiss. (Dkt. # 44.)

## BACKGROUND

After this Court consolidated the cases into a single action (Dkt. # 36), Plaintiffs filed a Consolidated Complaint on behalf of those who purchased or otherwise acquired Digital Turbine securities during the Class Period. (Dkt. # 38.) Plaintiffs allege securities fraud claims against Defendants under Section 10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. (Dkt. # 38 at 75-78.) Plaintiffs also bring claims for control person liability against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (Id. at 78-79.)

### I. The Company

Digital Turbine is an Austin-based mobile advertising technology company offering an end-to-end solution for mobile brand acquisition, advertising, and monetization. (Dkt. # 38 ¶ 2.) In 2021, Digital Turbine acquired AdColony Holding AS ("AdColony"), a mobile video advertising platform, and Fyber N.V. ("Fyber"), a cross-platform monetization platform with expertise in mediation, real-time bidding, advanced analytics tools, and video. (Id. ¶ 4.) These acquisitions made Digital Turbine a "full-stack mobile advertising solution," enabling the company to directly engage in mobile advertising and garner recurring

revenue streams. (Id.) However, these acquisitions are also the subject of the instant class action.

The Class Period begins on February 26, 2021, the day Digital Turbine published a press release announcing its definitive purchase agreement to acquire AdColony for between $350 million to $375 million. (Id. at ¶ 106.) Digital Turbine filed the press release with the SEC on March 1, 2021, as exhibit 99.1 to Form 8-K, which was signed by Garrison. (Dkt. # 45-17.) The press release quotes Stone as stating:

> The ability for Digital Turbine to utilize AdColony's unique mobile advertising solutions across our vast device distribution footprint will ***unlock significant new monetization opportunities for the combined company's platform offerings***. . . . Considering the current run-rate of recurring business at AdColony, along with expected realized synergies and the terms of consideration, we anticipate that the AdColony transaction will be ***substantially accretive to our expected profitability in the first full year following the transaction***.

(Id. at 5-6 (emphasis added).)

On March 22, 2021, Digital Turbine published another press release announcing its definitive purchase agreement to acquire approximately 95% of the shares of Fyber for close to $600 million. (Dkt. # 38 at ¶ 108.) Digital Turbine filed the press release with the SEC on March 23, 2021, again signed by Garrison and attached as exhibit 99.1 to Form 8-K. (Dkt. # 45-18.) The press release quotes Stone as saying:

> Combined with our recently announced AdColony and Appreciate acquisitions, Fyber represents an extremely valuable puzzle piece for Digital Turbine to strategically assemble one of the largest full-stack mobile advertising solutions in the industry. . . . We are certainly excited about the anticipated revenue synergies that Fyber, AdColony and Appreciate will engender for the combined company, our partners, and our customers.

(Id. at 24.)

On April 29, 2021, Digital Turbine issued a press release announcing the completion of the AdColony acquisition. (Dkt. # 38 at ¶ 109.) The press release was filed with the SEC on April 30, 2021 as exhibit 99.1 to Form 8-K and signed by Garrison. (Dkt. # 45-7.) As part of that announcement, the Company reported AdColony's preliminary financial results for the quarter ending March 31, 2021, stating that "AdColony previously announced unaudited financial results for its first quarter ended March 31, 2021. Revenue for AdColpony for the first quarter is estimated to be approximately $58.3 million[.]" (Dkt. # 45-7 at 4.) The press release also reported Fyber's preliminary financial results for the quarter ending March 31, 2021, stating "Fyber estimates total revenue in excess of 85 million [euros] in the March quarter[.]" (Id. at 6.)

On May 18, 2021, Digital Turbine posted an Investor Presentation with a slide indicating preliminary revenue results for the quarter ending March 31, 2021, in excess of $1 billion dollars. (Dkts. ## 38 at ¶ 111; 45-4 at 28.)

On May 25, 2021, Digital Turbine issued a press release announcing the completion of the acquisition of Fyber. (Dkt. # 38 at ¶ 112.) The press release was filed with the SEC on May 28, 2021 as exhibit 99.1 to Form 8-K, which was signed by Garrison. Stone was quoted as saying:

> Combined with our recently completed AdColony and Appreciate acquisitions, Fyber represents a very important puzzle piece for Digital Turbine in its mission to develop one of the largest full-stack, fully-independent, mobile advertising solutions in the industry. The combined platform offering is ***already generating more than $1 billion in annualized revenue***. . . . As evidenced by the ***reported 179% year-over-year revenue growth in the March quarter***, the Fyber team has done an amazing job of building a highly differentiated, growing and profitable standalone business.

(Id. (emphasis added))[1]

In an earnings call on June 1, 2021, Stone stated that the "combination of Digital Turbine, Appreciate, AdColony, and Fyber positions us as a company with greater than ***$1 billion in profitable annualized revenue***" and that "[t]oday, with the closing of Fyber, AdColony, Appreciate and our own Digital Turbine triple digit organic growth, ***we are now a company that has over $1 billion of annualized revenue***." (Id. at ¶ 48 (emphasis added).) On the same day, Digital Turbine filed a press release with the SEC also, as exhibit 99.1 to Form 8-K and signed by Garrison, with the following quote from Stone: "The combination of

[1] See sec.gov/Archives/edgar/data/317788/000110465921074178/tm2117957d1_ex99-1.htm

Digital Turbine, Appreciate, AdColony, and Fyber position us as a company with greater than $1 billion in profitable annualized revenue." (Id. at ¶ 114.)

On July 14, 2021, Digital Turbine filed a Firm 8-K/A, signed by Garrison, with the SEC. (Id. ¶ 116.) The company also attached a pro forma combined financial information for Digital Turbine and AdColony that stated, in relevant part: "[a]t this time, the Company is not aware of any other differences that would have a material effect on the unaudited pro forma condensed combined financial information[.]" (Id.)

Plaintiffs contend that (1) the AdColony and Fyber Q4 2021 estimates supporting Digital Turbine's $1B projection were overstated;[2] (2) that because AdColony and Fyber act as agents in some of their product lines, revenue for those product lines should be reported net of license fees and revenue share expenses; and (3) that Digital Turbine "in a gross departure from GAAP,[3] would account for

---

[2] Plaintiffs allege that in Digital Turbine's May 31, 2022 release, Defendants restated AdColony's revenue for the quarter ended March 31, 2021, from $58.3 million to $39.4 million and restated Fyber's revenue for the same period from $102.9 million/ €85 million to $20.3 million. (Dkt. # 38 ¶ 115.)

[3] Generally accepted accounting principles. Generally accepted accounting principles ("GAAP") comprise a set of basic postulates and broad accounting principles pertaining to business enterprises. These principles, approved by the American Institute of Certified Public Accountants ("AICPA"), establish guidelines for measuring, recording and classifying the transactions of a business entity.

the entirety of AdColony's and Fyber's revenue on a gross basis without regard to the nature of the revenue." (Id. at ¶ 115.)

## II. Fiscal Year 2022 Financial Statements

On August 9, 2021, Digital Turbine announced its financial results for Q1 2022 by press release, which was filed with the SEC that same day as exhibit 99.1 to Form 8-K, signed by Garrison. (Dkts. ## 38 at ¶ 118; 45-6.) It stated:

| | Revenue | Pro forma revenue | Pro Forma YOY Revenue Growth |
|---|---|---|---|
| AdColony | $44.9 million | $63.241 million | 46% |
| Fyber | $49.6 million | $113.465 million | 190% |
| In-App Media | $92.3 million | Not specifically identified in Complaint | 117%[4] |
| Digital Turbine | $212.6 million | $292.0 million | 104% |

(Dkt. # 38 at ¶ 118.) In both the 8-K and earnings call the same day, Stone and/or Garrison reiterated many of these numbers. (Id. at ¶¶ 119-124.) These numbers were also reflected in the Q1 2022 10-Q, signed by Stone and Garrison.[5] (Id. at ¶ 125.)

[4] Stated by Stone on August 9, 2021 earnings call. (Dkt. # 38 ¶ 120.)

[5] Plaintiffs specifically point out that under "Controls and Procedures" the 10-Q stated that "Based on the evaluation of our disclosure controls and procedures as of

On November 2, 2021, Digital Turbine issued a press release announcing its financial results for Q2 2022; this press release was filed with the SEC that same day as exhibit 99.1 to Form 8-K, signed by Garrison. (Dkts. ## 38 at ¶ 131; 45-20.) For the second fiscal quarter of FY 2022, Digital Turbine announced:

| | Revenue | Pro forma revenue | Pro Forma YOY Revenue Growth |
|---|---|---|---|
| AdColony | $61.5 million | Not specifically identified in Complaint | 19% |
| Fyber | $127.5 million | Not specifically identified in Complaint | 93% |
| In-App Media | $187.2 million | Not specifically identified in Complaint | 61% |
| Digital Turbine | $310.2 million | $190.2 million[6] | 63% |

(Dkt. # 38 at ¶ 131.) In the earnings call the same day, Stone and/or Garrison reiterated many of these numbers. (Id. at ¶¶ 132-138.) These numbers were also reflected in the Q2 2022 10-Q, signed by Stone and Garrison. (Id. at ¶ 138.)

---

the end of the period covered by this Report, our [CEO] and [CFO] concluded that, as of such date, our disclosure controls and procedures were effective." (Id. at ¶ 128.)

[6] Stated in the November 2, 2021 10-Q. (Dkt. # 38 at ¶ 138.)

Plaintiffs argue that Digital Turbine's financial statements were not presented in accordance with GAAP and therefore materially misstated. (Id. at ¶ 143.) Digital Turbine also issued an Investor Presentation dated November 11, 2021, which reiterated the Q2 2022 revenue and growth numbers articulated in the 10-Q. (Id. at ¶ 144- 147.) Garrison participated in a 2021 Analyst Day the same day and repeated these figures. (Id. at ¶ 148-149.) Plaintiffs argue that the figures presented in the Investor Presentation and on 2021 Analyst Day are misleading for the same reasons as when presented in the 10-Q. (Id. at ¶ 150.)

On February 8, 2022, Digital Turbine issued a press release announcing its financial results for Q3 2022; this press release was filed with the SEC that same day as exhibit 99.1 to Form 8-K, signed by Defendant Garrison. (Dkts. ## 38 at ¶ 151; 45-21.) For the third fiscal quarter of FY 2022, Digital Turbine announced:

| | Revenue | Pro Forma Revenue | Pro Forma YOY Revenue Growth |
|---|---|---|---|
| AdColony | $94.3 million | Not specifically identified in Complaint | 28% |
| Fyber | $157.4 million | Not specifically identified in Complaint | 48% |
| In-App Media | $251.7 million | Not specifically identified in Complaint | 40% |

| | | | |
|---|---|---|---|
| Digital Turbine | $375.5 million | $271.5 million[7] | 38% |

(Dkt. # 38 at ¶ 151.) In the earnings call the same day, Stone and/or Garrison reiterated many of these numbers. (Id. at ¶¶ 152-157.) These numbers were also reflected in the Q3 2022 10-Q, signed by Stone and Garrison. (Id. at ¶ 161.) On the February 8, 2022 earnings call, both Stone and Garrison repeated these figures, emphasizing the growth in revenue for the company overall and for AdColony and Fyber in specific. (Id. at ¶ 158-160) (stating that AdColony "had a really nice quarter," and that Digital Turbine was "seeing really nice growth there, across the board.")

III. Corrective Disclosures

During the fourth quarter of the 2022 fiscal year, Digital Turbine undertook a comprehensive review of revenue accounting for AdColony and Fyber—as the company told investors it would. See Ex. 6, Aug. 9, 2021 8-K/A at 40 (stating that "Company will continue to perform its detailed review of Fyber's and AdColony's accounting policies"). The comprehensive review of Fyber and AdColony's accounting policies included hiring KPMG, a Big 4 accounting firm, to assist Digital Turbine. Ex. 3, May 27, 2022 10-Q/A (Q1 2022) at 35. The Company determined through this review that some AdColony and Fyber product

[7] Taken from the 10-Q. (Dkt. # 38 at ¶ 161.)

lines should have been reported net of license fees and revenue share expense (in other words, using the agent-net accounting treatment and not the principal-gross approach) and announced this information to investors on May 17, 2022. Ex. 8, May 17, 2022 Press Release at 1. On this news, the company's shares fell $1.93, or 7.1%, to close at $25.28 per share on May 18, 2022, on unusually heavy trading volume. (Dkt. # 38 at ¶ 11.)

On May 2022, Digital Turbine issued restated financials for Q1-Q3 2022. (Id. ¶ 12.) The company explained that in certain AdColony and Fyber business lines, Digital Turbine "acts as an intermediary between DSPs and publishers by providing access to a platform and the SDKs that allow both parties to transact in the buying and selling of ad inventory." (Dkt. # 45-3 at 12.) Digital Turbine has "no pricing discretion" because the "transaction price is determined through a realtime auction." (Id.) Additionally, Digital Turbine has no "obligation related to the fulfillment of the advertising delivery." (Id.) For these reasons, Digital Turbine concluded that it lacked the requisite "control" over the deliverables for these transactions, thus acting as an agent.

The changes decreased revenue, license fees, and revenue share in each quarterly financial statement, but also increased reported gross profit margin and Non-GAAP Adjusted EBITDA margin. (Dkt. # 45-8 at 1.) There was no change to previously reported income from operations, net income/loss, Non-

GAAP gross profit, Non-GAAP Adjusted EBITDA, or Non-GAAP free cash flow. (Id.)

The restatements also led Digital Turbine to identify a material weakness in its internal control over financial reporting. Specifically, management concluded that Digital Turbine's internal control for business combinations "did not include a control adequately designed to ensure acquiree accounting policies, as they relate to presentation and classification, were conformed to those of the Company and GAAP." (Dkt. # 45-5 at 102.) To correct the issue, Digital Turbine announced that it would improve its policies and procedures by strengthening its "procedures for reviewing accounting policies of material acquired companies, inclusive of the accounting for revenue, through initial reviews during the due diligence period and alignment of accounting policies prior to the first interim reporting date," among other steps. (Id.)

On May 31, 2022, Digital Turbine announced its quarterly and fiscal year 2022 financial results for the period ended March 31, 2022, reporting quarterly revenue of $184.1 million. (Dkt. # 38 at ¶ 18.) On this news, Digital Turbine's shares fell $5.75, or 22.61%, to close at $19.68 per share on June 1, 2022, on unusually heavy trading volume. (Id. at ¶ 20.)

## LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d 343, 346 (5th Cir. 2013) (quoting In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In addition, when alleging claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must:

(1) specify each statement alleged to have been misleading, i.e. contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby;

(6) explain the reason or reasons why the statement is misleading, i.e. why the statement is fraudulent.

ABC Arbitrage Plaintiffs Grp. v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002). Further, if an allegation regarding a statement or omission is "made on information and belief, the plaintiff must (7) state with particularity all facts on which that belief is formed, *i.e.*, set forth a factual basis for such belief." Id. (citing 15 U.S.C. § 78u–4(b)(1)). According to the Fifth Circuit, "this is the 'who, what, when, where, and how' required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA." Id.

## DISCUSSION

### I. Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder

To state a Section 10(b) and Rule 10b-5 claim, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) scienter (a 'wrongful state of mind'); (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) a 'causal connection between the material misrepresentation and the loss.'" Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc., 935 F.3d 424, 429 (5th Cir. 2019) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005)).

A. False or Misleading Statements

Rule 10b-5(b) forbids "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). The PSLRA contains a safe harbor for statements that are forward-looking and accompanied by meaningful cautionary statements. See 15 U.S.C. § 78u-5(c)(1)(A). Statements may also be non-actionable as mere "puffery" if they are "'of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation.'" Southland Sec. Corp. v. INSpire Ins. Sols., Inc., 365 F.3d 353, 372 (5th Cir. 2004) (quoting Lain v. Evans, 123 F.Supp.2d 344, 348 (N.D.Tex. 2000)); cf. Lormand v. US Unwired, Inc., 565 F.3d 228, 249 n.14 (5th Cir. 2009) (holding statements with "concrete factual and material misrepresentations and omissions" did not qualify as mere puffery).

The pre-acquisition statements identified in paragraphs 106-108 of the Complaint are non-actionable puffery. Stone's optimistic announcements that the acquisition of AdColony would "accelerate [ ] growth," and "be substantially accretive to [ ] expected profitability," and being "excited about the anticipated revenue synergies that Fyber, AdColony and Appreciate will engender for the combined company" are merely "positive affirmations or opinions in his belief in

the [company]" that are "so vague and lacking in specificity that no reasonable investor could find them important in the total mix of information." In re Franklin Bank Corp. Sec. Litig., 782 F. Supp. 2d 364, 386 (S.D. Tex. 2011), aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella, 464 Fed. Appx. 334 (5th Cir. 2012).

Moreover, "[p]rojections of future performance generally are not actionable under the securities laws, unless they were false when made." Id.; see also Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir. 1993) ("Similarly, projections of future performance not worded as guarantees are generally not actionable under the federal securities laws."). And these statements do not appear to be false when made: AdColony and Fyber *did* accelerate growth and produce revenue for Digital Turbine after their acquisition, even if less than Plaintiffs had hoped.[8] (Dkt. # 38 at ¶ 64 (providing restated figures for Q1-Q3, 2022).)

However, the remaining pre-acquisition statements—about AdColony and Fyber's preliminary financial results for Q4 2021 and the anticipated Digital

[8] These statements are also likely unactionable under the PSLRA safe harbor as forward-looking statements accompanied by meaningful cautionary disclaimers. See 15 U.S.C §78u-5. The press releases cited in paragraphs 106 through 108 of the Complaint contained forward-looking statements and disclaimers that directed investors to the risk disclosures in Digital Turbine's SEC filings. (Dkts. ## 44-17; 44-18.) Under the PSLRA, courts must consider the risk factors and warnings included in documents cited in a complaint. 15 U.S.C. § 78u-5(e).

Turbine revenue for that quarter—are specific enough to be actionably misleading. (Dkt. # 38 at ¶¶ 109-114.) Digital Turbine first argues that these statements are unactionable because they "were true when made," since Digital Turbine was merely parroting figures provided by AdColony and Fyber, and attributed the figures to the companies. (Dkt. # 44 at 34.) But it is well-settled that "[t]he ability of a statement to provide accurate information, rather than the statement's literal truth, is the benchmark by which statements to the market are measured in securities fraud cases." KB Partners I, L.P. v. Pain Therapeutics, Inc., No. A-11-CA-1034-SS, 2015 WL 7760201, at *9 (W.D. Tex. Dec. 1, 2015) (citing Lormand, 565 F.3d at 248); see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.") The fact that AdColony and Fyber's revenue had not been reported in accordance with GAAP makes the revenues figures misleading, even if not at Digital Turbine's hand. (See Dkt. # 44 at 18 (admitting that AdColony and Fyber's revenue figures had "preexisting issues with revenue recognition for certain AdColony and Fyber business lines").)

Digital Turbine next argues that because it did not issue a separate restatement of AdColony or Fyber's Q4 2021 revenues, Plaintiffs cannot rely on case law for the proposition that a company's restatement "may show the falsity of

prior information[.]" In re ArthroCAre Corp. Sec. Litig., 726 F. Supp. 2d. 696, 709 (W.D. Tex. 2010). But Digital Turbine's May 31, 2022 report of its year-over-year growth rate—and that of AdColony and Fyber— implicitly adopts lower revenue numbers for AdColony and Fyber's Q4 2021 than Digital Turbine publicly advertised in its April 29, 2021 press release, May 18, 2021 Investor Presentation, May 25, 2021 press release, and June 1, 2021 press release. (Dkt. # 38 at ¶¶ 71-72, 109-114.) Lowering these numbers also deflates the $1 billion figure referenced in these pre-acquisition statements as the "[c]ombined revenue" of the companies. (Id. at ¶ 111.) Thus, Digital Turbine's own adjustments are sufficient to implicate the falsity of the figures given in paragraphs 109-114 for AdColony and Fyber's Q4 2021 revenues and Digital Turbine's $1 billion combined revenue.

Digital Turbine does not dispute that its post-acquisition statements about its Q1-Q3 2022 revenue were misleading, as evidenced by Digital Turbine's May 2022 restatement of these financial results. Plaintiffs have successfully pled falsity as to these statements. (Dkt. # 38 ¶ 12); see In re AthroCare Corp. Sec. Litig., 726 F. Supp. 2d. at 709 (holding restatement of financial information sufficient to show the restated financial information was false when published).

B. Failure to Plead Scienter

The PSLRA requires a complaint to support allegations of scienter with "facts giving rise to a strong inference that the defendant acted with the

required state of mind." Six Flags Ent. Corp., 58 F.4th at 214 (citing 15 U.S.C. § 78u-4(b)(2)(A)). "A complaint adequately pleads scienter by alleging facts that support the defendant acted with an 'intent to deceive, manipulate, or defraud or severe recklessness.'" Id. (citing Lormand, 565 F.3d at 251).

The Supreme Court has adopted a three-part test for examining scienter. Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Group, Inc., 537 F.3d 527, 533 (5th Cir. 2008). First, the factual allegations in the complaint must be taken as true. Id. (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2509 (2007)). Second, those allegations should be considered holistically, including documents incorporated in the complaint by reference. Id. Third, a court must consider plausible inferences opposing as well as supporting a strong inference of scienter. Id. The inference of scienter must ultimately be "cogent and compelling," not merely "reasonable" or "permissible." Id. (citing Tellabs, Inc., 127 S.Ct. at 2510). "[W]here there are competing inferences that establish or negate the scienter requirement, a tie favors the plaintiff on a motion to dismiss[.]" Spitzberg v. Houston Am. Energy Corp., 758 F.3d 676, 686 (5th Cir. 2014) (quotation marks and citation omitted).

The PSLRA requires that plaintiffs "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud. As such, corporate officers may not be held responsible for unattributed corporate

statements solely on the basis of their titles." Southland Sec. Corp., 365 F.3d at 365 (emphasis added/original). "The law of the Fifth Circuit is clear: 'pleadings of scienter may not rest on the inference that defendants must have been aware of a misstatement based on their positions with the company.'" In re ArthroCare Corp. Sec. Litig., 726 F. Supp. 2d. at 719-20 (quoting Abrams v. Baker Hughes Inc.,292 F.3d 424, 432 (5th Cir. 2002)).

1. GAAP Violations Alone Do Not Establish Scienter

The Fifth Circuit has repeatedly held that the "mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." Shaw Group, Inc., 537 F.3d at 534 (citations omitted); see also Barrie v. Intervoice–Brite, Inc., 397 F.3d 249, 264 (5th Cir. 2005), modified and reh'g denied, 409 F.3d 653 (5th Cir. 2005) (holding that allegations of GAAP violations were insufficient, but the addition of evidence from a confidential witness supported scienter); see also Centr. Laborers' Pension Fund, 497 F. 3d at 552-54 (affirming dismissal of case because "GAAP violations, without more, do not establish scienter" for company or for individual defendants who signed the incorrect financial statements). Digital Turbine's failure to follow GAAP in

accounting for certain revenues[9] for Q1-Q3 2022 does not itself speak to any "intent to deceive" or "manipulate." Lormand, 565 F.3d at 251.

2. Existence of Policy in AdColony's Financials Does Not Require Inference of Scienter

Plaintiffs attempt to augment Digital Turbine's alleged GAAP violations by arguing that because AdColony's December 31, 2020 financial statement noted a policy of principal-gross/agent-net revenue accounting,[10] Digital Turbine must have failed to apply this principal of accounting intentionally, or at least severely recklessly, to boost revenue. (Dkt. # 48 at 31-32.) But this fact is not the silver bullet Plaintiffs seem to imagine. As to the Individual Defendants, "a basis for scienter beyond signatures on SEC filings is required." Izadjoo v. Helix Energy Sols. Grp., Inc., 237 F. Supp. 3d 492, 520 (S.D. Tex. 2017). Plaintiffs provide no convincing evidence, other than aspirational statements about revenue that the Court has already found unactionable, from which the Court might infer

[9] Whether AdColony actually complied with this policy is disputed, because Digital Turbine claims that AdColony had its own accounting wrong, and the company merely adopted those incorrect practices for the first three quarters of 2022. For purposes of argument, the Court presupposes Plaintiffs' version of events. But to say that because AdColony had a written policy in accordance with GAAP, Digital Turbine intended to deceive investors by failing to fully follow that policy after acquisition, would mean that scienter is met every time a filing is inaccurate after having *been* accurate on the same point in the past. This result is unsupported by case law.

[10] This document was attached to an 8K/A signed by Garrison on July 14, 2021. (Dkt. # 38 at ¶ 90.)

that the Individual Defendants knew about this accounting principal and disregarded it. And whether AdColony actually followed this policy, such that Digital Turbine must have "abandoned its application to boost revenue figures", is far from evident. (Dkt. # 48 at 32.) As Plaintiffs themselves argue, Digital Turbine found that AdColony's *own* revenue recognition policy for at least Q4 2021 was not in accordance with GAAP. (Dkt. # 38 at ¶¶ 71-72.)

Nor does the existence of AdColony's written policy about principal-gross/agent-net accounting implicate severe recklessness, which is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an *extreme departure* from the standards of ordinary care, and present a danger of misleading . . . which is either known to the defendant or is so obvious that the defendant must have been aware of it." Nathenson v. Zonagen, Inc., 267 F.3d 400, 408 (5th Cir. 2001). Both AdColony and Fyber were audited by Big 4 accounting firms who warranted to Digital Turbine that the companies' financials were correct. In re IMAX Sec. Litig., 587 F. Supp. 2d 471, 482 (S.D.N.Y. 2008) (explaining that in a mere "GAAP violation case," the complex and subjective nature of the applicable accounting rules and the reliance on an outside accounting firm cut against an inference of scienter). Yet, according to Plaintiffs, those revenue numbers were incorrect even before acquisition by Digital Turbine. (Dkt. # 38 at ¶¶ 109-114.)

The principal-gross/agent-net accounting rule in AdColony's financials, and the absence of that stated rule in Fyber's financials, does not appear to present a risk of improperly calculating revenue "so obvious that the defendant must have been aware of it." See Nathenson, 267 F.3d at 408; see also Schott v. Nobilis Health Corp., 211 F. Supp. 3d 936, 953 (S.D. Tex. 2016) ("misapply[ying] two codified accounting standards" was not a red flag). Stating a GAAP-mandated accounting principle in a financial statement does not present the sort of red flag recognized in this Circuit, such as the allegation that top officials "were directly confronted by the financial media with evidence of various fraudulent practices." In re ArthroCare Corp. Sec. Litig., 726 F. Supp. 2d at 712.

3. Facts and Circumstances of Restatement Weight Against Scienter

Plaintiffs also argue that the facts and circumstances of Digital Turbine's May 2022 restatement support scienter. (Dkt. # 48 at 27.) The Court may consider "the number, size, timing, nature, frequency, and context of the misapplication or restatement" to evaluate scienter. In re ArthroCare Corp. Sec. Litig., 726 F. Supp. 2d at 721 (citing In re Triton Energy Ltd. Sec. Litig., 2001 WL 872019, at *11 (E.D. Tex. Mar. 30, 2001)). These factors weigh against a finding of scienter.

The nature of the error weighs against finding scienter. Though Plaintiffs portray the failure to use appropriate principal-gross/agent-net

accounting as a "straightforward," a comprehensive, contract-by-contract review is required to apply the rule appropriately. See FASB, ASC 606-10-55-36; see also Laura Alexander, Remarks Before the 2019 AICPA Conference on Current SEC and PCAOB Developments (2019) ("As discussed in previous staff speeches, we continue to observe that applying the principal versus agent guidance may require significant judgment, especially in the case of emerging business models."). While the difficulty of applying this rule does not excuse Digital Turbine's alleged failure to apply the rule at all, it bears consideration that under Plaintiffs' version of events, the two Big 4 accounting firms auditing AdColony and Fyber prior to the acquisition failed to apply it, yet warranted that the financial statements they prepared accorded with GAAP. (Dkt. # 45-6, 45-19); see Schott, 211 F. Supp. 2d at 956 (finding scienter lacking though corporate officers may have been "negligent in relying on the auditors" from a small auditing firm with as many accountants as entities needing to be audited).

The timing and frequency of the error does not weigh in favor of scienter. Digital Turbine's error was cabined to the first three quarters of 2022, distinguishing it from more "numerous and frequent" misstatements recognized in this circuit. See In re BP p.l.c. Sec. Litig., 843 F. Supp. 2d 712, 784 (S.D. Tex. 2012) (finding scienter when Defendant made "so many statements" about safety over the class period that he "admitted he got 'bored' with saying 'safety, people,

and performance.'"); see also In re ArthroCare Corp. Sec. Litig., 726 F. Supp. 2d at 721 (characterizing four years of misstatements "a substantial period of time" for purposes of scienter). Moreover, Digital Turbine did not "persist[] in the incorrect accounting" after it was brought to light; upon completion of the KPMG audit, Digital Turbine promptly filed the restated figures for Q1-Q3 2022. See Barrie, 397 F.3d at 264 (finding the fact "that the defendants persisted in the incorrect accounting" after it was brought to their attention supported a strong inference of scienter). While the magnitude of the revenue changes in the restatement was large, Digital Colony's costs decreased by an equal amount due to the impact of the agent-net reporting; accordingly, there was no impact bottom-line financial results: income, cash flows from operations, liquidity, or the balance sheet. (Dkts. ## 44 at 17; 45-8 at 1); see In re ArthroCare Corp. Sec. Litig., 726 F. Supp. 2d at 721-22 (finding scienter when the restatement reduced total revenue for four years and decreased net income by as high as 98.9% one year).

4. SOX Certifications, Executive Compensation, and Trading Do Not Support Scienter

Finally, Plaintiffs allege three factors specific to the Individual Defendants' positions in the company: signing Sarbanes-Oxley certifications, trading during the class period, and the executive compensation.[11] None of these

[11] For the first time in their Response to the Motion to Dismiss, Plaintiffs raise the "core operations" doctrine, which permits the Court to find that company

facts tips the scales in favor of finding scienter. Under the Sarbanes–Oxley Act, senior executives of public companies must certify the accuracy of quarterly and annual financial reports. See 15 U.S.C. § 7241(a). By virtue of their roles, both Individual Defendants signed SOX certifications attesting the information in their financial statements for Q1-Q3. But their signatures help Plaintiffs establish scienter only if the Individual Defendants had "reason to know or suspect the financial statements they were then signing contained material misrepresentations or omissions." Shaw Grp., Inc., 537 F.3d at 545 (quoting Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006)). In other words, Plaintiffs must have alleged facts showing that "the person signing the certification was severely reckless[.]" Id. As laid out previously, Plaintiffs have not laid out facts showing this is the case, and thus, the fact that Defendants signed the filings "does not

---

executives acted with scienter where the challenged statements go to the core of the company's business. (Dkt. # 48 at 35-36.) This claim is not raised. See, e.g. Davis v. DRRF Tr. 2015-1, No. 5:15-CV-880 RP, 2016 WL 8257126, at *3 (W.D. Tex. Jan. 6, 2016) (argument not included in Complaint but only in Response to Motion to Dismiss not before the Court). Even so, it fails on its merits, as this doctrine is limited to cases "exhibit[ing] some combination of four considerations": (1) the company's small size, (2) a transaction that was critical to the company's continued vitality, (3) the misrepresented or omitted information would have been readily apparent to the speaker, and (4) the defendant's statements were internally inconsistent with each other. Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc., 810 F.3d 951, 959 (5th Cir. 2016). Plaintiffs have not alleged a small size, that the acquisitions of AdColony and Fyber were critical to the company's continued vitality, that the incorrectness of the revenue figures was readily apparent to the Individual Defendants, or that they made internally inconsistent statements.

support a strong inference of scienter." Izadjoo v. Helix Energy Sols. Grp., Inc., 237 F. Supp. 3d 492, 516–17 (S.D. Tex. 2017) ("Given the insufficient allegations that Helix officers knew about problems … the fact that they signed the SEC filings does not support a strong inference of scienter.").

Plaintiffs' allegations of insider trading likewise fail to bolster their case. Officer trading "may give rise to an inference of scienter if it is unusual in timing or scope." Cent. Laborers' Pension Fund, 497 F.3d at 553. Plaintiffs allege that Stone and non-defendant Chief Technology Officer Christine Collins sold Digital Turbine shares during the class period and these sales raise an inference of scienter. (Dkt. # 38 at ¶¶ 170-72.) First, Collins' sales are irrelevant, as the Complaint is devoid of allegations that Collins knew about the improper revenue recognition. Moreover, Collins' transaction occurred in June 2021, almost a year prior to the disclosure of the restatements. See In re Sec. Litig. BMC Software, Inc., 183 F. Supp. 2d 860, 903 (S.D. Tex. 2001) ("Furthermore, to the extent that any [I]ndividual Defendant sold some of his BMC holdings, he generally did so well before or well after any of the earnings announcements targeted by Plaintiffs[.]"). Second, the timing and pattern of Stone's sales are not suspicious. Stone sold stock in the twelve months before and twelve months after the Class

Period.[12] (Dkt. # 44 at 24.) Stone's Class-Period sales represented only 5.8% of his 1.2 million shares, and he still held more than a million shares during and at the end of the Class Period. (Id.); see Centr. Laborers' Pension Fund, 497 F.3d at 553 ("[T]he fact that Allen retained over 700,000 shares … indicates that he did not possess scienter regarding the alleged fraud, because otherwise he would have sold these shares before the price fell."). Finally, Garrison's lack of sales during the Class Period strongly weighs against a finding of scienter. See Southland Sec. Corp., 365 F. 3d at 369 ("The fact that other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit.").

Neither does Stone and Garrison's performance-based compensation support an inference of scienter. (Dkt. # 38 at ¶ 175.) While "bonus plans may be considered in conjunction with other scienter allegations," they are "probative only in extraordinary cases." In re ArthroCare Corp. Sec. Litig., 726 F. Supp. 2d at 723. This is no such extraordinary case. Stone and Garrison's bonuses were not "extremely high": they equated to 23% and 17% of their salaries, respectively. Mun. Emps.' Ret. Sys. of Michigan v. Pier 1 Imports, Inc., 935 F.3d 424, 431 (5th Cir. 2019); (Dkt. # 38 at ¶ 176.). And the misstatements occurred primarily *after*

[12] Plaintiffs admit in their Response that they "inadvertently omitted Stone's September 8, 2020 sales when alleging that Stone had not sold any shares in the 12 months preceding the Class Period." (Dkt. # 48 at 33, n.14.)

the acquisitions, which makes the fact that the Individual Defendants' "performance goals were inclusive of the Company's acquisitions of Fyber N.V. and AdColony," specifically, "fees and expenses related to acquisitions," far from damning, as those fees and expenses would presumably already be incurred by the time of the misstatements. (Dkt. # 38 at ¶ 175.)

5. Plaintiffs Have Also Failed to Plead Digital Turbine's Scienter

Securities law does not recognize aggregate corporate intent. See Southland Sec. Corp., 365 F. 3d at 366-67. Instead, a "corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual." Id. at 367 (quoting First Equity Corp. v. Standard & Poor's Corp., 690 F. Supp. 256, 260 (S.D.N.Y.1988)). Plaintiffs allege vaguely that "if not the Individual Defendants, *someone* within the Company . . . had to have known that the decision to not continue with principal-gross/agent-net accounting was made and thus inflate revenue from the Acquired Companies." (Dkt. # 48 at 38 (emphasis added).) But because the Complaint "does not assert that any particular individual [Digital Turbine] director, officer or employee, *other than* the named individual defendants, acted with scienter in or respecting the making or issuing of any of the complained of statements," it is "only necessary for [the Court] to address the allegations claimed to adequately show such state of mind on the part of the individual defendants." Southland Sec. Corp., 365 F. 3d at 367; see

also In re ArthroCare Corp., 726 F. Supp. 2d. at 728 (evaluating only the individual defendants' scienter for attribution to corporation, since "Plaintiff has not alleged any individual ArthoCare director, officer, or employee other than the named defendants . . . acted with scienter."). Merely alleging that "someone" in the company must have acted with scienter does not circumvent this rule demanding specificity. As Plaintiffs have failed to allege scienter on the part of the Individual Defendants, Plaintiffs have failed to impute scienter to Digital Turbine.

6. Competing Inference

Viewed holistically, the facts do not support a "strong inference of scienter." Shaw Group, Inc., 537 F.3d at 533. "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Tellabs, Inc., 127 S.Ct. at 2510. The inference of nonfraudulent intent is far more compelling. The facts support Digital Turbine's account of (1) conducting an initial assessment pre-acquisition; (2) leaving in place the respective accounting treatments used by AdColony and Fyber; and (3) relying in part on the companies' financial statements that were audited by Big 4 accounting firms.[13] (Dkts. ## 45-19 at 2; 45-6 at 8.) Post-

[13] Plaintiffs' *own* argument about Digital Turbine restating AdColony and Fyber's Q4 2021 revenues supports this version of events, since Digital Turbine had no control over the accounting practices of AdColony and Fyber in Q4 2021.

acquisition, it appears that Digital Turbine conducted a more fulsome review with the assistance of KPMG—as it indicated that it would in its August 9, 2021 8K/A—and determined that some AdColony and Fyber product lines should have been reported using agent-net rather than principal-gross accounting treatment. (Dkts. ## 45-3 at 35; 45-8 at 1.) Digital Turbine then promptly issued its restatement addressing these problems.

The Court need not address the issue of loss causation because all the relevant statements are either unactionable or lack scienter. See Shaw Group, Inc., 537 F.3d at 533 ("In this case, we pretermit testing the sufficiency of the allegations of falsity and loss causation because the complaint insufficiently alleges that the defendants acted with scienter.").

II. Control Person Liability

Plaintiffs allege a violation of Section 20(a) of the Exchange Act against the Individual Defendants. (Dkt. # 38 at ¶ 220.) "'Control person' liability is, however, derivative—it is predicated on the existence of an independent violation of the securities laws." In re Dell Inc., 591 F. Supp. 2d 877, 912 (W.D. Tex. 2008). Because this liability "cannot exist in the absence of a primary violation," the Court must dismiss this claim due to Plaintiffs' failure to adequately plead a violation of Section 10(b). See Southland Sec. Corp., 365 F.3d at 383.

III. Leave to Amend

When a court is faced with a meritorious motion to dismiss, the Fifth Circuit has observed that "our cases support the premise that 'granting leave to amend is especially appropriate . . . when the trial court has dismissed the complaint for failure to state a claim.'" Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002) (quoting Griggs v. Hinds Junior Coll., 563 F.2d 179, 180 (5th Cir. 1977) (per curiam)). "In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." Id.; see also Hart v. Bayer Corp., 199 F.3d 239, 248 n.6 (5th Cir. 2000) (noting that a court may grant a motion to dismiss and dismiss the complaint, but "it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so.").

CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss the Complaint (Dkt. # 44) is **GRANTED WITH LEAVE TO AMEND** the

Complaint. Plaintiffs may file an amended complaint within **twenty-one (21)** days of the date of this Order to address the deficiencies identified herein. Failure to do so will result in the Court's dismissal of the case.

Within **fourteen (14)** days of the entry of an Amended Complaint, if any, the parties must submit a joint proposed scheduling order in accordance with the form set forth in Appendix B to the Local Rules and attached to the Court's February 27, 2023 order.[14]

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, July 19, 2023.



David Alan Ezra
Senior United States District Judge

[14] To the degree this deadline conflicts with the thirty days specified in Docket 42, that deadline is vacated. (Dkt. # 42.)