**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **IN RE DIGITAL TURBINE, INC. SECURITIES LITIGATION** | No. 1:22-cv-00550-DAE |
| | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | |

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................ 1

II.     FACTUAL BACKGROUND ......................................................................... 4

III.    PLAINTIFFS ALLEGE TWO INDEPENDENT THEORIES OF DEFENDANTS' SECTION 10(b) LIABILITY: SCHEME LIABILITY AND FALSE STATEMENTS ...................... 6

IV.     THE SAC ALLEGES SCHEME LIABILITY UNDER RULES 10b-5(a) & (c) ............. 7

        A.    Plaintiffs Adequately Allege Defendants' Deceptive Scheme to Artificially Prop Up Digital Turbine's Stock Price................................................................... 7

        B.    Defendants Did Not Challenge Scheme Liability, and thus Have Waived the Argument, In their Motion To Dismiss................................................... 8

V.      THE SAC ALLEGES DEFENDANTS MADE FALSE OR MISLEADING STATEMENTS IN VIOLATION OF RULE 10b-5(b).................................................................. 9

VI.     THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER ............................... 11

        A.    Plaintiffs' Motive Allegations Support a Strong Inference Of Scienter .............. 12

              1.    Defendants' Desire to Boost Digital Turbine's Share Price to Complete the Fyber Transaction Supports Scienter ........................................ 12

              2.    Stone's Stock Sales Enhance the Inference of Scienter........................... 13

        B.    The SAC Alleges Conscious Misbehavior .......................................... 16

              1.    Defendants Made a Conscious Decision to Report Fyber's Gross Figures and Omit Net Figures............................................................. 16

              2.    Defendants Made a Conscious Decision to Misrepresent Gross Revenue Figures as Net Revenue .......................................................... 18

        C.    The SAC Alleges an Inference of Actual Knowledge by Stone........................... 19

        D.    Defendants Made False Revenue Statements When they Were Aware of Control Deficiencies and Likely Revenue Problems ........................................ 21

        E.    The SAC Alleges a Duty to Monitor ................................................ 22

        F.    The Circumstances of the Restatement Support Scienter .................................... 24

1.      The Nature of the Error Supports Scienter; Defendants' References to the Involvement of "Big 4" Accounting Firms Do Not Negate Scienter ....... 24

2.      The Magnitude of the Restatement Supports Scienter .............................. 26

G.    Overstated Revenue Allowed Digital Turbine To Hit Analyst Estimates ............ 28

H.    Scienter Has Been Pled As To Digital Turbine ..................................................... 28

VII.    THE SAC ADEQUATELY ALLEGES LOSS CAUSATION ....................................... 28

VIII.    THE SAC ADEQUATELY ALLEGES CONTROL PERSON CLAIMS ...................... 30

IX.    CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

<u>CASES</u>

*ABC Arbitrage v. Tchuruk,*
  291 F.3d 336 (5th Cir. 2002) ........................................................................................ 24

*Abrams v. Baker Hughes Inc.,*
  292 F.3d 424 (5th Cir. 2002) ................................................................................... 16, 20

*Barrie v. Intervoice-Brite, Inc.,*
  397 F.3d 249 (5th Cir. 2005) ........................................................................................ 26

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,*
  497 F.3d 546 (5th Cir. 2007) ........................................................................................ 15

*Chalverus v. Pegasystems, Inc.,*
  59 F. Supp. 2d 226 (D. Mass. 1999) ............................................................................ 27

*City of Pontiac Gen. Emps.' Ret. Sys. v. Asar,*
  2016 WL 1322484 (W.D. Tex. Apr. 1, 2016)............................................................... 27

*Dalpark Partners, Ltd. v. Verus Mgmt. One, LLC,*
  2021 WL 3733013 (N.D. Tex. Mar. 1, 2021) ................................................................. 9

*Dudley v. Haub,*
  2013 WL 1845519 (D.N.J. Apr. 30, 2013) ................................................................... 23

*Flaherty & Crumrine Preferred Income Fund Inv. v. TXU Corp.,*
  565 F.3d 200 (5th Cir. 2009) ........................................................................................ 11

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.,*
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)........................................................................... 12

*Fryman v. Atlas Fin. Holdings, Inc.,*
  2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ................................................................ 14

*Gebhardt v. ConAgra Foods, Inc.,*
  335 F.3d 824 (8th Cir. 2003) ........................................................................................ 27

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.,*
  514 F. Supp. 3d 942 (S.D. Tex. 2021) ...................................................................... 9, 23

*Gould v. Winstar Commc'ns, Inc.,*
  692 F.3d 148 (2d Cir. 2012).................................................................................... 11, 19

*Gross v. Medaphis Corp.*,
   977 F. Supp. 1463 (N.D. Ga. 1997) ....................................................................... 12

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
   422 F.Supp.3d 821 (S.D.N.Y. 2019) ...................................................................... 30

*Hedick v. Kraft Heinz Co.*,
   2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ......................................................... 11

*In re Akorn, Inc. Sec. Litig.*,
   240 F. Supp. 3d 802 (N.D. Ill. 2017) ...................................................... 18, 22, 28

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ...................................................................................... 9

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004) .................................................................... 28

*In re ArthroCare Corp. Sec. Litig.*,
   726 F. Supp. 2d 696 (W.D. Tex. 2010) ............................................................ 24, 26

*In re BP p.l.c. Sec. Litig.*,
   843 F. Supp. 2d 712 (S.D. Tex. 2012) .............................................................. 17, 23

*In re Exxon Mobil Corp. Sec. Litig.*,
   387 F. Supp. 2d 407 (D.N.J. 2005) ........................................................................ 21

*In re Fleming Cos. Inc. Sec. & Deriv. Litig.*,
   2004 WL 5278716 (E.D. Tex. June 16, 2004) ................................................. 22, 24

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009) ............................................................. 18, 19

*In re Gilat Satellite Networks, Ltd.*,
   2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) ....................................................... 17

*In re Integrated Elec. Servs., Inc. Sec. Litig.*,
   2006 WL 54021 (S.D. Tex. Jan. 10, 2006) ............................................................ 27

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ..................................................................... 28

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ........................................................................... 14

*In re Parmalat Sec. Litig.*,
  376 F. Supp. 2d 472 (S.D.N.Y. 2005).................................................................. 8

*In re Seitel, Inc. Sec. Litig.*,
  447 F. Supp. 2d 693 (S.D. Tex. 2006) ............................................................... 27

*In re Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) ................................................................ 17

*In re Veeco Instruments, Inc. Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006) ....................................................................... 17

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
  2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021)................................................... 9

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ............................................................................ 20

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ............................................................................ 20

*Lemmer v. Nu-Kote Holding, Inc.*,
  2001 WL 1112577 (N.D. Tex. Sept. 6, 2001)................................................... 13

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
  810 F.3d 951 (5th Cir. 2016) ............................................................................ 13

*Lorenzo v. SEC*,
  139 S.Ct. 1094 (2019)..................................................................................... 7, 8

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ................................................................ 10, 11, 28

*Marcovski v. Groupon, Inc.*,
  553 F. Supp. 3d 460 (N.D. Ill. 2021) ................................................................ 14

*Morgan v. Sundance, Inc.*,
  142 S. Ct. 1708 (2022)........................................................................................ 9

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ........................................................................ 23

*Nguyen v. Radient Pharms. Corp.*,
  2011 WL 5041959 (C.D. Cal. Oct. 20, 2011).................................................... 18

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ................................................................................ 16

*Norfolk Cty. Ret. Sys. v. Ustian*,
2009 WL 2386156 (N.D. Ill. July 28, 2009).......................................................... 27

*Oklahoma Firefighters Pension and Ret. Sys. v. Six Flags Entm't Corp.*,
58 F.4th 195 (5th Cir. 2023) .................................................................................. 15

*Option Plan v. Fushi Copperweld, Inc.*,
929 F. Supp. 2d 740 (M.D. Tenn. 2013).................................................................. 27

*Padilla v. Cmty. Health Sys., Inc.*,
2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022) ...................................................... 25

*Parmelee v. Santander Consumer USA Holdings, Inc.*,
2018 WL 276338 (N.D. Tex. Jan. 3, 2018) ....................................................... 11, 30

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ................................................................................. 23

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
777 F. App'x 726 (5th Cir. 2019) ........................................................................... 10

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc*.,
769 F.3d 313 (5th Cir. 2014) ................................................................................. 29

*S.E.C. v. Snyder*,
292 F. App'x 391 (5th Cir. 2008) ........................................................................... 25

*Schott v. Nobilis Health Corp.*,
211 F. Supp. 3d 936 (S.D. Tex. 2016) .............................................................. 28, 30

*SEC v. Monterosso,*
756 F.3d 1326 (11th Cir. 2014) ............................................................................... 8

*SEC v. Winemaster*,
529 F. Supp. 3d 880 (N.D. Ill. 2021) ................................................... 8, 21, 22, 25

*SEC v. World Tree Fin., L.L.C*.,
43 F.4th 448 (5th Cir. 2022) .................................................................................. 17

*Singh v. 21Vianet Grp., Inc.*,
2017 WL 4322483 (E.D. Tex. Sept. 13, 2017)....................................................... 23

*Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*,
365 F.3d 353 (5th Cir. 2004) ...................................................................... 11, 13, 28

*St Clair Cty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*,
2021 WL 195370 (M.D. Tenn. Jan. 20, 2021).......................................................... 9

*Stone v. Life Partners Holdings, Inc.*,
26 F. Supp. 3d 575 (W.D. Tex. 2014)...................................................... 10, 15, 16, 20

*Taubenfeld v. Hotels.com*,
385 F. Supp. 2d 587 (N.D. Tex. 2004) .................................................................. 10

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)................................................................................... 11, 16

*U.S. v. Allen*,
76 F.3d 1348 (5th Cir. 1996) .............................................................................. 23

*United States v. Hoffman*,
901 F.3d 523 (5th Cir. 2018) ............................................................................... 9

*Wieland v. Stone Energy Corp.*,
2007 WL 2903178 (W.D. La. Aug. 17, 2007)......................................................... 18

*Yoshikawa v. Exxon Mobil Corp.*,
2023 WL 5489054 (N.D. Tex. Aug. 24, 2023)........................................................... 8

REGULATIONS

17 C.F.R. § 240.10b-5(a), (c)............................................................................... 7

OTHER AUTHORITIES

1 COMPUTER SOFTWARE AGREEMENTS: FORMS AND COMMENTARY, § 8:16 ............................... 20

Lead Plaintiff Howard J. Burch and plaintiff Jay Robison (collectively "Plaintiffs"), hereby oppose Defendants' Motion to Dismiss (Dkt. No. 60, the "Motion" or "Mot.")[1] the Consolidated Second Amended Complaint (Dkt. No. 56, "SAC").[2]

## I.      INTRODUCTION

Plaintiffs' SAC alleges a compelling case of Defendants' securities law violations. As the Order on Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint found, Digital Turbine's restatement of its financials largely established falsity. Dkt. 53 ("the Order") at 17-18. The remaining issue is whether Defendants acted with scienter, that is, purposefully, knowingly, or severely recklessly. The SAC establishes they did and cured any prior pleading deficiency as to scienter.

Motivated to prop up Digital Turbine's share price to execute a stock-funded acquisition of mobile advertising tech company, Fyber, with minimal dilution, Defendants made a conscious choice to cherry-pick misleading revenue figures from Fyber's European financials to make it seem as though the acquisition would boost Digital Turbine's revenue more than it actually would. At the same time, Defendants also overstated revenue associated with another recent acquisition, mobile advertiser, AdColony. The misleading overstatement of AdColony's and Fyber's revenue and growth were made during the very window when Digital Turbine's stock was being priced for the Fyber transaction. This pricing would determine the effective dilution from the transaction, and the timing is thus critical to Defendants' scienter: the higher Digital Turbine's share price, the less dilution, and vice versa. Defendants' deliberate cherry-picking of misleading revenue figures was no mere good-faith misapplication of complex accounting principles. It was intentional.

---

[1] Defendants are Digital Turbine, Inc. ("Digital Turbine" or the "Company"), CEO William Stone ("Stone"), and CFO Barrett Garrison ("Garrison").

[2] Unless otherwise stated, all "¶__" references are to, and all capitalized terms are as defined in, the SAC. The Class Period is April 29, 2021 through May 31, 2022. ¶1. In addition, unless otherwise noted, alterations, citations, and quotations are omitted and emphasis is added.

But even giving Defendants the benefit of the doubt that they simply got complicated revenue accounting rules wrong—a benefit to which they are not entitled on this Motion—this cannot explain their decision to mislabel Digital Turbine's revenue, which Defendants admit was comprised of *gross* revenue from AdColony and Fyber, as "Net revenues." *See* Sec. VI.B.2, *infra*. Defendants knew Digital Turbine was reporting AdColony and Fyber revenue on a gross basis *because they decided to do it that way at the time of the acquisitions*. ¶71. But they labeled it "Net" in Digital Turbine's financials. There's a big difference between (i) mistakenly concluding gross revenue reporting is appropriate, and reporting gross; and (ii) calling figures "Net revenues" while knowing they're gross. Defendants can offer no reasonable explanation for their decision to blatantly mislabel revenue as "net" that they knew was gross, let alone offer a *more compelling* explanation than Plaintiffs' proffered inference that they did it to mislead investors as to the Company's revenue and growth.

Additional facts that support Defendants' scienter in misleading investors as to the Company's revenue and growth during the Class Period. For example, by Defendants' own end-of-Class Period admission, Digital Turbine hired a new Chief Accounting Officer ("CAO") in August 2021, just three months after closing the Fyber transaction, to remediate weaknesses in the Company's internal controls. Then, beginning in or around January 2022, Defendants undertook a comprehensive review of revenue for Fyber and AdColony (¶71), and during that very quarter, Digital Turbine's CEO, Defendant Stone, sold $3.25 million worth of stock at inflated prices over $46 per share. ¶¶204-05.

Indeed, just two months after Stone's sales, on May 17, 2022, Digital Turbine first partially revealed to investors it had materially overstated its revenue by *massive* amounts due to over-reporting AdColony and Fyber revenue—by $54.5 million (34.5%) in Q1 2022; $121.6 million (64.5%) in Q2 2022; and $158.7 million (73.2%) in Q3 2022[3]—and would restate is financials as a result. ¶¶8-9. In

---

[3] Digital Turbine's fiscal year ("FY") ends on March 31. Thus, Q1 2022 is April-June 2021; Q2 2022 is July-September 2021; Q3 2022 is October-December 2021; and Q4 2022 is January-March 2022.

response, Digital Turbine's share price fell 7.1%, to close at $25.28/share. ¶11. More bad news about Digital Turbine's misreported revenue was revealed on May 31, 2022, when, after the close of trading, the Company announced its 4Q and FY 2022 financial results, reporting quarterly revenue of $184.1 million—a massive miss from analysts' previous estimates of $332-$338 million, and even a miss on revised estimates following the Restatement. ¶¶19-20. In response, Digital Turbine's shares fell $5.75/share (22.61%), to close at $19.68/share on June 1, 2022—erasing over $7 billion in market capitalization from the Class Period high. ¶¶21, 262.

A holistic assessment of the facts supports an inference of scienter that is *at least as compelling as* Defendants' non-culpable inference. That Defendants admit they knew Digital Turbine had internal control weaknesses within the first quarter after closing the acquisitions supports, at a minimum, that Defendants were severely reckless in over-reporting gross revenue associated with the acquisitions. Further, that Defendants had *both* gross and net revenue figures for Fyber—and chose to report only the gross figure to U.S. investors but *call it net*—shows they intentionally chose to cherry pick and misrepresent the better-looking number *because it looked better to unwitting investors*.

Defendants' competing narrative, by contrast, rests upon numerous factual assertions not in the record on this Motion and/or not supported by Defendants' cited exhibits, and improperly asks the Court to draw inferences in Defendants' favor to which they are not entitled. For example, Defendants claim they believed they were properly accounting for the AdColony and Fyber revenue on a gross basis because they relied, in part, on the financial statements of the acquired companies, which Defendants say had been audited by Big 4 accounting firms. Mot. 3. But Defendants' "Big 4" argument ignores Plaintiffs' allegation that Defendants abandoned the stated accounting policies AdColony previously had in place, which appropriately required recognition of revenue either on a gross or net basis depending on the nature of the underlying agreement, and instead decided to report gross figures

3

across the board. Defendants cannot negate scienter by pointing to the involvement of a Big 4 accounting firm whose accounting policies Defendants did not even follow. Nor can the pre-transaction involvement of Big 4 accounting firms (if such firms were involved) explain Defendants' post-transaction decision to blatantly misrepresent as "Net revenue" figures that were gross. At bottom, Defendants' competing narrative is *not more compelling* than the inference that they recklessly or intentionally misled investors as to Digital Turbine's revenue. The Motion should be denied.

## II.    FACTUAL BACKGROUND[4]

Digital Turbine is a tech company that delivers digital content, like advertising, to customers. ¶¶35-6. CEO Stone compared Digital Turbine to Uber, in the way that UberEats delivers food from restaurants to customers. ¶¶137-40. In the case of an UberEats customer buying food from the restaurant, the restaurant acts as the principal and Uber acts as the agent. ¶140. As such, Uber records revenue for the fee it charges to deliver food, but does *not* record revenue for the meal; *i.e.*, Uber records the *net* revenue from the transaction. ¶139. That is also how Digital Turbine's peers book their revenue, including several Stone cited in public remarks.  ¶136, n.12.

If Uber were to record the food transaction in Uber's own revenue (*i.e.*, the gross revenue), an investor couldn't tell if Uber's revenue growth stemmed from more people using Uber—and thus more Uber fee revenue—or from higher meal prices. ¶140, n.13. This is why investors must know *net* revenue: they want to assess whether more people are *using Uber*, and thus growing through increased adoption. If, however, Uber were improperly including higher meal charges in its revenue, that would severely distort Uber's actual revenue growth: on paper Uber would appear to be growing revenue far more than it really was. ¶140, n.13. That is what Digital Turbine did here. ¶143-201. Digital Turbine, unlike its many peers, reported gross revenue figures, even though it mostly acted in an agency

---

[4] The Court's familiarity with the facts as alleged in Plaintiffs' Consolidated Complaint (Dkt. No. 38, "the FAC") is presumed. *See* Order at 2-12. Newly-pleaded facts also are discussed *infra*.

capacity such that it should have booked revenue *net* of license fees and revenue share (*i.e.*, excluding the amounts akin to the meal cost for UberEats).[5] ¶¶61-62, 67, 136.

In addition, while Digital Turbine recorded gross revenue *amounts*, it *labeled* those amounts as "Net revenues" in its SEC filings. *See* ¶¶52-53, 159, 172, 195; Wolke Decl. Ex. 1 at 4, 14, 26 (Q1 2022 Form 10-Q reporting "Net revenues" of AdColony, Fyber, and Digital Turbine overall).[6] Based on these misleading "Net" revenue figures (which were actually gross), Defendants touted impressive YOY revenue growth of 46% for AdColony and 198% for Fyber in Q1 2022, which contributed to Digital Turbine's reported net revenue of $212.6 million and YOY growth of 264.3% for the quarter. ¶¶53, 67, 156-58. As part of Digital Turbine's announcement that it had completed the AdColony acquisition on April 29, 2021, it also gave revenue figures for both AdColony and Fyber for the quarter ended March 31, 2021 (Digital Turbine's Q4 2021), reporting AdColony net revenue of $58.3 million (37% YOY growth) and Fyber net revenue of $102.4 million (179% YOY growth). ¶53 n.3.

The overstatement of revenue and false appearance of growth caused analysts to predict far more growth for Digital Turbine than was warranted, which in turn led analysts to raise price targets. ¶¶7, 50-51, 55, 78-80. Digital Turbine used artificially-inflated share prices to fund the all stock Fyber acquisition. ¶¶213 n. 15, 214. Defendants made several misrepresentations about net revenues during the very 30-day Pricing Period when Digital Turbine's average share price would determine precisely how many Digital Turbine shares Fyber would receive. ¶¶114-18, 144-47.

Before the Fyber deal closed, it was still making some filings to European regulators. ¶¶109-121. Defendants cherry-picked some of those filings—at times cutting Fyber's statements off *mid-sentence* (*see* ¶116)—conveying misleading half-truths to its U.S. investors by reporting Fyber's gross

---

[5] According to Digital Turbine's Class Period SEC filings, "License fees and revenue share are reflective of amounts paid to our carrier and OEM partners who drive the revenues generated from advertising…." *See* Declaration of Kara M. Wolke ("Wolke Decl.") Ex. 1 (Q1 2022 Form 10-Q) at 27.

[6] *See also id.* Ex. 2 at 4, 16, 29 (Q2 2022 Form 10-Q); *id.* Ex. 3 at 4, 17, 31 (Q3 2022 Form 10-Q).

revenue but omitting its net, thus making Fyber's revenue and growth appear more robust than it really was. ¶¶109-121. This helped prop up Digital Turbine's shares to a weighted average price of $68.78 per share during the Pricing Period for the Fyber transaction. ¶¶211-215.

The Fyber merger closed May 25, 2021. ¶214. After Fyber and AdColony closed, but before the Restatement, Digital Turbine hired new CAO, Michael Miller ("Miller), on August 23, 2021, to remedy control weaknesses. ¶234. Miller came from an entity, L-3, that had been plagued by accounting fraud, and specifically, the overstatement of revenue. ¶¶239-241. According to a later admission, beginning in or around January 2022, the Company conducted a comprehensive review of revenue accounting for Fyber and AdColony. ¶71. In the midst of that review, on March 2, 2022, CEO Stone sold $3.25 million worth of stock at $46 per share. ¶¶204-05.

On May 17, 2022, Digital Turbine announced it had reported materially overstated net revenue by 34.5%, 64.5%, and 73.2%, for fiscal Q1, Q2, and Q3, 2022, respectively. ¶63. This overstatement was driven primarily by revenue associated with AdColony and Fyber: AdColony's revenue was overstated by 48.2% to 61.5% during the Class Period, and Fyber's revenue overstated by 412.7% to 439.1% during the Class Period. ¶68. In response, Digital Turbine's stock price dropped 7.1%, closing at $25.28/share. ¶11. The truth of Defendants' revenue-related misrepresentations was further revealed, and risks inherent therein further materialized, on May 31, 2022, when Defendants disclosed Q4 2022 and FY 2022 results, revealing quarterly revenue of just $184.1 million. ¶19. In response, Digital Turbine's stock price dropped 22.61%, closing at just $19.68/share. ¶21.

## III.   PLAINTIFFS ALLEGE TWO INDEPENDENT THEORIES OF DEFENDANTS' SECTION 10(b) LIABILITY: SCHEME LIABILITY AND FALSE STATEMENTS

Plaintiffs' Section 10(b) claim rests on two separate, and independently sufficient, theories of liability: one under SEC Rule 10b-5(b) for false or misleading *statements* (*e.g.* ¶¶152-200, 272); and another under SEC Rule 10b-5(a) and (c) for fraudulent *conduct* (*e.g.* ¶¶203, 272-74). Making

misleading statements in violation of Rule 10b-5(b) and engaging in fraudulent or deceitful practices in violation of Rules 10b-5(a)/(c) form separate and independent bases for liability under Section 10(b). *See Lorenzo v. SEC*, 139 S.Ct. 1094, 1102-03 (2019) (discussing differences in theories of Section 10(b) liability under Rule 10b5-(b) for false statements and Rules 10b-5(a)/(c) for deceptive practices and schemes). Both bases for Section 10(b) liability are alleged.

## IV.    THE SAC ALLEGES SCHEME LIABILITY UNDER RULES 10b-5(a) & (c)

### A.    Plaintiffs Adequately Allege Defendants' Deceptive Scheme To Artificially Prop Up Digital Turbine's Stock Price

Section 10(b) is violated where, as here, a defendant "employ[s] any device, scheme, or artifice to defraud" or "engage[s] in any act, practice, or course of business which operates…as a fraud or deceit" in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5(a), (c).

Defendants' use of improper accounting to falsely boost Digital Turbine's net revenue by hundreds of millions of dollars in total to meet analysts' estimates (*e.g.* ¶¶7, 52-55, 58, 63, 68) and to artificially prop up its stock price to support the Fyber merger (*e.g.* ¶¶213 n.15, 214) constitutes an actionable scheme. Stone specifically told the market that "the key rationale of our new acquisitions is based on driving new revenue growth" (¶50), and, critically, the merger-derived revenue allowed the Company to meet analysts' aggressive growth forecasts. ¶¶7, 50 (Stone confirmed estimates following Q4 2021 results); ¶¶55, 56, 58 (Q1-Q3 2022 revenue all exceeded analysts' estimates). Digital Turbine's purported rapid revenue growth prompted analysts to boost their revenue forecasts *and* price targets. ¶¶48-49 (Craig-Hallum raising price target).

The scheme to inflate revenue in turn propped up Digital Turbine's share price, which the Company used to close the Fyber merger. ¶¶203, 211-215. It also enabled Stone to sell stock at inflated prices of just over $46/share just two months before the Restatement was announced and Digital Turbine's stock price plummeted to under $20/share. ¶204. These facts sufficiently allege a scheme

7

claim. *See, e.g.*, *SEC v. Winemaster*, 529 F. Supp. 3d 880, 918 (N.D. Ill. 2021) ("Broadly, the SEC has pleaded here a scheme to artificially inflate PSI's revenue figures."); *SEC v. Monterosso,* 756 F.3d 1326, 1334 (11th Cir. 2014) (scheme liability based on defendants' "commission of deceptive acts as part of a scheme to generate fictitious revenue for GlobeTel."); *Cf. In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005) (scheme to artificially boost revenue adequately alleged Section 10(b) liability under SEC Rules 10b-5(a)/(c)).

In addition to the deceptive scheme to artificially boost Digital Turbine's revenue, Defendants' dissemination of admittedly false financial statements to investors alleges scheme liability. As the Supreme Court held, disseminating a false statement "easily" alleges sufficient conduct to allege a scheme claim. *Lorenzo*, 139 S.Ct. at 1101 (dissemination of statement by email to investors alleged scheme liability). Plaintiffs allege similar conduct here. ¶¶25, 201, 264(b), 264(c), 275, 277. As the Court held, the Restatement established the falsity of Digital Turbine's Class Period financial reports. Order at 18. And before Digital Turbine restated, it disseminated those false financials to investors, including by e-mail. ¶¶264(b) & (c). Plaintiffs thus adequately allege scheme liability under a dissemination theory.[7] There is "nothing borderline about this case." *Lorenzo*, 139 S.Ct. at 1101.

### B. Defendants Did Not Challenge Scheme Liability, And Thus Have Waived The Argument, In Their Motion To Dismiss

While the SAC alleges Defendants' scheme liability in violation of Rules 10b-5(a)/(c),[8] these

---

[7] It matters not that the Individual Defendants did not personally state the words in Company's SEC filings. *Cf. Yoshikawa v. Exxon Mobil Corp.*, 2023 WL 5489054, at *9 (N.D. Tex. Aug. 24, 2023) ("Dissemination is a form of conduct, and 'the scheme subsections can cover conduct that involves a misstatement even if the defendant was not the maker of it.'").

[8] *E.g.*, ¶203 ("The *fraudulent scheme* at issue lasted for several fiscal quarters"); ¶245 ("Defendants…*engaged in a scheme*"); ¶260(d) (common issues include "whether Defendants *engaged in a scheme* to defraud investors"); ¶271 ("Defendants *carried out a plan, scheme*, and course of conduct"); ¶272 (Defendants "*employed devices, schemes, and artifices* to defraud" and "*engaged in acts, practices, and a course of business which operated as a fraud and deceit*"); ¶274 ("Defendants employed *devices, schemes and artifices* to defraud,…and *engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Digital Turbine's value and performance and continued substantial growth*").

allegations are unchallenged in Defendants' Motion. Thus, the sufficiency of Plaintiffs' Rule 10b-5(a)/(c) scheme claim allegations is not before the Court. Its dismissal would be error. *See In re Alphabet, Inc. Sec. Litig*., 1 F.4th 687, 709 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. Rhode Island*, 142 S. Ct. 1227 (2022) ("Because the district court erred in sua sponte dismissing [plaintiffs'] claims under Rule 10b-5(a) and (c) when Alphabet had not targeted those claims in its motion to dismiss, we reverse dismissal of the claims under Section 10(b) and Rule 10b-5(a) and (c)").

Under these circumstances, the Court should permit Plaintiffs' scheme claim to proceed no matter how it rules on the other arguments raised in Defendants' Motion. *See e.g*., *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp*., 514 F. Supp. 3d 942, 951 (S.D. Tex. 2021) ("Defendants did not move to dismiss and, in any event, Plaintiff adequately alleges, a Rule 10b-5(a) 'scheme to defraud' claim in Count I of the Complaint.").[9] This Court previously held that an argument not raised was not before it. Order at 25-6, n.11.[10]

## V. THE SAC ALLEGES DEFENDANTS MADE FALSE OR MISLEADING STATEMENTS IN VIOLATION OF RULE 10b-5(b)

As the Court previously held, the Restatement establishes the falsity of Digital Turbine's financials. Order at 16-17. Recognizing this, Defendants challenge only a portion of statements Stone

---

[9] *See also See e.g.*, *United States v. Hoffman*, 901 F.3d 523, 553, n.16 (5th Cir. 2018), *as revised* (Aug. 28, 2018) ("The reason we do not allow new arguments in a reply is that the other side does not have a chance to respond."); *Dalpark Partners, Ltd. v. Verus Mgmt. One, LLC*, 2021 WL 3733013, at *2, n.1 (N.D. Tex. Mar. 1, 2021) ("Generally, neither this court nor the district courts of this circuit will 'review arguments raised for the first time in a reply brief.'"); *St Clair Cty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2021 WL 195370, at *2 (M.D. Tenn. Jan. 20, 2021) ("Defendants did not raise or articulate any arguments specific to the scheme liability allegations in their opening brief, and the Court declines to consider the arguments raised for the first time in their Reply in ruling on the pending motion to dismiss."); *Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *4 (M.D. Tenn. Apr. 8, 2021) ("In their Reply, Defendants argued that Plaintiffs had failed adequately to plead reliance upon any purported scheme. The Court finds that Defendants did not move to dismiss Plaintiffs' scheme liability claims and, therefore, it will not address Defendants' belated argument related thereto, which are deemed waived for purposes of the Motion").

[10] Waiver is particularly appropriate here because Defendants acknowledged the claim (*see* Mot. 26, "to uncover the scheme") yet failed to move to dismiss it—thus evincing an "intentional relinquishment or abandonment of a known right" that further warrants waiver. *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022).

9

made in a February 8, 2022 earnings call, relating to AdColony's and Fyber's Q3 2022 revenue growth, characterizing the statements as "immaterial puffery." Mot. 27-28. The argument fails.

Only statements that "contain no concrete factual or material misrepresentation" can be "puffery." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249, n.14 (5th Cir. 2009); *accord Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014). Stone made a "concrete factual… misrepresentation" on February 8, 2022 when he said "we're still talking about **50-plus percent** growth in [Fyber's] business"—context Defendants omit from their Motion—in response to an analyst question about Fyber's slowing revenue growth. ¶194. The Restatement revealed Stone's 50% growth rate claim to be false. *See* ¶¶53, 68 (Fyber pre-Restatement 3Q22 net revenue of $157.4 million (reporting 48% YOY growth) was reduced to just $30.7 million after the Restatement, showing the true YOY growth rate was nowhere near 50%). Moreover, Stone's explanation that "It's just a little bit of a large numbers" that was purportedly causing the revenue to slow at Fyber was misleading because it was not the true cause of Fyber's slowing revenue growth. The expression "law of large numbers" tends to suggest that a company had grown so much that it was difficult to continue growing at the same rate of change—but as the Restatement revealed, that was not the case at Fyber. Fyber would not continue to grow at the same or similar rates because those rates were not real.[11]

As to AdColony, Stone's statement came in response to an investor's question. ¶194. Investors are presumed to care only about material information, which cuts against Defendants' theory of immateriality; investors don't ask about things they don't care about. Given the context that Stone

---

[11] Defendants' cases are distinguishable because in those cases the plaintiffs made no concrete statements like "50-plus percent growth". *See* Mot. 28 (citing *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019) ("aspirational statements includ[ing] affirmations of [defendant's] commitment to safety, goals it was seeking to reach, and outlines of procedures" were inactionable puffery); *Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 593 (N.D. Tex. 2004) (generic statements like "'we're not seeing any slowing .... [W]e're seeing very large increases and we expect that to continue. And ... we're still ... doing incredibly well'" were deemed puffery)).

made this statement in response to a "request to elaborate on how AdColony 'turned around in the December quarter,'" the information was clearly material to investors. The statement is not properly dismissed as immaterial puffery. *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, \*10 (N.D. Ill. Aug. 11, 2021) ("the amended complaint's alleged statements are generally factual, specific, and in response to questions from analysts, none of which are indicative of mere puffery").

## VI.   THE SAC ALLEGES A STRONG INFERENCE OF SCIENTER

Both Plaintiffs' scheme claims and their false statement claims require allegations that give rise to a strong inference of scienter, which the SAC does. Plaintiffs satisfy the scienter requirement by alleging intentional (*i.e.*, conscious) conduct or severe recklessness. *Lormand*, 565 F.3d at 252. "Scienter based on recklessness may be demonstrated where a defendant has engaged in conduct that was 'highly unreasonable, . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158-59 (2d Cir. 2012). Recklessness exists where a defendant "'failed to review or check information that [it] had a duty to monitor, or ignored obvious signs of fraud.'" *Id.* (collecting cases). When assessing whether a strong inference of conscious behavior or recklessness has been alleged, the allegations should be assessed holistically: a tie goes to the plaintiff. Order at 19 (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 329 (2007)). "There are numerous factual scenarios a plaintiff can allege in a complaint that, taken together, can sufficiently plead scienter." *Parmelee v. Santander Consumer USA Holdings, Inc.*, 2018 WL 276338, at \*3 (N.D. Tex. Jan. 3, 2018).

Moreover, while alleging a plausible motive to mislead investors is not required to allege scienter, "motive and opportunity allegations may meaningfully enhance the strength of the inference of scienter." *Flaherty & Crumrine Preferred Income Fund Inv. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009); *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 368 (5th Cir. 2004). Here, such allegations are present, making the inference is "meaningfully" stronger. *See id.*

11

### A.    Plaintiffs' Motive Allegations Support A Strong Inference Of Scienter

#### 1.    Defendants' Desire to Boost Digital Turbine's Share Price To Complete The Fyber Transaction Supports Scienter

In arguing that Plaintiffs fail to plead any facts that support a plausible motive to mislead investors, Defendants give short shrift to Plaintiffs' new allegations relating to the Fyber deal. Mot. 12-16. As detailed in the SAC, Defendants were highly motivated to boost the value of Digital Turbine's stock to complete the Fyber acquisition. To do so, Defendants made specific misrepresentations about revenue growth rates at least three times during a critical window: on April 29, 2021 (¶¶143-44), May 18, 2021 (¶145), and May 25, 2021 (¶¶146-47).[12] These statements were made during the 30-day Pricing Period (April 25, 2021 through May 25, 2021), which *directly determined* how many shares Digital Turbine would need to issue to Fyber to complete the transaction, and thus how dilutive the transaction would be. ¶¶213-214, SAC n.15. Propped up by Defendants' misleading statements about AdColony and Fyber revenue and growth, Digital Turbine's shares traded at an inflated weighted average price of $68.78/share during the Pricing Period, compared to just $19.68 by the time the full truth about revenue was revealed (a 71% decline). ¶¶214-15.

Without this propping up of Digital Turbine's share price during the Pricing Period, Defendants would have either (a) had *far more* dilution buying Fyber than they did (*see* ¶213 n.15); or (b) perhaps not completed the Fyber transaction, which both Stone and Garrison said was critical to Digital Turbine's growth story (¶50). These facts allege motive. *See Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 554 (S.D.N.Y. 2017) ("The form of the all-stock acquisition, the timeline of events, and the disclosure that the restatement is attributable to misconduct, when combined with the other allegations, plausibly establishes a culpable motive with respect to each individual 10(b) defendant that is more cogent and compelling than any alternative inference"); *Gross*

---

[12] The nature and substance of these false statements are further discussed below in §VI.B.1.

*v. Medaphis Corp.,* 977 F. Supp. 1463, 1472 (N.D. Ga. 1997) ("Defendants knowingly made numerous false and misleading statements in order to inflate the value of its stock which, in turn, allowed Defendants to acquire other companies it would not have been able to acquire had the value of its stock not been at sufficiently high levels.").

Defendants' authority also supports Plaintiffs' argument. For example, *Lemmer* (Mot. 16) noted that it "assume[d] arguendo that ***motive would be adequately alleged by describing specific planned acquisitions using stock***, for which the amount of stock to be issued was tied to stock price and the timing of which was closely related to the alleged misrepresentations." *Lemmer v. Nu-Kote Holding, Inc.*, 2001 WL 1112577, at *11 (N.D. Tex. Sept. 6, 2001), *aff'd*, 71 F. App'x 356 (5th Cir. 2003).[13] Plaintiffs allege exactly that. ¶¶143-145 (misrepresentations made during Pricing Period to prop up Digital Turbine's stock price to complete the Fyber Transaction); ¶¶213-15 (stock trading at inflated $68.78/share during Pricing Period, which was used to determine how many shares would be issued to Fyber, as compared to $19.68 per share at the end of the Class Period). Thus, by Defendants' own authority, Plaintiffs have "adequately alleged" motive. *See Lemmer*, 2001 WL 1112577, at *11.

### 2.    Stone's Stock Sales Enhance the Inference of Scienter

"Insider stock sales can enhance an inference of scienter if the trading occurs 'at suspicious times <u>**or**</u> in suspicious amounts.'" *Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 960 (5th Cir. 2016); *Southland*, 365 F.3d at 368 (same). While the Order previously held that Stone's sales did not support scienter (Order at 27-28), the SAC alleges facts showing the sales were suspicious in timing and amount.

---

[13] Defendants misrepresent *Lemmer*. There, the court identified three motive allegations—of which a desire to bolster a stock price to avoid dilutive acquisitions was **the third**. *Id.* The court said, "[t]he **first two** are clearly insufficient, as they are <u>general allegations that could be made about virtually any large public corporation.</u>" *Id.* Defendants quote the underlined text as though it stands for the third motive allegation. Mot. 16. In fact, the court in *Lemmer* discounted the motive to fund acquisitions with an inflated share price there in part because the one deal at issue *was disputed to have been even paid for using stock*. *Lemmer*, at n.9.

*Timing*. Stone's sale of $3.25 million worth of Digital Turbine stock at more than $46/share on March 2, 2022 was suspicious. ¶204. Around six months before his sale, in August 2021, Digital Turbine hired CAO Miller to remediate the internal control weaknesses disclosed in the May 2022 Restatement. ¶¶14, 73, 234; Dkt. 45-5 at 102 (PDF page 103). Thus, Stone was aware of undisclosed problems in Digital Turbine's internal controls over financial reporting when he sold his shares in March 2022. ¶14, 73. Even more, when Stone sold his shares, Digital Turbine was in the midst of a "comprehensive review" of the Company's revenue accounting (¶¶71, 205)—the review which ultimately culminated in the Restatement.[14] Stone sold his stock shortly after the last alleged false statements on February 8, 2022, and just two months before the devastating May 2022 disclosures revealing the truth about Digital Turbine's revenue. ¶205. This fact pattern supports the inference of scienter. *See Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *29 (N.D. Ill. Apr. 18, 2022) (stock sales "during the time Defendants claimed to be performing their file-by-file review of claims to ensure reserve adequacy" suspicious); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (stock sales two months before corrective disclosure were suspiciously timed).

The SAC also alleges the timing of Stone's sales was suspicious in light of Digital Turbine's historical stock prices. For decades before the Class Period, Digital Turbine stock traded in the single digits (as it does now). ¶¶206-07. Stone's sales at over $46/share after determining Digital Turbine had control weaknesses, while revenue was being reviewed, and just two months before it was restated support an inference that Stone timed his sale to occur while the stock was still trading at highly

---

[14] In connection with the Restatement, Defendants stated that they conducted the "comprehensive review" of AdColony and Fyber revenue "[d]uring the fourth quarter of the fiscal year ended March 31, 2022." ¶71. Because the fourth fiscal quarter began on January 1, 2022, Plaintiffs are entitled to the inference that the review began in January 2022, and that the review was well underway by the time Stone sold in March 2022, in the last month of the quarter. *Marcovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 475 (N.D. Ill. 2021) (admission that trend became apparent in the "second half of 2019" supported inference that defendants were aware of the trend in July 2019 when allegedly false statement was made).

14

inflated levels. *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 553 (5th Cir. 2007) (suspicious sales include sales made "at times calculated to maximize personal profit").

*Amount.* Stone's May 2022 sales at $46/share (more than twice the price after the truth was revealed) allowed him to reap $3.25 million while he was in possession of adverse inside knowledge. The Order's prior finding that Stone's sales were not suspicious because he retained over a million shares (Order at 28) does not make non-culpability a stronger inference here because a suspicious amount is only one of two non-exclusive considerations. *See Stone*, 26 F. Supp. 3d at 605 (strong inference of scienter as to CEO who had 7,502,084 shares remaining after stock sales). Logically, a public company CEO with adverse inside information understands that if he sells *all* his holdings shortly before a stock crash following release of that information, he may go to jail. Yet if he sells *just enough*—say $3.25 million worth—he may be able to successfully evade civil liability.

Still, the SAC added allegations that Stone's sales at the artificially inflated $46/share were suspicious in amount. The sales allowed him to avoid $1.85 million in unrealized losses that he would have otherwise incurred had he held or sold at or below $19.68 after the price inflation was removed on May 31, 2022. ¶207. To assess the size of financial motive, the Fifth Circuit instructs that it be viewed relative to salary, and here, Stone's total loss avoided by selling early equaled 3.3x his salary. ¶207; *cf. Oklahoma Firefighters Pension and Ret. Sys. v. Six Flags Entm't Corp.*, 58 F.4th 195, 215 (5th Cir. 2023) (noting, "In *Barrie*, we held that a defendant's performance-based bonus of 175% of his base salary contributed to a strong inference of scienter."). In *Six Flags*, the compensation at issue consisted of "equity awards," and the court found desire to obtain an equity award equal to 3x to 6x salary supported motive. *Id*. Here, Stone's total sale proceeds of $3.25 million preserved equity-created wealth equal to 5.6x his salary and avoided unrealized losses equal to 3.3x his salary. ¶207. These multiples are sufficient to allege suspicious amounts under *Barrie* and *Six Flags*.

15

Finally, Garrison's lack of stock sales during the Class Period (Mot. at 15) does not negate scienter. "Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). Indeed, in *Tellabs*, the Supreme Court definitively held that the "absence of a motive allegation is not fatal." 551 U.S. at 325.[15]

### B.    The SAC Alleges Conscious Misbehavior

#### 1.    Defendants Made a Conscious Decision to Report Fyber's Gross Figures and Omit Net Figures

Several times in their Class Period statements about Fyber, Defendants touted various metrics of Fyber's European results, except in their statements to U.S. investors, Stone and Garison excluded net revenue figures *from the same sentence* in which Fyber had reported both gross and net. ¶¶109-121. Their decision to tout the gross revenue amounts, and omit the less impressive net, when reporting the companies' European financial results suggests a conscious choice.

For instance, on April 29, 2021, *i.e.*, five days into the Pricing Period, in an update regarding the AdColony transaction, a Digital Turbine press release included a cherry-picked snippet of Fyber's preliminary Q1 2021 European results, in which Digital Turbine said Fyber's net revenue was "in excess of €85 million in the March quarter, representing year-over-year growth of 179%." ¶144. Yet when Fyber reported those same results in Europe, Fyber reported €85 million gross revenue *and* only €17 million net revenue in the same sentence. ¶¶116-117. Weeks later, on May 25, 2021 (the last day of the Pricing Period), Stone touted the purported 179% year-over-year growth rate for Fyber's

---

[15] *Contra* Mot. 14-15 (citing *Abrams v. Baker Hughes Inc*., 292 F.3d 424, 438 (5th Cir. 2002)). *Abrams* was decided five years before *Tellabs* made clear motive is not required for scienter. Since *Tellabs*, courts in the Fifth Circuit have found scienter alleged where mixed insider trading exists. *See Stone*, 26 F. Supp. 3d at 605 (scienter alleged as to three defendants where only CEO had suspicious sales). Nor does the fact that Stone sold below the Class Period peak weigh against scienter. *Id*., at 605 (sales at $26 per share supported scienter despite being below $43 class period peak in a $10 to $43 trading range) (*contra* Mot. at 14). While Stone failed to sell at the peak, he knew his window to benefit from Digital Turbine's inflation was quickly closing.

revenue. ¶147. A few days later, when asked by an analyst about Fyber's growth rate on a June 1, 2021 earnings call, Garrison claimed "Fyber reported about $100 million in revenue for their March quarter" (¶119), again touting *only* the gross figure and omitting any mention of net (which was significantly less, at just $20 million). ¶¶119-120; *see also* ¶121.[16]

Defendants acted *consciously* when they chose to omit a significantly lower—and more meaningful—revenue figure from *the same sentence* that Fyber itself provided. *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) ("the most powerful evidence of scienter is the content and context of the statements made by [Defendants], which were made in response to analysts questions."). Indeed, "cherry-picking 'necessarily involves knowing and intentional conduct.'" *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 464 (5th Cir. 2022). That the cherry-picked representations *recurred* here strengthens the inference. *See In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 784 & n.37 (S.D. Tex. 2012) (that defendants "made numerous and frequent statements" about alleged misstatements supported scienter).

Many courts have held that similar conduct reflects a *conscious choice*. *See e.g*, *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) ("accounting manipulations involving premature revenue recognition ... are ***especially indicative*** of ***conscious misbehavior*** since such violations do not commonly occur inadvertently, but instead suggest a ***conscious decision*** to improperly recognize revenue."); *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *20 (E.D.N.Y. Sept. 19, 2005) ("GAAP violations that involve the premature recognition of revenue have been said to 'suggest a ***conscious choice*** to recognize revenue in a manner improper, and may therefore support a stronger inference of scienter.'"). While these cases dealt with premature revenue

---

[16] The "about $100 million in revenue" refers to the €85 million in gross revenue that Fyber had reported in Europe; the difference between the two figures is due to exchange rates. ¶120 n.10. The same calculation can be done for converting €17 million to $20 million in net revenue.

recognition, the conduct here is worse. With premature revenue recognition, the revenue is "pulled forward," so it's just recognized *sooner* than it would otherwise. Here, Digital Turbine's misstated revenue was only and massively overstated (never understated), and the overstated amounts won't be recognized *at all*. *Cf. In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) (scienter alleged where "accounting violations had the near-uniform effect of increasing its reported revenue and net income…unlike what one might expect from…innocent mistakes.").

Finally, Defendants argue they could not have concealed the truth about Fyber's net revenue because its European financial filings were supposedly "in the public domain." Mot. at 18. "[T]hough not labeled as such, [Digital Turbine] appears to be asserting the 'truth-on-the-market' affirmative defense" which does not apply *to scienter* and should not be decided in Defendants' favor on a motion to dismiss, in any event. *Cf. Nguyen v. Radient Pharms. Corp.*, 2011 WL 5041959, at *6 (C.D. Cal. Oct. 20, 2011) (a press release which omitted key details of an agreement can be misleading, even where the full agreement was publicly-filed as an exhibit to a 10-K eight months before). At best, Defendants' "public domain" argument raises a question of fact as to whether and to what extent Fyber's European filings (¶¶112-116, 121), some of which were in foreign languages (German and Dutch), were publicly available and conveyed to U.S. investors.[17]

### 2.   Defendants Made a Conscious Decision to Misrepresent Gross Revenue Figures as Net Revenue

Defendants' argument that the applicable accounting rules are complicated (Mot. 11-12, 16-18, 22) does not explain their decision to blatantly misrepresent gross revenue figures as "Net

---

[17] "[W]hether [Fyber's purportedly] corrective information was conveyed 'with a degree of intensity and credibility' is a fact-specific inquiry, which is not appropriately disposed of on a motion to dismiss." *Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *11 (W.D. La. Aug. 17, 2007); *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009) (publication of information in Chinese newspapers did not "transform the information contained within the articles into 'matters of general public knowledge'").

revenues" in Digital Turbine's SEC filings. In Forms 8-K and 10-Q for fiscal Q1 2021, Q2 2022, and Q3 2022, Defendants falsely told investors that the Company had earned "Net revenues" of $212.6 million, $310.2 million, and $375.5 million, respectively. ¶¶63, 152, 159, 165, 172, 185, 195; Wolke Decl. Ex. 1 at 4 (Q1 2021 Form 10-Q); *id.* Ex. 2 at 4 (Q2 2021 Form 10-Q); *id.* Ex. 3 at 4 (Q3 2021 Form 10-Q). The same filings purported to report "Net revenues" for AdColony and Fyber specifically. *Id.* Ex. 1 at 14, 26; *id.* Ex. 2 at 16, 29; *id.* Ex. 3 at 17, 31.

By Defendants own admission, however, they were not reporting net revenue figures for AdColony and Fyber; they were reporting *gross* revenue figures. In explaining the Restatement, Defendants said that "[a]s part of the post-acquisition integration process, the Company initially assessed the accounting policies of the recently acquired businesses and determined the Company acted as a principal in the revenue arrangements of the recently acquired businesses. As a result, ***revenue was reported gross*,…**" ¶71. Defendants admitted that revenue "***should*** have been reported net of license fees and revenue share expense." *Id*.

Despite Defendants' statement that they reported gross revenue figures for AdColony and Fyber, Digital Turbine's SEC filings ***labeled the revenue as "Net."*** This is not a case where Defendants elected to do gross revenue recognition, told investors they were recording gross revenue, and then realized that they got it wrong and corrected the mistake. Here, Defendants decided to record revenue on a gross basis, but ***told investors it was net***. And they did so aware that *net revenue*, particularly given the nature of Digital Turbine's business, is the metric investors are interested in. *See* Sec. II, *supra*. The danger of misleading investors as to the companies' revenue by ***recording gross figures but calling them net is easily*** alleged to be "either known to the defendant or so obvious that the defendant must have been aware of it." *Winstar Commc'ns*, 692 F.3d at 158.

C.      The SAC Alleges an Inference of Actual Knowledge by Stone

While "an allegation of actual knowledge is not required to withstand a motion to dismiss,"

19

alleging it is alone sufficient to plead scienter because knowledge is more demanding than recklessness. *Abrams*, 292 F.3d at 436. The SAC alleges Stone's demonstrated understanding of the nature of Digital Turbine's transactions with AdColony and Fyber, responding to the Court's concerns at pp. 24-26 of the Order whether the accounting at issue here was straightforward.

The parties agree that the key question is whether Digital Turbine acted as a principal or an agent in the transaction at issue; the former would allow Digital Turbine to report gross revenue, the latter requiring net. ¶¶104-08, Mot. 2. The question for scienter is thus whether Defendants knew, or were severely reckless in not knowing, that Digital Turbine mostly acted as an agent.

The SAC shows Stone understood clearly Digital Turbine acted as an agent: several times Stone specifically compared Digital Turbine to UberEats in the way that both entities "***deliver***[ ] things from their store, their restaurant *to customers*." ¶137. Delivering to a customer—whether from a restaurant to a customer (as UberEats does), or from a cellphone app to a customer (as Digital Turbine does)—is the essence of an agency relationship. ¶139. "The essence of an agency transaction is that the agent's activities are entirely for the supplier . . . When a supplier of software or technology conducts distribution of technology products through an agent, . . . ***the agent*** receives, handles, stores and ***delivers*** the products on behalf of the supplier." Practice Guide: *Introduction to use of "full agency" in supply chain transactions and checklist of key terms*, 1 COMPUTER SOFTWARE AGREEMENTS: FORMS AND COMMENTARY, § 8:16. Because Stone understood Digital Turbine acted as an agent—the same way UberEats is—he thus understood net revenue recognition was required.[18]

---

[18] Defendants misconstrue this comparison (Mot. 21, n.10) by citing an extraneous subscription-based magazine that is outside of the record and improperly considered on their Motion. Defendants' attempt to recharacterize the SAC's allegations by referencing extraneous materials is improper. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (Defendants cannot use judicial notice to "present their own version of the facts at the pleading stage."); *Stone*, 26 F. Supp. 3d at 603 ("the Court may not take judicial notice of a fact that is 'subject to reasonable dispute.'"). Precisely what Stone meant by his comparison to Uber is subject to reasonable dispute and "The Court presupposes Plaintiffs' version of events." Order at 21, n.9. *See also*, *Indiana*

20

Indeed, none of the companies that Stone cited as peers in June 2021 booked their revenue on a gross basis—each of these admitted peers acknowledged in SEC filings that they **were agents** as it related to the sale of third-party advertising inventory, and all recognized revenue on a net basis. ¶136.[19] Simply put, Stone admitted that Digital Turbine, like UberEats, is in the delivery business; as such, it is an agent. ¶139. Defendants overplay the complexity here. Indeed, according to Fyber itself—citing its revenue recognition—"Generally, the service of the Company is billed based on transactions tracked by Fyber with *no significant estimation involved*." ¶132.[20]

Stone's comparisons establish that he *understood* the nature of the Fyber and AdColony transactions. ¶¶136, n.12. Digital Turbine's accountants handled the math, but the Individual Defendants made the call on gross or net—this case is not about faulty math, but fraudulent classification. *Cf. Winemaster*, 529 F. Supp. 3d at 912 ("while the intricacies involved in recognizing revenue from a sale subject to a right of return might be complex, a CEO need not be well-versed in GAAP to understand that the existence of such right should be properly disclosed.").

### D.    Defendants Made False Revenue Statements When They Were Aware of Control Deficiencies and Likely Revenue Problems

The SAC adds detail around the departure of Digital Turbine's CAO, Wesch, and his replacement with Miller in August 2021 that further supports scienter. ¶¶234-241. Defendants admitted that they hired Miller to strengthen weaknesses in Digital Turbine's internal controls over

---

*Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (plaintiff's allegations must be taken as true and all reasonable inferences drawn in their favor).

[19] Because Stone specifically cited the peers, Defendants' reliance on *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 431 (D.N.J. 2005) is inapt. Mot. at 20. In *Exxon*, there was no discussion about whether the CEO ever cited the competitors multiple times, as Stone did here.

[20] Defendants argue "There is no discussion of agent-net versus principal-gross revenue recognition" with respect to this allegation (Mot. at 19), which is a mis-framing because ¶132 is about Fyber's **entire revenue recognition policy**—which necessarily includes the principal-gross/agent-net decisions included therein.

21

financial reporting. ¶¶14, 73.[21] In addition, Miller's background suggests he was brought on to clean up revenue accounting issues, in particular. Miller came to Digital Turbine from an entity plagued by accounting fraud, L-3, and specifically, the overstatement of revenue. ¶¶239-241. Defendants are right that Plaintiffs do not allege that Miller was *involved with the wrongdoing* at L-3. Mot. at 25.  But they miss the point—Miller apparently helped *address* the revenue recognition problems at L-3 (*e.g.*, ¶240), so he had exactly the background to *remediate* the revenue accounting problems at Digital Turbine. Hiring a CAO with specific expertise in remediating revenue accounting problems, for the specific purpose of addressing control deficiencies, is circumstantial evidence of Defendants' knowledge of potential revenue accounting problems at the time of hire. *Cf. Winemaster*, 529 F. Supp. 3d at 911 ("common sense dictates that actions taken after the fraud occurred can be circumstantial evidence that the defendant had acted with the requisite state of mind.").

Even after Defendants hired Miller to address control deficiencies, they continued to tout misleading revenue. ¶¶165-84. They touted misleading revenue as late as February 2022, while quietly undertaking a "comprehensive review" of revenue reporting. ¶¶185-200. This is strong indicia of scienter. *Akorn*, 240 F. Supp. 3d at 819 (knowledge of internal control deficiencies while issuing false accounting statements supports scienter).

### E.    The SAC Alleges A Duty To Monitor

Scienter is alleged where the defendants "knew facts or had access to information suggesting that their public statements were not accurate, or … failed to check information they had a duty to monitor." *In re Fleming Cos. Inc. Sec. & Deriv. Litig.*, 2004 WL 5278716, at *11 (E.D. Tex. June 16,

---

[21] *See also* Dkt. 45-5 at 102 (PDF p. 103), as part of remediation plan, "management had taken several actions to strengthen the Company's control environment, including the hiring of a new Chief Accounting Officer," who was hired in August 2021). Moreover, it takes time to find a CAO, interview him, consider him, negotiate his compensation, *etc.*, and that all had to have happened *before* August 23, 2021 for Miller to start by then; it is likely that Defendants knew of the control weaknesses even earlier than August 2021.

2004); *Singh v. 21Vianet Grp., Inc.*, 2017 WL 4322483, at *3 (E.D. Tex. Sept. 13, 2017) (same).[22] At a minimum here, Defendants' choice to alter the presentation of Fyber's reported results by only referring to the higher and better-sounding figures triggered a duty to verify the proper accounting. "Whenever a defendant 'voluntarily chooses to speak publicly, he or she has a duty to tell the whole truth, and must disclose material, adverse facts that affect the validity or plausibility of his statement." *Anadarko Petroleum*, 514 F. Supp. 3d at 956.

Additional allegations supporting Defendants' duty to check the accuracy of their revenue statements here include: (1) "Fraud risk in relation to revenue recognition" and specifically "with respect to an overstatement of revenue" was one of two *key risks* Fyber identified in its 2019 annual report (¶226), triggering Defendants' duty to monitor; (2) revenue growth was the *key metric* and *key rationale* for the transactions (¶¶48, 50, 222-223)[23]; (3) AdColony and Fyber's revenue recognition policies differed from one another and *both* purported to be correct (¶¶17-18, 94-108); (4) all publicly-traded peers Stone cited were agents and reported net revenue (¶¶136-141, n.12); and (5) the Company's former CAO lied about being a CPA.[24] Viewed holistically, these allegations allege scienter. *Cf. Dudley v. Haub*, 2013 WL 1845519, at *17 (D.N.J. Apr. 30, 2013) ("allegations of

---

[22] *See In re BP*, 843 F. Supp. 2d at 786 (cited by Defendants at 23) ("securities fraud complaint may survive where plaintiffs have alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor.").

[23] Scienter is reinforced when the misstatements affect metrics and factors that are "key to measuring [a company's] financial performance and [were] a subject about which investors and analysts often inquired" which further "reinforces the inference of scienter." *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011); *Cf. Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) (strong inference of scienter for statement announcing strategic partnership as "[i]t is reasonable to assume, given the importance of these deals to the company, that [defendant company] would have familiarized itself with the financial condition of [the companies in the deal]").

[24] The Company's former CAO, Wesch, had his CPA license suspended in 2016. ¶236. Defendants downplay the allegation as "absurd" (Mot. 25), but that it went unnoticed at a public company that its CAO was falsely claiming to be a CPA *for years* is probative of recklessness in an alleged accounting fraud. *Cf. U.S. v. Allen*, 76 F.3d 1348, 1363 (5th Cir. 1996) ("The wire fraud occurred after First City Bank extended a second loan to Shepherd Fleets on the strength of financial documents bearing the false representation that Allen was a CPA.").

23

generally accepted auditing standards violations, coupled with allegations that significant red flags were ignored, can suffice to withstand a motion to dismiss.") (cleaned up).[25]

## F.    The Circumstances of the Restatement Support Scienter

To evaluate scienter on a restatement, the Court may consider "the number, size, timing, frequency, and context." Order at 23 (citing *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 721 (W.D. Tex. 2010)). While the Order held that the restatement did not support scienter (Order at 23-25), the SAC alleged, *inter alia*, Stone understood the nature of the transactions (¶¶132-141); Fyber stated that "no significant estimation was required" with respect to its revenue recognition (¶132); and Digital Turbine was the only one of its peers to elect gross over net (¶136). These and other new allegations render the Order inapplicable to the SAC. *Contra* Mot. 22-23.

### 1.    The Nature of the Error Supports Scienter; Defendants' References to the Involvement of "Big 4" Accounting Firms Do Not Negate Scienter

Defendants' argument that Digital Turbine's fraud was somehow blessed by "Big 4" accounting firms (Mot. 10-11, 17, 22) is both wrong and misleading. Defendants claim to have deferred to "Big 4" accounting firms, but *only AdColony had a true "Big 4" firm*, and Defendants decided to abandon AdColony's policy that assessed gross or net based on the nature of the underlying agreement, instead recording gross revenue across the board. ¶¶17, 94-95.[26] Moreover, while Defendants say KPMG assisted their January 2022 internal revenue review (Mot. 3), this cannot negate their scienter in recklessly or intentionally misrepresenting revenue from April through December

---

[25] Defendants chide Plaintiffs for not "identify[ing] an internal memo, e-mail, or presentation." Mot. 11-12. But, particularly as the PSLRA stay prevents Plaintiffs from obtaining discovery, Plaintiffs need only plead facts, not detailed evidentiary matter. *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 356 (5th Cir. 2002); *Fleming*, 2004 WL 5278716, at *6 ("[T]he particularity rules should not be interpreted to require the pleading of facts which, because of the lack of discovery, are in defendants' exclusive possession.").

[26] Fyber's results were not audited by a "Big 4" accounting firm, but a separate legal entity that had done only 10 audits of U.S. issuers. ¶232. The entity that performed Fyber's audit was noted by the PCAOB to have contained "multiple deficiencies." ¶¶230-233. Digital Turbine's financials were audited by Grant Thorton, which is similarly not a "Big 4" accounting firm. Dkt. 45-5 at 69.

2021—*i.e.*, when the bulk of the false statements in this case were made.[27]

Indeed, the documents previously cited by the Court (Order 24, 30, 31 (citing Dkt. No. 45-6 and 45-19)) and by Defendants again here (Mot. at 3) ***do not support the inference Defendants claim***. No Big 4 firm ever blessed the decision to record revenue across the board at AdColony or Fyber on a gross basis—while calling such gross revenue "net revenues." ¶68. In fact, many false statements alleged here were ***unaudited***.[28] These significant disputes about what, exactly, any accountant knew and what, if any, statements any accountant approved are not resolved in Defendants' favor on this motion.[29] Public companies are *required* to have auditors—simply having one does not immunize companies from securities fraud. Whether Defendants' claimed reliance on the opinion of an outside accountant firm negates scienter is a question of fact not properly resolved in Defendants' favor on this Motion. *S.E.C. v. Snyder*, 292 F. App'x 391, 406 (5th Cir. 2008) ("***the jury is free to decide*** whether the facts demonstrate that the defendant acted with scienter in light of the advice he received from his attorneys or accountants.").

At bottom, Defendants misframe the issue at the pleading stage. Mot. 17-20. "It is not necessary to allege that [Stone or Garrison] knew the particular GAAP standard that was implicated by the sale or otherwise show his extensive familiarity with GAAP." *Winemaster*, 529 F. Supp. 3d at 912 (discussing scienter in alleged revenue recognition fraud case) (*contra* Mot. 17). For scienter purposes, the issue on the "nature of the error" factor is whether the gross versus net decision was

---

[27] Moreover, Defendants' citation does not demonstrate *any* involvement by KPMG. *Compare* Mot. at 3 *with* Dkt. 45-3 at 35 (Defendants' announcement says nothing more than management began a comprehensive accounting review with the assistance of an unnamed accounting firm).

[28] E.g., ¶¶143-146 (press release); ¶147 (statements on earnings call); ¶148 (press release and 8-K); ¶150 ("accounting policies used in the preparation of this ***unaudited*** pro forma condensed combined financial statements. . ."); ¶152-158 (press releases and earnings call statements); ¶¶165-171 (press releases and statements made on earnings calls).

[29] *Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318, at *20 (M.D. Tenn. Aug. 17, 2022) ("[C]ourts treat the issue of whether a defendant has complied with relevant accounting standards as inappropriate to resolve on a motion to dismiss.") (collecting cases).

straightforward **based on the allegations**. *See ArthroCare*, 726 F. Supp. 2d at 722. Where Plaintiffs allege facts showing the accounting was straightforward (*e.g.*, ¶¶132-141, Sec. VI.C, *supra*), and Defendants contend it was complicated (Mot. 20-22[30]), *that issue* cannot be decided in Defendants' favor at the pleading stage. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257-58 (5th Cir. 2005) ("Because the accounting questions in this case are disputed, dismissal was not appropriate" and "We agree with the plaintiffs that the defendants' argument is fact-based and is therefore insufficient to support a motion to dismiss").[31]

### 2.       The Magnitude of the Restatement Supports Scienter

As Court recognized, the magnitude of Digital Turbine's Restatement "was large." Order at 25. The Restatement revealed that for the first three quarters of 2022, quarterly revenue for AdColony was overstated by $14.6 to $35.9 million (48.2% to 61.5%), quarterly revenue for Fyber was overstated by $40.4 to $126.7 million (412% to 439%), and for Digital Turbine overall, quarterly revenue was overstated by $54.5 million to $158.7 million (34.5% to 73.2%). ¶¶67, 68.

Defendants argue that because the Restatement did not impact Digital Turbine's net income, its magnitude is irrelevant to scienter. Mot. 23. The Fifth Circuit rejected that argument in *Barrie*. 397 F.3d at 257 (rejecting defendants' argument that "their accounting methods were not improper and that they made no false statements *regarding earnings*" and holding "[t]he Complaint states a claim

---

[30] Defendants raise many factual issues such as: (i) was the accounting straightforward, or did it require significant judgment (Mot. at 21); what was meant by Stone's comparison to Uber (Mot. at 21-22); what was meant by statement that "no significant estimation is required (Mot. at 19).

[31] In *Barrie*, 397 F.3d at 257-58, the Fifth Circuit instructs:

Undoubtedly, the accounting issues are complex; whether they were handled within the parameters of good faith decision-making or **whether the decisions amounted to recklessness** will surely be the **focus of any trial** of this case. We will not prejudge that issue. But neither the district court, nor we, can conduct a battle of experts on a motion to dismiss. Rather, we must assume the truth of the allegations pleaded with particularity in the complaint. The strong-inference pleading standard does not license us to resolve disputed facts at this stage of the case.

of fraud on the overstatement of revenue issue.").[32]

Indeed, "significant overstatements of revenue tend to support the conclusion that the defendants acted with scienter." *In re Seitel, Inc. Sec. Litig*., 447 F. Supp. 2d 693, 705 (S.D. Tex. 2006); *Chalverus v. Pegasystems, Inc.,* 59 F. Supp. 2d 226, 234 (D. Mass. 1999) ("Courts have held that significant overstatements of revenue tend to support the conclusion that defendants acted with scienter."). As the SEC has observed, overstatement of revenue leads to *larger* impacts on share price than other metrics. *See, e.g*., Lynn E. Turner, Chief Accountant, SEC Speech by SEC Staff: *Revenue Recognition* (May 31, 2001) ("Based on research performed by my office, restatements for revenue recognition also result in larger drops in market capitalization than any other type of restatements.");[33] *cf*. Order at 25. Defendants do not decide whether revenue or earnings is more important; the trier of fact does. *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003).

Many courts have found that a restatement can still be significant in magnitude even when adjusted net income is restated *upwards* or has no impact on net income. *See N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 758, 784-87 (M.D. Tenn. 2013) (magnitude of restatement supported scienter, even though net income was overstated in certain periods and understated in others).[34] Finally, the importance of revenue here is alleged as analysts were acutely focused on Digital Turbine's *revenue*, not earnings, with some even raising Digital Turbine's price targets in response to strong *revenue growth*. ¶¶48-50, 55-59. It is thus unlikely that

---

[32] Defendants' cited cases are inapt. Mot 23. In *In re Integrated Elec. Servs., Inc. Sec. Litig.*, 2006 WL 54021, at *3 (S.D. Tex. Jan. 10, 2006), the restatement amounted to a $5.7 million, or 14%, reduction in net income over a 30-month period. Here, Defendants overstated revenues by much higher figures and percentages in *each* of the quarterly financial periods restated. ¶¶63-68. In *City of Pontiac Gen. Emps.' Ret. Sys. v. Asar*, 2016 WL 1322484, at *11 (W.D. Tex. Apr. 1, 2016), the court found inconsistent adjustments to net income, while "not strong enough on its own to satisfy" scienter, did "provide some basis [from which] to infer scienter."

[33] Available at http://www.sec.gov/news/speech/spch495.htm

[34] *See also Norfolk Cty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009) (magnitude of restatement supported a strong inference scienter notwithstanding the fact that "the accounting errors did not consistently overstate income or understate expenses").

27

Defendants were unaware of the accounting implications therewith. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 639 (E.D. Va. 2000) (significance of three contracts to MicroStrategy "certainly makes less credible the inference that the Defendants were not aware of or did not recklessly disregard the [revenue] accounting irregularities relating to these contracts.").

### G.   Overstated Revenue Allowed Digital Turbine To Hit Analyst Estimates

Defendants' scienter is further supported by the fact that the overstated revenue figures allowed Digital Turbine's reported revenue ($898.3 million for the period of Q1 through Q3 (¶68)) to meet estimates and guidance that annualized revenue would top $1 billion (¶¶56-58), and to beat analysts' quarterly revenue estimates (¶¶7, 50-51, 55, 78-80). *Akorn*, 240 F. Supp. 3d at 820 (accounting violations that allowed company to meet internal revenue guidance and consensus revenue estimates alleged scienter); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004) (manipulated revenue used to meet quarterly revenue targets strengthened inference of scienter). Fyber itself noted "a pressure to meet the requirements of third parties" as one of two "key risks" that related to potential "fraudulent revenue recognition." ¶¶227-228. Once corrected in the Restatement, investors and analysts learned Digital Turbine's true revenue for the first three quarters of FY 2022 was $334.8 million lower (in aggregate) than reported. ¶¶63-64.

### H.   Scienter Has Been Pled As To Digital Turbine

Because the SAC adequately alleges scienter as to Stone and/or Garrison, it has adequately alleged it as to Digital Turbine. *See Southland*, 365 F.3d at 367.

## VII.   THE SAC ADEQUATELY ALLEGES LOSS CAUSATION

To plead loss causation, Plaintiffs must allege only "a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss." *Lormand*, 565 F.3d at 258. Such a "corrective disclosure" can occur through "partial disclosures." *Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 957 (S.D. Tex. 2016). Loss causation is subject to Rule 8(a) notice

28

pleading. *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). Plaintiffs provide that notice here: on May 31, 2022, Defendants announced abysmal Q4 and FY 2022 results, further revealing the truth about Digital Turbine's revenue problems, revealing a miss on even revised analyst estimates, and causing Digital Turbine's stock price to drop $5.75/share (22.6%). ¶¶252-54.

Defendants challenge only the May 31, 2022 corrective disclosure, arguing that it "reveals no new information related to the restated financials for the periods ending June 30, September 30, or December 31, 2021." Mot. 29. But the news need not relate to Q1-Q3 2021 financials to allege loss causation because Plaintiffs' alleged false statements are not so limited. For example, on May 25, 2021, Digital Turbine announced the completion of the Fyber acquisition, stressing that "***the combined platform offering is already generating more than $1 billion in annualized revenues***." ¶146. A June 1, 2021, press release, similarly touted Digital Turbine as "***a company with greater than $1 billion in profitable annualized revenue***." ¶148. A November 11, 2021 investor presentation claimed Digital Turbine was "Operating at global scale with strong results" and generating ***$1B in revenue***. ¶178.

This case is not just about the first three fiscal quarters of 2021 that were ultimately restated. As listed immediately above, Defendants made many additional misleading representations about the supposed revenue growth associated with the addition of AdColony and Fyber, which Defendants ignore.[35] The May 31 disclosure revealing 4Q revenue of just $184.1 million and FY 2022 revenue of just $747.6 million[36] thus *directly relates* to the subject matter of the alleged misstatements; it revealed, for the first time, the full extent of the revenue recognition issues stemming from Defendants' revenue boosting scheme, including on full year results. The May 31 release also effectively restated reported

---

[35] Defendants failed to challenge the falsity of these alleged misstatements (*see* Mot. 27-28, challenging the falsity of only ¶¶193-94), and as such they have waived the argument. *See* Sec. IV.B, *supra*.

[36] Calculated by adding restated net revenue for Q1 through Q3 of ($158.1+$188.6+$216.8) + newly reported Q4 of $184.1. *See* ¶¶68, 252.

net revenues of Fyber and AdColony in Digital Turbine's April 29, 2021 release. ¶¶145, 253.

Indeed, the SAC alleges the market recognized the May 31 announcement as new information: a June 17, 2022 Seeking Alpha report observed that "[t]here is no doubt that the market did not expect Digital Turbine, Inc. [ ] to report revenues of $184.1M in FQ422…this is attributed to the changes in its accounting report methods." ¶78. The report continued: "since analysts and investors were expecting revenues in the range of $300M with a consensus revenue estimate of $336.45M, representing YoY growth of 253.9%, it is apparent that many were taken aback by the changes in its accounting reporting method." *Id*. On these facts, loss causation is alleged. *See Schott*, 211 F. Supp. 3d at 957; *Parmelee*, 2018 WL 276338, at *6; *see also Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F.Supp.3d 821, 855 (S.D.N.Y. 2019) (loss causation in connection with earnings miss where poor performance was within "zone of risk" created by fraud).

## VIII.   THE SAC ADEQUATELY ALLEGES CONTROL PERSON CLAIMS

Defendants only argue that the §20(a) claims fail because the §10(b) claims do. Mot. 30. Because the §10(b) claims survive, so do the §20(a) claims.  *See Parmelee*, 2018 WL 276338, at *7.

## IX.   CONCLUSION

The SAC remedied the Court's prior scienter concerns and alleges a strong inference of scienter. Viewed holistically, no nonfraudulent inference is *more* compelling than the cogent and compelling inference of reckless or intentional misrepresentations detailed above. Plaintiffs have alleged at least a tie, and that's all they need. The Court thus should deny Defendants' Motion.

Dated: October 23, 2023

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By:  */s/ Kara M. Wolke*
Kara M. Wolke (*pro hac vice*)
Leanne H. Solish (*pro hac vice*)
Raymond D. Sulentic (*pro hac vice* forthcoming)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: kwolke@glancylaw.com
        lsolish@glancylaw.com
        rsulentic@glancylaw.com

*Counsel for Plaintiffs and*
*Lead Counsel for the Class*

**AHMAD, ZAVITSANOS & MENSING, PLLC**
Sammy Ford IV
State Bar No. 24061331
Jordan Warshauer
State Bar No. 24086613
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Telephone: (713) 665-1101
Facsimile: (713) 665-0062
Email: sford@azalaw.com
        jwarshauer@azalaw.com

*Liaison Counsel for Plaintiffs and Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Jonah H. Goldstein
Eric I. Niehaus
Joseph J. Tull
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  (619) 231-1058
Facsimile:  (619) 231-7423
Email: jonahg@rgrdlaw.com
        ericn@rgrdlaw.com
        jtull@rgrdlaw.com

*Additional Counsel*

31

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel for Plaintiff Jay Robison*

32

**CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2023, I electronically filed a true and correct copy the

foregoing document with the Clerk of Court using the CM/ECF system which will send a notice of

electronic filing to all counsel of record who have consented to electronic notification.

*/s/ Kara M. Wolke*
Kara M. Wolke