# Exhibit 29

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| GEORGIA FIREFIGHTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | § § § § | Civil Action No. 4:20-cv-00576 |
| Plaintiff, | § § § | |
| vs. | § § | |
| ANADARKO PETROLEUM CORPORATION, R.A. WALKER, ROBERT G. GWIN, ROBERT P. DANIELS, and ERNEST A. LEYENDECKER, III, | § § § § § § | |
| Defendants. | § § § | |

**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

4820-5568-8391.v2

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................................1

JURISDICTION AND VENUE ..............................................................................................6

THE PARTIES..........................................................................................................................6

BACKGROUND .......................................................................................................................9

DEFENDANTS' FRAUDULENT SCHEME ........................................................................9

    A.    Defendants Dig Themselves a Hole in Hailing Shenandoah as a Multi-Billion Dollar Opportunity....................................................................................10

    B.    Defendants Embark on a Campaign to Systematically Suppress and Conceal Known Adverse Facts .......................................................................12

        1.    Defendants Muzzle Dissenting Views .......................................................12

        2.    Defendants Conceal that Shen 3 Is a Dry Hole...........................................16

        3.    Defendants Use Outdated, Misleading Maps for Shen 4 ...........................17

    C.    Frye Blows the Whistle to the SEC and Defendants Retaliate ..............................19

    D.    Defendants Abandon the Shenandoah Project and Write off Losses Without Disclosing the Fraud ................................................................................23

    E.    Defendants Threaten to Sue Frye Under a Proprietary Non-Disclosure Agreement to Cover Their Tracks ........................................................................24

    F.    Frye Files a Sealed Lawsuit Against Anadarko........................................................25

    G.    The Fifth Circuit Reveals Frye's Whistleblower Allegations in a Published Decision Issued After Anadarko's Acquisition by Occidental ..............................26

DEFENDANTS' MISLEADING STATEMENTS DURING THE CLASS PERIOD.................26

    A.    2015 Statements....................................................................................................28

    B.    2016 Statements....................................................................................................34

    C.    2017 Statements....................................................................................................42

SEC REGULATION S-K ITEM 303 ....................................................................................44

DEFENDANTS' SCIENTER...................................................................................................45

4820-5568-8391.v2

**Page**

LOSS CAUSATION ....................................................................................................49

THE PRESUMPTION OF RELIANCE APPLIES ....................................................52

NO STATUTORY SAFE HARBOR ..........................................................................53

CLASS ACTION ALLEGATIONS ...........................................................................53

CAUSES OF ACTION ...............................................................................................55

      COUNT I ..........................................................................................................55

      COUNT II .........................................................................................................56

PRAYER FOR RELIEF .............................................................................................57

JURY DEMAND ........................................................................................................58

4820-5568-8391.v2

**INTRODUCTION**

1. This is a securities fraud class action brought on behalf of all persons and entities that purchased or otherwise acquired the common stock of Anadarko Petroleum Corporation ("Anadarko" or the "Company") between February 20, 2015 and May 2, 2017, inclusive (the "Class Period") against Anadarko and former executives R.A. Walker ("Walker"), Robert G. Gwin ("Gwin"), Robert P. Daniels ("Daniels"), and Ernest A. Leyendecker, III ("Leyendecker") (collectively, "Defendants") for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.[1]

2. Until its acquisition by Occidental Petroleum Corporation ("Occidental") on August 8, 2019, Anadarko was one of the world's largest independent oil and natural gas exploration and production companies and was publicly traded on the New York Stock Exchange ("NYSE") under the ticker "APC." Anadarko's domestic portfolio of oil assets included basins in the Gulf of Mexico and Southwestern states.

3. In early 2009, Anadarko discovered the "Shenandoah" oil field in the Gulf of Mexico, drilling the first exploration well "Shenandoah-1" to the depth of 30,000 feet. Beginning in 2013 with the results from the "Shenandoah-2" ("Shen 2") appraisal well, and continuing throughout the Class Period, Defendants hailed the Shenandoah basin as "one of the largest discoveries in the company's history" with "'the potential to become one of the most prolific new areas in the deep-

---

[1] This Complaint is alleged on information and belief based on Lead Counsel's investigation, including analysis of: (i) recently unsealed whistleblower materials filed in *Frye v. Anadarko Petroleum Corp.*, No. 4:17-cv-02289 (S.D. Tex.); (ii) SEC filings; (iii) transcripts of earnings conference calls and securities pricing data; (iv) other public statements and presentations made by the Company and/or its representatives; (v) media reports; (vi) securities and financial analyst reports; (vii) consultation with persons familiar with Anadarko's business and formerly employed or associated with the Company; and (viii) publicly available material and data. Lead Counsel's investigation is ongoing, and many relevant facts are known only to Defendants or remain within their exclusive control. Lead Plaintiff (defined below) is confident that additional support will exist for these allegations, given an opportunity for discovery.

4820-5568-8391.v2

water Gulf of Mexico.'"  Defendants emphasized Shen 2's "more than 1,000 net f[ee]t of oil pay in multiple high-quality Lower Tertiary-aged reservoirs" and that the "well, log and pressure data from the Shenandoah-2 well indicate[d] excellent-quality reservoir and fluid properties."

4.      Anadarko described its next appraisal well, "Shenandoah-3" ("Shen 3"), as an even greater success, claiming 50% more "excellent quality" sand and confirmation of "lateral sand continuity, excellent reservoir qualities, and down-dip thickening," in addition to enabling the "projection of oil-water contacts," all of which "reduced the uncertainty of the resource range" and conveyed the unequivocal commercial viability of Shenandoah.  In reality, Shen 3 was a ***dry hole***, and bad information about Shenandoah kept gushing in.  Nevertheless, Defendants continued to provide glowing reports quarter-after-quarter and for two more appraisal wells in 2015 and 2016.

5.      Throughout the Class Period, Anadarko's public face was a mask, hiding Defendants' ugly scheme to defraud investors (and their partners) by multiple methods and means, including:

(a)      making, issuing, and disseminating public statements that knowingly or recklessly overstated Shenandoah's commercial viability;

(b)      making, issuing, and disseminating public statements that knowingly or recklessly understated the uncertainty of Shenandoah's commercial viability;

(c)      making, issuing, and disseminating public statements concerning the positive aspects of Shenandoah's potential while concealing the negative ones;

(d)      making, issuing, and disseminating public statements that re-cast failed appraisal wells as triumphs;

(e)      making, issuing, and disseminating positive public statements about Shenandoah while concealing that Anadarko's plan for extracting its oil was one no one had ever successfully deployed;

- 2 -

(f)      making, issuing, and disseminating misleading information to Anadarko's partners that overstated Shenandoah's commercial viability;

(g)      directing employees to use outdated, misleading maps that made Shenandoah seem more commercially viable than it really was so as to ensure that Anadarko's partners could not expose the truth;

(h)      retaliating against employees who tried to stand up for the truth about Shenandoah or any aspect of Defendants' scheme, including berating them, excluding them from important meetings and discussions, and threatening to sue them, while rewarding employees who helped perpetuate Defendants' scheme;

(i)      defying Anadarko's own internal policies and procedures by, among other things, disregarding the findings and recommendations of its Risk Consistency Team (the "RCT"), which served an internal audit function at the Company, and was specifically tasked with examining the Shenandoah project, including the size of the resource;

(j)      representing to employees that every aspect of its scheme qualified as "proprietary" information under the "Proprietary Information and Inventions Agreement" (the "PIIA") that most employees were required to sign as a condition of employment;

(k)      representing to employees that the PIIA prohibited them from disclosing to investors the truth about Shenandoah or any aspect of Defendants' scheme;

(l)      intimidating employees, including threatening to sue them, if they disclosed to investors the truth about Shenandoah or any aspect of Defendants' fraudulent scheme;

(m)      hiring lawyers to prevent a whistleblower from disclosing the truth about Shenandoah or any aspect of Defendants' scheme;

(n)      concealing the existence of a whistleblower complaint alleging their fraud;

- 3 -

4820-5568-8391.v2

(o)     hiring lawyers to argue to multiple federal courts that a former employee should be prohibited from disclosing the truth about Shenandoah or any aspect of the scheme;

(p)     hiring lawyers to argue to multiple federal courts that a former employee's allegations and evidence concerning Shenandoah and Defendants' scheme should be sealed from the courts' publicly accessible dockets;

(q)     undoubtedly spending hundreds of thousands dollars in legal fees in order to carry out (m)-(p), *supra*;

(r)     perpetuating the scheme by concealing it for so long as to trigger a statute of repose that reduces over time recoverable damages available to investors for their losses; and

(s)     perpetuating the scheme by concealing it long enough for the Individual Defendants (defined below) to receive golden parachutes worth tens of millions of dollars.

6.     Defendants wielded every tool at their disposal to suppress the truth, which the Senior Reservoir Engineer assigned to the Shenandoah project tried to expose. Engineer Lea S. Frye ("Frye") repeatedly objected to Anadarko's dissemination of misleading information about Shenandoah and urged the Company to come clean with investors. By no later than February 2014, Frye had assembled and presented undeniable evidence that Anadarko was exaggerating Shenandoah's potential to the market. Each new appraisal, and Anadarko's own RCT findings that the Shenandoah resource needed a significant downward adjustment, confirmed Frye's analysis, but rather than commend her accuracy and integrity, Anadarko, led by one of its Vice Presidents ("VP") (defendant Leyendecker), embarked on a systematic campaign to harass, exclude, and force Frye to choose between joining their fraudulent scheme or quitting. Frye chose to quit, but not until after submitting a whistleblower complaint to the SEC on May 9, 2016 ("SEC Letter"). Even after being forced to quit in 2016, Frye tried to convince Anadarko to do the right thing. Anadarko still refused to level with investors.

- 4 -

7.      A year later, Frye's and the RCT's analyses were validated when Anadarko wrote off the Shenandoah project.  On May 2, 2017, Anadarko disclosed by way of its first quarter ("1Q") 2017 SEC Form 10-Q ("1Q 2017 10-Q") a $467 million impairment charge and expensed $435 million in suspended exploratory well costs for Shenandoah.  Following this news, the price of Anadarko common stock fell approximately 8% to close at $51.95 per share on May 3, 2017.  Nevertheless, Defendants continued to conceal the years-long scheme.

8.      Still facing Defendants' threats to sue her if she disclosed the truth, on July 25, 2017, Frye finally turned to the courts by filing a lawsuit to seek a judgment allowing her to disclose the truth.  Defendants responded by paying a team of lawyers what was likely hundreds of thousands of dollars to try to dismiss Frye's lawsuit and to keep virtually every aspect of it hidden from the public, contrary to centuries of public access to our country's courts and court records.

9.      While still concealing their scheme, in April and May 2019, Defendants arranged for what turned out to be hundreds of millions in "golden parachute" payoffs to Anadarko executives as part of an acquisition that began with Chevron Corporation, but ended up with Occidental (closing in August 2019).  Walker, alone, received $98 million.  Gwin, alone, received $55 million.

10.      On November 4, 2019, only months after Defendants had cashed in, the Fifth Circuit Court of Appeals issued a published decision in Frye's lawsuit against Anadarko, revealing for the first time her whistleblower allegations to the investing public.  *See Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285 (5th Cir. 2019).  Among other things, the Fifth Circuit revealed Frye's whistleblower allegations that, in March 2014, Anadarko "'knowingly published inflated information about its 2013 exploration successes during an investor conference'" (*id.* at 288); in February 2015, it described Shen 3 "'in glowing terms'" with "'over 1,500 feet of "quality sand,"'" knowing it was a dry hole (*id.*); and in October 2015, it concealed that the potential of "Shenandoah-4" ("Shen 4") "'was vastly overstated'" (*id.*).  Bottom-line, Frye alleged that Anadarko

- 5 -

"'knew the Shenandoah resource was less than half the size Defendant had originally claimed in March 2014,'" but had "'made no corrections to its original projections'" throughout the Class Period. *Id.*

11.     Documents recently unsealed in the *Frye* action further confirm the existence of Defendants' scheme, though its full scope remains obscured by the myriad redactions on which Defendants insisted years-after-the-fact in their ongoing quest to evade accountability.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa) because the claims arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because Anadarko maintained its corporate headquarters in this District at all relevant times. Additionally, many of the acts charged herein, including the preparation and dissemination of materially misleading information, occurred in substantial part in this District.

14.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and/or facilities of the national securities exchanges.

## THE PARTIES

15.     Lead Plaintiffs Norfolk County Council as Administering Authority of the Norfolk Pension Fund, Iron Workers Local #580 Joint Funds, and Building Trades United Pension Trust Fund (collectively, "Lead Plaintiff") purchased the common stock of Anadarko during the Class Period and were damaged as a result of Defendants' fraudulent scheme.

- 6 -

4820-5568-8391.v2

16.    Defendant Anadarko was a Delaware corporation with its principal executive offices located at 1201 Lake Robbins Drive, The Woodlands, Texas, at all relevant times.  Until the Company was acquired by Occidental on August 8, 2019, Anadarko common stock traded on the NYSE under the ticker symbol "APC."

17.    Defendant R.A. Walker was, at all relevant times, Anadarko's Chairman, President, and Chief Executive Officer ("CEO").  Walker remained Chairman and CEO until the Occidental acquisition.  Walker joined Anadarko in 2005 and held various leadership roles, including Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") before becoming CEO in May 2012.  In addition, Walker was Chairman of the Executive Committee.  As CEO, Walker had the power to control publicly disseminated information about the Company, was quoted in press releases, regularly spoke on quarterly earnings calls, and signed SEC reports.  During fiscal years 2015-2017, Walker received over $52 million in total executive compensation.

18.    Defendant Robert G. Gwin was Anadarko's Executive VP of Finance and CFO from May 2013 to November 2018.  Gwin was responsible for Anadarko's financial reporting, investor relations and communications, and corporate development.  Gwin was President at the time of the Occidental acquisition.  Previously, Gwin was Senior VP of Finance and CFO since March 2009 and Senior VP since March 2008.  Gwin was a member of the Executive Committee and reported directly to Walker.  As CFO, Gwin had the power to control publicly disseminated information about the Company, regularly spoke on quarterly earnings calls, and signed SEC reports.  During fiscal years 2015-2017, Gwin received $20.6 million in total executive compensation.

19.    Defendant Robert P. Daniels was Anadarko's Executive VP of International and Deepwater Exploration from May 2013 until his retirement in December 2016.  Daniels joined the Company in 1985 and held key positions in exploration and operations, including Senior VP of Worldwide Exploration, Senior VP of Exploration and Production, and Geologic Supervisor for

- 7 -

Algeria. Daniels was a member of the Executive Committee and reported directly to Walker. Daniels was quoted in press releases and regularly spoke on earnings calls, among other public statements to the market. During 2015, Daniels received $6.5 million in total executive compensation. Daniels engaged in insider sales of Anadarko common stock during the Class Period at inflated prices from which he received proceeds of $3.1 million.

20. Defendant Ernest A. Leyendecker, III was promoted as the scheme progressed. He was Senior VP of Exploration – Gulf of Mexico from February 2014 until April 2015, then promoted to Senior VP of International Exploration, and finally promoted to Executive VP of International & Deepwater Exploration on August 23, 2016, until he retired on October 4, 2017, at the age of 57. Among other public statements, Leyendecker spoke on calls with analysts and investors about the Shenandoah project. During fiscal years 2015-2017, Leyendecker received in excess of $4 million in total executive compensation.

21. Defendants Walker, Gwin, Daniels, and Leyendecker are collectively referred to herein as the "Individual Defendants."

22. The Individual Defendants, by virtue of their positions, had the power and authority to control the contents of Anadarko's SEC reports, shareholder letters, press releases, and presentations to analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of SEC reports and press releases before or shortly after issuance and had the ability and opportunity to prevent their issuance or to correct them. By virtue of their positions, and their personal knowledge or access to material non-public information, the Individual Defendants knew or were severely reckless in disregarding that material facts were being withheld from the investing public. The Individual Defendants are liable for the omissions of fact alleged herein, as well as others that may be revealed as such with the benefit of further investigation and/or discovery.

- 8 -

## BACKGROUND

23.     During the Class Period, Anadarko was one of the largest independent oil and gas exploration and production companies in the United States and globally.

24.     On August 8, 2019, Anadarko became an indirect, wholly owned subsidiary of Occidental.

25.     Before Occidental's acquisition of Anadarko, the Company's common stock traded on the NYSE under the ticker symbol "APC."

26.     In 2009, Anadarko discovered the Shenandoah deepwater oil field in the Gulf of Mexico.  Located approximately 200 miles south of New Orleans, it spans a leased area of about 13,000 acres in what is referred to as the "Walker Ridge" area.  The specific leases or "blocks" relating to Shenandoah at Walker Ridge are blocks 51, 52, and the north half of block 53.

27.     After drilling an initial exploratory well named "Shenandoah-1," Anadarko drilled a series of five more wells in the Shenandoah basin (Shenandoah-2, Shenandoah-3, Shenandoah-4, Shenandoah-5, and Shenandoah-6).

28.     Anadarko operated the Shenandoah field with a 30% working interest.  At the time, Anadarko partners included ConocoPhillips (40% working interest), Cobalt International Energy, L.P. (20% working interest), and Marathon Oil Corporation (10% working interest).[2]

## DEFENDANTS' FRAUDULENT SCHEME

29.     Leading up to and throughout the Class Period, Defendants engaged in a fraudulent scheme through various means and methods that operated as a deception on the investing public concerning the size and commercial viability of the Shenandoah project and a whistleblower complaint about Defendants' multi-billion dollar securities fraud as described herein.

---

[2]     Over time, Shenandoah's ownership has passed through different companies, including LLOG Exploration Offshore, Venari Resources, Navitas Petroleum, and Blackstone Group.

4820-5568-8391.v2

**A.     Defendants Dig Themselves a Hole in Hailing Shenandoah as a Multi-Billion Dollar Opportunity**

30.     In May 2009, Anadarko announced its Shenandoah oil discovery well in deepwater Gulf of Mexico. Defendants described the well as encountering net oil pay approaching 300 feet in Lower Tertiary sands in the Wilcox formation and drilled in 5,750 feet of water to a total depth of 30,000 feet. Daniels touted Shenandoah's "'reservoir properties that appear to be of much higher quality than industry has seen previously in the emerging Lower Tertiary play.'"

31.     During a March 13, 2012 investor relations conference call, Anadarko boasted of an exploration goal of delivering "***over 800***" million barrels of oil equivalents ("MMBOE"). Shenandoah alone constituted approximately one-third of the projected resources to meet that goal, which at that time would have made it the third largest resource ever found in the Gulf of Mexico.

32.     On March 19, 2013, Defendants issued a press release about its appraisal drilling activities and oil-producing potential in Shenandoah. The press release touted favorable results from the Shen 2 well with recoverable oil of over 1,000 feet vertically from the rock structure into which Defendants were drilling. The press release quoted Daniels as saying:

> "The successful Shenandoah-2 well marks ***one of Anadarko's largest oil discoveries in the Gulf of Mexico***, with more than 1,000 net feet of oil pay and reservoir rock and fluid properties of much higher quality than previously encountered by industry in Lower Tertiary discoveries . . . . With ownership in the successful Shenandoah wells, the adjacent Yucatan prospect, and the very encouraging results from the nearby Coronado well, ***Anadarko is strategically positioned in the Shenandoah Basin, which has the potential to become one of the most prolific new areas in the deepwater Gulf of Mexico***."

33.     On March 4, 2014, Defendants published inflated information about the Company's 2013 exploration successes during an investor conference, contrary to internal information provided by their Senior Reservoir Engineer that showed far lower projections of recoverable oil.

34.     For example, a slide show at the March 4, 2014 conference provided inflated estimates of the Shenandoah resource, which were far too optimistic given the available data and

- 10 -

science.  One slide boasted of Anadarko's "***900+ MMBOE Net Discovered Resources***" (a third of which was attributable to Shenandoah), while another described the Shenandoah basin alone as a "***~$2 - $4 Billion Net Opportunity***."



4820-5568-8391.v2

35. The market was duped by Defendants' inflated numbers. In December 2016, one analyst stated that Anadarko's data "revealed that the resource base could be far bigger than initial estimates," and as late as February and March of 2017, analysts stated that the resource potential at Shenandoah could exceed 400 to 500 MMBOE of the Company's gross resource potential.

36. In reality, the data collected from the Shenandoah wells proved that Defendants' public characterization of Shenandoah as a "~$2 - $4 Billion Net Opportunity" was vastly overstated and required a significant downward adjustment. The overstated value was compounded by Anadarko's understatement of the net capital required to develop the resource. Yet, Defendants never corrected their projected value and size of Shenandoah project during the Class Period.

**B.      Defendants Embark on a Campaign to Systematically Suppress and Conceal Known Adverse Facts**

37. Leading up to and throughout the Class Period, Defendants systematically suppressed dissenting voices and known adverse facts about the Shenandoah project through a variety of means and methods, including, but not limited to, misleading statements made to investors and partners.

### 1.      Defendants Muzzle Dissenting Views

38. Illustrative of Defendants' years-long campaign to suppress adverse known information before and during the Class Period is their mistreatment of Frye, the Senior Staff Reservoir Engineer and team lead for the Shenandoah project. In 2000, Frye graduated with a degree in Petroleum Engineering from Penn State University. She launched a career in the oil and gas industry shortly thereafter as a reservoir engineer for ExxonMobil from 2001 to 2005. In 2005, Frye began working as a Senior Reservoir Engineer for Anadarko. Within two years, she was promoted to Staff Reservoir Engineer, and she was promoted again in 2012 to Senior Staff Reservoir Engineer, a position she held until forced to quit in 2016.

39. As a reservoir engineer, it was Frye's job to evaluate the size of an oil field resource to develop economic models. Frye's responsibilities included, among other things: (i) performing

- 12 -

complex economic analysis based on the known data to evaluate the viability of taking a project to production and presenting economic evaluations and recommendations to senior executives (including Walker); (ii) communicating and coordinating with the subsurface, facility, and 20,000 psi technology teams to evaluate components needed to develop the project; (iii) overseeing real-time (24-hour) operations on wells being drilled to gather information to evaluate economic viability; (iv) preparing and presenting well and development evaluations to partners; and (v) estimating oil and gas reserves based on known geological data compliant with SEC disclosure and reporting guidelines. During her employment, each of Frye's performance evaluations indicated that she had met and/or exceeded the Company's expectations.

40. Frye worked primarily with members of Anadarko's development team, which was responsible for keeping partners informed about the size, anticipated capital expenditures, and timing considerations to understand the potential profitability of the resource. As part of her job, Frye participated in weekly partner drilling update meetings for the various Shenandoah wells. Others in attendance typically included the exploration team, the landman, the drilling engineer, and the operations geologists. The meetings concerned the overall state of appraisal drilling operations, including updated timing of operations for Shenandoah (a time-sensitive project), discussion of well log data (such as evidence of faulting), and data that revealed obstacles to the project's economic viability. Although Frye was formally a part of the development team, she worked closely with both the development team and the exploration team, which included Leyendecker and other executives.

41. In January 2014, Defendants tasked Frye with evaluating Shenandoah and analyzing the available scientific data to assess whether the project should move forward to production. Jim Kleckner ("Kleckner") (Executive VP of Deepwater and International Development and Executive Committee member) asked Frye to develop an economic model summarizing the development team's view of the Shenandoah resource. Specifically, Frye was asked to focus on Shenandoah's

- 13 -

4820-5568-8391.v2

perceived value and any risks to that perceived value. The objective was to use the economic model to assist the Executive Committee in establishing budgets for the following year. Walker, Gwin, and Daniels were all members of the Executive Committee throughout the Class Period.

42. On February 19, 2014, Frye participated in a meeting about Shenandoah, along with her supervisor and several of Anadarko's executives, including Leyendecker. Other executives in attendance included Darrell Hollek ("Hollek") (Senior VP Gulf of Mexico and International Development and Executive Committee member), Pat McGrievy ("McGrievy") (General Manager, deepwater Gulf of Mexico), David Blakely (Manager of Gulf of Mexico Exploration Engineering), and David O'Brien (Business Advisor). During the meeting, Frye presented the development team's economic model based on all known scientific data, using industry best practice modeling and sensitivity analysis with input from the integrated project team. The upshot was that the most reliable scientific information indicated that the Shenandoah resource was much smaller and less commercially viable than previously claimed.

43. Some in attendance, including Leyendecker, were displeased with the economic model as it contradicted Defendants' overly optimistic claims. During the meeting, Leyendecker, who was considered an up-and-rising star at the Company and feared by many co-workers, berated Frye, saying "[y]ou do not know anything" and insisted that Shenandoah was "the best field ever" and "as good as Troika" (one of the larger deepwater oil fields in the Gulf of Mexico).

44. Though Frye's immediate supervisor McGrievy described Frye as "conscientious" and having "high moral standards," and acknowledged her opinions about Shenandoah were "spot on" in terms of scientific accuracy, he stood mute as Frye was derided for her accurate assessment.

45. Still, Frye continued to speak up internally in 2014 and 2015 against Anadarko's "false, misleading statements about Shenandoah and the misleading way faults were being mapped" to "justify resource projections that it knew were flimsy and unscientific."

- 14 -

4820-5568-8391.v2

46.     Indeed, Frye and her colleagues, Paul Chandler ("Chandler"), Chip Oudin ("Oudin"), McGrievy, and support staff from the drilling facilities and equipment teams presented their collective view of the Shenandoah resource and its limitations and deficiencies numerous times to Hollek and/or Kleckner.  At the time, Chandler was a geologist on the development team who had pointed out numerous errors in the exploration team's methodology and stated that their resource statements were incorrect.  As members of the Executive Committee, it is inconceivable that Hollek and Kleckner did not share this critical information regarding one of Anadarko's most significant projects with Walker, Gwin, and Daniels, all of whom also served on the Executive Committee.

47.     As part of Defendants' campaign to suppress known adverse information, on February 17, 2015, Leyendecker abruptly canceled a scheduled presentation by Project Reservoir Engineer Doug Shotts ("Shotts") (an internal expert who was not on the exploration team) once he became aware that it included information about the geologic uncertainty surrounding Shenandoah. Leyendecker and P.K. Pande (Director of Reservoir Characterization and Dynamics) informed Shotts that the presentation was being canceled and all references to it removed from Anadarko's intranet (called "Insider").  Shotts' presentation included an honest assessment of the size of the Shenandoah resource and the economic obstacles to its profit potential.  Leyendecker did not want the truth about the uncertainty in size and value of the resource to get out.

48.     The suppression of Shotts' presentation was not an isolated event.  During the same period, Defendants heavily edited the verbiage its engineers used when describing the Shenandoah resource and any references to faulting or other evidence that warranted a downward adjustment to Anadarko's earlier projections about the size and economic promise of Shenandoah.

49.     By February 17, 2015, the day Shotts' presentation was canceled, Defendants' efforts to skew the truth had reached the point where even Oudin, an independent Geophysical Advisor (who believed the exploration team was overstating the Shenandoah resource and pointed out

- 15 -

numerous flaws in their methodology), wrote a sarcastic email mocking the exploration team's insistence that engineers and geologists use sterile, amorphous verbiage instead of plain language that accurately described Shenandoah's limitations. For example, they were instructed to refer to faulting as "barriers." Oudin joked that the phrase "'Dynamic Uncertainty'" was "too strong and too negative" for a discovery that was considered "probably one of Anadarko's all-time greatest" and if any of the email recipients "have any references to faults in your presentation – as barriers, either unmapped or mapped – please refrain from calling them 'faults', referring to them instead as 'hypothetical lineaments with potential for full transmissibility.'"

### 2. Defendants Conceal that Shen 3 Is a Dry Hole

50. Drilling of Shen 3 commenced during the second quarter ("2Q") of 2014. Shen 3 was located two miles from Shen 2 and was a "dry hole" that did not reveal the presence of oil and gas. It was understood internally within the Company that Shen 3 estimates were wrong, and it did not contain a lot of oil – instead, it was widely understood to be a failure and a money pit.

51. However, Defendants concealed this news from the public and described the findings of the well in terms similar to those used to describe Shen 2: "***[t]he Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening***."

52. Likewise, during a February 3, 2015 investor call, Daniels described Shen 3 in glowing terms, claiming there was 1,500 feet of "***excellent***" sand continuity. In a press release on February 2, 2015, Defendants claimed that their Shenandoah appraisal activities "continued to validate the company's geologic models" and was "laying the foundation for [a] potential future mega project[]," even though the well data had revealed that Shen 3 was a dry hole.

4820-5568-8391.v2

### 3. Defendants Use Outdated, Misleading Maps for Shen 4

53. Defendants likewise exaggerated the findings associated with the Shen 4 appraisal well drilled in 2015, when in fact it was well known throughout the Company, including the management team, that the results were disastrous.

54. As with Shen 3, it was known internally at the Company that Shen 4 was "garbage" and suffered from major problems, including misleading mapping. Like Shen 3, Shen 4 showed poor results due to poor production and bottom-hole pressure and had relied on a bad model, leading to oil column content which had more water versus oil than previously estimated.

55. Shen 4 involved multiple penetrations for diagnostic purposes. Frye's (heavily redacted) allegations to the SEC indicated that Shen 4 encountered "salt" which is "a rock structure that can never yield oil." In other words, there were massive salt deposits (or faults) that blocked oil extraction. These diagnostic findings mandated a reduction in the estimated size of the Shenandoah resource, given that the amount of oil and the feasibility of extracting it can change dramatically when a fault line is encountered, and accurately extrapolating oil-water contact requires evaluation of data within the same fault block.

56. The second Shen 4 penetration was a sidetrack well (referred to as Walker Ridge 51 #2 ST #1). The purpose of a sidetrack well is to gain greater understanding of the size of the resource.

57. The Shen 4 sidetrack well found hydrocarbon in the range of 600+ vertical feet, much less than the 1,000 vertical feet Defendants had boasted of in the Shen 2 well. In other words, Shen 4 was an objectively smaller resource than Shen 2.

58. The data obtained from Shen 4 mandated a downward adjustment to Shenandoah's size estimates. Instead, Defendants elected to manipulate the data to maintain their exaggerated narrative without revealing materially adverse known facts. Put simply, Defendants concealed from

- 17 -

4820-5568-8391.v2

investors (and their partners) the information that would have enabled investors and their partners to make their own, more accurate, assessments of the Shenandoah resource.

59.     For example, during an October 28, 2015, third quarter ("3Q") 2015 earnings call, Anadarko's top executives discussed Shen 4 without mentioning any of the known obstacles and limitations. Instead, Defendants reiterated prior exaggerated estimates about the size and economic promise of Shenandoah. For example, Gwin claimed that Shen 4 had identified even more oil, pushing the known depth of oil down by an additional 400 feet, stating that "we didn't establish an oil water contact here, so that tells us there's more down below us" and "we're very encouraged with what we saw, and *it was well within the range of expectation of what we had put out there*."

60.     Defendants also manipulated and falsified Shenandoah maps to hide known faults from their partners so they could not detect or expose the scheme. In fact, when the mapping did not support their overly optimistic statements, executives tried to justify further drilling by recalibrating the maps. Internal emails from on or about August 18, 2014, provide evidence that Leyendecker insisted Frye and other scientists conceal maps revealing the existence of faulting and instead use false maps of Shenandoah. Further, during internal meetings, the Shenandoah team was instructed by Leyendecker and others (such as Tim Trautman ("Trautman"), who reported directly to Leyendecker) to conceal the faults. This directive concealed data highly relevant to an assessment of the size and overall economic analysis of Shenandoah and was concealed from Anadarko's partners during meetings and presentations. The true maps were not shown to Anadarko's partners or to the public.

61.     One of the emails sent from Oudin to McGrievy, Chandler, and Frye on August 18, 2014 cryptically stated:

> Depending on what's been shown, to whom it's been shown, and when it was shown, we may be stuck (politically) between a rock and a hard place. Especially if interested third parties are involved in any of the basin discoveries.

62. Leyendecker's insistence on using fraudulent maps to conceal known faults chilled many involved in the Shenandoah project into silence. Many of Frye's colleagues had attended the February 2014 meeting during which Leyendecker berated Frye for explaining why the science was inconsistent with Defendants' public statements. Now, Leyendecker was ordering the use of fraudulent maps to conceal the economic limitations of the project. At this point, personnel began to realize that honest evaluation and reporting were not Defendants' primary objectives. Further, engineers and subject matter experts, such as Frye, were discouraged or prevented from expressing their fact-backed assessments of the Shenandoah project.

63. Even as Defendants punished Frye for her honesty, they promoted Leyendecker for his dishonesty. On August 23, 2016, months after receiving the SEC Letter and evidence outlining Leyendecker's role in the scheme, Defendants ensured his continued participation by promoting him to Executive VP of International and Deepwater Exploration. Walker stated Leyendecker was "***instrumental in advancing Anadarko's exploration, production and development*** worldwide, and we are confident [he] will continue to create value for our stakeholders."

C. **Frye Blows the Whistle to the SEC and Defendants Retaliate**

64. Defendants may have gotten away with their scheme but for the fact that Frye decided to blow the whistle on their fraud.

65. Frye had become increasingly concerned after Defendants disregarded the assessment of their own RCT that they should revise downward their assessments of Shenandoah, meaning it was worth billions less than Defendants led others to believe.

66. By way of background, Anadarko's RCT served an internal audit function by reviewing the exploration team's methods for reporting on resources to prevent "salesmanship and overly optimistic evaluations of exploration prospects." One of the stated goals of the RCT was to

"minimize personal bias" of those involved in exploration efforts to "characterize the subsurface risk and potential of leads and prospects in a consistent manner."

67.     The RCT was asked to examine the Shenandoah project and more specifically its size. During the process of evaluating Shen 4, it became increasingly apparent to the development team that the exploration team was selectively ignoring relevant data. After reviewing the available geological data, the RCT confirmed that the resource claims made by exploration executives needed a significant downward adjustment. Still, Defendants made no corrections to their prior statements, instead continuing to overstate Shenandoah's size and economic viability, while concealing known adverse information necessary to enable investors (and their partners) to avoid being deceived.

68.     Frye became worried about the potential for liability (as lead engineer) or perceived complicity in the fraud unfolding before her eyes. Frye also worried about adverse career ramifications.

69.     In January 2016, Frye advised her supervisor McGrievy that she would not endorse or participate in overstating the Shenandoah economics, despite ongoing pressure to do so from Leyendecker, Trautman, and others on the exploration team. As Frye told McGrievy, "*[i]t's wrong*." This exchange was the culmination of others in which Frye expressed similar concerns, so it was clear to Frye that McGrievy knew exactly what she meant. Following this discussion, Frye still saw no indication that anything was being done to stop the fraud from continuing. To the contrary, Frye was appalled to learn that defendant Daniels and others were simply ignoring the RCT's feedback.

70.     On February 1, 2016, Walker, Gwin, and Daniels met with Frye and others (Chandler, Oudin, McGrievy with additional support staff from drilling facilities and the equipment team) to present the proposal for "Shenandoah-5" ("Shen 5"). During the meeting, the attendees discussed the Shenandoah project at large, and Defendants appeared to be familiar and well-versed in the subject. The following day, on February 2, 2016, Defendants continued to tout the "high quality" of

- 20 -

Shen 4 without disclosing the use of outdated and misleading maps, and simultaneously touted plans to start drilling more wells to the East, dubbed Shen 5 and "Shenandoah-6" ("Shen 6"). Regarding Shen 5, Daniels stated the "well should spud here in this first quarter. We have high expectations for it . . . ."

71. In early 2016, Frye sought to participate in a phased reduction in force ("RIF") for which she would have received over $300,000 in severance pay and benefits. Her request went unheeded, despite the Company's custom and practice of honoring such requests. Frye understood this refusal to be in retaliation for her opposition to the fraud involving the Shenandoah project.

72. By the spring of 2016, Frye's work environment had become intolerable. She knew Defendants were violating their own internal rules and guidelines in addition to SEC rules, yet it was apparent that executives in charge had no intent of changing course. After trying to expose Anadarko's fraud to the exploration team and her supervisor, Leyendecker and others on the exploration team badgered Frye and ordered her and others to ignore fact-based maps in favor of phony, unscientific maps. Defendants began stripping Frye of job duties, even as two other reservoir engineers joined the project. It was clear that Defendants would continue to pressure Frye to either remain silent or face continuing retaliation. Frye began experiencing anxiety and depression, among other health conditions, so she took Family and Medical Leave Act ("FMLA") leave. At the time, Frye remained concerned about later being falsely blamed for Anadarko's violations. She was also worried about the harm Defendants' actions would have on investors and partners who trusted and relied on them.

73. In late April 2016, Frye provided Defendants with a detailed 20-page letter previewing much of the same information she intended to submit to the SEC. After hitting a brick wall with Defendants, Frye decided she had no option but to submit a whistleblower complaint.

- 21 -

74. On May 9, 2016, Frye submitted the SEC Letter pursuant to the Dodd-Frank Act whistleblower protections. The SEC Letter discussed and attached lawfully-obtained supporting evidence detailing Anadarko's violations of federal securities laws in connection with the Shenandoah project, including details about Defendants' misleading statements, internal meetings, and a list of percipient witnesses.

75. After submitting the SEC Letter, Frye resigned on May 18, 2016, stating:

> Over the last 18 months, Ernie Leyendecker pushed forward a portrait of the Shenandoah project that was beyond optimistic and in doing so violated nearly every aspect of our internal reporting and ethics guidelines. My repeated attempts to have the company follow those guidelines and practices and to report the find honestly and realistically were met with abuse and retaliatory behavior. The saddest part to me is that this was observed and tolerated by numerous other managers and executives. For reporting false information to investors, Ernie has been promoted and received large bonuses. Other executives have benefitted by selling their stock at inflated prices due to this blatantly false information. Policies are meaningless when no one follows them.

76. In apparent retaliation for the SEC Letter, among other things, Defendants: (i) instructed employees not to speak to Frye, even on a personal basis; (ii) retroactively shortened Frye's FMLA leave even though neither Frye nor her physician provided information that warranted it; (iii) canceled Frye's health insurance; (iv) delayed Frye's COBRA coverage; and (v) withheld Frye's pay for accrued but unused vacation time.

77. On June 14, 2016, Frye's counsel wrote to Defendants requesting that they take immediate steps to halt the retaliation and right the wrongs. It was only after counsel intervened that Defendants reinstated Frye's health insurance and paid Frye the money she was owed.

78. That summer, Frye also voluntarily met with lawyers for Anadarko's Audit Committee after submitting her SEC Letter. The lawyers interrogated Frye over the course of two meetings, during which she provided additional detailed information regarding the scheme. During the course of the questioning, Frye made "a big point not to divulge any of her co-worker's names who had similar opinions because they had asked her not to." Her co-workers were "scared" and

- 22 -

"[didn't] want their names anywhere." Given the importance of the Shenandoah project to Anadarko during this time, it is unthinkable that Walker, Gwin, and Daniels would not have been informed of the Audit Committee's investigation.

79.     Even after receiving Frye's resignation letter in which she explicitly reiterated the Company's "reporting false information to investors," Defendants continued to tout the economics of the Shenandoah project, with Gwin stating on May 24, 2016: "[Y]ou'd be very excited to take [final investment decision ('FID') in Shenandoah], knowing that the *rates of return here would be compelling* . . . . I'll call it not just that break-even number, but the number at which you'd really be excited about sanctioning and moving the project forward *continues to come down with success. So Shen 5 is a material derisking of what we're doing*."

80.     Again, on July 26, 2016, without disclosing the use of misleading maps, Defendants announced that "Anadarko *continued to advance its understanding of the Shenandoah discovery*, as it encountered more than 1,040 net feet of oil pay in the Shenandoah-5 appraisal well," and that the Company also "increased its working interest in Shenandoah to 33 percent." The following day, Walker also announced that drilling plans for "Shen-6 [are] now underway."

**D.      Defendants Abandon the Shenandoah Project and Write off Losses Without Disclosing the Fraud**

81.     The SEC requires publicly traded companies to file quarterly and annual financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP").[3] GAAP requires oil and gas companies like Anadarko to capitalize a significant portion of costs

---

[3]     GAAP comprises the standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices. The SEC has authority for the promulgation of GAAP for public companies and has generally delegated that authority to the Financial Accounting Standards Board ("FASB"). The FASB's standards are generally contained within the FASB Accounting Standards Codification ("ASC"). SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC not in conformity with GAAP are presumed misleading, despite footnotes or other disclosures.

associated with the acquisition of leasehold and mineral-rights, as well as the costs to explore for oil and gas. If substantial doubt about the economic or operational viability of an unproved property arises during periodic assessments,[4] those costs are said to be "impaired" and must be written down to actual fair value by taking a charge against earnings, thereby lowering the profits that companies may report to investors.

82.     Throughout the Class Period, Defendants concealed the impairment of Shenandoah even after internal assessments called into serious doubt its economic and/or operational viability.

83.     On May 2, 2017, Defendants filed the 1Q 2017 10-Q, disclosing that Anadarko had "suspended further appraisal activities" on the Shenandoah project and had taken a $467 million impairment for the purchase price of the leases and a $435 million charge for previously capitalized Shenandoah exploratory drilling costs.

84.     Anadarko's decision to abandon Shenandoah after years of touting it as "one of the biggest finds ever" validated the analysis that Frye and others provided years earlier. Defendants ignored the facts and deliberately overstated the value of the resource and engaged in a campaign to deliberately mislead shareholders, the general public, and Anadarko's partners.

85.     In 2018, the Company relinquished its ownership interest in Shenandoah. On June 1, 2018, around the time that Anadarko relinquished ownership in Shenandoah, Leyendecker retired at the approximate age of 57.

**E.     Defendants Threaten to Sue Frye Under a Proprietary Non-Disclosure Agreement to Cover Their Tracks**

86.     When Frye learned in May 2017 that Defendants were writing off Shenandoah, she felt compelled to tell Anadarko shareholders about the fraud she had reported to the SEC. However,

---

[4]     FASB ASC 932-360-35-11, "*Extractive Activities – Oil and Gas*."

- 24 -

4820-5568-8391.v2

for years she was unable to do so for fear of being sued by Anadarko, which threatened to do so under a 2005 PIIA.

87.     On June 20, 2017, Frye's counsel sought Anadarko's position on whether it believed the PIIA prohibited Frye from disclosing the SEC Letter to the parties in *Edgar v. Anadarko Petroleum Corporation, et al.*, an investor lawsuit then pending before the Court.[5]

88.     On June 21, 2017, counsel for Anadarko wrote a letter warning Frye that the Company believed the PIIA forbade Frye from disclosing the SEC Letter to shareholders.

89.     On July 6, 2017, Anadarko's counsel emailed a second letter containing an express threat to sue Frye, stating in relevant part:

> Any disclosure of Anadarko's proprietary information contained in the SEC Letter to third parties (except as may be permitted by any applicable whistleblower or other laws) . . . is prohibited by th[e] [PIIA] agreement.  The Company is not waiving any of its rights under the PIIA, and will specifically enforce the protections it bargained for in the PIIA should its confidential information be disclosed in violation of the agreement.
>
> Additionally, Anadarko reserves all of its rights, including but not limited to its rights under both the PIIA and applicable law, to enforce the agreement or seek a remedy for any breach.

**F.     Frye Files a Sealed Lawsuit Against Anadarko**

90.     On July 25, 2017, Frye filed a lawsuit under seal against Anadarko seeking, among other things, a declaratory judgment that the PIIA did not prohibit disclosure of her SEC Letter because it was neither confidential nor proprietary and fell outside the intended scope of the PIIA.[6]

91.     Still operating under seal and hidden from public view, the district court dismissed Frye's claims on May 15, 2018.  An appeal followed to the Fifth Circuit Court of Appeals.

---

[5]     *See Edgar v. Anadarko Petroleum Corporation, et al.*, No. 4:17-cv-01372 (S.D. Tex.).

[6]     *See Frye v. Anadarko Petroleum Corp.*, No. 4:17-cv-02289 (S.D. Tex.).

- 25 -

4820-5568-8391.v2

**G.  The Fifth Circuit Reveals Frye's Whistleblower Allegations in a
Published Decision Issued After Anadarko's Acquisition by
Occidental**

92.  On November 4, 2019, the Fifth Circuit issued a published decision in Frye's sealed lawsuit against Anadarko, publicly revealing for the first time her whistleblower allegations. *See Frye*, 953 F.3d at 285.  Among other things, the Fifth Circuit revealed Frye's claims that, in March 2014, Anadarko "'knowingly published inflated information about its 2013 exploration successes during an investor conference'" (*id.* at 288); that in February 2015, it "'described Shen 3 in glowing terms'" with "'over 1,500 feet of "quality sand,"'" even though it was a dry hole (*id.*); and that in October 2015, it concealed the potential of Shen 4 "'was vastly overstated'" (*id.*). Bottom-line was Anadarko allegedly "'knew the Shenandoah resource was less than half the size Defendant had originally claimed in March 2014,'" but "'made no corrections to its original projections'" throughout the Class Period.  *Id.*

93.  Documents recently unsealed in the *Frye* action further confirm the existence of Defendants' scheme, though its full scope remains obscured by the myriad redactions on which Defendants insisted years-after-the-fact in their ongoing quest to evade accountability.

**DEFENDANTS' MISLEADING STATEMENTS DURING THE CLASS PERIOD**

94.  One of the methods and means of Defendants' scheme was to make, issue, and disseminate statements that omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants' omissions of material facts caused Anadarko shares to trade at artificially inflated prices during the Class Period.

95.  Specifically, Defendants' statements made during the Class Period omitted at least the following material facts necessary not to make their statements misleading:

(a)  credible test results and analysis indicated Shenandoah was much smaller and less commercially viable than Defendants had previously and continued to indicate;

- 26 -

(b)     the Senior Reservoir Engineer for the Shenandoah resource had determined the reliability of test results and analysis that indicated the Shenandoah resource was much smaller and less commercially viable than Defendants had publicly indicated;

(c)     the fluid quality from the Shenandoah appraisal wells was poor;

(d)     Anadarko's RCT had determined the reliability of test results and analysis that indicated Shenandoah was much smaller and less commercially viable than publicly indicated;

(e)     Anadarko incentivized exaggerated resource assessments by offering bonuses to its exploration team based on preliminary assessments without validation by the development team or the RCT and without a claw-back for assessments later shown to be exaggerated;

(f)     Defendants had actively suppressed the truth about Shenandoah through a campaign of retaliation against and harassment of the Senior Reservoir Engineer Frye to set an example for others who were considering speaking the truth about Shenandoah;

(g)     Shen 3 was a dry hole;

(h)     Shen 4 confirmed massive salt deposits that would obstruct or prevent access to deposits;

(i)     Shen 4 indicated a much smaller size resource than Defendants had described after Shen 2;

(j)     Leyendecker prohibited employees from using accurate maps that would reveal faulting and other significant shortcomings in the Shenandoah resource;

(k)     Anadarko had defied its own internal policies and procedures by, among other things, disregarding the findings and recommendations of the RCT; and

(l)     Anadarko's plan for extracting oil from Shenandoah was one that no one had ever successfully deployed.

- 27 -

4820-5568-8391.v2

96.     Below are the Class Period statements, including, but not limited to, Defendants' SEC filings and investor conferences and calls, that were rendered misleading by virtue of omitting the material facts above.  Defendants' misleading statements should be considered holistically as part of their fraudulent scheme.  Lead Plaintiff reserves its rights to allege other omissions of fact and/or misleading statements as they are discovered and/or occur.

**A.      2015 Statements**

97.     The Class Period commences on February 20, 2015, when Defendants filed Anadarko's 2014 Form 10-K for the year ended December 31, 2014 ("2014 10-K").  The 2014 10-K spanned 194 pages with details about Anadarko's oil and natural-gas portfolio, including a specific discussion of positive aspects of the Shenandoah resource while concealing negative ones:

> *Shenandoah Basin*:  The Company spud the Shenandoah-3 well, its second appraisal well at the Shenandoah discovery, in the second quarter of 2014.  The well finished drilling at the end of 2014 and found approximately ***50% (1,470 feet) more of the same reservoir sands 1,500 feet down-dip*** and 2.3 miles east of the Shenandoah-2 well, which encountered over 1,000 feet of net oil pay in excellent quality Lower Tertiary-aged sands. ***The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening. The well also enabled the projection of oil-water contacts based on pressure data and reduced the uncertainty of the resource range***.  Planning is underway for the next appraisal well, which the Company expects to spud in the second quarter of 2015.

98.     The 2014 10-K also contained 14 pages of detailed risk factors without disclosing that such risks had already materialized as to the Shenandoah resource, including "the risk that we will not encounter commercially productive oil or natural-gas reservoirs" and "exploratory drilling involves greater risks of dry holes or failure to find commercial quantities of hydrocarbons."

99.     As to accounting methods, the 2014 10-K stated:

> At the end of each quarter, management reviews the status of all suspended exploratory drilling costs in light of ongoing exploration activities, in particular, whether the Company is making sufficient progress in its ongoing exploration and appraisal efforts or, in the case of discoveries requiring government sanctioning, analyzing whether development negotiations are underway and proceeding as planned.

- 28 -

100.     The 2014 10-K contained Walker's and Gwin's signed Sarbanes-Oxley Act ("SOX") certifications that they had reviewed the filing, and: (a) it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; (b) the financial information "fairly present in all material respects the financial condition, results of operations and cash flows"; (c) they had adequate internal controls and procedures to ensure material information was made known to them for disclosure purposes; (d) they had adequate control over financial reporting to ensure the reliability of financial reporting and compliance with GAAP; and (e) they had disclosed to the Company's auditors and Audit Committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information" and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

101.     On March 3, 2015, Defendants issued a press release announcing Anadarko's "2015 initial capital expectations and guidance" and stated that "Anadarko continues to advance existing discoveries at Shenandoah in the Gulf of Mexico."  Walker was quoted as saying:

> "During 2015, we are confident in our ability to leverage our deep, **high-quality portfolio of opportunities, strong balance sheet and efficient capital allocation to preserve value and maintain flexibility** . . . .  Few companies have accomplished operationally what Anadarko has achieved over the last five years; although, in the current market, we believe it is prudent to reduce capital investments and position the company for the future, rather than to pursue year-over-year growth. As a result, we've reduced our initial 2015 capital expectations by approximately 33 percent relative to last year, with plans to reduce our short-cycle U.S. onshore rig activity by 40 percent and defer approximately 125 onshore well completions. We have successfully delivered value during previous challenging commodity-price cycles, and I believe we have the skills, financial capacity and portfolio to deliver in this environment.  Our focus continues to be on getting better, not necessarily bigger, while ensuring we are well positioned to accelerate activity as costs become more aligned with commodity prices and returns improve."

- 29 -

102. On March 3, 2015, Defendants also hosted Anadarko's 2015 capital program and guidance conference call with investors and analysts. During the call, Daniels touted the "successful appraisal" of Shen 3 in "the Gulf of Mexico at Shenandoah" and stated:

> Let's look at some more details of a couple of our focus areas, starting in the Deepwater Gulf of Mexico. We're excited about the advancement of Shenandoah. We pushed down dip on Shenandoah-3, searching for the oil/water contact, looking for reservoir continuity and quality, and to get a core in the down dip portions of the reservoir.
>
> ***This was a very successful appraisal well***. In 2015, we will drill Northwest of the Shenandoah number 2 well, with our Shenandoah-4. This will be to extend the field to the West, and up dip, and to obtain a core in the oil lag for our development plannings.

103. During the conference call, Defendants also touted Shenandoah as a "High-Margin" project in the Company's "Mega-Project Pipeline" in the following slide:



104. On May 4, 2015, Defendants filed Anadarko's 1Q 2015 Form 10-Q ("1Q 2015 10-Q") with the SEC. As to the suspended exploratory well costs, the 1Q 2015 10-Q stated:

> Projects with suspended exploratory well costs are those identified by management as exhibiting sufficient quantities of hydrocarbons to justify potential development and where management is actively pursuing efforts to assess whether reserves can be attributed to these projects. If additional information becomes available that raises

- 30 -

substantial doubt as to the economic or operational viability of any of these projects, the associated costs will be expensed at that time.

The Company made substantially similar statements in each of its quarterly Forms 10-Q during the Class Period.

105. During a May 5, 2015, 1Q 2015 earnings call, Daniels responded to a question from an analyst about whether Shenandoah was in its final stages of delineation:

[T]here's an awful lot of work that's gone into defining what data we still need to get to that FID decision and the Shenandoah-4 is focused on really moving us and advancing us in that direction.

I think we're planning on getting a core there in the oil column. *We're going to be updip to the 1,000-feet of pay that we had, and so that will really help with some of the modeling going forward*.

106. On May 20, 2015, Defendants hosted the UBS Global Oil and Gas Conference with investors and analysts. During the call, Gwin stated that "we continue to move [the Shenandoah] project towards development in the future" and touted that, "by having good project development expertise and a strong exploration capability, the Gulf of Mexico becomes a place where our core skills create a competitive advantage where we've been able to drive very profitable and increasingly oilier operations here over time."

107. On July 28, 2015, Defendants issued a press release announcing the Company's 2Q 2015 results, highlighting that Anadarko had "[a]chieved large-scale project milestones in the Gulf of Mexico" and announcing that "Anadarko spud its third appraisal well in the Shenandoah field." Walker was quoted as saying:

"In addition, we've created significant option value through our exploration success offshore Colombia and in the Gulf of Mexico, and accelerated value through active portfolio management. We believe these actions and differentiating achievements, the depth and strength of our portfolio, and the commitment of our employees, position us well for continued success."

108. During a July 29, 2015, 2Q 2015 earnings call, Gwin responded as follows to a question about Anadarko's "exploration success" with regards to Shenandoah:

4820-5568-8391.v2

Coronado is part of the Shenandoah mini-basin. ***We've got a discovery there that we have appraised. So we think we've got a pretty good handle on what it is***. We recently picked up our blocks again; we had some expiries that we had to put back in, and then picked them back up. That's going to stay that way until we have a Shenandoah development put in place, because we see it as a tie-back through that facility.

109. On October 27, 2015, Defendants issued a press release announcing Anadarko's 3Q 2015 financial and operating results, including results from the recently spud Shen 4 appraisal well, stating: "[We c]ompleted a successful appraisal test at the Shenandoah field in the Gulf of Mexico" and expounded that the "***third appraisal test of the Shenandoah discovery encountered more than 620 net feet of oil pay***." Walker was quoted as saying:

> "We remain committed to building and preserving value in this challenging environment . . . . During the third quarter, we continued our focus on maintaining long-term flexibility, while enhancing short-cycle returns by delivering higher-margin sales volumes for lower costs. Our employees have continued to do outstanding work optimizing our performance by moderating our base decline, safely improving efficiencies and rig productivity, and achieving greater cost savings. These efforts and achievements have us well positioned to create differentiating value today and to accelerate activity when the market begins to reward growth again."

110. During an October 28, 2015, 3Q 2015 earnings call, Walker told investors they could "expect [Anadarko] to see continued investment in higher percentage longer-cycle opportunities" such as "success delineating our activities at Shenandoah." Gwin touted the "very good reservoir quality" at Shenandoah and added:

> ***The team did a really good job on that, and we're real pleased with it. We got 622 feet of pay.***
>
> What we ended up doing was we tested up to the north with trying to find out where the basin edge was, and the first well established where the basin edge was. Then we came in and drilled to the south with a side track, and got the 622 feet of pay. ***It was all oil, we encountered no water in that***.
>
> ***The reservoir quality in the initial assessment looks pretty – well it looks comparable to everything else we've found out there. So very good reservoir quality***. We're still in the early stages of that evaluation.

4820-5568-8391.v2

We're in the process of getting a core, so we just kicked off and we're going to do a bypass core just right next to this well. And that's to establish the reservoir quality in the oil column, which will roll directly into our development planning.

So it's very important to get that core, and we're just in the process of it. That's going to give us a much better handle on all the fluid properties, all the reservoir properties. *But we pushed the most known oil down about 400 feet*.

*As I've mentioned, we didn't establish an oil water contact here, so that tells us there's more down below us*. And we're looking at what the forward plan is after this bypass core, as to what else we're going to need to turn over to the planning team for the development planning. *But we're very encouraged with what we saw, and it was well within the range of expectation of what we had put out there*.

111. On the same October 28, 2015 call, a Goldman Sachs analyst asked a question about the cost structure of the Shenandoah project to which a Company representative responded:

*[W]hen we look at our offshore developments, look at larger, more prolific reservoirs as Shenandoah is. It has a very high oil column, and we'll be testing deliverability of these oil columns to see what type of flow rates we have*.

So we aren't going to be able to offset the commodity prices completely. But what we'll look at are higher flow rate completions, and try to work the cost structure down on the offshore marine development systems as well. We've brought in new 6 generation rigs, and the initial results on those wells are very, very encouraging as far as reducing our cycle time to drill.

So we're seeing some cost improvements, that not so much equate to service reductions, but efficiencies in drill times. Some of our recent wells in Heidelberg that hit record costs for us of less than $100 million to drill. That's not the completion costs, but the drill costs.

112. On the same October 28, 2015 call, Gwin responded to a Deutsche Bank inquiry about Shenandoah's resource range and appraisal wells as follows: "Yes, *on the resource range, we're right where we thought. We always do a probabilistic resource range. We're still in that range with the results of the well*."

113. During a November 11, 2015 call with investors and analysts, Leyendecker encouraged investors:

*[N]ot to miss out on the Shenandoah Basin*, which is somewhat near and dear to my heart as I used to be responsible for the US Gulf deepwater exploration program, *a remarkable discovery and recently another appraisal well, which we found over*

- 33 -

4820-5568-8391.v2

***620 feet of oil pay full of the base***. And we are currently in the process of doing a bypass core on that.

So, the Gulf really is still an important part, and it delivers very high margin barrels and, as I said, offsets our declines with conventional decline rates in the Gulf.

Leyendecker also emphasized "the remarkable Shenandoah accomplishments": "We drilled the well to test the up-dip part of the basin. We found it, and we've sidetracked and we're cutting a core. We continue to do high impact exploration in the US Gulf, and we will continue to do that in the future."

### B. 2016 Statements

114. On February 2, 2016, Defendants hosted Anadarko's fourth quarter ("4Q") 2015 earnings call, during which Walker responded to a BofA analyst's questions about Shenandoah:

As we think about 2016 and taking the comment that's been made about trying to preserve value, when you consider – I believe this year, we would estimate that our maintenance . . . .

. . . But by lowering that maintenance CapEx two-thirds, or two-thirds, rather, of what it was the prior year, that's pretty impressive in terms of being able to create that value preservation that we are looking for.

***These other longer-dated projects [such as Shenandoah], we believe today are worthy of spending capital***, expecting that oil is not going to be at $30 for the rest of our life. At some point, when we make a decision to take – either to sanction or FID any of these longer-dated projects, it will be in an environment which we believe we can recommend to our Board first that we make that investment. So that's the confidence that I would have if I were an investor, that we will do that when it is appropriate.

115. On February 17, 2016, Defendants filed the Company's 2015 Form 10-K for the year ended December 31, 2015 ("2015 10-K"). The 2015 10-K spanned 387 pages with details about Anadarko's oil and natural-gas portfolio, including positive aspects about the Shenandoah resource while omitting negative ones:

*Shenandoah* The Company spud the Shenandoah-4 well, the third appraisal well at the Shenandoah discovery (30% working interest), in the second quarter of 2015. The well tested the up-dip extent of the basin. The subsequent Shenandoah-4 sidetrack encountered ***more than 620 net feet of oil pay, extending the lowest known oil column down-dip***. ***Following the success of the Shenandoah-4 sidetrack***, the

- 34 -

4820-5568-8391.v2

Company and its partners successfully acquired more than 550 feet of whole-core from the hydrocarbon-bearing reservoir interval.

116. The 2015 10-K also contained over 16 pages of risk factors without disclosing that such risks had already materialized as to the Shenandoah resource, including "the risk that we will not encounter commercially productive oil or natural-gas reservoirs" and "exploratory drilling involves greater risks of dry holes or failure to find commercial quantities of hydrocarbons."

117. The 2015 10-K described accounting methods for suspended costs and impairment:

At the end of each quarter, management reviews the status of all suspended exploratory drilling costs in light of ongoing exploration activities, in particular, whether the Company is making sufficient progress in its ongoing exploration and appraisal efforts or, in the case of discoveries requiring government sanctioning, analyzing whether development negotiations are underway and proceeding as planned.

\* \* \*

If additional information becomes available that raises substantial doubt as to the economic or operational viability of any of these projects, the associated costs will be expensed at that time.

As to impairments, the 2015 10-K stated: "Significant undeveloped leases are assessed individually for impairment, based on the Company's current exploration plans, and a valuation allowance is provided if impairment is indicated."

118. The 2015 10-K also contained Walker's and Gwin's signed SOX certifications, which were substantially identical to the certifications above at ¶100.

119. During a February 24, 2016 Credit Suisse Energy Summit with investors and analysts, Daniels responded to a question about Shenandoah's breakeven point:

The **Shenandoah Number 5 well** will be drilled and that'll be off to the east, again trying to prove lateral extent that kind of thing. **We did appraise it last year. We had successful wells, 620 feet of pay in that, so we're still are advancing the project** but we're ways away from a sanction at Shenandoah.

- 35 -

4820-5568-8391.v2

120. On March 1, 2016, Defendants issued a press release announcing the Company's "2016 initial capital expectations and guidance." The press release highlighted "plans to advance existing discoveries through appraisal activities at Shenandoah." Walker was quoted as saying:

> "In 2016, we will continue our disciplined and focused approach, preserving and building value by leveraging our best-in-class capital allocation, enhancing operational efficiencies and continuing an active monetization program . . . . We are committed to again investing well within cash inflows from a combination of anticipated discretionary cash flow and our ongoing monetizations, with the expectation of also reducing net debt during the year. As we announced last week, we have already closed or announced monetizations totaling approximately $1.3 billion, and we expect our cash position to be further strengthened during the year through substantial cost reductions and additional identified monetization opportunities."

121. During a May 3, 2016, 1Q 2016 earnings call, Walker and Daniels responded to a BofA analyst's question about Shenandoah as follows:

> [**Doug Leggate** (BofA):] You obviously had a partner sell down their interest not specific on Shenandoah exactly. It looks like it was a fairly low number. You guys have preemptive rights, so I'm wondering at what your thoughts are there both on *terms of the value of your position but also the fact that we're now we're at five appraisal wells in*.
>
> *What are you seeing there that is taking so long to appraise it, if you like it? Is it really just scale or something unique to the reservoir that may make it more challenging to get a sanction decision*? And I'll leave it there. Thanks.
>
> [**Walker**:] Doug, understandable questions. I think the first part of the question I'll address and ask Bob Daniels to talk to you more specifically about leasing from the appraisal perspective. The press period is running. I think you should expect that we will hopefully be communicating something towards the end of that period – and I think your observations, I can't find any fault with them.
>
> [**Daniels**:] Yes, Doug on the wells in the appraisal program it's partly scale, it's partly some of the complexities that we're seeing out there mostly on the imaging side of it, *not necessarily that were seeing lots of bad surprises*.

122. Even *after* Frye submitted the SEC Letter, Defendants did not disclose the omitted material facts, which now also included the existence of a whistleblower complaint alleging they had engaged in a billion-dollar securities fraud scheme.

- 36 -

123.    At a May 11, 2016 Citi Global Energy & Utilities Conference with investors and analysts, Leyendecker stated: "[W]e continue to appraise our Shenandoah, *our fantastic Shenandoah discovery* and apply the rest of our rig fleet to tiebacks and near-field infrastructure, exploiting our hub-and-spoke focus in the Gulf [of Mexico]."

124.    During a May 24, 2016 UBS Global Oil and Gas Conference with investors and analysts, Gwin and Shandell Szabo, Investor Relations Director, stated in relevant part:

> [**Gwin**:] [Shenandoah] is an opportunity we are incredibly excited about. There is you see the log, and even a financial person can look at that log and say that's pretty good. That's the log from Shenandoah 2. And as we've continued to move forward with Shenandoah, drilling Shenandoah 5 now, we've gotten ***even more excited about the upside and the potential here as we move toward development***, and I thought it might be good for Shandell to take a moment, talk to you a little bit about this program, where it's been, kind of where it's going, what we expect in the future and I guess many of the reasons why we're so excited about it.
>
> . . . [**Szabo**:] [W]hen you look at ***Shenandoah, it goes without saying that it's the – it is the finest lower tertiary discovery to date in the Gulf of Mexico***, and I say that because of a few reasons. When you're looking at these resources potentially, you look at a couple things. ***One, you look at thickness, two, you look at area, and then, three, recovery factor***.
>
> And when you look at this log and you can see that 100-foot scale bar on there, that's 1,000 feet of sand full of hydrocarbons, so it's – one, it's extremely thick. Two, when you look at the scale across those blocks – and you can see the northern part there – this spans nine miles. Those are three-mile blocks, so you're talking about something that has a lot of area, which is really the biggest driving factor when you talk about size.
>
> And then the last thing is the recovery of this. And so this particular discovery had Miocene-like properties, which means that the reservoir quality is very good. You're looking at porosities of up to 25% here. You're looking at permeabilities in the 100 millidarcy range. Some of the individual sands see 300, 400 millidarcies perm. And then the last thing you look at is the fluid property, since it's very light oil out here. So from the overall discovery, it's got everything that you're looking for.
>
> . . . [I]t looks a whole heck of a lot like the log that you're looking at right here, and when you look at where that falls on that cross-section, you can see the number five well up there on that cross-section, so you can see that lighter green color – we're going to be able to turn that dark green. So the lighter green on there is the probable, and the darker green is the proven, and so we're going to have the

- 37 -

4820-5568-8391.v2

ability for that large area over there to go ahead and say, yes, that's proven, so that's tremendous for us.

So the number six well was very dependent on what we saw on the number five well, and so what we can say is that we're definitely drilling the number six well and we're out there to hunt for the oil-water contact, which is going to give us a whole heck of a lot more comfort around just how big is this. ***We know it's big, but not only is it big, but it sits in a fantastic basin***.

. . . [W]e want Shenandoah to be a standalone on its own. Its economics need to support that project. But we do have the opportunity to leverage the infrastructure when we do put it out there.

So we're going to go ahead and spud the Shenandoah [6] well . . . . The FEED study is already underway. ***You should take some comfort that we're committed to the development out here. The last two wells that we drilled are keeper wells, which means that when we take this to production, we will be able to produce from those well bores***.

And the other thing that I would note is that we've actually dropped our costs out here by 40% from the beginning to the end, so when you look at the better oil backdrop we've got right now and the fact that we're driving costs down here and we just continue to see great explorations and appraisal success out here, we're going to continue the appraisal work, finish it, we're going to incorporate it into our modeling, and then we're going to move forward with the proper size development out here.

125.    During the call, Defendants also presented the following slide touting Shenandoah:



4820-5568-8391.v2

126. Gwin later answered a question from a UBS analyst as follows:

What we can tell you is that everything we've been doing brings that number down, at which you'd be very excited to take FID, knowing that the rates of return here would be compelling, and so that – I'll call it not just that break-even number, but the number at which you'd really be excited about sanctioning and moving the project forward continues to come down with success.

**So Shen 5 is a material derisking of what we're doing**. It's also going to be a significant amount of information to work into our models and the work that our engineers are doing around what that development solution looks like.

127. On June 28, 2016, Defendants participated in the JPMorgan Inaugural Energy Conference with investors and analysts. During the conference, Gwin indicated that "Shenandoah is obviously [a] tremendous resource potential," stating:

And, in addition, we are very excited to be working toward completing the Shenandoah #5 well. Some of you may have heard some comments we had made in the past there. I don't have the log here or the number two appraisal well, which had over 1000 feet of net pay that we announced, I think it was now, a couple of years ago. **But Shenandoah #5, at least in the uphole sections, we talked about the fact it looked a lot like Shenandoah #2. A lot of enthusiasm around our activities here because of Shen #5, the results of Shen #5 have put us in a position where we clearly expect to drill Shen #6 later this year and continue with an appraisal program there beginning – continuing to frame the aerial extent of the reservoir. Clearly, we know we have a lot of column. We know we have very attractive Miocene-like sands, and now we need to determine the aerial extent of the reservoir so that we can move forward with our pre-feed work and begin to conceptualize what a development opportunity would look like here**.

128. At the same conference, Gwin elaborated as follows:

**Something like a Shenandoah is obviously tremendous resource potential**, but the development plan could be from a relatively smaller spar opportunity to maybe multiple spars to something bigger that you might pursue because we have Coronado and Yucatan in the same mini basin that are tremendous kind of in situ buyback opportunities for the future.

\*     \*     \*

So too many moving pieces to answer the question directly, but **we don't believe we are a long way off relative to our forward look at oil prices to consider greenfield**.

- 39 -

129.    On July 26, 2016, Defendants filed their 2Q 2016 Form 10-Q ("2Q 2016 10-Q"), spanning 161 pages of detailed financials and detailed discussions about Anadarko's oil and natural-gas portfolio, including the Shenandoah resource: "The Shenandoah-5 appraisal well (33% working interest) encountered more than 1,040 net feet of oil pay, extending the eastern limits of the field." As to the suspended exploratory well costs, the 2Q 2016 10-Q stated:  "If additional information becomes available that raises substantial doubt as to the economic or operational viability of any of these projects, the associated costs will be expensed at that time."

130.    The 2Q 2016 10-Q also contained Walker's and Gwin's signed SOX certifications, which were substantially identical to the certifications above at ¶100.

131.    On July 26, 2016, Defendants' press release stated that Anadarko "[e]ncountered more than 1,040 net feet of oil pay at the Shenandoah-5 appraisal well and increased working interest in this operated deepwater discovery," and the Company "continued to advance its understanding of the Shenandoah discovery, as it encountered more than 1,040 net feet of oil pay in the Shenandoah-5 appraisal well, expanding the eastern extent of the field. Additionally, the company increased its working interest in Shenandoah to 33 percent and added several new exploration opportunities to the portfolio by participating in a preferential-right process."  Walker also stated:  "'Our portfolio continues to perform exceptionally well, and we've continued to significantly reduce our cost structure throughout the year . . . .'"

132.    During a July 27, 2016 earnings call, Walker stated that Anadarko "had outstanding performance in the Gulf of Mexico.  This is an area where we hold several competitive advantages, a successful exploration track record and industry-leading project management capability and a large operated infrastructure position."  Walker stated:

> [W]e drilled another appraisal well at Shenandoah.  The Shenandoah-5 well encountered ***more than 1,000 feet of net oil pay and expanded the eastern extent of the field*** with planning of the Shen-6 now underway.  We have a 33% working

- 40 -

interest in Shenandoah after participating in a pref-right process, and through that process we picked up some additional blocks and exploration opportunities at no cost.

133. On the same July 27, 2016 call, Walker stated the following regarding the Shenandoah project in response to a question from a Morgan Stanley analyst: "[W]e were ***real pleased with what we saw*** in the number 5 well. Not surprised but we were very pleased to see it come in as we had predicted it would, 1,040 feet-plus of pay."

134. During an August 16, 2016 EnerCom Oil & Gas Conference with investors and analysts, Brad Holly (Senior VP of Operations in the Rockies) stated:

> In the Gulf of Mexico, we just finished our Shenandoah-5 well. Again, over 1,000 feet of pay in that well.
>
> It extended the limits of the field. We did not find the oil-water contact.
>
> ***The partnership is excited about Shenandoah***. We'll go back out in the fourth quarter of 2016 to drill Shenandoah-6; and so expect an update maybe mid next year as we get the results of that.

135. During a September 14, 2016 UBS Houston Energy Bus-Less Tour with investors and analysts, Gwin stated:

> The great thing about it is, the brownfield economics in the Gulf of Mexico are phenomenal. And so they're a real competitive advantage that removes the commodity pricing environment from the decision-making process. The real advantage is the infrastructure and the capacity at that infrastructure.
>
> So a lot of people focus on: Well, when are we going to see greenfield development and at what price, et cetera? And ***we've still got an opportunity at Shenandoah we're excited about***. And so we ask ourselves those questions all the time. We're working at answering it.
>
> But you don't need material commodity price improvement to make money in the Gulf of Mexico. We're doing it at strip and we think we can continue to do it at strip for a long time to come.

136. During a November 1, 2016, 3Q 2016 earnings call with investors and analysts, Walker had the following exchange with a Deutsche Bank analyst:

4820-5568-8391.v2

[**Ryan Todd**:] [O]ne quick one on Shenandoah. I see you made a concept selection of a semi-sub. Any thoughts around the concept selection, maybe the passive potential an FID, and if you think – can a standalone development like Shenandoah really compete with the tie back opportunities you have in the Gulf? And I will leave it there.

\* \* \*

[**Walker**:] I think it would be fair to say that as we contemplate sanctioning Shenandoah, we will be mindful of what we can do on the margin with the capital. And it will be an allocation like it would be for anything where we are looking at what the rate of return is as well as the cash-on-cash return.

A lot of times our industry's very focused on rate of return and not cash-on-cash because, as everybody knows on this call, it's great to have an internal rate of return that's 50%, but if you get the cash back in a year, and you're pretty much done, that is a hard treadmill to continue. So we want a cocktail or a mix that gives us really good rates of return with really good cash-on-cash characteristics.

***So there could be a role that Shenandoah or another option like that plays in our portfolio***. So I do not want to leave people with the view that allocation of capital is purely an IRR-driven derivative. Consequently, we have a portfolio to run, and we will consider whether or not at the time of sanctioning it makes sense to commercially develop Shenandoah along with our partners or not.

### C. 2017 Statements

137.    During a February 1, 2017, 4Q 2016 earnings call with investors and analysts, Walker

and Leyendecker responded as follows to a question by a Sanford C. Bernstein & Co. analyst:

[**Walker**:] You bet.  Keep in mind that is what of one that's in both Ernie's shop and in Darrell's shop. So it sort of – it's neither fish nor fowl, so we're going to hand that in two parts here. Let me have Ernie just speak a little bit about where we are geologically with our understanding of the asset, or the opportunity of the asset. And then Darrell'll answer the question about the production solution.

[**Leyendecker**:] ***Last year we drilled the number five well where we found yet over 1,000 feet of hay***, and we have moved onto the sixth appraisal well. . . .

So the number six well we're drilling today is designed really to test part of the eastern side of the field for reservoir continuity, as well as cut some oil-water contacts, which we haven't physically done yet. We're hopeful, of course, that the well will penetrate those. ***I can also share with you that the well is designed ultimately to be kept as a keeper, and potentially be a producible well ultimately one day when we see ourselves as a final solution for the field***.

\* \* \*

- 42 -

[**Bob Brackett**:] If I interpret that little, a standard 80,000 barrels spar wasn't big enough to handle the volumes you expect to come off Shenandoah?

. . . [**Darrell Hollek**:] [I]t doesn't give us the flexibility for the entire area. We're still learning my Shenandoah itself, so that in itself we want that flexibility. But when you look at the entire area and the prospectivity and the leases that we actually have today, we want to make sure we have the flexibility to grow that facility, if need be.

138.    On February 17, 2017, Defendants filed the Company's 2016 Form 10-K for the year ended December 31, 2016 ("2016 10-K"), which spanned 437 pages with details about Anadarko's oil and natural-gas portfolio, including a discussion of the positive aspects of the Shenandoah resource while concealing negative ones:

*Shenandoah*  **Anadarko and its partners are continuing to work toward determining the commerciality of the Shenandoah field**.  The Company has selected a Semisubmersible concept to support the potential development as part of these efforts.  The front-end engineering design (FEED) on the Semisubmersible will continue while Anadarko continues appraisal drilling to further delineate the opportunity before making a future sanctioning decision.

**The Company spud the Shenandoah-5 well, the fourth appraisal well at the Shenandoah discovery (33% working interest), in the first quarter of 2016.  The well encountered more than 1,040 net feet of oil pay, extending the resource in the central-to-eastern limits of the field**.  The well has been secured for potential future production operations.  The Shenandoah-6 appraisal well was spud in the fourth quarter of 2016.  The drilling objective is to establish the oil-water contact on the eastern flank of the field and to help quantify the resource potential of the basin.  During 2016, Anadarko increased its working interest in Shenandoah from 30% to 33% by participating in a preferential-right process.

139.    The 2016 10-K described the accounting methods for exploratory costs:

At the end of each quarter, management reviews the status of all suspended exploratory drilling costs in light of ongoing exploration activities, in particular, whether the Company is making sufficient progress in its ongoing exploration and appraisal efforts or, in the case of discoveries requiring government sanctioning, analyzing whether development negotiations are underway and proceeding as planned.

As to impairment, the 2016 10-K stated:  "If management determines that future appraisal drilling or development activities are unlikely to occur, associated suspended exploratory well costs are expensed."  In addition:

- 43 -

In determining whether a significant unproved property is impaired numerous factors are considered including, but not limited to, current exploration plans, favorable or unfavorable exploration activity on the property being evaluated and/or adjacent properties, our geologists' evaluation of the property, and the remaining months in the lease term for the property.

140. The 2016 10-K also contained Walker's and Gwin's signed certifications, which were substantially identical to the certifications cited above in ¶100.

141. In addition to the omitted facts listed above in ¶95, Defendants' statements after April 2016 were misleading because they omitted:

(a) in April 2016, the Senior Reservoir Engineer had provided to Anadarko a demand letter that set forth most of the information comprising the SEC Letter; and

(b) the Senior Reservoir Engineer provided the SEC Letter to the SEC.

**SEC REGULATION S-K ITEM 303**

142. By the end of 2014, Defendants knew that internal Company engineering and exploration assessments of the Shenandoah exploration data had called into substantial doubt its value and economic viability. Defendants, nevertheless, failed to disclose this fact in their Forms 10-K and 10-Q reports, thereby rendering these SEC filings materially misleading.

143. SEC Regulation S-K Item 303 ("Item 303") requires disclosure of operational and other information necessary to understand the Company's "financial condition, changes in financial condition and results of operations." According to the SEC, this includes "unusual or infrequent events or transactions," "known trends or uncertainties that have had or [might] reasonably [be] expect[ed to] have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." These MD&A requirements are intended to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management.

- 44 -

144.    The uncertainty surrounding Shenandoah's economic viability, and the inevitable impairment and exploration cost write-offs that would follow its abandonment, constituted an "uncertaint[y]" that was reasonably expected to have an "unfavorable material effect" on the Company's future operating and net income within the meaning of Item 303.  Further, the Shenandoah project was clearly material to investors.  For example, Defendants understood that investors were keenly interested in the Shenandoah project, as evidenced by the fact that the project's ongoing status was repeatedly discussed during Company presentations and earnings conference calls with investors and securities analysts.  Moreover, the inevitable Shenandoah impairment and exploration cost write-offs of $467 million and $435 million disclosed on May 2, 2017, respectively, were quantitatively and qualitatively material to Anadarko's 2016 year-end financial statements filed with the SEC on Form 10-K.

145.    Defendants violated Item 303 by failing to make truthful and accurate disclosures concerning the size and economic viability of the Shenandoah project in the MD&A contained within Anadarko's Forms 10-K and Forms 10-Q during the Class Period.

## DEFENDANTS' SCIENTER

146.    As detailed herein, Defendants concealed the truth from investors during the Class Period.  At all relevant times, Defendants knew or were severely reckless in disregarding that material facts were being concealed from investors.

147.    Defendants had the motive and opportunity to commit fraud.  Defendants had actual knowledge of the misleading statements they made and/or acted in severe reckless disregard of the truth at the time they spoke.  In doing so, Defendants participated in a scheme to defraud or course of conduct to deceive purchasers of Anadarko common stock during the Class Period.  Defendants have exclusive control over communications concerning their fraudulent scheme.

148.     Anadarko is liable for all the actions of its agents and subsidiaries, including the Individual Defendants.  Through the actions and knowledge of, or severe reckless disregard by, persons or entities acting on its behalf, Anadarko had the requisite scienter.  And as Anadarko's most important executives, the Individual Defendants' scienter is imputed to the Company.

149.     Throughout the Class Period, Defendants' misstatements and omissions were made knowingly or with severe recklessness based on, *inter alia*:

(a)     The Allegations Concern Core Operations:  The Individual Defendants were top executives at the Company and led its day-to-day operations.  Likewise, they monitored and/or oversaw the Shenandoah project as it concerned a critical aspect of Anadarko's operations – one of the largest projects (if not the largest) in the Gulf of Mexico.  The Individual Defendants were the persons with ultimate responsibility for directing and managing the Company's business, operations, and communications to investors, and they were required to keep themselves informed of the Company's day-to-day business and operations.

(b)     Defendants Were Personally Involved:  By addressing the Shenandoah project, the Individual Defendants evidenced their involvement in the underlying facts.  Such facts necessarily include the fraud alleged herein, thus providing a strong inference that they were aware of the fraud, or severely reckless in failing to be aware of it.  *See, e.g.*, ¶¶30-34, 51-52, 59, 79-80, 102, 105-110, 112-113, 119-121, 123-124, 126-128, 132, 135-137.

(c)     Defendants Held Themselves out as Knowledgeable:  The Individual Defendants held themselves out as knowledgeable about the Shenandoah project during earnings calls, investment conferences, and through other public statements.  *See, e.g.*, ¶¶97-140.  Moreover, Anadarko's SEC filings acknowledged: "Significant management judgment is required to determine whether sufficient progress has been made in assessing the reserves and the economic and operating

- 46 -

viability of the project to continue capitalization of the exploratory drilling costs." Management could not exercise such judgment without the information Defendants concealed.

(d)     Defendants Received Briefings:  As senior executive officers, and members of the Executive Committee, the Individual Defendants were privy to confidential and proprietary information concerning the Shenandoah project.  Each of them had access to internal corporate documents, communications with other corporate officers and employees, attendance at management meetings, Board of Directors (the "Board") meetings, and committee meetings, as well as reports and information provided to them or made available to them.  Each of them knew or were severely reckless in their disregard that adverse facts were being concealed from the investing public.  *See, e.g.*, ¶¶41-43, 46-47, 60, 70.

(e)     Defendants Executed SOX Certifications:  Walker and Gwin signed SOX certifications, undertaking the affirmative obligation to ensure the Company's disclosures to the market were true.  *See, e.g.*, ¶¶100, 118, 130.

(f)     Defendants Directed Public Statements:  The Individual Defendants were able to, and did, control the content of SEC filings, press releases, and other public statements about the Company.  The Individual Defendants attended conference calls and spoke on behalf of Anadarko throughout the Class Period.  Defendants Walker and Gwin signed the Forms 10-K and 10-Q.  The Individual Defendants participated in the drafting, preparation, review, and/or approval of public statements and were provided with copies of documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or correct them.  *See, e.g.*, ¶¶97-140.

(g)     Defendants Suppressed Negative Information About the Shenandoah Resource:  Defendants used manipulated, outdated maps of the Shenandoah resource and heavily edited its engineers' descriptions of Shenandoah and references to faulting or other evidence that

- 47 -

warranted a downward adjustment to their estimates about the size and economic viability of Shenandoah. *See, e.g.*, ¶¶47-49, 53-62, 70.

(h)     Defendants' Awareness of the Facts from Frye:  Defendants' scienter is further supported by their knowledge of Frye's concerns, her SEC Letter, and the resulting litigation, all of which were actively concealed.  Leyendecker received truthful information from Frye and the RCT directly, and he responded by retaliating against Frye, violating policy by disregarding the RCT, and ordering other subordinates to use fraudulent maps.  Moreover, Leyendecker directly reported to Walker, who worked closely with Gwin and Daniels.  After Frye provided Defendants with a demand letter that largely foreshadowed the eventual SEC Letter and then SEC Letter itself, which included multiple specific allegations of Leyendecker's misconduct and evidence thereof, Leyendecker received a promotion.  This indicates that Defendants were already aware of Leyendecker's misconduct and sought to reward him for his past participation in their scheme and to encourage his continued participation.  Likewise, even after receiving Frye's resignation letter and the SEC Letter, Defendants' messaging to investors remained on the same path of deception, further indicating that Defendants had been aware of the information all along.  Likewise, Defendants threatened Frye and spent hundreds of thousands of dollars to keep her allegations from the public, which behavior is far more logical if Defendants knew they had something to hide than if they did not.  Last, Defendants' statements prior to and throughout the Class Period perpetuated the same deceptive themes about Shenandoah, and it is highly unlikely Defendants could have achieved such synchronization by coincidence.  Put bluntly, the only plausible explanation is that Defendants were aware of the scheme to defraud and intentionally participated in it. *See, e.g.*, ¶¶42-46, 69-80, 86-93.

150.     Defendants were motivated to conceal the truth for a variety of reasons, including the damage their disclosure would have on Anadarko's profits.  Defendants knew disclosure of any of the adverse facts would undermine their public claims and cause damage to the corporate reputation

- 48 -

they so frequently touted – not to mention Anadarko's stock price. Defendants are sufficiently sophisticated to have realized that any revelation of their scheme would have likely made Anadarko unmarketable to potential acquirers or at least cost them their jobs – either of which would have cost them over $100 million in golden parachute payments. Defendants were also motivated to conceal or downplay the truth because its revelation would subject the Company, its executives, and/or Board to penalty, fines, and/or civil or criminal liability.

## LOSS CAUSATION

151. As a result of Defendants' fraudulent scheme, including their omission of material facts, Anadarko was overvalued throughout the Class Period. Like other members of the Class (defined below) who purchased Anadarko common stock at artificially inflated prices during the Class Period, Lead Plaintiff suffered an economic loss, *i.e.*, damages, when the trading price of Anadarko shares declined upon the revelation of the truth through partial disclosures. The Class was damaged as set forth herein and as Lead Plaintiff may further discover during its investigation and discovery.

152. The lack of commercial viability of the Shenandoah project was first revealed to the market in Anadarko's 1Q 2017 10-Q, disclosing $435 million in expensed suspended exploratory well costs and a $467 million impairment related to the Shenandoah project:

> Impairments during the three months ended March 31, 2017, were primarily related to oil and gas properties in the Gulf of Mexico due to lower forecasted commodity prices and a U.S. onshore midstream property due to a reduced throughput fee as a result of a producer's bankruptcy.
>
> **Impairments of Unproved Properties** Impairments of unproved properties are included in exploration expense in the Company's Consolidated Statements of Income. The Company recognized $532 million of impairments of unproved Gulf of Mexico properties during the three months ended March 31, 2017, of which $467 million related to the Shenandoah project. The unproved property balance related to the Shenandoah project originated from the purchase price allocated to Gulf of Mexico exploration projects from the acquisition of Kerr-McGee Corporation in 2006. For additional details on the Shenandoah project, see *Note 5 – Suspended Exploratory Well Costs*.

- 49 -

\*    \*    \*

## 5.  Suspended Exploratory Well Costs

The Company's suspended exploratory well costs were $1.1 billion at March 31, 2017, and $1.2 billion at December 31, 2016. Projects with suspended exploratory well costs include wells that have sufficient reserves to justify completion as a producing well and sufficient progress is being made in assessing the reserves and the economic and operating viability of the project.  If additional information becomes available that raises substantial doubt as to the economic or operational viability of any of these projects, the associated costs will be expensed at that time.

During the three months ended March 31, 2017, the Company expensed suspended exploratory well costs of $435 million related to the Shenandoah project in the Gulf of Mexico, including $267 million previously capitalized for a period greater than one year.  The Shenandoah-6 appraisal well and subsequent sidetrack, which completed appraisal activities in April 2017, did not encounter the oil-water contact in the eastern portion of the field.  Given the results of this well and the present commodity-price environment, the Company has currently suspended further appraisal activities.  Accordingly, the Company determined that the Shenandoah project no longer satisfies the accounting requirements for the continued capitalization of the exploratory well costs.

\*    \*    \*

For the three months ended March 31, 2017, total exploration expense increased by $959 million primarily related to the following:

### Dry Hole Expense

Dry hole expense increased by $465 million, primarily due to the following:

- The Company expensed suspended exploratory well costs of $435 million during the three months ended March 31, 2017, related to the Shenandoah project in the Gulf of Mexico.  See *Note 5 – Suspended Exploratory Well Costs* in the *Notes to Consolidated Financial Statements* under Part I, Item 1 of this Form 10-Q.

- The Company expensed $41 million during the three months ended March 31, 2017, due to unsuccessful drilling activities primarily associated with the Gulf of Mexico and an international property.

### Impairments of Unproved Properties

- The Company recognized $532 million of impairments of unproved Gulf of Mexico properties during the three months ended March 31, 2017, of which $467 million related to the Shenandoah project. The unproved property balance related to the Shenandoah project originated from the purchase price

- 50 -

allocated to the Gulf of Mexico exploration projects from the acquisition of Kerr-McGee Corporation in 2006. See *Note 5 – Suspended Exploratory Well Costs* in the *Notes to Consolidated Financial Statements* under Part I, Item 1 of this Form 10-Q.

153. That same day, Defendants issued a press release, announcing that Shen 6 "did not encounter the oil-water contact in the eastern portion of the field," and the Company had "currently suspended appraisal activity."

154. Following news of the 1Q 2017 10-Q, the trading price of Anadarko common stock declined approximately 8%.

155. Even with this one-day statistically significant price decline, the corrective impact of the disclosure was blunted by Defendants' continued concealment of the scheme. Nevertheless, the timing and magnitude of the price decline that followed the 1Q 2017 10-Q negate any inference that the losses suffered by Lead Plaintiff and the Class were caused entirely by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated in any way to Defendants' fraud. The economic losses, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class were a direct result of Defendants' scheme.

156. It was not until after Anadarko was acquired by Occidental (and the Individual Defendants had flown away in their golden parachutes) that the fraudulent scheme was revealed to the market by way of a November 4, 2019 published decision of the United States Court of Appeals for the Fifth Circuit issued in *Frye v. Anadarko Petroleum Corporation*, No. 18-20543 (5th Cir.). In its decision, the Fifth Circuit revealed Frye's whistleblower allegations that Anadarko had "fraudulently overstated the economic prospects of its Shenandoah [assets] and then retaliated against her for objecting to these misrepresentations." *Frye*, 953 F.3d at 288.

157. Before the issuance of the Fifth Circuit's decision in *Frye*, investors did not (and could not) have known about the scheme.

4820-5568-8391.v2

## THE PRESUMPTION OF RELIANCE APPLIES

158.    The Class is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as the class claims primarily concern the omission of material facts.

159.    Alternatively, the Class is entitled to a presumption of reliance under the *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), fraud-on-the-market doctrine because, among other things:

(a)    Defendants made misstatements or failed to disclose material facts;

(b)    the omissions and misrepresentations were material;

(c)    the Company's stock traded in an efficient market;

(d)    Defendants' misrepresentations and omissions would tend to induce a reasonable investor to misjudge the value of the Company; and

(e)    Class members purchased Anadarko common stock between the time Defendants misstated or failed to disclose material facts and the time that the truth was disclosed.

160.    At all relevant times, the market for Anadarko common stock was efficient:

(a)    Anadarko common stock was actively traded on the NYSE;

(b)    as a regulated issuer, Anadarko filed periodic reports with the SEC; and

(c)    Anadarko regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

161.    Lead Plaintiff reserves its rights to modify these allegations by way of an amended complaint or a motion for class certification.

4820-5568-8391.v2

**NO STATUTORY SAFE HARBOR**

162.    Many (if not all) of Defendants' misleading statements during the Class Period were not forward-looking statements ("FLS") and/or were not identified as such by Defendants, and thus did not fall within any "Safe Harbor."

163.    Anadarko's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

164.    Defendants are also liable for any misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was misleading and the FLS was authorized and/or approved by an executive officer of Anadarko who knew that the FLS was misleading.

**CLASS ACTION ALLEGATIONS**

165.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all members of the Class, defined as all persons and entities that purchased or otherwise acquired the common stock of Anadarko between February 20, 2015 and May 2, 2017, inclusive.  Excluded from the Class are Defendants and their families, the officers and directors of the Company, their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

166.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Anadarko's stock was actively traded on the NYSE.  While the exact number remains unknown to Lead Plaintiff, there are at least hundreds or thousands of Class members.  Record owners and other Class members may be identified from records maintained by Anadarko or a transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

167. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

(a)     whether Defendants violated the Exchange Act;

(b)     whether Defendants engaged in a fraudulent scheme;

(c)     whether Defendants omitted and/or misrepresented material facts;

(d)     whether Defendants knew or were severely reckless in disregarding that their public statements were misleading;

(e)     whether Defendants' materially misleading statements and/or omissions of material fact artificially inflated the prices of Anadarko shares during the Class Period; and

(f)     the extent and appropriate measure of damages sustained by the Class.

168. Lead Plaintiff's claims are typical of those of the Class, as all Class members were similarly damaged by Defendants' unlawful conduct alleged herein.

169. Lead Plaintiff will adequately protect the interests of the Class and have retained counsel who are competent and experienced in class action securities litigation. Moreover, neither Lead Plaintiff nor Lead Counsel has any interests that conflict with those of the Class.

170. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

171. Lead Plaintiff reserves its rights to amend or modify the class allegations by way of an amended complaint or a motion for class certification.

- 54 -

## CAUSES OF ACTION

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

172. Lead Plaintiff incorporates by reference and expressly re-alleges all of the above allegations, as if fully set forth herein.

173. This count is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

174. During the Class Period, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange, they:

(a) employed one or more devices, schemes, and/or artifices to defraud;

(b) omitted to state one or more material facts necessary in order to make their statements made in light of the circumstances under which they were made not misleading; and/or

(c) engaged in one or more acts, practices, and courses of business which operated as a fraud or deceit upon Lead Plaintiff and the Class during the Class Period.

175. Defendants and the Company's officers, management, and agents did not have a reasonable basis for their misleading statements and omissions of fact and engaged in a scheme and/or course of business which operated as a fraud and deceit upon purchasers of Anadarko common stock during the Class Period.

176. Defendants and the Company's officers, management, and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information.

4820-5568-8391.v2

177.    Anadarko is liable for all misleading statements and omissions of fact during the Class Period, including those by the Individual Defendants and other Company officers and agents, as the maker of such statements and under the principle of respondent superior.

178.    The allegations above establish a strong inference that Anadarko, as an entity, acted with scienter throughout the Class Period, as its officers and agents had actual knowledge of the scheme and/or omission of material facts, or acted with severe reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such misleading statements and/or omissions of material fact were done knowingly or with severe recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth from investors.  By concealing these material facts from investors, Anadarko's stock price was artificially inflated during the Class Period.

179.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Anadarko stock.  Lead Plaintiff and the Class would not have purchased at the price paid if they had been aware that the market prices had been artificially and falsely inflated by Defendants' scheme and omissions of material fact.

180.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Anadarko common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Defendants Walker, Gwin, Daniels, and Leyendecker

181.    Lead Plaintiff incorporates by reference and expressly re-alleges all of the above allegations, as if fully set forth herein.

182.    This count is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

- 56 -

183. As detailed *supra*, Defendants each violated §10(b) and Rule 10b-5, and Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of Anadarko common stock as a direct and proximate result of Defendants' wrongful conduct.

184. During the Class Period, the Individual Defendants acted as controlling persons of Anadarko within the meaning of §20(a) of the Exchange Act. By virtue of their high-level positions, and their ability to control and direct the Company's decision making and day-to-day operations, the Individual Defendants had the power and ability to control and influence – and, in fact, did control and influence, directly or indirectly – the wrongful conduct alleged herein, including, without limitation, the methods and means of the scheme set forth herein.

185. The Individual Defendants, individually and as a group, are liable as control persons within the meaning of §20(a) of the Exchange Act. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as Anadarko is liable.

186. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A. Certifying this action as a class action pursuant to Rule 23 and designating Lead Plaintiff to serve as Class Representatives and Lead Counsel as Class Counsel;

B. Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expenses, and expert fees; and

- 57 -

4820-5568-8391.v2

D.      Such equitable, injunctive, or other further relief as the Court may deem just.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:  August 17, 2020                    KENDALL LAW GROUP, PLLC
                                           JOE KENDALL (Texas Bar No. 11260700)
                                              Attorney-in-charge


                                           _____
                                                       */s/ Joe Kendall*
                                                       JOE KENDALL

                                           3811 Turtle Creek Blvd., Suite 1450
                                           Dallas, TX  75219
                                           Telephone:  214/744-3000
                                           214/744-3015 (fax)
                                           jkendall@kendalllawgroup.com

                                           Local Counsel

                                           ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                           MARK SOLOMON
                                           JASON A. FORGE
                                           RACHEL L. JENSEN
                                           SARA B. POLYCHRON
                                           FRANCISCO J. MEJIA
                                           655 West Broadway, Suite 1900
                                           San Diego, CA  92101
                                           Telephone:  619/231-1058
                                           619/231-7423 (fax)
                                           marks@rgrdlaw.com
                                           jforge@rgrdlaw.com
                                           rachelj@rgrdlaw.com
                                           spolychron@rgrdlaw.com
                                           fmejia@rgrdlaw.com

                                           Lead Counsel for Lead Plaintiff

- 58 -

- 59 -

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served on all counsel of record on

August 17, 2020 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

*/s/ Joe Kendall*
JOE KENDALL

4820-5568-8391.v2