IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE DIGITAL TURBINE, INC. SECURITIES LITIGATION | § | No. 1:22-CV-550-DAE |
| | § | CLASS ACTION |
| This Document Relates to: | § | |
| ALL ACTIONS. | § | |

ORDER GRANTING
DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

This consolidated case arises from two related class action lawsuits brought under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act") on behalf of persons and entities that purchased or otherwise acquired Digital Turbine securities between February 26, 2021 and May 31, 2022, inclusive (the "Class Period."). Before the Court is a Motion to Dismiss Plaintiffs' Second Consolidated Complaint, filed on September 23, 2023, by Defendants Digital Turbine ("Digital Turbine"), Digital Turbine CEO William Stone ("Stone"), and Digital Turbine CFO Barrett Garrison ("Garrison") ("Individual Defendants" and with Digital Turbine "Defendants"). (Dkt. # 60.) Defendants filed an affidavit in support of their motion on September 22, 2023. (Dkt. # 61.)

Lead Plaintiff Howard J. Burch, together with Plaintiff Jay Robison (collectively, "Plaintiffs"), filed a Response on October 23, 2023. (Dkt. # 64.) Defendants filed a Reply on November 13, 2023. (Dkt. # 68.) Defendants filed an affidavit in support of their reply on November 13, 2023. (Dkt. # 69.)

This Court finds the matter suitable for disposition without a hearing. After careful consideration of the memoranda filed in support of and in opposition to the Motion, the Court, for the reasons below, **GRANTS** Defendants' Motion to Dismiss. (Dkt. # 60.)

## BACKGROUND

After this Court consolidated the cases into a single action (Dkt. # 36), Plaintiffs filed a Consolidated Complaint on behalf of those who purchased or otherwise acquired Digital Turbine securities during the Class Period. (Dkt. # 38.) Defendants filed a Motion to Dismiss Plaintiffs' Complaint on April 18, 2023. (Dkt. # 44.) The Court GRANTED Defendant's Motion to Dismiss with Leave to Amend on July 19, 2023. (Dkt. # 53.)

Plaintiffs filed a Second Amended Consolidated Complaint on August 23, 2023. (Dkt. # 56.) Plaintiffs allege securities fraud claims against Defendants under Section 10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. (Id.) Plaintiffs also bring claims for control person

liability against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (Id.)

The background facts have not changed since the Court's Order on Defendant's first Motion to Dismiss the Original Consolidated Complaint. (See Dkt. # 69-1.) The Court incorporates the facts from this order by reference and replicates them in full for ease of reference here with citations updated to reflect Plaintiffs' Second Amended Complaint. (Dkt. #56.)

I. The Company

Digital Turbine is an Austin-based mobile advertising technology company offering an end-to-end solution for mobile brand acquisition, advertising, and monetization. (Dkt. # 56 ¶ 2.) In 2021, Digital Turbine acquired AdColony Holding AS ("AdColony"), a mobile video advertising platform, and Fyber N.V. ("Fyber"), a cross-platform monetization platform with expertise in mediation, real-time bidding, advanced analytics tools, and video. (Id. ¶ 4.) These acquisitions made Digital Turbine a "full-stack mobile advertising solution," enabling the company to directly engage in mobile advertising and garner recurring revenue streams. (Id.) That said, these acquisitions are also the subject of the instant class action.

The Class Period begins on April 29, 2021, the day Digital Turbine published a press release announcing its completed acquisition of AdColony. (Id.

at ¶ 143.) Digital Turbine filed the press release with the SEC on April 30, 2021, as exhibit 99.1 to Form 8-K, which was signed by Defendant Garrison. (Id.) This press release reported AdColony's preliminary financial results for the quarter ended March 31, 2021, reporting revenue of "approximately $58.3 million, representing growth of 37% as compared to revenue in the first quarter of 2020." (Id.)

On May 25, 2021, Digital Turbine published another press release announcing its completed acquisition of Fyber. (Id. at ¶ 146.) Digital Turbine filed the press release with the SEC on May 28, 2021, again signed by Garrison and attached as exhibit 99.1 to Form 8-K. (Id.) The press release states:

> Combined with our recently announced AdColony and Appreciate acquisitions, Fyber represents an extremely valuable puzzle piece for Digital Turbine to strategically assemble one of the largest full-stack mobile advertising solutions in the industry. . . . ***The combined platform offering is already generating more than $1 billion in annualized revenue[.]***

(Id. (emphasis in original).)

The press release also reported Fyber's preliminary financial results for the quarter ending March 31, 2021, stating "Fyber estimates total revenue in excess of 85 million [euros] in the March quarter[.]" (Id. at ¶ 114.)

On May 18, 2021, Digital Turbine posted an Investor Presentation with a slide showing preliminary revenue results for the quarter ending March 31, 2021, in excess of $1 billion dollars. (Id. at ¶ 145.)

On May 25, 2021, Digital Turbine issued a press release announcing the completion of the acquisition of Fyber. (Dkt. # 56 at ¶ 146.) The press release was filed with the SEC on May 28, 2021 as exhibit 99.1 to Form 8-K, which was signed by Garrison. Stone was quoted as saying:

> Combined with our recently completed AdColony and Appreciate acquisitions, Fyber represents a very important puzzle piece for Digital Turbine in its mission to develop one of the largest full-stack, fully-independent, mobile advertising solutions in the industry. ***The combined platform offering is already generating more than $1 billion in annualized revenue***. . . . As evidenced by the ***reported 179% year-over-year revenue growth in the March quarter***, the Fyber team has done an amazing job of building a highly differentiated, growing and profitable standalone business.

(Id. at ¶ ¶ 146–147(emphasis in original)).

In an earnings call on June 1, 2021, Stone stated that the "combination of Digital Turbine, Appreciate, AdColony, and Fyber positions us as a company with greater than ***$1 billion in profitable annualized revenue***" and that "[t]oday, with the closing of Fyber, AdColony, Appreciate and our own Digital Turbine triple digit organic growth, ***we are now a company that has over $1 billion of annualized revenue***." (Id. at ¶ 50 (emphasis added.)) On the same day, Digital Turbine filed a press release with the SEC also, as exhibit 99.1 to Form 8-K and signed by Garrison, with the following quote from Stone: "The combination of Digital Turbine, Appreciate, AdColony, and Fyber position us as a company with greater than $1 billion in profitable annualized revenue." (Id. at ¶ 148)

On July 14, 2021, Digital Turbine filed a Firm 8-K/A, signed by Garrison, with the SEC. (Id. ¶ 150.) The company also attached a pro forma combined financial information for Digital Turbine and AdColony that stated, in relevant part: "[a]t this time, the Company is not aware of any other differences that would have a material effect on the unaudited pro forma condensed combined financial information[.]" (Id.)

Plaintiffs contend that (1) the AdColony and Fyber Q4 2021 estimates supporting Digital Turbine's $1B projection were overstated;[1] (2) that because AdColony and Fyber act as agents in some of their product lines, revenue for those product lines should be reported net of license fees and revenue share expenses; and (3) that Digital Turbine "in a gross departure from GAAP,[2] would account for the entirety of AdColony's and Fyber's revenue on a gross basis without regard to the nature of the revenue." (Id. at ¶ 115.)

---

[1] Plaintiffs allege that in Digital Turbine's May 31, 2022 release, Defendants restated AdColony's revenue for the quarter ended March 31, 2021, from $58.3 million to $39.4 million and restated Fyber's revenue for the same period from $102.9 million/ €85 million to $20.3 million. (Dkt. # 56 ¶ 149.)

[2] Generally accepted accounting principles. Generally accepted accounting principles ("GAAP") comprise a set of basic postulates and broad accounting principles pertaining to business enterprises. These principles, approved by the American Institute of Certified Public Accountants ("AICPA"), establish guidelines for measuring, recording and classifying the transactions of a business entity.

II. Fiscal Year 2022 Financial Statements

On August 9, 2021, Digital Turbine announced its financial results for Q1 2022 by press release, which was filed with the SEC that same day as exhibit 99.1 to Form 8-K, signed by Garrison. (Dkt. # 56 at ¶ 152.) It stated:

| | Revenue | Pro forma revenue | Pro Forma YOY Revenue Growth |
|---|---|---|---|
| AdColony | $44.9 million | $63.241 million | 46% |
| Fyber | $49.6 million | $113.465 million | 190% |
| In-App Media | $92.3 million | Not specifically identified in Complaint | 117%[3] |
| Digital Turbine | $212.6 million | $292.0 million | 104% |

(Id.) In both the 8-K and earnings call the same day, Stone and/or Garrison reiterated many of these numbers. (Id. at ¶¶ 153-158.) These numbers were also reflected in the Q1 2022 10-Q, signed by Stone and Garrison.[4] (Id. at ¶ 159.)

[3] Stated by Stone on August 9, 2021 earnings call. (Dkt. # 56 ¶ 154.)

[4] Plaintiffs specifically point out that under "Controls and Procedures" the 10-Q stated that "Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our [CEO] and [CFO] concluded that, as of such date, our disclosure controls and procedures were effective." (Id. at ¶ 162.)

On November 2, 2021, Digital Turbine issued a press release announcing its financial results for Q2 2022; this press release was filed with the SEC that same day as exhibit 99.1 to Form 8-K, signed by Garrison. (Dkts. #165.) For the second fiscal quarter of FY 2022, Digital Turbine announced:

| | Revenue | Pro forma revenue | Pro Forma YOY Revenue Growth |
|---|---|---|---|
| AdColony | $61.5 million | Not specifically identified in Complaint | 19% |
| Fyber | $127.5 million | Not specifically identified in Complaint | 93% |
| In-App Media | $187.2 million | Not specifically identified in Complaint | 61% |
| Digital Turbine | $310.2 million | $190.2 million[5] | 63% |

(Id.) In the earnings call the same day, Stone and/or Garrison reiterated many of these numbers. (Id. at ¶¶ 166–171.) These numbers were also reflected in the Q2 2022 10-Q, signed by Stone and Garrison. (Id. at ¶ 172.) Plaintiffs argue that Digital Turbine's financial statements were not presented in accordance with GAAP and therefore materially misstated. (Id. at ¶ 174.) Digital Turbine also issued an Investor Presentation dated November 11, 2021, which reiterated the Q2

[5] Stated in the November 2, 2021 10-Q. (Dkt. # 56 at ¶ 172.)

2022 revenue and growth numbers articulated in the 10-Q. (Id. at ¶ 178–181.) Garrison participated in a 2021 Analyst Day the same day and repeated these figures. (Id. at ¶ 182–183.) Plaintiffs argue that the figures presented in the Investor Presentation and on 2021 Analyst Day are misleading for the same reasons as when presented in the 10-Q. (Id. at ¶ 150.)

On February 8, 2022, Digital Turbine issued a press release announcing its financial results for Q3 2022; this press release was filed with the SEC that same day as exhibit 99.1 to Form 8-K, signed by Defendant Garrison. (Dkts. #56 at ¶ 185.) For the third fiscal quarter of FY 2022, Digital Turbine announced:

| | Revenue | Pro Forma Revenue | Pro Forma YOY Revenue Growth |
|---|---|---|---|
| AdColony | $94.3 million | Not specifically identified in Complaint | 28% |
| Fyber | $157.4 million | Not specifically identified in Complaint | 48% |
| In-App Media | $251.7 million | Not specifically identified in Complaint | 40% |
| Digital Turbine | $375.5 million | $271.5 million[6] | 38% |

[6] Taken from the 10-Q. (Dkt. # 56 at ¶ 195.)

(Dkt. # 56 at ¶ 185.) In the earnings call the same day, Stone and/or Garrison reiterated many of these numbers. (Id. at ¶¶ 186-194.) These numbers were also reflected in the Q3 2022 10-Q, signed by Stone and Garrison. (Id. at ¶ 195.) On the February 8, 2022 earnings call, both Stone and Garrison repeated these figures, emphasizing the growth in revenue for the company overall and for AdColony and Fyber in specific. (Id. at ¶ 1193) (stating that AdColony "had a really nice quarter," and that Digital Turbine was "seeing really nice growth there, across the board.")

III. Corrective Disclosures

During the fourth quarter of the 2022 fiscal year, Digital Turbine undertook a comprehensive review of revenue accounting for AdColony and Fyber—as the company told investors it would. (Dkt. # 56 at 21, n.7.) The comprehensive review of Fyber and AdColony's accounting policies included hiring KPMG, a Big 4 accounting firm, to assist Digital Turbine. Ex. 3, May 27, 2022 10-Q/A (Q1 2022) at 35. The Company determined through this review that some AdColony and Fyber product lines should have been reported net of license fees and revenue share expense (in other words, using the agent-net accounting treatment and not the principal-gross approach) and announced this information to investors on May 17, 2022. Ex. 8, May 17, 2022 Press Release at 1. On this news,

the company's shares fell $1.93, or 7.1%, to close at $25.28 per share on May 18, 2022, on unusually heavy trading volume. (Dkt. # 56 at ¶ 251.)

On May 27, 2022, Digital Turbine issued restated financials for Q1-Q3 2022. (Id. ¶ 66.) The company explained that in certain AdColony and Fyber business lines, Digital Turbine "acts as an intermediary between DSPs and publishers by providing access to a platform and the SDKs that allow both parties to transact in the buying and selling of ad inventory." (Dkt. # 45-3 at 12.) Digital Turbine has "no pricing discretion" because the "transaction price is determined through a realtime auction." (Id.) Additionally, Digital Turbine has no "obligation related to the fulfillment of the advertising delivery." (Id.) For these reasons, Digital Turbine concluded that it lacked the requisite "control" over the deliverables for these transactions, thus acting as an agent.

The changes decreased revenue, license fees, and revenue share in each quarterly financial statement, but also increased reported gross profit margin and Non-GAAP Adjusted EBITDA margin. (Dkt. # 45-8 at 1.) There was no change to previously reported income from operations, net income/loss, Non-GAAP gross profit, Non-GAAP Adjusted EBITDA, or Non-GAAP free cash flow. (Id.)

The restatements also led Digital Turbine to identify a material weakness in its internal control over financial reporting. Management concluded

that Digital Turbine's internal control for business combinations "did not include a control adequately designed to ensure acquiree accounting policies, as they relate to presentation and classification, were conformed to those of the Company and GAAP." (Dkt. # 45-5 at 102.) To correct the issue, Digital Turbine announced that it would improve its policies and procedures by strengthening its "procedures for reviewing accounting policies of material acquired companies, inclusive of the accounting for revenue, through initial reviews during the due diligence period and alignment of accounting policies prior to the first interim reporting date," among other steps. (Id.)

On May 31, 2022, Digital Turbine announced its quarterly and fiscal year 2022 financial results for the period ended March 31, 2022, reporting quarterly revenue of $184.1 million. (Dkt. # 56 at ¶ 19.) On this news, Digital Turbine's shares fell $5.75, or 22.61%, to close at $19.68 per share on June 1, 2022, on unusually heavy trading volume. (Id. at ¶ 21.)

## LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d

343, 346 (5th Cir. 2013) (quoting In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In addition, when alleging claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must:

(1) specify each statement alleged to have been misleading, i.e. contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby;

(6) explain the reason or reasons why the statement is misleading, i.e. why the statement is fraudulent.

ABC Arbitrage Plaintiffs Grp. v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002). Further, if an allegation regarding a statement or omission is "made on information and belief, the plaintiff must (7) state with particularity all facts on which that

belief is formed, *i.e.*, set forth a factual basis for such belief." Id. (citing 15 U.S.C. § 78u–4(b)(1)). According to the Fifth Circuit, "this is the 'who, what, when, where, and how' required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA." Id.

## DISCUSSION

### I. Plaintiff's Section 10(b) Claim Fails for a Lack of Scienter

To state a Section 10(b) and Rule 10b-5 claim, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) scienter (a 'wrongful state of mind'); (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) a 'causal connection between the material misrepresentation and the loss.'" Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc., 935 F.3d 424, 429 (5th Cir. 2019) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005)). Yet again, Plaintiffs fail to allege scienter.

#### A. The Court's Order on the Previous Motion to Dismiss

As explained in the Court's order on the previous motion to dismiss, Defendants' pre-acquisition statements about AdColony and Fyber's preliminary financial results for Q4 2021 and the anticipated Digital Turbine revenue for that quarter are specific enough to be actionably misleading. (Dkt. # 53 at 17–18.) But the PSLRA also requires a complaint to support allegations of scienter with "facts giving rise to a strong inference that the defendant acted with the required state of

mind." Six Flags Ent. Corp., 58 F.4th at 214 (citing 15 U.S.C. § 78u-4(b)(2)(A)). "A complaint adequately pleads scienter by alleging facts that support the defendant acted with an 'intent to deceive, manipulate, or defraud or severe recklessness.'" Id. (citing Lormand, 565 F.3d at 251). Plaintiffs, on their second amended complaint, still fail to meet this standard.

This Court previously established that alleged GAAP accounting violations on their own do not establish scienter. (Dkt. #53 at 20–21.) The Court rejected Plaintiffs' argument that Digital Turbine failing to adhere to AdColony's pre-acquisition revenue recognition policy and changing the policy to principal-gross revenue recognition showed intent or at least severe recklessness requiring an inference of scienter. (Id. at 21–22.) The Court further found that the principal-gross/agent-net accounting rule in AdColony's financials, and the absence of that stated rule in Fyber's financials, did not appear to present a risk of improperly calculating revenue "so obvious that the defendant must have been aware of it." (Id. at 22–23 (collecting cases)).

The Court then found that the nature, timing, and frequency of the accounting error weighed against an inference of scienter. (Id. at 23–25.) The two Big 4 accounting firms auditing AdColony and Fyber before the acquisition failed to apply appropriate principal-gross/agent-net accounting. Digital Turbine's error was cabined to the first three quarters of 2022, distinguishing it from more

"numerous and frequent" misstatements recognized in this circuit, and Digital Turbine did not "persist[] in the incorrect accounting" after it was brought to light; and upon completion of the KPMG audit, Digital Turbine promptly filed the restated figures for Q1-Q3 2022. (Id. (collecting cases.)) There was no impact on the bottom-line financial results from the errors either.

The Court then held that the Sarbanes-Oxley certifications, stock sales, and executive compensation failed to contribute to an inference of scienter.

Ultimately, the Court found that the "facts support Digital Turbine's account of (1) conducting an initial assessment pre-acquisition; (2) leaving in place the respective accounting treatments used by AdColony and Fyber; and (3) relying in part on the companies' financial statements that were audited by Big 4 accounting firms," then promptly issued a restatement to address the problems after KPMG discovered that "some AdColony and Fyber product lines should have been reported using agent-net rather than principal-gross accounting treatment." (Id. at 30 – 31.)

B. Plaintiffs' Amended Complaint Does not Address the Deficiencies

The Court granted Plaintiffs leave to amend to correct the deficiencies that it identified in the previous order. But Plaintiffs merely attempt to repeat or slightly augment their already rejected theories. For instance, Plaintiffs add an allegation that Digital Turbine's former Chief Accounting Officer failed to

complete continuing education requirements for his CPA license. (Dkt. # 56 at ¶¶ 235–236.) It is unclear to this Court how this additional detail, or any of the few others Plaintiffs added, change any of this Court's previous analysis.

1. The Change in Accounting Policy Does Not Impute Scienter

Plaintiffs fail to allege any new facts suggesting that Digital Turbine changed AdColony's accounting policy with an intent to defraud or with severe recklessness. Plaintiffs add no facts supporting their theory that individual defendants here knew or recklessly disregarded the accounting errors. See Owens v. Jastrow, 789 F.3d 529, 543 (5th Cir. 2015) (explaining that plaintiffs "must plead facts leading to a strong inference that each defendant knew the numbers violated GAAP or was severely reckless in disregarding the concerns").

2. Plaintiffs Fail to Plead Motive

Plaintiffs also fail to address the deficiencies in pleading motive. Again, the alleged stock sales do not raise an inference of fraud based on timing or pattern, the sales were not a large percentage of Stone's overall holdings, Stone retained a large amount of stock shares during and at the end of the class period, and Stone did not sell only when the stock price was high or sell a huge number of shares when the price was high. See Microcapital Fund LP v. Conn's Inc., No. 4:18-cv-1020, 2019 U.S. Dist. LEXIS 127748, at *39–40 (S.D. Tex. July 24, 2019) (holding that a defendant's sales did not raise an inference of scienter where he did

not sell stock "immediately after the alleged misstatements to take advantage of a spike in stock prices" or "at a time when the stock price peaked"). And Garrison sold no stocks at all.

3. Executive Compensation Does Not Impute Scienter

Plaintiffs also add nothing to change the Court's analysis of executive compensation. Fifth Circuit precedent still does not support incentive compensation creating an inference of scienter, and Plaintiffs add no facts or allegations in this area.

4. Scheme Liability Fails

Plaintiffs add a new claim that the Individual Defendants were motivated to defraud investors because the agreement for Digital Turbine to acquire Fyber included a term requiring payment to Fyber of $400 million in Digital Turbine stock. (Dkt. # 56 at ¶ 212.) Plaintiffs allege that Defendants inflated Digital Turbine's stock price to reduce the number of shares the Company would have to issue as part of the transaction, which in turn would reduce the "dilutive effect on Digital Turbine's earnings per share" and "the Individual Defendants' holdings in the Company." (Id. at ¶ 215.) But caselaw cuts directly against this argument. Allegations that Defendants were motivated to engage in securities fraud to execute an "acquisition strategy without diluting earnings by making acquisitions with stock at artificially high prices" are the kind of "general

allegations that could be made about virtually any large public corporation." Lemmer v. Nu-Kote Holding, Inc., Civ. A. No. 3:98-cv-0161-L, 2001 U.S. Dist. LEXIS 13978, at *35 (N.D. Tex. Sep. 6, 2001).

Plaintiffs argue the scheme to inflate revenue not only helped Digital Turbine to close the Fyber merger but also "enabled Stone to sell stock at inflated prices of just over $46/share just two months before the Restatement was announced and Digital Turbine's stock price plummeted to under $20/share." (Dkt. # 64 at 7.) But again, Stone did not sell only when the stock price was high or sell a huge number of shares when the price was high.

Plaintiffs allege that they sufficiently plead scheme liability under a discrimination theory because they allege Digital Rubine disseminated false financial statements to investors. Plaintiffs then claim this argument is not reviewable because the sufficiency of its scheme claim allegations is not before the Court. (Dkt. # 64 at 16–17.)

Plaintiffs are wrong. Plaintiffs raise the scheme liability arguments in their response, and Defendants answer in their reply. This Court does not raise the issue sua sponte, and this Court finds it appropriate to address the argument here where it was unexpectedly made in Plaintiffs' response. See, e.g., In re Tupperware Brands Corp. Sec. Litig., No. 6:20-cv-357-orl-31GJK, 2021 U.S. Distc. LEXIS 13632, at *12 (M.D. Fla. Jan. 25, 2021). The scheme claim is novel

to Plaintiffs' response and based entirely on allegations that existed in the prior complaint. It is only now that Plaintiffs attempt to cobble together their existing allegations into a scheme claim. There are no specific, particularized factual allegations that identify the scheme or the specific actions Defendants took in furtherance of the scheme. Attempting to overlay this claim onto existing allegations, which this Court already found fail to establish scienter, does not amount to sufficiently pleading a scheme claim. There are no facts specific to the scheme, and as explained above and in the Court's previous order, there is no showing of scienter, which is required for a scheme claim.

5. Plaintiffs Fail to Show Severe Recklessness

Plaintiffs wholly fail to sufficiently allege severe recklessness. "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961–62 (5th Cir. 1981). Plaintiffs fail to incorporate any facts rising even close to this standard. "Plaintiff[s] must come forward with specific supporting factual allegations, not mere conclusory allegations or mischaracterizations of defendants' actual statements." Alcina v. pcOrder.com,

Inc., 230 F. Supp. 2d 732, 736 (W.D. Tex. 2002). Plaintiffs claim Defendants concealed information about Fyber's net revenue from investors, but the evidence Plaintiffs cite were all in the public domain. (See Dkt. # 56 at ¶¶ 110, 112, 116, 121 (listing, for example, a Fyber filing with a German government database and a Fyber press release.))

Plaintiffs argue that Digital Turbine were aware of the net revenue figures of AdColony, Fyber, and Mobile Posse when it acquired them. But Plaintiffs do not allege that Digital Turbine then knew these figures were not in accordance with GAAP and used them anyway. This allegation does not show severe recklessness.

Plaintiffs similarly try to pull from Fyber's notes on its 2020 consolidated financial statements to show severe recklessness, but the paragraph Plaintiffs cite never mentions agent-net versus principal-gross revenue recognition. This fails.

Plaintiffs claim that statements made by Stone and another Digital Turbine executive, including those at investor presentations, establish severe recklessness. These statements are all based on significant judgment. Plaintiff makes deductions about the statements and what they could mean, and the Court need not accept this as true. See Alaska Elec. Pension Fund v. Flotek Indus., Inc., 915 F.3d 975, 981 (5th Cir. 2019).

Plaintiff attempts to string together excerpts of statements and notes, taken entirely out of context, to establish severe recklessness. This is not sufficient. Plaintiff fails to establish that Defendants knew or should have known that their actions could mislead buyers or sellers or that their actions were poised to mislead at all.

6. Duty to Monitor is Insufficiently Pled

In their response, Plaintiffs introduce the core operations doctrine and argue Defendants had a duty to monitor. Plaintiffs fail to identify a specific source of information Defendants had a duty to monitor and then failed to monitor. A conclusory allegation is insufficient. This claim fails.

7. Plaintiffs Fail to Correct Deficiencies in Lost Causation

Plaintiffs still have not sufficiently alleged loss causation. The Fifth Circuit has held that "confirmatory information—that information already known to the market—may not constitute such a corrective disclosure." Catogas v. Cyberonics, Inc., 292 F. App'x 311, 314 (5th Cir. 2008) (citing Greenberg v. Crossroads Sys., Inc., 364 F.3d 657, 663 (5th Cir. 2004) and Nathenson v. Zonagen, Inc., 267 F.3d 400, 415 (5th Cir. 2001)). A corrective disclosure must be "related to an allegedly false, non-confirmatory positive statement made earlier" and the stock decrease must be related to "this negative statement, and not other unrelated negative statements." Greenberg, 364 F.3d at 666 (5th Cir. 2004).

The second alleged corrective disclosure reveals no new information about the restatements, so it cannot be a corrective disclosure. This claim fails.

II. Control Person Liability

Plaintiffs allege a violation of Section 20(a) of the Exchange Act against the Individual Defendants. (Dkt. # 38 at ¶ 220.) This liability "cannot exist in the absence of a primary violation." Plaintiffs have failed to plead a violation of Section 10(b) as a primary violation, so the Court dismisses with prejudice Plaintiffs' claim pursuant to Section 20(a). See Southland Sec. Corp., 365 F.3d at 383.

III. Leave to Amend

When a court is faced with a meritorious motion to dismiss, the Fifth Circuit has observed that "our cases support the premise that 'granting leave to amend is especially appropriate . . . when the trial court has dismissed the complaint for failure to state a claim.'" Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002) (quoting Griggs v. Hinds Junior Coll., 563 F.2d 179, 180 (5th Cir. 1977) (per curiam)). A court should not dismiss a complaint with prejudice "unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so." Hart v. Bayer Corp., 199 F.3d 239, 248 n.6 (5th Cir.

2000). Plaintiffs have been afforded two opportunities to amend their complaint. The Court now finds it appropriate to dismiss the complaint with prejudice.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss is **GRANTED WITH PREJUDICE**. (Dkt. # 60.)

**THE CLERK IS INSTRUCTED TO CLOSE THE CASE.**

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, August 22, 2024.

David Alan Ezra
Senior United States District Judge